**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **2:07-cv-577-MEF** |
| **v.** | § | |
| | § | |
| **SOUTHEAST CHEROKEE** | § | |
| **CONSTRUCTION, INC.** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, Southeast Cherokee Construction, Inc., and moves this Honorable Court to enter, pursuant to the *Federal Rules of Civil Procedure*, an order dismissing this Defendant with prejudice on the grounds that there is no genuine issue as to any material fact and that this Defendant is entitled to summary judgment as a matter of law.  In support of this motion, Defendant would rely on the following:

1. All pleadings and motinos filed in this matter;

2. The EEOC charge filed by Decarey Floyd, attached hereto as Exhibit "A;"

3. The Letter of Determination issued by the EEOC, attached hereto as Exhibit "B;"

4. The Right to Sue letter issued by the EEOC, attached hereto as Exhibit "C;"

5. The deposition testimony of Decarey Floyd, excerpts attached hereto as Exhibit "D;"

6. Decarey Floyd's employment application, attached hereto as Exhibit "E;"

7. The affidavit of Jerry Carter, attached hereto as Exhibit "F;"

8. The traffic violation ticket issued to Decarey Floyd, attached hereto as Exhibit "G;" and

9. Plaintiff's responses to Defendant's consolidated discovery requests, attached hereto as Exhibit "H."

Defendant requests that said order be entered as a final order in accordance with the terms and conditions of the *Federal Rules of Civil Procedure* as there is no just reason for delay.

Respectfully submitted this the 30th day of May, 2008.

_s/ R. Brett Garrett_____
ROBERT A. HUFFAKER (HUF003)
R. BRETT GARRETT (GAR085)
Attorneys for Defendant, Southeast Cherokee
Construction, Inc.

Of Counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
PO Box 270
Montgomery, AL 36101-0270
334-206-3138 (telephone)
334-481-0808 (fax)
bg@rsjg.com (email)

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2008, I have electronically filed and served a copy of the foregoing by placing same in the United States Mail, postage prepaid and properly addressed, upon:

Jerry D. Roberson, Esq.                    jdratty@charter.net
ROBERSON & ROBERSON
PO Box 380487
Birmingham, AL 35238

_s/ R. Brett Garrett_____
Of Counsel

2

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| **SOUTH EAST CHEROKEE CONSTRUCTION**<br>**Attn: Jim & Linn Carter, Owners**<br>**P. O. Box 2057**<br>**Wetumpka, AL 36092** | **Decarey Floyd** |

THIS PERSON (check one or both)

- [X] Claims To Be Aggrieved
- [ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**130-2006-00282**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

- [X] Title VII of the Civil Rights Act
- [ ] The Americans with Disabilities Act
- [ ] The Age Discrimination in Employment Act
- [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **21-NOV-05** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **14-NOV-05** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033** If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Debra B. Leo,
ADR Coordinator

*EEOC Representative*

Telephone: **(205) 212-2146**

Enclosure(s): [X] Copy of Charge

**Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

- [X] RACE
- [ ] COLOR
- [ ] SEX
- [ ] RELIGION
- [ ] NATIONAL ORIGIN
- [ ] AGE
- [ ] DISABILITY
- [ ] RETALIATION
- [ ] OTHER

**See enclosed copy of charge of discrimination.**

EXHIBIT
A
Blumberg No. 5118

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| | **Bernice Williams-Kimbrough,** | |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | [ ] FEPA  [X] EEOC | 130-2006-00282 |

and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Decarey Floyd** | **(334) 612-1104** | **10-19-1977** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2103-G Victoria Place Apts., Prattville, AL 36066** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code |
|---|---|---|
| **SOUTH EAST CHEROKEE CONSTRUCTION** | **over 15** | **(334) 567-9858** |

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| **P. O. Box 2057** | **Wetumpka, AL 36092** | | |

| Name | No. Employees, Members | Phone No. (Include Area Code |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[ ] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest          Latest
**09/28/2005**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment on May 2, 2005, as a Truck Driver. Within 2-3 days of my employment, I was offered the Service Truck Driver's job which I accepted at a higher rate of pay. During my employment derogatory comments were made using racial names referring to me as a Black man rather than my name as they did for similarly situated White employees. In my presence, the owner's son referred to Black man (who did not work at the company) as a "nigger." The owner, on one occasion said he would shoot me if he learned that I was ever selling his fuel. During my employment, I was required to service a bush hog offsite without compensation for the service. A similarly situated White male was compensated for the service. On September 28, 2005, I was summoned to the office and informed by the owner that I was no longer needed. It is my belief that the company did not wish to have a Black male driving its newly purchased fuel truck. The truck was delivered approximately 2-weeks prior to my discharge, but I was never allowed to drive the vehicle.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED
EEOC

OCT 1 7 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Oct 17, 2005**  _Decarey Floyd_  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number:  130 2006 00282

Decarey Floyd
196 Mt. Zion Road
Wetumpka, AL 36904                          Charging Party

Southeast Cherokee Construction
P. O. Box 2057
Wetumpka, AL 36902                          Respondent

## LETTER OF DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII).  Timeliness and all other requirements for coverage have been met.

Charging Party alleged that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964, in that he was subjected to a racially hostile work environment, and was discharged because of his race, black.  The Respondent denied the allegations.

The investigation revealed that Charging Party was selected to drive the service truck on more than one occasion because he was the only one qualified to do so.  The evidence indicated that Respondent replaced Charging Party with a White male who had no experience as an operator of a service truck and who had just received the endorsement to drive the service truck two days before the Charging Party was discharged.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe that Charging Party was discharged, as alleged.  There is insufficient evidence to support the Charging Party's allegation that he was subjected to a racially hostile work environment.



EXHIBIT
B

Letter of Determination
Charge No. 130-2006-00282
Page 2

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate form and return it to the Commission at the above address no later than **29 JAN 2007**. You may fax your response directly to (205) 212-2105 to the attention of Julia Y. Hodge. Failure to respond by **29 JAN 2007**, will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a Conciliation Agreement is acceptable to the District Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

**1 2 JAN 2007**

Date

Delner Franklin-Thomas
District Director

Enclosure:     Invitation to Conciliation

cc::     R. Brett Garrett, Respondent's Attorney

# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
INVITATION TO PARTICIPATE IN CONCILIATION DISCUSSIONS

Section 706(b) of Title VII of the Civil Rights Act of 1964, as amended, requires that when the Commission determines there is reasonable cause to believe the charge is true, it shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. This invitation is being issued to both parties to determine their willingness to engage in such conciliation discussions. If either party declines discussion, or the Commission is unable to secure an acceptable agreement, the District Director shall inform both parties, in writing, of alternatives for obtaining relief available to the Charging Party and the Commission.

Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned.

| DATE | 1 2 JAN 2007 | CHARGE NUMBER | 130 2006 00282 |
|---|---|---|---|

*PLEASE COMPLETE THE FOLLOWING INFORMATION AND RETURN TO EEOC BY MAIL OR FACSIMILE (205/212-2105):*

| TO: U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ~ Birmingham District Office Ridge Park Place 1130 - 22 Street South, Suite 2000 Birmingham, AL 35205-2070 | FROM: *(Name and address of charging party or respondent)* |
|---|---|

*I ☐ WILL ☐ WILL NOT ENGAGE IN CONCILIATION DISCUSSIONS.*

| | SUGGESTED | |
|---|---|---|
| DATE | TIME | |
| LOCATION | | |
| COMMENTS | | |
| DATE | TELEPHONE NUMBER WHERE SIGNOR CAN BE REACHED | |
| TYPED NAME OF CHARGING PARTY/RESPONDENT | SIGNATURE | |

EEOC FORM 153



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Brett Garrett
Rushton, Stakely, Johnston & Garrett
Post Office Box 270
Montgomery, AL 36101-0270

Re:     Belinda Speigner-Lyons  v  AmSouth
        Charge Number:  130-2005-06355

Dear Mr. Garrett:

The U. S. Equal Employment Opportunity Commission (EEOC) has determined that efforts to conciliate this charge as required by Title VII of the Civil Rights Act of 1964 (Title VII), as amended, have been unsuccessful.  This letter constitutes the notice required by Section 1601.25 of the Equal Employment Opportunity Commission's Procedural Regulations which provide that the EEOC shall notify a respondent in writing when it determines that further conciliation efforts would be futile or non-productive.

Nor further efforts to conciliate this case will be made by the EEOC.  The EEOC has decided that it will not bring a civil action under Title VII based on this charge.  The Charging Party has been notified and issued a Notice of Right to Sue that entitles the Charging Party to sue the Respondent under Title VII.  A Copy of the Notice of Right to Sue is enclosed.

Sincerely,

2 7 MAR 2007

_____
Date

Delner Franklin-Thomas
District Director

Encl:  Title VII Notice of Right to Sue
Conciliation Failure

EXHIBIT
C

EEOC Form 161-A (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE
### (CONCILIATION FAILURE)

To:  **Decarey Floyd**
     **196 Mt. Zion Road**
     **Wetumpka, AL 36904**

From:  **Birmingham District Office**
       **Ridge Park Place**
       **1130 22nd Street, South**
       **Birmingham, AL 35205**

☐  *On behalf of person(s) aggrieved whose identity is*
   *CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2006-00282 | **Julia Y. Hodge,**<br>**Investigator** | **(205) 212-2147** |

### TO THE PERSON AGGRIEVED:

This Notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

## – NOTICE OF SUIT RIGHTS –
### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Delner Franklin-Thomas* (signature)

**2 7 MAR 2007**

Enclosure(s)

**Delner Franklin-Thomas,**
**District Director**

*(Date Mailed)*

cc:  **Brett Garrett**
     **Rushton, Stakely, Johnston & Garrett**
     **Post Office Box 270**
     **Montgomery, AL 36101-0270**

Enclosure with EEOC
Form 161-A (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge <u>within 90</u> <u>days</u> of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred **more than <u>2 years (3 years)</u>** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit <u>before 7/1/02</u> -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA backpay recovery period.

## ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

## FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CASE NUMBER:  2:07-CV-577-MEF

6

7    CURTIS DECAREY FLOYD,

8         Plaintiff(s),    *ORIGINAL*

9         vs.

10   SOUTHEAST CHEROKEE CONSTRUCTION, INC.,

11        Defendant(s).

12

13        S T I P U L A T I O N

14        IT IS STIPULATED AND AGREED

15   by and between the parties through

16   their respective counsel, that the

17   deposition of CURTIS DECAREY FLOYD may

18   be taken before TAMIE J. STORY,

19   Commissioner, at the offices

20   of RUSHTON, STAKELY, JOHNSTON &

21   GARRETT, 184 Commerce Street,

22   Montgomery, Alabama 36195, on the 19th

23   day of May, 2008.

EXHIBIT
D

## FREEDOM COURT REPORTING

77

1      A.    I didn't say anything in

2  particular or specific.

3      Q.    Okay.  Did you request to

4  be a truck driver?

5      A.    Yes, sir.

6      Q.    Okay.

7      A.    I mean, I presented myself

8  as  CDL truck driving is my trade, but

9  anything in particular around truck

10 driving, no.

11     Q.    Let me just ask you -- I

12 mean, I'm just trying to get a simple

13 answer.   Did you apply to be a truck

14 driver?

15     A.    Yes, sir.

16     Q.    You didn't apply to be a

17 mechanic?

18     A.    No, sir.

19     Q.    You didn't apply to be a

20 laborer?

21     A.    No, sir.

22     Q.    You applied to be a truck

23 driver?

## FREEDOM COURT REPORTING

79

1           THE WITNESS:  Six.

2           MR. ROBERSON:  Six wheels.

3           THE WITNESS:  Yes, sir.

4      Q.      Were you driving dump

5  trucks?

6      A.      With Hodgson and Blake?

7      Q.      Correct.

8      A.      No, sir.

9      Q.      Before you applied to be a

10 truck driver with Southeast Cherokee,

11 had you ever driven a dump truck?

12     A.      No, sir.

13     Q.      What kind of materials were

14 you hauling at Hodgson on the flatbed?

15     A.      Storm drain pipes.

16     Q.      So you were actually -- you

17 were driving pipes to and from the work

18 scenes?

19     A.      If need be, yes, sir.

20     Q.      When you went in that

21 day, do you recall filling out an

22 application?

23     A.      No, sir, I didn't.  It was

## FREEDOM COURT REPORTING

89

1    gravel?

2         A.    Uh-huh (nodding head).

3         Q.    What do you mean?  Load

4    dirt and gravel, what do you mean?

5         A.    I mean, the kind of work

6    that is generally used for a backhoe.

7    I mean, a backhoe can be used for many

8    different things.

9         Q.    When you say "load dirt and

10   gravel," what do you mean?  I'm

11   confused.  What were you loading from

12   and to?  I mean, what were you loading?

13        A.    Loading dirt from -- or

14   transporting dirt from one place to

15   another.

16        Q.    Okay.  How often would you

17   do this kind of work with the backhoe?

18        A.    They did -- they did it --

19   they did it.

20        Q.    I know they did it.  I'm

21   interested in what you did with this

22   piece of equipment.

23        A.    I'd do it every now and

## FREEDOM COURT REPORTING

90

1    again.  I would go along with them, but

2    I did -- I would get up on the

3    equipment.  I knew how to operate it,

4    I never said that I was a specialist.

5    I knew -- I knew how to operate it.

6         Q.    How did you know how to

7    operate the machinery?

8         A.    Past experience.

9         Q.    Well, who taught you?

10        A.    My granddaddy, my uncle.

11        Q.    They taught you how to run

12   a backhoe?

13        A.    Yes, sir.  It's real

14   simple.  I mean, it's not --

15        Q.    Hold on.  Who taught them?

16        A.    I don't know.

17        Q.    You say every once in a

18   while you'd hop up there and move some

19   stuff around?

20        A.    Yes, sir.  And even like

21   when they were around the farm and they

22   were just sitting there not being

23   needed, I would get on it and play

# FREEDOM COURT REPORTING

91

1    around with them and whatnot.

2              Q.     Just for fun?

3              A.     Yes, sir.

4              Q.     What years would you

5    operate that backhoe; how old were

6    you?  Give me the years you did it.  I

7    know you were --

8              A.     Young, young, extremely

9    young.

10              Q.     Give me the dates.  How old

11    were you when you were playing on the

12    backhoe?

13              A.     Between eleven and

14    seventeen.

15              Q.     Okay.  Since you were --

16    between the time you were seventeen and

17    the time you went to apply for a job at

18    Southeast Cherokee, had you had any

19    other experience operating a backhoe?

20              A.     No, sir.

21              Q.     All right.  Tell me about

22    the bulldozer.

23              A.     The same --

## FREEDOM COURT REPORTING

92

1        Q.    What experience did you

2  have with the bulldozer?

3        A.    The same type of

4  experience.  Just by them being around

5  the farm, just playing around on them

6  and occasionally going to work with my

7  granddaddy and my uncle and whatnot,

8  the same type of experience.

9        Q.    Let me back up.  Did they

10  own a bulldozer?

11        A.    Yes, sir.

12        Q.    What kind of -- who made

13  the bulldozer?

14        A.    Who made it?

15        Q.    Yeah, who made it.

16        A.    They were all Cat.

17        Q.    And then you used it the

18  same time period, eleven to seventeen?

19        A.    Yes, sir.

20        Q.    Tell me about how often a

21  week you would operate that backhoe.

22        A.    Just sometime on the

23  weekends when I weren't at school or --

## FREEDOM COURT REPORTING

93

1        Q.    Give me an average.  How

2    many times, say, every -- how many

3    times a year would you do it; would you

4    actually be up there and riding on the

5    backhoe and bulldozer?

6        A.    How many times a year?

7        Q.    Yes, just on average.

8        A.    I don't know, I don't know.

9        Q.    I mean, less than five?

10        A.    More than five; it would be

11    more than five.

12        Q.    More or less than ten?

13        A.    In a year's time?

14        Q.    Yes.

15        A.    It would be more than ten.

16        Q.    Ten to twenty, twenty to

17    thirty, forty to fifty, a hundred?  I

18    mean, you tell me.  I don't know, I

19    wasn't there.

20        A.    Twenty or thirty times a

21    year.

22        Q.    Twenty or thirty times a

23    year?

# FREEDOM COURT REPORTING

94

1      A.      (Witness nodding head).

2      Q.      Any of those twenty or

3 thirty times a year, what were you

4 moving with the bulldozer?  What kind

5 of work were you doing with it?

6      A.      The majority of the time, I

7 would just be playing around the farm

8 on it.

9      Q.      So you weren't really

10 working it, you were just kind of

11 playing around on it?  You weren't

12 actually working with it, you were just

13 kind of playing with it?

14      A.      Well --

15      Q.      Well, you tell me.  Again,

16 I wasn't there.

17      A.      I would -- I would --

18 occasionally, when I went to work with

19 them, they would have me to move some

20 dirt or gravel from this area and put

21 it at this area so it would be close to

22 where they were working at and whatnot;

23 go get them some dirt in this area.  I

## FREEDOM COURT REPORTING

95

1     mean -- yes, sir.

2         Q.    Well, were you paid for

3     this work?

4         A.    No, sir.  I was just a

5     youngster raring to go along with his

6     granddaddy.

7         Q.    The same question on the

8     front-end loader.

9         A.    The same type, the same

10    thing.  That question, the answer to

11    each one of those --

12        Q.    So did your uncle and

13    grandfather own a front-end loader?

14        A.    Yes, sir.

15        Q.    The same thing, the

16    Caterpillar brand?

17        A.    Yes, sir.

18        Q.    Okay.  The same deal, you

19    would have had some experience with it

20    between the time you were eleven and

21    seventeen?

22        A.    Yes, sir.

23        Q.    No experience between

## FREEDOM COURT REPORTING

96

1  seventeen and the time you applied for

2  Southeast Cherokee?

3  　　　　A.　　No, sir.

4  　　　　Q.　　And that would be the same

5  -- true for the bulldozer; correct?

6  　　　　A.　　Yes, sir.

7  　　　　Q.　　You were never paid for

8  moving the front-end loader -- using

9  the front-end loader, either, I assume?

10  　　　　A.　　No, sir.

11  　　　　Q.　　What was the -- Did they

12  have a corporation or some kind of name

13  for the farm that your granddad and

14  uncle were --

15  　　　　A.　　No, sir.  They just -- I

16  guess you could call it -- well, I

17  don't know.  If they had a name for it,

18  I was too young to know what it was.

19  　　　　Q.　　You were seventeen --

20  eleven to seventeen, you never knew it

21  to have a name?

22  　　　　A.　　No, sir.

23  　　　　Q.　　Was that their primary

## FREEDOM COURT REPORTING

98

1    this equipment on an outside job for

2    pay?  These other clearing jobs that

3    you were talking about they would do,

4    did you ever go work with them in doing

5    these other jobs?

6           A.    Occasionally (nodding

7    head).

8           Q.    Okay.  And you were paid

9    for that work?

10          A.    No, sir.

11          Q.    Why weren't you paid?

12          A.    Again, I was just a

13   youngster, just raring to be going

14   along with his granddaddy and his

15   uncle.

16          Q.    So you would just kind of

17   ride with your granddad on the

18   equipment?

19          A.    Sometimes (nodding head).

20          Q.    Now, when you filled out

21   this application with your work

22   experience, did you ever explain to Mr.

23   Davis the extent of your expertise in

## FREEDOM COURT REPORTING

104

1      A.    If -- I was told -- I was

2    told by Mr. Davis that -- just minor

3    service work; changing fluids; changing

4    tires like on a truck or something;

5    putting fluids into the machines, gas,

6    oil, hydraulic fluid; keeping a check

7    on the fluids making sure they stay up

8    around where they supposed to be and

9    whatnot.

10      Q.    All right.  I've got

11    changing oil, changing fluids, changing

12    tires, putting gas in the equipment.

13    You said putting hydraulic fluid?

14      A.    Uh-huh (nodding head),

15    yes, sir.

16      Q.    Okay.  What else?

17      A.    That's all I was told that

18    I was required to do.

19      Q.    Okay.  Do you recall being

20    told that you might have to change

21    belts and hoses?

22      A.    Yes, I may have -- yes,

23    yes.  I believe I do recall belts and

## FREEDOM COURT REPORTING

106

1          A.     -- if I knew how to operate

2     a piece of equipment, then if there

3     wasn't anyone else around, then -- if

4     there wasn't anyone else around that

5     did operate that equipment, then I

6     would have to move it myself because

7     the equipment still had to be seen

8     about.

9          Q.     Right.  So you were told

10     that you might have to move equipment

11     to service it; correct?

12          A.     From time to time (nodding

13     head).

14          Q.     Okay.  Upon being told that

15     you were going to have to be able to

16     move equipment from time to time, did

17     you ever voice any concern that you

18     might not have the knowledge to move

19     any equipment?  Did you ever bring it

20     to anybody's attention that you might

21     not have the training to move certain

22     equipment?

23          A.     No, sir.

## FREEDOM COURT REPORTING

107

1    Q.    Have you received training

2    at any time in the past with regard to

3    how to change oil in heavy equipment,

4    front-end loaders, bulldozers,

5    backhoes?

6    A.    Have I ever received any

7    training or have I ever done it?

8    Q.    I'll ask you both ways.

9    First, have you received any

10   training --

11   A.    No, sir.

12   Q.    -- formal training?

13   A.    No, sir.

14   Q.    The same applies for fluid

15   levels, maintaining fluid levels, or

16   adjusting fluid levels in heavy

17   equipment, have you ever received any

18   training?

19   A.    No, sir.

20   Q.    How about changing tires on

21   the heavy equipment, any training --

22   A.    Training, no, sir.

23   Q.    -- in that regard?

## FREEDOM COURT REPORTING

108

1          A.     No, sir.

2          Q.     Do you have any training

3    with regard to working on starters or

4    alternators?

5          A.     No, sir.

6          Q.     And you said earlier that

7    you had experience moving backhoes,

8    bulldozers, front-end loaders when you

9    were a kid with your granddad.

10          A.     Yes, sir.

11          Q.     Aside from that, have you

12    had any training with regard to moving

13    the equipment that was utilized in the

14    Southeast Cherokee's heavy equipment

15    fleet?

16          A.     Excuse me?

17          Q.     Aside from what you told me

18    about riding around with your granddad

19    on the farm on the backhoe and the

20    bulldozer and the front-end loader,

21    aside from that, have you had any

22    training with regard to how to move

23    heavy equipment?

## FREEDOM COURT REPORTING

109

1       A.      Aside from that?

2       Q.      Right, aside from that.

3       A.      No, sir.

4       Q.      Well, with that

5   established, tell me how you knew how

6   to change oil on the heavy equipment at

7   Southeast Cherokee -- I mean, change

8   oil, change oil filters, check levels,

9   who taught you -- how did you have that

10  knowledge?

11      A.      When I owned my own truck,

12  I did all the service work on it

13  myself; changed the oil, the filters,

14  the brakes, the tires, the hoses, the

15  belts.  And this is what I informed Mr.

16  Davis.  And they're basically all the

17  same thing, you take the bolt out and

18  let the oil out and put the oil back in

19  and put the bolt back on it and change

20  the filter -- replace the filter.

21  Changing oil is real simple.

22          And all of them -- heavy

23  equipment has diesel engines.  My

## FREEDOM COURT REPORTING

110

1    eighteen-wheeler had a diesel engine in

2    it.  They're just the same thing; a

3    diesel engine.  I did the service work

4    on my own diesel engine, and it would

5    be the same process of doing the

6    service work on another diesel engine.

7         Q.    So it's your opinion in --

8    just to make sure I've got this

9    straight, you did -- well, first of

10   all, let me break that down.

11             Tell me the extent of the

12   preventive maintenance work you did on

13   your own truck when you owned it.

14   Start there and tell me everything you

15   did on that truck by yourself with

16   regard to mechanical work.

17        A.    I greased it, I greased the

18   grease fittings --

19        Q.    Uh-huh (nodding head).

20        A.    -- I changed the oil in it,

21   I changed the oil filters, I changed

22   the belts on it, I replaced the grease

23   fittings on it, I changed the brakes on

## FREEDOM COURT REPORTING

120

1    A.    After Mr. Jerry Carter

2    asked me would I operate it until

3    Donnie Gantt gets back, just

4    temporarily, I just need you just to do

5    this for me, your pay is going to stay

6    the same, your ten dollars and fifty

7    cents, your pay is going to stay the

8    same until Donnie Gantt gets back, and

9    then I'm going to put you back in the

10    dump truck.

11    Q.    And he said this is going

12    to be a temporary position until Donnie

13    Gantt gets back, your pay is going to

14    remain the same --

15    A.    Yes, sir.

16    Q.    -- and that was at ten

17    dollars and fifty cents?

18    A.    Yes, sir.

19    MR. ROBERSON:  Did he tell

20    you where Donald Gantt was going?

21    MR. GARRETT:  Hold on a

22    minute.  You aren't going to sit here

23    and ask questions in the deposition.  I

## FREEDOM COURT REPORTING

124

1    this:  When Donnie came back,

2    obviously, he took the position back;

3    correct --

4         A.    Yes, sir.

5         Q.    -- and you went back to

6    driving the dump truck?

7         A.    Yes, sir.

8         Q.    And how long did you drive

9    the dump truck before you were asked to

10   again fill in as the service truck

11   driver?

12        A.    I think -- I believe Donnie

13   only stayed a couple of weeks before he

14   quit permanently this time.

15        Q.    All right.  So you drove

16   the tri-axle again for a couple of

17   weeks?

18        A.    Uh-huh (nodding head).

19        Q.    And were you again

20   approached about taking the service

21   truck position?

22        A.    Yes, sir.

23        Q.    Who approached you?

## FREEDOM COURT REPORTING

127

1      time, it's going to be permanent.

2      Later on that day --

3              Q.      Hold on, hold on, let me

4      stop you there.   So Jerry approached

5      you in the morning and told you that he

6      needed you on the service truck?

7              A.      Yes, sir, correct.

8              Q.      And is it your testimony

9      that Jerry then told you it was going

10     to be a permanent position?

11             A.      That's correct.

12             Q.      Okay.  And what did you say

13     when he said it was going to be a

14     permanent position?  What did you say

15     to Jerry?

16             A.      I told him that I was going

17     to -- I told him that I really -- I

18     really would rather drive my tri-axle

19     dump truck.  If I was going to exercise

20     my hazardous material license and do

21     all the requirements of that service

22     truck, then I would have to have more

23     money.

## FREEDOM COURT REPORTING

128

1    Q.    And so you told him that
2  you would rather just keep driving the
3  tri-axle --
4    A.    Yes, sir.
5    Q.    -- that you didn't really
6  want the service truck job --
7    A.    Yes, sir.
8    Q.    -- and that if you were
9  going to take it, you were going to
10  need more money?
11    A.    Yes, sir.
12    Q.    What was -- in your mind,
13  what was the basis of the additional
14  money?
15    A.    Excuse me?
16    Q.    What was the basis for the
17  -- Well, first of all, let me ask you
18  this:  How much did you demand?
19    A.    Well, I didn't demand
20  anything to Jerry because me and him
21  didn't discussed price.  It was later
22  on that afternoon when Randy -- when
23  I was already in the service truck,

## FREEDOM COURT REPORTING

131

1    operate that service truck with it

2    being raggedy and beat down and leaking

3    fluids and whatnot like it was --

4         Q.    Uh-huh (nodding head).

5         A.    -- that I would have to

6    have at least thirteen dollars, and he

7    agreed.

8         Q.    Okay.  So you said -- you

9    told Randy look, this truck is old and

10   beat up --

11        A.    (Witness nodding head).

12        Q.    -- and because of that, I'm

13   going to need thirteen dollars?

14        A.    (Witness nodding head).

15        Q.    What about the condition of

16   the truck justified three dollars more

17   an hour, in your opinion -- in your

18   mind?

19        A.    Because in my mind, I knew

20   when I was operating it that it was

21   just temporarily, so it didn't really

22   bother me.  I was just ready for Donnie

23   Gantt to come on back so I could get

## FREEDOM COURT REPORTING

132

1    out of that DOT hazard.

2        Q.    Yeah, that wasn't what I

3    asked you.  What about the truck being

4    old and what you're saying, quote,

5    "beat down," end quote, justified three

6    dollars more an hour?

7        A.    In order for me to

8    jeopardize my CDL and operate a truck

9    that does not pass DOT standards, I

10   would have to have more -- I would have

11   to have more money in order for me to

12   do that or else I wouldn't have -- I

13   wouldn't have jeopardized my license to

14   even operate it permanently.

15       Q.    Okay.  So your testimony is

16   that the truck wouldn't have passed DOT

17   standards?

18       A.    That's correct.

19       Q.    Where did you get that

20   information?  How do you know that?

21       A.    I have a CDL.  I mean, you

22   have to inspect a vehicle before --

23   before -- and based on -- based on my

## FREEDOM COURT REPORTING

136

1    mean --

2        Q.    I'm just asking if you've

3    seen it, yes or no?

4        A.    No, sir, I have not seen

5    any paperwork of such.

6        Q.    Okay.  Thank you.

7              Now, do you know how much

8    -- well, strike that.

9              Was Mr. Gantt a white

10   driver?

11       A.    Yes, sir, he is.

12       Q.    Would you agree that he had

13   more experience on that truck than you

14   did?

15       A.    Yes, sir, I would.

16       Q.    Do you know how much he got

17   paid an hour to do his job?

18       A.    No, sir, I don't.

19       Q.    Do you know if he got more

20   or less than you did?

21             MR. ROBERSON:  Object to

22   the form.

23       Q.    You can answer.

## FREEDOM COURT REPORTING

141

1       A.      Go ahead.

2       Q.      Now, you're claiming that

3   the word "nigger" was used around

4   you --

5       A.      Uh-huh (nodding head).

6       Q.      -- and nobody likes that

7   word --

8       A.      Yes, sir.

9       Q.      -- but I'm going to use it

10  in this deposition --

11      A.      Yes, sir.

12      Q.      -- because it's the word

13  you're saying was used.  I don't mean

14  anything by it.  I'm just using the

15  word.

16      A.      Yes, sir, I understand, I

17  understand.

18      Q.      First and foremost, let me

19  do this:  I need a detailed explanation

20  from you of every time someone at

21  Southeast Cherokee called you a nigger.

22      A.      I never said anyone called

23  me a nigger.

## FREEDOM COURT REPORTING

142

1     Q.     Okay.  So that's a good

2     thing.  We can agree on that?

3     A.     Yes, sir.

4     Q.     No one at Southeast

5     Cherokee ever referred to you as a

6     nigger; is that true?

7     A.     I never heard anyone at

8     Southeast Cherokee call me a nigger.

9     Q.     Okay.  Good.  All right.

10    Now, the second step, you say that you

11    were a witness to persons at Southeast

12    Cherokee referring to other black men

13    as niggers?

14    A.     Yes, sir.

15    Q.     I need -- I need those

16    conversations; I need every one of

17    them.  So you can start with the first

18    one you remember, and I'll go from

19    there.

20    A.     Me and Mrs. Carter's son,

21    he was taking me to Montgomery to the

22    job site down there.  I was driving the

23    tri-axle dump truck, and it was getting

## FREEDOM COURT REPORTING

143

1    a tire change.

2          Q.     Okay.  Now that I've got my

3    reference, do you know what day that

4    was?

5          A.     No, sir, I can't remember.

6          Q.     How long after you first

7    started?

8          A.     It was during the time I

9    was driving the tri-axle dump truck.  I

10   can't remember.

11         Q.     So you were driving the

12   dump truck?

13         A.     Yes, sir.

14         Q.     Was it Brent Carter?

15         A.     Yes, sir.

16         Q.     Okay.

17         A.     Yes, sir.

18         Q.     And you and Brent Carter

19   were driving a dump truck from --

20         A.     No, sir, I didn't say that.

21         Q.     Okay.  Tell me.

22         A.     I said that me and Brent

23   Carter were driving to Montgomery to

144

1    pick up my dump truck that was getting

2    the tire changed.  We were riding in

3    Brent's truck, the truck that Brent

4    drives.

5           Q.    Okay.  He was giving you a

6    ride?

7           A.    Yes, sir.

8           Q.    Okay.  Got you.  Go on.

9           A.    And as we were headed to

10   Montgomery, Brent was kind of speeding

11   a little bit, and a state trooper

12   jumped in behind him and hit his

13   lights.  And when he hit his lights,

14   Brent said, "This nigger's fixing to

15   pull me over."  But the state trooper

16   didn't pull him over, he went on

17   around, he was after somebody else.

18   But he didn't pull Brent over.  He said

19   it so easily just as if I wasn't even

20   there.

21           Q.    So you were riding along

22   and Brent made the statement, quote --

23   in reference to a police officer?

## FREEDOM COURT REPORTING

147

1    left-hand side.

2        Q.    So it's your testimony that

3    as the trooper was pulling around you

4    on the left, that you could see into

5    the trooper's car and determine that he

6    was a black male?

7        A.    Yes, sir, that's my

8    testimony.

9        Q.    It's your testimony that

10    you could see -- was the black trooper

11    driving?

12        A.    Excuse me?

13        Q.    Was the black trooper

14    driving his car?

15        A.    His car, yes, sir.

16        Q.    So it's your testimony

17    that, from your position in the

18    passenger seat of the dump truck, that

19    you were able to look at the trooper's

20    car --

21        MR. ROBERSON:    Object to

22    the form.

23        Q.    -- as it passed on your

## FREEDOM COURT REPORTING

148

1    left, and you could tell that he was a

2    a black male?

3             MR. ROBERSON:  Object to

4    the form.  It's not a dump truck.  It's

5    Brent Carter's truck.

6             MR. GARRETT:  He said it

7    was a dump truck.

8         A.    No, sir.  I said that we

9    were in Brent Carter's truck.

10        Q.    Okay.  I'm sorry.  I

11   misunderstood.

12            MR. ROBERSON:  Three times

13   he said it.

14        Q.    What kind of truck were you

15   in; clarify it for me, what kind of

16   truck were you in?

17        A.    It was a small white Ranger

18   or something.

19        Q.    A small white Ranger?

20        A.    Ford Ranger.

21        Q.    Was it a Southeast Cherokee

22   vehicle or his personal vehicle?

23        A.    It was a Southeast Cherokee

## FREEDOM COURT REPORTING

149

1    vehicle.

2        Q.    Okay.  But I am correct in

3    that Brent was driving?

4        A.    Brent was driving (nodding

5    head).

6        Q.    You were sitting in the

7    passenger seat?

8        A.    Yes, sir.

9        Q.    And you claim to have seen

10   the trooper's race as he passed by you

11   on the left?

12       A.    Yes, sir, he was a black

13   man.

14       Q.    On Brent's side?

15       A.    Yes, sir.

16       Q.    Okay.  And after he made

17   that statement, what did you say?

18       A.    I didn't say anything.  I

19   was shocked that he could just refer to

20   that guy like that just in my presence

21   just with no regard like that.  I was

22   shocked.  I didn't say anything.

23       Q.    Okay.  Is it your testimony

## FREEDOM COURT REPORTING

150

1    that you didn't say anything at all?

2         A.    I didn't say anything.

3         Q.    Okay.  Did you make any

4    reference to the officer?

5         A.    Did I make any reference to

6    the officer?

7         Q.    (Nodding head).

8         A.    No, sir.

9         Q.    Did you ever tell Brent

10   that his statement had made you

11   uncomfortable?

12        A.    No, sir, I didn't.

13        Q.    Did you ever report that to

14   anyone at Southeast Cherokee after you

15   got back to the office?

16        A.    I mentioned it.  I didn't

17   report it to anybody, but I mentioned

18   it to a couple of -- to a co-worker,

19   but I didn't report it to anybody.

20        Q.    Why didn't you report it?

21        A.    I just felt like he -- I

22   just -- because it wasn't really a big

23   deal to me because I felt like he was

## FREEDOM COURT REPORTING

162

1    occur?

2        A.    Do you mean date, time of

3    day?

4        Q.    Time of day; morning,

5    afternoon?

6        A.    I think it was after

7    lunch -- I believe it was going to be

8    after lunch.

9        Q.    All right. Tell me about

10    it.

11        A.    Well, the conversation was

12    going on about how gasoline had just

13    started to rise quickly and diesel

14    fuel, and Mr. Jerry and Pedro and

15    Justin, they were having a conversation

16    about a guy that had pulled off with

17    some gas. And each one -- and Pedro

18    and Jerry, they were exchanging stories

19    about recent -- guys recently pulling

20    off with some gas. And Mr. Jerry

21    Carter looked at me and pointed his

22    finger and told me, he said, "Decarey,

23    if I ever catch you stealing some of my

## FREEDOM COURT REPORTING

163

1    fuel, I won't press charges on you,

2    I'll just shoot your damn ass."

3        Q.    Anything else?

4        A.    No, sir.

5        Q.    So we had Pedro, Jerry, and

6    -- was Justin there talking about the

7    fuel?

8        A.    Justin was there, yes, sir.

9        Q.    So Pedro, Jerry, and Justin

10   were standing around in the Wetumpka

11   location?

12       A.    Yes, sir.

13       Q.    And they were exchanging

14   stories about people who drive off and

15   don't pay for gas; is that correct?

16       A.    Yes, sir.  We were talking

17   about the rising cost of gasoline and

18   diesel fuel.

19       Q.    Y'all were talking about

20   how gas and diesel fuel was getting

21   real expensive?

22       A.    Yes, sir.

23       Q.    And it's your testimony --

## FREEDOM COURT REPORTING

173

1          Q.     Correct, his own -- a side

2    job; what you called a side job.

3          A.     Yes, sir.

4          Q.     What time of the day was

5    that?

6          A.     Around lunchtime give or

7    take.

8          Q.     Okay.  I mean, was it

9    during the work week or was it on the

10   weekend or a holiday?

11         A.     It was during the work

12   week.

13         Q.     So you were on the clock

14   getting paid by Southeast Cherokee at

15   that time?

16         A.     Yes, sir.

17         Q.     So your time was being

18   paid?

19         A.     Yes, sir.

20         Q.     And at that time --

21         A.     Well, my time -- I wasn't

22   being paid to service -- I wasn't being

23   paid to service -- to do work that was

## FREEDOM COURT REPORTING

174

1    not Southeast Cherokee, I wasn't being

2    paid to do that.

3         Q.    Right.  I understand what

4    you're saying, but you were on the

5    clock is what I'm saying?

6         A.    Yes, sir, I was on the

7    clock.

8         Q.    So your time was being paid

9    by Southeast Cherokee because you were

10   on the clock?

11        A.    Yes, sir.

12        Q.    So you go over to the --

13   you go across the road to this other

14   job?

15        A.    Yes, sir.

16        Q.    And what does Randy ask or

17   tell you?

18        A.    Well, once Mr. Davis --

19   once Mr. Davis gave me forty dollars to

20   go and service his bush hog --

21        Q.    Okay.

22        A.    -- because he knew that it

23   wasn't a part of my work order.  Once

## FREEDOM COURT REPORTING

176

1        A.    Yes, sir.

2        Q.    Okay.  And how long did it

3  take you to do that work, just out of

4  curiosity?

5        A.    Depending on what all I had

6  to do.

7        Q.    I mean, how long did it

8  take you to do -- the first time we are

9  talking about, how long did it take you

10  to do -- put the gas in, put the oil

11  in, and do some greasing?

12        A.    Maybe twenty minutes.

13        Q.    And then you went back to

14  work over at Southeast?

15        A.    Yes, sir.

16        Q.    And I got from your

17  interrogatory responses that there was

18  another person that also helped in that

19  fashion?

20        A.    Yes, sir, Donnie Gantt.

21  Donnie Gantt.

22        Q.    So Donnie Gantt had also at

23  some time in the past done that kind of

## FREEDOM COURT REPORTING

177

1      work for Randy?

2              A.     Yes, sir, he did.

3              Q.     And Donnie is a white guy;

4      right?

5              A.     Yes, sir.

6              Q.     How much did he get paid to

7      do it?

8              A.     I believe Donnie told me

9      that he was getting paid eighty dollars

10     to do it; eighty dollars per day.

11             Q.     Eighty dollars per day?

12             A.     (Witness nodding head).

13             Q.     And who told you that?

14             A.     Donnie.

15             Q.     Okay.

16             A.     And also others, also

17     others because I --

18             Q.     Well, tell me what others.

19             A.     Pedro told me that Donnie

20     was getting paid.  Pedro told me that

21     Donnie was getting paid to go over and

22     service that equipment.

23             Q.     So Pedro told you that

# FREEDOM COURT REPORTING

186

1     your testimony he didn't pay you?

2          A.     Yes, sir.

3          Q.     Okay.  At that time, did

4     you ask him to be paid?

5          A.     Yes, sir, I did.

6          Q.     What did you say exactly?

7          A.     I can't remember exactly

8     what I said, but I remember his

9     statement after I said what I said.

10         Q.     You can't remember what you

11    said, you remember the statement.  What

12    do you recall saying to him?

13         A.     I can't remember exactly

14    how -- I can't remember exactly how I

15    asked him.

16         Q.     Uh-huh (nodding head).

17         A.     I can't remember that.

18         Q.     Okay.  Well, how did he

19    respond to you asking him to be

20    compensated?

21         A.     He responded "You do

22    whatever I tell you to do and you do it

23    or you take your ass home."

## FREEDOM COURT REPORTING

187

1        Q.      Okay.  Did he compensate
2    you?
3        A.      No, sir, he didn't.  He put
4    it in reverse and backed out after he
5    said that and left.
6        Q.      Okay.  Did he use any
7    racial slurs?
8        A.      No, sir.
9        Q.      I don't see it in here
10   (indicating).
11       A.      No, sir.
12       Q.      No?
13       A.      No, sir.
14       Q.      Okay.  And at any time did
15   you report any of this working for
16   Randy to anybody, working on his side
17   job?  Did you tell anybody this was
18   going on?  Did you report it to anybody
19   at Southeast Cherokee?
20       A.      I mean, Randy is -- if it's
21   a job -- if Southeast Cherokee's got a
22   job going on, Randy is over it.  Randy
23   is like the head foreman over each

# FREEDOM COURT REPORTING

189

1        A.     Randy is my supervisor.

2        Q.     Right.  Did you report it

3 to anybody higher than Randy?

4        A.     No, sir, I didn't.

5        Q.     Okay.  Did you mention it

6 to anyone else just around?

7        A.     Yes, sir, I did.

8        Q.     Okay.  Who did you mention

9 it to?

10       A.     I mentioned it to -- I

11 mentioned it to Pedro, I mentioned it

12 to Deon, I mentioned it to Tyrone, I

13 mentioned it to that bulldozer driver

14 too.  I can't think of his name.  I

15 never knew his real name, only his

16 nickname.

17       Q.     Okay.  Anyone else?

18       A.     Not that I can remember.

19       Q.     Okay.  I mean, what did you

20 tell these folks?

21       A.     I told them that Mr. Randy

22 Davis was making me go service his

23 personal equipment without being

## FREEDOM COURT REPORTING

210

1      Q.     Yes.

2      A.     It was the day before I was

3   fired.

4      Q.     Okay.  Where were you at;

5   what job?  Where was the job?

6      A.     I was on the job in

7   Montgomery.

8      Q.     Do you remember where in

9   Montgomery?

10     A.     Off of -- a job off of

11  Vaughn Road down -- I can't remember

12  exactly the name of it, but it was in

13  Montgomery off of Vaughn Road.

14     Q.     And you were in the service

15  truck?

16     A.     Yes, sir.

17     Q.     I'm sorry, is that correct?

18     A.     Yes, sir.

19     Q.     And what happened?  How did

20  you get the truck stuck?

21     A.     I was going to service a

22  piece of equipment, it had rained

23  previously, and it was real muddy;

# FREEDOM COURT REPORTING

211

1    which is real common; muddy or dry.  If

2    it's muddy, I've got to spin through

3    the mud to get to the equipment.  And

4    this particular time, I got stuck.

5    And --

6         Q.    Let me stop you there.

7    How did you get stuck?

8         A.    It was muddy.

9         Q.    What happened?  What part

10   of your truck got stuck?

11        A.    The back tires.

12        Q.    The back tires.  The right

13   or the left?

14        A.    The left.

15        Q.    So the left rear tire was

16   in the mud?

17        A.    The left rear tire was

18   stuck.

19        Q.    And it was -- was it

20   spinning?

21        A.    It was spinning (nodding

22   head).

23        Q.    Were the other three wheels

## FREEDOM COURT REPORTING

212

1      on the ground or were they stuck as

2      well?

3             A.      They were on the ground

4      stuck as well.

5             Q.      They were all stuck?

6             A.      I mean, the whole truck was

7      stuck.

8             Q.      Okay.

9             A.      The whole truck was stuck,

10     but the left rear tire was spinning.

11            Q.      Okay.  You said all four

12     tires of the truck were sunk in the

13     mud; is that correct?

14            A.      That's correct.

15            Q.      How deep were you sunk?

16     Was it to the axle?  I mean, I don't

17     know.

18            A.      It was to the axle.

19            Q.      So you were stuck pretty

20     good?

21            A.      I was stuck pretty good.

22            Q.      Were you near or on a road?

23            A.      I had almost made it to the

## FREEDOM COURT REPORTING

215

1    A.    No, sir.

2    Q.    Was it leaning?

3    A.    I mean, it was stuck.

4    Q.    Was it leaning to one side

5    or the other?

6    A.    One side was maybe leaning

7    a little more than the other.

8    Q.    Which side?

9    A.    The left side.

10    Q.    Did you spill any fuel?

11    A.    No, I didn't.

12    Q.    And you have HAZMAT

13    certification; correct?

14    A.    Yes, sir.

15    Q.    And you understand that --

16    through that training, I guess, and in

17    receiving your CDL, that fuel spills

18    have to be taken very seriously?  You

19    agree with me; right?

20    A.    Yes, sir.

21    Q.    And that a fuel spill can

22    be a pretty bad environmental problem,

23    do you agree with me?

## FREEDOM COURT REPORTING

216

1       A.    Yes, sir.

2       Q.    And specialized steps and

3  methods have to be utilized in cleaning

4  up fuel spills; correct?

5       A.    Yes, sir.  The truck itself

6  had a fuel leak itself.  The truck was

7  in extremely bad shape.  The truck

8  shouldn't even have been on the road.

9  That's why another one was on order.  A

10  new one was on order because that truck

11  had had it.  That truck was leaking

12  everything that was in it.

13       Q.    I believe you said in your

14  interrogatory responses that, in fact,

15  Southeast Cherokee received a new fuel

16  truck while you were still operating

17  the old one; is that correct?

18       A.    That's correct.

19       Q.    And that it actually stayed

20  up at the shop for some period of time;

21  is that correct?

22       A.    That's correct.

23       Q.    How long did the new fuel

## FREEDOM COURT REPORTING

217

1    truck stay up at the shop while you

2    were operating the old one?

3         A.    Two, three weeks.

4         Q.    And what were they doing to

5    the fuel truck during that two to

6    three-week period?

7         A.    What were they doing?

8         Q.    Yeah, what were they doing

9    to it?

10         A.    Every time I saw it, they

11    wasn't doing nothing to it.  It was

12    just there parked in the shed.  When it

13    came from the factory, it came ordered

14    -- specially ordered ready for the job.

15         Q.    Okay.  Do you disagree that

16    they were making modifications to that

17    truck during the two or three-week

18    period?

19         A.    Not according to Pedro.

20         Q.    Well, I'm asking if you

21    disagree or agree.

22         A.    I disagree; yes, I

23    disagree.

## FREEDOM COURT REPORTING

218

1    Q.    Okay.  And you had a
2  conversation with Pedro about the new
3  fuel truck?
4    A.    Yes, I did.
5    Q.    What was that conversation
6  about?
7    A.    The conversation that I and
8  Pedro had was Pedro was -- I was asking
9  him was the fuel truck ready, he said
10  yeah, and I asked, "Well, why ain't I
11  in it, why am I still having to drive
12  this old raggedy one that's leaking
13  this fuel?"  And he kind of laughed and
14  said, "Man, I don't know."
15    Q.    So he told you he didn't
16  know why it wasn't in operation yet?
17    A.    Yes, sir.
18    Q.    Any other statements about
19  the new fuel truck?
20    A.    Between me and Pedro?
21    Q.    Or anyone.
22    A.    I mean -- I mean, sure, I
23  was being told that the new service

## FREEDOM COURT REPORTING

219

1    truck still needed modifications, but

2    that wasn't the case.  It wasn't a

3    thing in the world wrong with the new

4    fuel truck.  I was there every morning

5    and every afternoon where the new fuel

6    truck was.  That's where I left the old

7    fuel truck at, I parked the old fuel

8    truck right in there beside it each

9    night and I pulled it out of there each

10   morning.

11          Q.    And who told you the fuel

12   truck was undergoing modifications?

13          A.    At first, when it first

14   got there, the first couple of days it

15   did undergo modifications, but not the

16   whole -- but not the whole couple of

17   weeks it was there; it did not.

18          Q.    That wasn't my question.

19   My question was:  Who told you?

20          A.    Pedro; Pedro did.

21          Q.    So now Pedro has told you?

22          A.    And after the modifications

23   were finished, he also told me that --

## FREEDOM COURT REPORTING

220

1     that they wasn't doing any more

2     modifications on it.

3          Q.     Well, let me ask you this:

4     What modifications did Pedro tell you

5     they were doing?

6          A.     He didn't tell me.

7          Q.     Did you ask?

8          A.     No, I didn't.

9          Q.     Any reason why not?

10         A.     As a matter of fact -- as a

11    matter of fact, to be exact, he did

12    tell me about what modifications, but I

13    can't remember.  It was something real

14    simple though; it was something

15    extremely simple.  I can't remember

16    exactly what, but I know it was

17    something extremely simple, that in a

18    couple of days' time, Pedro had already

19    done.

20         Q.     Okay.  So it's your belief

21    that it took two days to modify the

22    truck?

23         A.     It's my belief that in a

## FREEDOM COURT REPORTING

222

1    interrogatory responses, you say that

2    the new fuel truck had certain things

3    on it that were going to make your job

4    easier.

5         A.    Uh-huh (nodding head).

6         Q.    What are those?

7         A.    Well, the new fuel truck

8    had state of the art updated

9    modifications, like hoses that would

10   unwind and would lock, and then you'd

11   pull them, and they'd wind itself back

12   up.  It had -- it was bigger.  It was

13   bigger, it had a better tool -- it had

14   a better -- the place where you placed

15   the tools on the side, they were

16   better.  It was just a totally -- it

17   was a better -- all around better truck

18   that would make life as a service man a

19   lot easier.

20        Q.    So it's your belief the new

21   truck would have made your job easier?

22        A.    Yes, sir.

23        Q.    Is there anything on the

## FREEDOM COURT REPORTING

223

1    truck that the new truck could do that

2    the old truck could not do?

3            A.    A lot of things (nodding

4    head).

5            Q.    I Need to know about

6    them.  I don't mean to make your life

7    easier, I mean things it could do that

8    the old one could not; capability --

9            A.    Well, for one, the new

10   truck wasn't leaking all different kind

11   of fuels.

12           Q.    I understand you on that.

13   I'm saying what could the new truck do

14   that the old truck could not do?

15           A.    The new truck had -- like I

16   say, it had hoses that would stretch a

17   lot farther so you wouldn't have to get

18   so close to the equipment; the hoses

19   would stretch a lot farther.

20           Q.    Maybe I can simplify it.

21   Is your testimony that this new truck

22   was just going to make your job easier

23   but it did the same things as the old

## FREEDOM COURT REPORTING

224

1    job (sic); is that true?

2         A.    No, it did more than the

3    old truck would.  Now, I don't have

4    both of the paperworks here in front of

5    me to see what this truck had that this

6    truck doesn't, but now the new truck

7    was a heck of a lot better truck and

8    more qualified and more suitable for

9    that job.

10         Q.    Okay.  But sitting here,

11   you can't tell me what it could do?

12         A.    No, sir, I can't, because I

13   was never allowed to drive the truck.

14   I just saw the truck as I was pulling

15   in beside it and pulling out beside it.

16         Q.    I mean, do you know -- I

17   mean, you know, do you know what

18   specifications were made for the new

19   truck versus the old one?

20         A.    No, I can't be for sure.

21         Q.    Is there any aspect of -- I

22   understand that you're claiming in the

23   case that you were made to work in a

## FREEDOM COURT REPORTING

245

1     the tri-axle truck for Southeast

2     Cherokee where you got a ticket in

3     Calera; is that correct?

4          A.     That is correct.

5          Q.     And you were actually cited

6     for being overweight; is that correct?

7          A.     That's correct.

8          Q.     Give me your story on

9     that --

10         A.     Well --

11         Q.     -- as best you can.

12         A.     -- I -- they overweight --

13    they overloaded me at the mill in

14    Calera, and it's cited for being

15    overweight because they overloaded me.

16         Q.     Okay.  Let's kind of start

17    there.  Let's start at the beginning.

18    Do you know the date of this?  I mean,

19    it's on this ticket (indicating).

20         A.     It should be on the ticket.

21         Q.     I'm just wondering is it

22    toward the beginning or end of your

23    tenure.

## FREEDOM COURT REPORTING

258

1        receipt (indicating).

2

3            (Whereupon, Defendant's Exhibit 4

4            was marked for identification and

5            same is attached hereto.)

6

7            Q.      They gave you a receipt,

8    and I believe I'm reading this

9    correctly, and if I'm not, tell me, but

10    it looks like they weighed you down

11    with eighty-one thousand seven hundred

12    and forty pounds total on that ticket

13    there.  Will you take a look at that

14    for me?

15            A.      (Witness complies).  Yeah,

16    gross weight at scale at Calera,

17    eighty-one thousand seven hundred

18    forty.

19            Q.      And that's indicated on the

20    receipt that they gave you showing how

21    much they weighed you in at Calera;

22    correct?

23            A.      That's correct.

## FREEDOM COURT REPORTING

259

1          Q.      Did you sign that?

2          A.      I did.

3          Q.      And then after you signed

4    that, you got on the interstate with

5    your truck; correct?

6          A.      That's correct.

7          Q.      So you got on the

8    interstate overweight; correct?

9          A.      That's correct.

10          Q.      In fact, that eighty-one

11    thousand seven forty is more than the

12    seventy-six thousand pounds that you

13    understood you could operate on the

14    interstate pursuant to your CDL

15    training; is that correct?

16          A.      That's correct.

17          Q.      Now, you say in your

18    interrogatory responses that you tried

19    to call -- the other truck -- I'm

20    quoting, "It was my first time in

21    Calera, the other trucks had gone off

22    and left me behind.  I tried to reach

23    them on the CB.  I suppose they had

## FREEDOM COURT REPORTING

262

1      A.    I didn't know whether or

2  not they were -- I know the interstate

3  was quicker because the whole while

4  going up that way, I was wondering why

5  we were going up 31 with all these

6  little small towns and traffic lights,

7  why didn't we just go straight up the

8  interstate.  The whole time up there, I

9  was wondering -- the whole time up

10  there, I was wondering that.

11      Q.    Uh-huh (nodding head).

12      A.    And on the way back, I

13  guess I thought maybe somebody got a

14  genius idea and they was going to go

15  back down the interstate, a quicker

16  way.  So after I couldn't get them,

17  after I couldn't get nobody, after I

18  couldn't get either of them on the CB,

19  I just went down the interstate.

20      Q.    So you just made that call?

21      A.    I did (nodding head).

22      Q.    Who did you try to call on

23  the CB?

## FREEDOM COURT REPORTING

270

1         Q.    Do you deny causing that

2  damage?

3         A.    Yeah, I do.

4         Q.    You do deny it?

5         A.    Yeah, I do.

6         Q.    If the -- Let me ask you

7  this:  Do you recognize that damage?

8         A.    I don't even recognize this

9  damage (indicating).

10        Q.    Are you going to testify

11  that that damage was not on the truck

12  when you were driving it?

13        A.    I'm going to testify that

14  that damage was already at this same

15  left fender.  Now, that right -- this

16  right clip thing (indicating), I don't

17  know anything -- I don't know anything

18  about that.

19        Q.    Okay.  Go ahead.

20        A.    But this left front fender,

21  I did bump it with an excavator, but it

22  was on a place that was already like

23  this (indicating).

## FREEDOM COURT REPORTING

271

1        Q.    Okay.

2        A.    It caused -- it caused

3  another little crack there, but this is

4  the crack right here (indicating) that

5  I did cause; truth and honest, this is

6  the crack I did cause (indicating).

7  But this hole right here and all the

8  rest of that, a lot of that was already

9  there when I first started driving the

10  truck.

11       Q.    Okay.

12       A.    This left front fender,

13  Donnie Gantt had already bumped it

14  himself; this same place, this same

15  spot.

16       Q.    Okay.  So your testimony is

17  you made it worse, but you didn't cause

18  the original damage; is that correct?

19       A.    Um --

20       Q.    You just said you added

21  that big crack.  I'm going to draw an

22  arrow --

23       A.    I'm not going to say I made

## FREEDOM COURT REPORTING

304

1    Q.    Is he mechanically in-

2    clined?  Has he worked as a mechanic?

3    A.    Well, he was a service man

4    for Southeast Cherokee.  I don't know

5    exactly what he did while he was there

6    and what he didn't do.

7    Q.    Do you think he was

8    qualified for that job?

9    A.    I believe he was (nodding

10    head).

11    Q.    And, obviously, he either

12    -- he left Southeast Cherokee because

13    he had a drug problem and they hired

14    him back, is that your understanding?

15    A.    That's my understanding.

16    Q.    Any problem in them hiring

17    him back?

18    A.    Excuse me?

19    Q.    Do you have any problem

20    with Southeast Cherokee hiring him

21    back?

22    A.    Did I have any problem with

23    it?

## FREEDOM COURT REPORTING

305

1      Q.    Yes.

2      A.    Not at all.

3      Q.    I'll show you a couple of

4  things here.  We're getting close.

5            Do you recall receiving a

6  handbook when you started your

7  employment with Southeast Cherokee?

8      A.    What kind of a handbook?

9      Q.    An employee handbook.

10     A.    What kind of an employee

11 handbook?

12     Q.    I'm just asking if you

13 recall receiving one.

14     A.    I received some kind of a

15 package along with my application.

16     Q.    Okay.

17

18     (Whereupon, Defendant's Exhibit 8

19     was marked for identification and

20     same is attached hereto.)

21

22     Q.    I'll show you two

23 documents which have been marked

# SOUTHEAST CHEROKEE CONSTRUCTION
## NEW HIRE PROSPECT FORM

NAME Decarey L. Floyd    DATE 4/28/05

ADDRESS 196 mt Zion Rd    PHONE 334-561-6524

Wetumpka, AL 36092    CELL 201-8606

POSITION APPLYING FOR: Driver

REFERED BY    :

SALARY DESIRED    : $10.50

**WORK EXPERIENCE**    :

Date Month/Year    Previous Employer    Salary    Position
From 1/04 To 4/05    D. Floyd Trucking    130.00 load    Driver
Dump Truck Driver
With Hodgson + Blake a Pipe Fitting Co.
Putting in Storm drains ex....

Equipment Experience
Backhoe / Bulldoser / Frontend loader /

Reviewed by: _____ Hire_____ Rate_____

Position_____ Crew_____

Comments:

EXHIBIT
E

Blumberg No. 5118

**FOR EMPLOYEE FILE RECORDS**
# PERSONAL INFORMATION
**Complete the following:**

NAME: _Lacurtis Decarey Floyd_
(AS SHOWN ON SOCIAL SECURITY CARD)

ADDRESS: _196 mt Zion Rd_
_Wetumpka, Al. 36092_

TELEPHONE NUMBER: _(334) 567-6524_

SOCIAL SECURITY NUMBER: _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_

RACE: _A/A_    SEX: CIRCLE ONE (M)  F

DRIVERS LICENSE NUMBER: _7021776_

DATE OF BIRTH: _10/19/77_

CURRENT MEDICAL CARD? (YES) OR  NO

POSITION FOR WHICH YOU WERE HIRED:  EXAMPLE:  TRUCK DRIVER,
DOZER, SCRAPER, LABORER  **(BE SPECIFIC):** _Truck Driver_

CLASSIFICATIONS OF RACE:

BA- "BLACK AMERICAN"          HA-"HISPANIC AMERICAN"

NA-"NATIVE AMERICAN"          W-"CAUCASIAN"

AP-"ASIAN-PACIFIC AMERICAN"

AL-"ASIAN-INDIAN AMERICAN"

-------------------------------------------------------

**EMERGENCY CONTACT INFORMATION**

NAME: _Linda Merkerson_

RELATIONSHIP TO YOU: _Mother_

TELEPHONE NUMBER:  HOME _567-6524_ WORK _567-5131_

CELLULAR : _567-6884_

*FOR EMPLOYEE FILE RECORDS*
**SOUTHEAST CHEROKEE CONSTRUCTION, INC.**

### RECEIPT OF HANDBOOK

### THIS HANDBOOK NOT A CONTRACT

The contents of the Handbook are presented as a matter of information only. While Southeast Cherokee Construction, Inc. (the Company) believes in the plans, policies and procedures described herein, they are not conditions of employment. The Company reserves the right to modify, revoke, suspend, terminate or change any or all such plans, policies or procedures, in whole or in part, at any time, with or without notice.

**The language used in this publication is not to create, nor is it to be construed to constitute, a contract between the Company and any one or all of its employees.**

In consideration of my employment, I agree to conform to the rules of the Company. I understand that my employment and compensation can be terminated, with or without cause, and without notice, at any time at the option of either the Company or myself. I understand that no employee or representative of the Company, other than the Chairman of the Board, has the authority to make any agreement contrary to the foregoing.

I understand that it is my responsibility to read its contents in order that I would be aware of the Company's personnel policies.

I hereby verify receipt of the Company Employee Handbook.

Decarey Floyd
Print Name

Decarey Floyd
Signature

4 | 29 | 05
Date

A signed copy of this receipt must be returned to the Company Office and filed with the employee's personal file.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **2:07-cv-577-MEF** |
| **v.** | § | |
| | § | |
| **SOUTHEAST CHEROKEE** | § | |
| **CONSTRUCTION, INC.** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### AFFIDAVIT OF JERRY CARTER

BEFORE ME, _Grace E. Goolsby_, a notary public in and for said County and State, personally appeared **JERRY CARTER**, and being duly sworn, deposed and says on oath that the averments contained in the foregoing are true to the best of his ability, information, knowledge and belief, as follows:

"My name is Jerry Carter. I am over the age of twenty-one and am personally familiar with all the facts set forth in this Affidavit. I am the Vice President of Operations at Southeast Cherokee Construction, Inc.

The "oil/greaser" or "service truck" is designed to carry diesel fuel, oil, fluids, water and grease. The driver of the service truck is responsible for using the service truck to perform mechanical repairs and preventive maintenance duties for Southeast's vehicle and heavy equipment fleet including, but not limited to, dump trucks, backhoes, front-end loaders, bulldozers, excavators and scraper tractors. As such, the service truck driver position requires specialized mechanical training and skill. A service truck driver's duties include (1) monitoring/changing belts and hoses on the fleet's heavy equipment, (2) maintaining/changing



oil levels, (3) maintaining/changing fluid levels, (4) changing tires, (5) keeping heavy equipment fueled, (6) maintaining/changing hydraulic fluid, (7) greasing fittings, and (8) being able to work under the master mechanic for starter and alternator repair. In order to perform services on job sites, the service truck driver must also have training or experience necessary to operate all of the vehicles and heavy equipment in Southeast's fleet and, further, to maneuver the equipment as needed for servicing. Since the service truck driver position requires specialized training and experience, the position pays more than a tri-axle dump truck driver. Further, since the service truck is designed to carry fuel, its driver must have a Commercial Drivers License (CDL) with HAZMAT certification.

On or about May 7, 2005, approximately one week after Decarey Floyd was hired, my service truck driver unexpectedly quit. As such, I was put in a position where I needed a service truck driver immediately with the appropriate CDL and HAZMAT certification. A long time Southeast employee, Justin Bethea, approached me and asked for the position. Mr. Bethea, a white male, had been employed with Southeast for a number of years. During that time period he trained as an assistant to Southeast's master mechanic and as an equipment operator. Prior to being hired by Southeast, Mr. Bethea received mechanics training, including preventive maintenance training, with Express Oil Change, a former employer. Mr. Bethea also had engine repair experience and, according to Southeast's master mechanic, was mechanically inclined. Mr. Bethea did not, however, have a CDL or HAZMAT certification as needed to drive the service truck. As such, I told Mr. Bethea that if he wanted the job he needed to take the appropriate training courses and pass the licensure test. Mr. Bethea began taking courses to receive his CDL.

2

Since Mr. Bethea did not have the necessary license to drive the service truck, I approached Mr. Floyd and asked if he would be willing to drive the service truck temporarily until an experienced operator could be hired. I asked him to fill the position because he was the only employee available who had the requisite CDL and HAZMAT certification. I instructed Mr. Floyd with regard to the service truck driver's duties and told him to do the best he could with his limited training and experience, generally, to get the truck to the job sites. It was my expectation that the mechanics and foremen would have to help Mr. Floyd take care of the equipment since he was not qualified to do so. I agreed to increase Mr. Floyd's pay from $10.25 to $11.50 per hour, the rate of pay given to the previous service truck driver.

Within ten minutes of offering Mr. Floyd $11.50 per hour, he again approached me and demanded that his rate of pay be increased from $11.50 to $13.00 per hour, a pay rate substantially higher than that paid to the previous service truck driver. I acquiesced to Mr. Floyd's demand since he was the only employee available with the necessary CDL and HAZMAT certification.

Mr. Floyd drove the service truck until a more qualified employee, Donald Gantt, was hired on June 5, 2005. Mr. Floyd relinquished the service truck position without complaint and returned to driving a tri-axle dump truck. When he resumed his position as tri-axle dump truck driver, he received a pay raise for driving the dump truck from $10.25 to $10.50 per hour.

Mr. Gantt, a white male in his 50's, had worked for Southeast in the past as a service truck driver. He was paid less money to drive the service truck than Mr. Floyd, $12.10 per hour. Mr. Gantt continued to operate the service truck until approximately July 23, 2005 when he quit for health reasons. After Mr. Gantt quit, Mr. Floyd was again asked to fill in temporarily as

3

service truck driver until an experienced operator could be hired. He again agreed to accept the position at the rate of $13.00 per hour.

When Mr. Floyd was driving the service truck subsequent to Mr. Gantt leaving, Mr. Bethea was in the process of completing his studies to obtain his CDL and HAZMAT certification. Also, during this time period, Southeast ordered a new service truck. The new truck was delivered to Southeast and, subsequently, placed in the company garage for modifications. Mr. Floyd continued to operate the service truck until his termination on September 28, 2005. Soon thereafter, Mr. Bethea received his CDL license and HAZMAT certification. He was hired to operate the service truck after Mr. Floyd's termination. Mr. Bethea was paid $10.25 per hour to operate the new service truck, substantially less than Mr. Floyd.

I terminated Mr. Floyd on September 28, 2005 for a number of legitimate, non-discriminatory reasons including (1) being repeatedly late for work, (2) being insubordinate to foremen on job sites, (3) placing grease on areas of equipment that would not take grease, i.e., "faking" his service duties, and (4) driving too fast on job sites. Moreover, Mr. Floyd did not (5) have the proper mechanical training/knowledge necessary to service and/or repair the equipment in Southeast's fleet or (6) have the mechanical experience necessary to operate/maneuver the equipment in the fleet for servicing purposes. As a result of Mr. Floyd's inability to properly operate heavy equipment, he inadvertently caused damage to the service truck by striking its fender with an excavator. I also received numerous complaints from employees and foremen that Mr. Floyd's performance as service truck driver was substandard. In addition, Mr. Floyd was ticketed on June 7, 2005 for driving overweight on the Interstate.

The day before Mr. Floyd was terminated, September 27, 2005, he was operating the service truck at a job site in Montgomery, Alabama. Mr. Floyd was warned by fellow workers to

4

avoid certain areas of the job site as they were extremely wet. Mr. Floyd ignored the warnings, however, and drove the service truck into an area that was extremely soft (next to a newly poured sidewalk), causing the service truck to sink to its axles. After bottoming out, the truck leaned over and to the left creating a potentially dangerous HAZMAT situation as related to a fuel spill. The service truck had to be pulled out with the use of heavy equipment on the job site.

The next day, September 28, 2005, I confronted Mr. Floyd with regard to the incident as well as other performance concerns addressed above. He did not appear to take the incidents seriously and displayed a poor attitude about his job performance. Specifically, when confronted about wiping grease on fittings that would not accept grease, i.e., "faking" service work, Mr. Floyd simply smiled and did not deny the allegation. I subsequently terminated his employment."

Further, affiant sayeth not.

JERRY CARTER

STATE OF ALABAMA                    )
                                    )
COUNTY OF _Elmore_                  )

Sworn to and subscribed before me on this the _30th_ day of _May_ 2008.

_Grace G. Doolittle_
Notary Public
MyCommissionExpires
_8-22-10_

5

FORM UTC-7
REV. 3/97

**ALABAMA UNIFORM TRAFFIC
TICKET AND COMPLAINT**

COURT CASE NO. ___

ALABAMA COUNTY OF _Autauga_    CO. _01_ / CITY ___    TICKET NUMBER  **M 8389823**
YEAR ___ NUMBER ___

The undersigned, being duly sworn, deposes and says that he/she has probable cause to believe and does believe that the person herein named did, within the previous 12 months, commit the offense set forth contrary to law in that: on or about  Month _10_ Day _01_ Year _05_  At Approx. _3:10_ Time ☐ AM ☑ PM ☐ MT

TYPE VEHICLE
☑ Commercial
☐ Haz-Mat Involved
☐ Other ___
☐ Private

First Name _Lacurtis_  Middle/Maiden _Decuray_  Last _Floyd_

Address _196 MT Zion Rd._  Street ___

City _Wetumpka_  State _AL._  Zip Code _36092_

State _AL_  Driver's License Number _7021776_  Class of License _A_

Sex _M_ Race _B_ DOB _10/07/77_  Social Security Number _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_  Drivers License in Possession ☐ Yes ☐ No

Ht _5'4"_ Wgt _155_ Eyes _Bro_ Hair _Blk_  Vehicle Tag Number _29X 9532_  State _AL_  Year _05_

Vehicle Description _Mack Dump WHT_  Owner of Vehicle ☐ Driver ☑ Employer ☐ Other

Employer/Owner of Vehicle (Address) _Southeast Cherokee Const, Wetumpka, AL_

☐ Did unlawfully operate a motor vehicle, other vehicle, or ☐ otherwise unlawfully use a public street, road, highway or other place, at or near ___, within the ☐ city limits or ☐ police jurisdiction of _I65/MM#87_, or ☐ within _Autauga_ County, at or near the following location in violation of ☑ Section _32-9-20 (4)_ Code of Alabama 1975,

☐ or Rule/Regulation number (or) ☐ Municipal Ordinance No. ___, duly adopted and in force at the time the offense was committed, (if applicable) ☐ adopting Section ___ Code 1975, more particularly described below:

UCR Code ___ KM No. ___ Street/Road Code ___

**CHECK THE APPROPRIATE BLOCK:**

1 ☐ Speeding ___ MPH ___ Speed Limit
2 ☐ Reckless Driving
3 ☐ Driving Without First Obtaining a Driver's License
DID DRIVE OR BE IN ACTUAL PHYSICAL CONTROL OF A VEHICLE WHILE:
4 ☐ There was .08% or More By Weight of Alcohol in His/Her Blood
4 ☐ Under the Influence of Alcohol
5 ☐ Under the Influence of Controlled Substance
71 ☐ Under the Combined Influence of Alcohol and Controlled Substance
72 ☐ Under the Influence of any Substance which Impairs the Mental or Physical Faculties
6 ☐ Failure to Yield Right of Way
☑ Other Violation (Specify) _Over weight (83,300 Legal 55,500 over 27,800 lb)_

7 ☐ Driving While Revoked
8 ☐ Driving While Suspended
10 ☐ Running Red Light
13 ☐ Improper Equipment (Specify)
14 ☐ Improper Passing
28 ☐ Improper Tag (Specify)
29 ☐ Improper Turn
42 ☐ Overweight Vehicle
61 ☐ Child Restraint Violation
77 ☐ Seat Belt Violation

FACTS RELATING TO THE OFFENSE: (Witnesses, etc)  ☐ Companion Case (Traffic, Non-Traffic, Felony, Other)  ☐ Accident Involved

Complainant's Signature _P.D. Taylor_  Officer I.D. _V647_ Agency ORI _AL A 0300_

☐ Municipal  ☑ District Court _Autauga_  **COURT APPEARANCE INFORMATION**  Phone _(334) 954-9399_

Court Appearance Date _8/1/00_ Time _8:30_  ☑ AM ☐ PM  Court Address _Autauga_

I promise to appear in court at said time and place or otherwise comply with the provisions of this complaint and instructions of the notice part of this ticket.

Defendant's Signature X _Decuray Floyd_  Phone ( )

☐ Released on Own Recognizance    ☐ Driver's License Posted in Lieu of Bond

TICKET NO. M 8389823  CASE NO. 8389823

**DEFENDANT'S COPY**

**INSTRUCTION**   **PRESS FIRMLY**
TO OFFICER:  ASK IF MOTORIST'S ADDRESS IS CORRECT ON DRIVER'S LICENSE
_Au C.Hse 334-361-3811_  _July 25th Clerk_
_Whit Monchief_  _361-3739_


EXHIBIT
G

Blumberg No. 5118

A.S.T. 24 REV. 12-15-93
BM 171 REV.
MAINTENANCE

## ALABAMA STATE TROOPERS/ALABAMA DEPARTMENT OF TRANSPORTATION
## VEHICLE WEIGHT REPORT

SCALE NUMBERS:

| NUMBER | COUNTY | ROUTE | MILEPOST NUMBER | TIME |
|--------|--------|-------|-----------------|------|
| 11 | | | | |

| TYPE OF LOAD | TAG NO: | STATE: | HAULING: AM PM |
|--------------|---------|--------|----------------|
| | DOT. | ICC MC | INTERSTATE ( ) |
| | | | INTRASTATE (✓) |

| OWNER | DRIVER |
|-------|--------|
| CITY & STATE | D.L. NO: |

| AXLE NUMBER | WHEEL WEIGHT | AXLE OR GROUP WEIGHT | | |
|-------------|--------------|-------|----------------|-------|
| | | TOTAL | MINUS TOLERANCE | LEGAL |
| 1 (L) | | | | |
| (R) | | 15100 | | |
| 2 (L) | | | | |
| (R) | | 15200 | | |
| 3 (L) | | | | |
| (R) | | 26500 | | |
| 4 (L) | | | | |
| (R) | | 26500 | | |
| 5 (L) | | | 83300 Gross | |
| (R) | | | 55500 Legal | |
| 6 (L) | | | 27800 overweight | |
| (R) | | | | |
| 7 (L) | | | | |
| (R) | | | | |

| TOTAL OF WHEELBASE | GROSS WEIGHT | GROSS LESS TOLERANCE | LEGAL WEIGHT |
|--------------------|--------------|----------------------|--------------|
| 20' | 83300 | | 55500 |

ACTION: ARREST (✓)    WARNING ( )    NONE ( )
TICKET NO: M805583

SIGNED: _____    _____    _____
TROOPER                          SCALE OPERATOR              TITLE

Dist:   Original to Major
        Copy to Court on Arrest          DATE: 6-7-05  Ending Time 3:17
        Copy to Department of Transportation                    AM PM
        Copy to Arresting Officer

OTHER CHARGES: _____

0042

Decarey Floyd

*Put with Decay's overweight ticket*

**Vulcan**
Materials Company
SOUTHERN AND GULF COAST DIVISION
VULCAN CONSTRUCTION MATERIALS, LP
THE NATION'S LEADING PRODUCER OF CONSTRUCTION AGGREGATES
EXTRA COPY/MEMO/BILL OF LADING

2A0104

**See Product Warning on Reverse Side**

BMT-10 I hereby certify that this shipment of aggregates is from an approved source
and meets the specifications for this project and the weight shown is true and accurate.

Pit #    Approved by authorized rep.
135    BARRY WOODS #77

SHIPPING LOCATION:

1614 HWY 84
CALERA, AL 35040    769006
205-668-2492    AUDIT NO:

Weighed By:    TED WENDELL    FORM C-609 REV. 2/04

This document is a bill of lading / freight bill subject to terms and conditions of the Uniform Domestic Straight
Bill of Lading set forth in the National Motor Freight Classification, ICC NMF 100-1 or reissues thereof.
Carrier signature acknowledges receipt of the property described below in apparent good order, except as
noted, consigned and destined as indicated, which said carrier agrees to carry to its usual place of delivery at
destination. Customer / consignee signature acknowledges receipt of said property in apparent good order,
except as noted.

CARRIER    CUSTOMER / CONSIGNEE

*Decarey Floyd*

| DATE: | TIME | PLANT | TICKET NO. |
|---|---|---|---|
| 06/07/05 | 14:09 | CALERA QUARRY | 769006 |

| CUSTOMER | | | |
|---|---|---|---|
| 170255  SEM | | SOUTHEAST CHEROKEE | |
| SOUTHEAST MATERIALS CORP | | MG-7725(601) MONSTONE | |
| SALES ORDER 331387   031 | DESTINATION 002079 | | |
| CUSTOMER ORDER/P.O. NO. | | MONT CO | |
| 002079/5500-346 | | 301A-012 | |

| CARRIER | | TRUCK NO. | DRAY. |
|---|---|---|---|
| 999  CUSTOMER'S TRUCK | | SC3  PICKED UP | |

| PRODUCT | | ORDER TO DATE: 1,726.45 |
|---|---|---|
| 476  CRAGBASETY-B/DRY | | TONS TODAY: 172.45 |

| GROSS [Sc1 2] | TARE LBS [Sc1] | NET LBS | NET Mg | WEIGHER |
|---|---|---|---|---|
| 81,740 | 31,440 | 50,300 | 25.15 | TAW |

| GROSS kg | TARE kg | NET kg | NET Mg | |
|---|---|---|---|---|
| 37,077 | 14,261 | 22,816 | 22.8157 | |

COMMENTS AND ADDED CHARGES:

LOADS TODAY    7

| CASH SALE ONLY | | | |
|---|---|---|---|
| PRODUCT | DRAY | TAX | TOTAL |
| PER TON | | | |
| AMOUNT | | | |

8/8/05

Over weight
2T
app ($650.00)

0045
Decarey Floyd
0044

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CURTIS DECAREY FLOYD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: |
| | ) | |
| v. | ) | 2:07-cv-577-MEF |
| | ) | |
| SOUTHEAST CHEROKEE | ) | |
| CONSTRUCTION, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S CONSOLIDATED DISCOVERY

1.    Please state your full name, residence address, home telephone number, cell phone number, date of birth and Social Security number.

**Answer:    Decarey Lacurtis Floyd.  My phone number is 334/567-6524.  My address is 196 Mt. Zion Road, Wetumpka, Al. 36092.  My date of birth is October 19, 1977 and my social security number is 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.**

2.    Please state your present occupation and the name and address of your present employer(s).

**Answer:    My present employer is Town of Eclectic, P.O. Box 24030, 50 Main Street, Eclectic, Al. 36024.  I work as a part-time public works employee.**

3.    For each marriage of which you have been a part, state the dates and places of the marriage, the spouse's full name, and the names and addresses of any children born of such marriage.

**Answer:    I have never been married.**



EXHIBIT

H

4.    State each address where you have resided during each of the past ten (10) years, including the street address, city, county, and state, and the dates you have resided at each address.

**Answer:**    **I lived at 2103-G, Victoria Place Apartments, Prattville, Al. 36066. I lived there from around July 2005 to December 2005. I have lived at my present address which is 196 Mt. Zion Road, Wetumpka, Al. 36092, at all other times within the last 10 years.**

5.    Please provide a complete synopsis of your educational background including the names of, and dates attended, for each and every institution where you have received any formal schooling, vocational or other training.

**Answer:**    **Wetumpka Elementary, Wetumpka Junior High and Wetumpka High School.**

6.    Describe each job you have held during the ten (10) year period immediately before you began your employment with Southeast Cherokee, including the name and address of each employer, the inclusive dates of employment, and a description of each job or position held, and the nature and amount of your compensation.

**Answer:**    **I was a laborer/driver and was paid $7.00/hour at Hodgson-Blake, Inc., Montgomery, Al. 36125;**

**I was a driver for MBM Corporation, 800 Rocky Mount, NC 27802-0800. My pay varied by route. Different routes were paid different amounts;**

**I was a driver for D. Floyd Trucking, 196 Mt. Zion Road, Wetumpka, Al. 36092. My pay varied by load and by mile;**

**I was a driver/mover and was paid $10.00 per hour for A & A Transfer & Storage, Inc., P.O. Box 2317, Fort Walton Beach, Florida, 32549.**

**I was a driver/hauled logs from job site to log mill for Saco Wood, Inc., Prattville, Al. My pay varied by the load and plus miles.**

7.    If you have been a party to, witness, or given a deposition in, any judicial proceeding

prior to the present, state the court or jurisdiction in which each action was instituted, the approximate time the action was instituted, the nature of each action, and your involvement therein.

**Answer:    I believe I was made a party defendant to a lawsuit involving a motor vehicle accident. I do not know the status of this lawsuit but I believe it was settled. This involved an automobile accident while I was driving a truck for MBM. I have been the defendant in several criminal proceedings.**

8.     Give the name, address, background, training, and experience, including any specialties, of each person you propose to call or may call as a witness at the trial of this case and state the substance of the testimony you expect to be given by each said witness.

**Answer:    I have retained no expert witnesses.**

9.     If you, or anyone acting on your behalf (other than your attorney(s)), has any written statements, tapes, notes of interviews, written reports, notes of oral reports, or any other record concerning any witness or potential witness to this case, describe each such written statement, tape, note of interview, written report, note of oral report or other record involving the testimony, knowledge, opinion or statement of said witnesses.

a.     Give the name, address and phone number of the person or persons in possession of each such written statement, tape, note of interview, written report, note of oral report or other record.

**Answer:    My attorney has provided you with a copy of all written statements that have been taken in this case.**

10.     If any investigation has been personally made by you concerning the circumstances made the subject matter of this action, state the date it was made, the names and addresses of all persons who participated in the investigation and the results of each investigation,

including all facts and opinions established thereby.

**Answer:**    **The EEOC performed an investigation and issued a cause finding.**

11.    If you, anyone in your family, anyone acting on your behalf, or anyone in your

presence, has ever had any communication, discussion or conversation with anyone

employed by, affiliated with, or representing Southeast Cherokee concerning the

matters/charges referenced in your compliant, injuries claimed therefrom, or any

circumstances surrounding this lawsuit, please state the name and address of each person

who has had such a discussion or conversation, the name(s) of the person(s) with whom

you/they spoke, the date of each discussion or conversation, and the substance of each

discussion or conversation, including who said what to whom. This interrogatory is

intended to cover communications occurring at any time.

**Answer:**    **The EEOC investigated my complaint and issued a cause finding.**
              **A copy of the EEOC investigation is provided.**

12.    Describe each job you have held since the termination of your employment with

Southeast Cherokee, including the name and address of each employer, the inclusive dates

of employment, and a description of each job or position held, and the nature and amount

of your compensation and benefits. Also, please describe in detail the reason you left each

employment as applicable.

**Answer:**    **I do not remember the exact dates.**

**I worked through a temporary service for about three or four**
**months during the first of 2006. I worked for The Cabinet Shop**
**building door frames.  My pay was $8.00 an hour.  This was only**
**a temporary position.**

**I was a laborer making $8.00 an hour for Alabama Metal**
**Roofing, Hwy 231, Montgomery, Al.  I worked there for two or**
**three months after The Cabinet Shop.**

**Transport Drivers, Inc., 4252 Carmichael Road, Suite 219,**

Montgomery, Al. 36106. I was a driver making $11.37 per hour. I took a leave of absence and was told to take as much time as needed.

13.  Please identify by name and address each and every witness whom you expect to call

at the trial of this case and briefly identify the facts/issues upon which you expect the

witness to testify.

**Answer:**  No decision has yet been made about who my witnesses will be. Discovery is ongoing. However, please see my initial disclosures which advise of the persons whom I know of that may have information regarding this complaint. I will supplement this answer in accordance with the court's scheduling order regarding witnesses.

14.  While employed at Southeast Cherokee, were you ever reprimanded, censured,

demoted, or otherwise disciplined for any act or omission committed in the

course of your duties as a Southeast Cherokee employee? If so, please identify the nature

and reasons for each such action.

**Answer:**  Drivers usually get to work around 5:50 a.m to 6:15 a.m. The driver who gets there first, starts up all the trucks in the morning so they will be warming up. At 6:30 a.m. all the trucks leave the shop headed to the job site. This is customary action. The drivers at the time did not have time clocks. We wrote down our own time and turned them in weekly. It is customary to give the truck thirty minutes to warm up. Before leaving at 6:30 a.m., this particular morning, Jerry Carter was there when I got there around 6:05 a.m. He told me the truck needed 30 minutes to warm up. I needed to get there at 6:00 a.m. It never happened again. I was never late again. One other time, and the only time was when I got an overweight ticket for driving on the interstate with a load. It was my first time driving a tri-axel dump truck. I did not know that you could not drive on the interstate. It was my first time in Calera. The other trucks had gone off and left me behind. I tried to reach them on the CB. I suppose they had gotten out of reach. They didn't respond, so I went down the interstate. I learned that you could not drive on the interstate with a load when I got the ticket. When I took the job I was never briefed on places to drive and not to drive by leadership. Come to find out the truck would have been over weight on any road. It was simply over loaded at Calera. Jerry called up there and got mad for over loading my

truck.

15.    Please describe each and every instance of retaliation directed toward you by

Southeast Cherokee.

**Answer:**    **I complained to my supervisor Pedro that I was being treated differently than other drivers because of my race.    I also complained to Deon. Sometime after my complaint, I was fired.**

16.    Please describe in detail the circumstances/reasons surrounding your termination

of employment at Southeast Cherokee.

**Answer:**    **Southeast Cherokee had invested over a hundred thousand dollars in a new service truck.  The new accommodations on the new service truck were a lot more helpful and up to date.  It was brand new and ordered, tailor made for the job at Southeast Cherokee. The old service trucks that I drove were old and out dated.   My truck had already had the motor replaced or rebuilt once or twice already. It had oil leaks and fuel leaks and hydraulic oil leaks. The old truck had hydraulic oil that leaded down on one of the break drums.  The truck was not up to  D.O. T. standards.  It could not pass a D.O.T. inspection.  When you parked the truck and pulled off,  the truck would leave a big fuel puddle stain on the ground or in the street.   With a truck like this old one on the road and you have a new truck there for weeks at the shop and I was never allowed to drive it.     On the morning I was fired, I pulled up to work that morning, Justin pulled up behind me in the new service truck that I was never not one time allowed to drive.  After Justin pulled up in the new service truck, Jerry called me in the office and told me I was fired.  Justin has your job because he is more qualified.  Justin had worked on a car motor for me once.**

17.    List and describe in detail each and every injury or item of injury or damage you

claim against Southeast Cherokee. This interrogatory is intended to elicit a complete and

detailed description of the injuries and/or damages of any type or nature that you claim to

have experienced to date, or believe you will experience in the future, and it therefore seeks

more than a generic reference to the allegations of the complaint.

**Answer:**    **I am claiming back-pay, or the difference between what I was making at Southeast Cherokee and what I have earned to date.**

> I am also claiming garden variety mental anguish because of the way I was treated while I worked there and because of the emotional distress I suffered from my firing. I am also claiming punitive damages because the defendant acted with reckless indifference toward my civil rights. I am also alleging that I am entitled to attorneys' fees and costs if I am a prevailing party in this lawsuit.

18.   Since the termination of your employment at Southeast Cherokee, have you been terminated, reprimanded, censured, demoted, or otherwise disciplined for any act or omission committed in the course of your employment with any other employer? If so, please specify the nature and reasons for each such action.

**Answer:   No**

19.   As indicated within paragraph 6 of your complaint, please describe the individual who offered you the service truck driver position, your rate of pay prior to being offered the position of service truck driver, and the rate of pay you received subsequent to becoming a service truck driver.

**Answer:   The first time Jerry Carter asked me if I would drive the service truck temporarily, until Donny Gant came back, I agreed. Donny came back, I gave him back the truck. I went back to driving the tri-axel dump truck at $10.50 per hour. Donny worked for a short while then quit. I was informed that Donny quit and that I was needed to drive the service truck again. I left in the service truck, leaving my dump truck at the shop. Making my rounds I made it to the job site in Prattville. As I was servicing a piece of equipment, Randy Davis, Head Supervisor, pulled up in his truck. I went over to his truck to meet with him after he waived for me to come. I sat in the truck with im. He asked me if I wanted the job full-time. I told him it was a lot more responsibility than just driving my dump truck. And, I was exercising my hazardous materials endorsement. I told Randy Davis the only way I would drive the service would be for $13.00 hour and he agreed to make me full time service truck driver at the rate of $13.00 hour.**

20.   As referenced within paragraph 7 of your complaint, please identify the employees and supervisory employees at Southeast Cherokee who you allege referred to you as a

"nigger." Also, identify those individuals who are not employees of Southeast Cherokee whom you allege were referred to as "niggers."

**Answer:** **Lin and Jerry Carter are the owners of Southeast Cherokee. They have two sons working for the company at the time I was there. The youngest son of the two, Brian or something with a B, a young tall, slender fellow, taller than the other son. One day he and I were driving from Wetumpka to Montgomery, Al., in the truck that he drives, a black state trooper was following behind us. The black state trooper turned his siren and lights on behind us. Lin and Jerry's son stated "this Nigger is fixing to pull me over". But the state trooper did not pull us over. He went around us with his lights flashing.**

21. Please identify by name the individual whom you alleged threatened to shoot you if he learned that you were selling his fuel.

**Answer:** **Jerry Carter**

22. With regard to your allegation that the owner of the company threatened to shoot you if he ever learned that you were selling his fuel, describe the events leading up to this statement, including, the context in which the statement was made, as well as the full names, addresses, and telephone numbers of any and all individuals who witnessed this statement being made.

**Answer:** **Master Mechanic Pedro, Justin, the other mechanic operator, now the service truck driver and Jerry Carter. We were discussing fuel prices. How they were going up so high and how the elevating prices were effecting things. I was not really in the conversation, just standing with them. Then Jerry looked at me and stated, "Decarey if I ever hear of you stealing or selling my fuel, I won't press charges on you, I'll just shoot your damn ass".**

23. In paragraph 8 of your complaint, you allege that you were required to service a bush hog that was located off the premises of the employer. Please identify the date when you serviced the bush hog, where the bush hog was located off premises, who owned the bush hog in question, and who asked you to service said bush hog on the date in question. Also,

identify the "similarly situated white male" who also serviced the bush hog by name, as well as how you allege this individual was compensated for said work.

**Answer:** **Randy Davis, the head supervisor, had a job on the side in Prattville. Now Southeast Cherokee had a job in Prattville as well. In another location. Randy Davis had a bush hog, his personal bush hog. I was made to service the bush hog off the job site without compensation. The previous service truck driver was given $40.00 a day to service Mr. Randy Davis' off job site equipment. I asked Randy Davis about compensating me as he did for Donny Gant. Randy Davis gave me $40.00 at that time. We were at his job site at the time I was servicing the bush hog. The next time I asked him of my compensation, Randy Davis stated "you'll do it or take your ass home". If Danny Gant was not compensated, Mr. Davis would have never compensated me that one time. Other employees also had knowledge of Danny's compensation. Deon the excavator operator and others.**

24.    As related above, identify by name the individual who allegedly said, "You do what I tell you or you take your ass home."

**Answer:    Randy Davis.**

25.    In paragraph 12 of your complaint, you allege that you were forced to work in a racially hostile environment. Describe, in complete detail, how Southeast Cherokee created a racially hostile environment, including, but not limited to, those individuals who were responsible for creating an alleged racially hostile environment and how they acted in doing so.

**Answer:    Lin and Jerry Carter's son, the same one that called the black state trooper a nigger, he and I were riding together. He walked up as Pedro was changing a tire on the dump truck I was driving and the son stated "Decarey what you done tore up" and said before I could respond, "just like a black man".**

**In another incident, the day before I was fired, Mr. Randy Davis attempted to make me quit. I had gotten the truck stuck, it had rained and was muddy and slick. Now, rain or no rain, my job is to still get fuel to the equipment, wet or dry. When it rains the truck will get stuck. Even equipment will get stuck. Not a problem, you just get another piece of equipment to push you out.**

It is common for the equipment to get stuck, even the service truck, after it has rained. As I was being pulled out one tire in the mud, one tire in the street, only one side of the truck in the mud, Randy Davis pulled up. After the truck was out Randy Davis looked at the place where the truck tires stuck. Randy Davis looked at me and said you get a shovel and clean this place up. I told him a piece of equipment could smooth the place over in seconds, but it would take some time with a shovel. A good deal of time. Randy Davis stated "no, you get that shovel and do it or you can take your ass home" and you can take your ass home anyway, whether you know it or not. Kind of under his voice as he was putting his truck in reverse to back out. So I straightened the place back out with the shovel which was really the job for a piece of equipment.

_Decarey Floyd_

Decarey Floyd

STATE OF ALABAMA          )
Jefferson COUNTY          )

    Sworn to and subscribed before me on this the ___11th___ day of __April__ , 2008.

_Mary L. Baker_

Notary Public

MY COMMISSION EXPIRES:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: Jan 8, 2013
BONDED THRU NOTARY PUBLIC UNDERWRITERS

_J. D. Roberson_

Jerry D. Roberson (ROB010)

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.    Any and all correspondence or written communications sent by you to any employee or representative of Southeast Cherokee regarding any of the matters/issues set forth in your complaint.

**RESPONSE:**    **The EEOC investigation is enclosed.**

2.    Any and all correspondence or written communications received by you from any employee or representative of Southeast Cherokee regarding any of the matters/issues set forth in your complaint.

**RESPONSE:**    **The EEOC investigation is enclosed.**

3.    Copies of any and all tapes, recordings, notes, data compilations, memorializations or other representations of any communications that you have had with any employee or representative of Southeast Cherokee concerning any of the matters/issues set forth in your complaint.

**RESPONSE:**    **The EEOC investigation is enclosed.**

4.    Copies of any and all tapes, recordings, noted, data compilations, memorializations or other representations of any communications reflecting any act or statement that you contend constitutes retaliation.

**RESPONSE:**    **The EEOC investigation is enclosed.**

5.    Copies of any and all tapes, recordings, notes, data compilations, memorializations or other representations or any communications reflecting any act or statement that you contend constitutes evidence of a hostile work environment.

**RESPONSE:**    **The EEOC investigation is enclosed.**

6.    Copies of your federal and state tax returns for the years 2003 through 2008.

**RESPONSE:**    **I am producing tax returns for the years 2004-2007**

7.    Copies of any pay stubs, check stubs, W2 forms, 1099 forms, or similar documentation reflecting compensation and/or benefits earned in any employment from 2003 through 2008.

**RESPONSE:**    **I have provided the only pay-stubs in my possession.**

8.    Copies of any and all documents submitted to the EEOC as part of, or in support of, Charge No. 130-2006-00282.

**RESPONSE:**    **The EEOC investigation is enclosed.**

9.    Copies of any and all documents (including "right to sue letters") received from the EEOC concerning Charge No. 130-2006-00282.

**RESPONSE:**    **The EEOC investigation is enclosed.**

10.    Copies of any and all documents that you submitted to Southeast Cherokee as part of any application by you to fill any job vacancy at Southeast Cherokee.

**RESPONSE:**    **I do not have documents that I submitted to Southeast Cherokee.**

11.    Copies of any and all documents that you received from Southeast Cherokee as part of any application by you to fill any job vacancy at Southeast Cherokee.

**RESPONSE:**    **I do not have documents that I submitted to Southeast Cherokee.**

12.    Copies of any and all documents that you submitted to, or received from, Southeast Cherokee concerning the termination of your employment with Southeast Cherokee.

**RESPONSE:**    **I did not receive any documents.**

13.    Copies of any and all evaluations of your employment duties and responsibilities (whether by yourself or by another Southeast Cherokee employee) at Southeast Cherokee.

**RESPONSE:**    **I did not receive copies of evaluations**.

14.    Copies of any and all evaluations of your employment duties and responsibilities (whether by yourself or by a co-worker or supervisor) at any employment you have held since the termination of your employment with Southeast Cherokee.

**RESPONSE:**    **I did not receive copies of evaluations**.

Respectfully submitted,

Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Phone Number:  205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April, 2008, I served a copy of the foregoing document upon counsel of record either through the CM/ECF system, via facsimile or by placing a copy of the same in the United States Mail, first class postage prepaid and addressed as follows:

Richard Brett Garrett
Robert A. Huffaker
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270
Phone: 334-206-3100
Fax:   334-262-6277
E-mail: rah@rsjg.com

s/Jerry Roberson
Jerry D. Roberson (ROB010)