## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **2:07-cv-577-MEF** |
| **v.** | § | |
| | § | |
| **SOUTHEAST CHEROKEE** | § | |
| **CONSTRUCTION, INC.** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This is a race discrimination case brought by Plaintiff, Decarey Floyd, against his former employer, Southeast Cherokee Construction, Inc. (hereinafter "Southeast"), a corporation located in Wetumpka, Alabama.  Southeast specializes in general building, contracting, construction, site preparation and improvement.  Floyd, a black male, was employed by Southeast as truck driver. Floyd alleges that he was retaliated against and made subject to racial discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981.  [See Doc. 1].  Specifically, Floyd alleges that he performed his job duties in a satisfactory manner, but, nonetheless was wrongfully terminated due to his race.  [Id.]  There are no genuine issues of material fact; as such, Southeast is entitled to judgment as a matter of law.

### II.  PROCEDURAL NARRATIVE

Floyd was terminated from Southeast on September 28, 2005.  He subsequently filed a Charge of Discrimination with the EEOC.  [See EEOC Charge, attached to Motion for Summary Judgment as Ex. "A"].  In his charge, Floyd claimed (1) that derogatory comments were made during his employment "using racial names referring to [him] as a Black man rather than [his]

name as they did for similarly situated White employees," (2) that "the owner's son referred to Black man (who did not work at the company) as a "nigger," (3) that "the owner, on one occasion said he would shoot [him] if he learned that [he] was ever selling his fuel," and (4) that he was "required to service a bush-hog offsite without compensation for the service" and that a "similarly situated White male was compensated for the service." [Id.] Floyd further alleged that it is his belief that Southeast did not want a black male driving its new service truck. [Id.] The EEOC interpreted Floyd's charge to include a claim of hostile work environment. [See Letter of Determination, attached to Motion for Summary Judgment as Ex. "B"].

On January 12, 2007, the EEOC issued a Letter of Determination finding that a violation of Title VII occurred when Southeast (1) selected Floyd to drive the service truck on more than one occasion because he was the only individual qualified to do so, and (2) replaced Floyd with a white male who had "no experience as an operator of a service truck" and who had received the proper endorsement to drive the service truck days before Floyd was terminated. [Id.] Importantly, the EEOC specifically determined that there was *insufficient* evidence to support Plaintiff's allegations that he was subjected to a racially hostile work environment. [Id.] Thereafter, on March 27, 2007, the EEOC issued a Right to Sue letter, and Floyd initiated this lawsuit on June 25, 2007. [See Right to Sue letter, attached to Motion for Summary Judgment as Ex. "C"].

On June 25, 2007, Floyd filed a Complaint alleging that the following violations of Title VII and 42 U.S.C. § 1981 occurred during the tenure of his employment, (1) that he was repeatedly referred to by employees and "supervisory employees" of Southeast as a "nigger;"(2) that other blacks, who were not employees of Southeast, were repeatedly referred to by employees and "supervisory employees" of Southeast as "niggers;" (3) that the owner of

Southeast threatened to shoot him if he ever learned he was selling Southeast's fuel, (4) that he was required to service a bush-hog which was located off the premises of the employer without compensation and that a similarly situated white male was compensated for said work; (5) that when he complained of not being paid he was told "you do what I tell you or you take your ass home;" (6) that he was not allowed to drive the new fuel truck; (7) that Southeast retaliated against him because he engaged in "protected activities by reporting racially disparate treatment;" and (8) that he was forced to work in a racially hostile work environment. [See Doc. 1].

Floyd demands that the Court issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of Southeast (in the general sense) are in Violation of Title VII and 42 U.S.C. § 1981; that the Court grant Floyd a permanent injunction enjoining Southeast from continuing to violate Title VII; that the Court enter an order requiring Southeast to pay back pay, compensatory and punitive damages, reinstatement of the position Floyd would have occupied save the alleged discrimination, or, in the alternative, front pay; and that the Court enter an order awarding Floyd costs, expenses and attorney's fees. [Id.]

## III. NARRATIVE SUMMARY OF UNDISPUTED FACTS

Floyd was hired by Southeast on May 2, 2005 as a tri-axle dump truck driver at the pay rate of $10.25 per hour.  [See Doc. 1 at ¶ 6; Floyd depo. at p. 77].[1]

On or about May 7, 2005, approximately one week after Floyd was hired, a position became available for an "oil/greaser" or "service truck" driver.  [See Ex. "F" and Floyd depo. at p. 116].  The "service truck" is designed to carry diesel fuel, oil, fluids, water and grease.  [See Ex. "F"].  The driver of the service truck is responsible for using the service truck to perform mechanical repairs and preventive maintenance duties for Southeast's vehicle and heavy equipment fleet including, but not limited to, dump trucks, backhoes, front-end loaders, bulldozers, excavators and scraper tractors.  [Id.]  As such, the service truck driver position requires specialized mechanical training and skill.  [Id.]  A service truck driver's duties include (1) monitoring/changing belts and hoses on the fleet's heavy equipment, (2), maintaining/changing oil levels, (3) maintaining/changing fluid levels, (4) changing tires, (5) keeping heavy equipment fueled, (6) maintaining/adjusting hydraulic fluid, (7) greasing fittings, and (8) being able to work under the master mechanic for starter and alternator repair.  [See Floyd depo. at p. 104; Ex. "F"].  In order to perform services on job sites, the service truck driver

---

[1] In his employment application, Floyd represented that he had work experience as a dump truck driver with a previous employer, Hodgson and Blake Construction Company, and experience operating heavy equipment including backhoes, bulldozers and front-end loaders.  [See Floyd's employment application, attached to Motion for Summary Judgment as Ex. "E"].  Floyd has testified, in contradiction to the information provided to Southeast, that he did **not** have any experience as a dump truck driver prior to applying at Southeast for employment as represented.  [See Floyd depo. at p. 79]. The extent of Floyd's "equipment experience" in operating heavy machinery -- including backhoes, bulldozers and front end loaders -- was driving these types of equipment "every now and again" on his grandfather's farm between the ages of 11 and 17.  [See Floyd depo. at pp. 89-96].  Floyd testified that his experience consisted of "play[ing] around [on the equipment]" when it was not being used for legitimate purposes.  [Id. at p. 92].  Floyd was not paid for his "work" because he was "just a youngster raring to go along with his granddaddy."  [Id. at p. 98].  He received no other experience or formal training regarding heavy equipment operation between the age of 17 and the time he applied for employment at Southeast.  [Id. at p. 95-96].  Prior to applying for employment at Southeast, Floyd never received any formal mechanics training or any formal training with regard to conducting preventive maintenance work on heavy equipment including backhoes, bulldozers and front-end loaders.  [Id. at pp. 107-108].

4

must also have training or experience necessary to operate all of the vehicles and heavy equipment in Southeast's fleet and, further, to maneuver the equipment as needed for servicing. [Id. at p. 106; Ex. "F"].  Since the service truck driver position requires specialized training and experience, the position pays more than a tri-axle dump truck driver.  [See Ex. "F"].  Further, since the service truck is designed to carry fuel, its driver must have a Commercial Drivers License (CDL) with HAZMAT certification.  [Id.]

On May 7, 2005, Southeast's service truck driver, a white male, quit.  [Id.]  As such, Southeast was put in a position where it needed a driver immediately who had CDL and HAZMAT certifications.  [Id.]  A long time Southeast employee, Justin Bethea, approached Jerry Carter, Vice President of Operations, and asked for the position.  [Id.]  Mr. Bethea, a white male, had been employed with Southeast for a number of years.  [Id.]  During time period, he trained as an assistant to Southeast's master mechanic and as an equipment operator.  [Id.]  Prior to being hired by Southeast, Mr. Bethea received mechanics training and preventive maintenance training with Express Oil Change, a former employer.  [Id.]  Mr. Bethea also had engine repair experience and, according to Southeast's master mechanic, was mechanically inclined.  Mr. Bethea did not, however, have a CDL or HAZMAT certification as needed to drive the service truck.  [Id.]  As such, Mr. Carter told Mr. Bethea that if he wanted the job he needed to take the appropriate training courses and pass the licensure test.  [Id.]  Mr. Bethea began taking courses to receive his CDL.  [Id.]

Since Mr. Bethea did not have the necessary license to drive the service truck, Mr. Carter approached Floyd and asked if he would be willing to drive the service truck temporarily until an experienced operator could be hired.  [Id.; see Floyd depo. at p. 120].  Mr. Carter asked Floyd to fill the position because he was the only employee available who had the requisite CDL and

5

HAZMAT certification. [See Ex. "F"]. Mr. Carter instructed Floyd with regard to the serviceman's duties and told him to do the best he could with his limited training and experience, generally, to get the truck to the job sites. It was expected that the mechanics and foremen would have to take care of the equipment since Floyd was not qualified to do so. [Id.] Mr. Carter agreed to increase Floyd's rate of pay from $10.25 to $11.50 per hour, the rate of pay given to the previous service truck driver. [Id.]

Within ten minutes of being offered $11.50 per hour, Floyd approached Mr. Carter and demanded that his rate of pay be increased from $11.50 to $13.00 per hour, a pay rate substantially higher than that paid to the previous service truck driver. [Id.] Floyd reasoned that he was due to be given a pay raise because he was (1) "exercising [his] hazardous material license" and (2) doing "all the requirements of [the] service truck." [See Floyd depo. at p. 127]. Mr. Carter acquiesced to Plaintiff's demand since he was the only employee available with the necessary CDL and HAZMAT certification. [See Ex. "F"]. At $13.00 per hour, Floyd received more pay to drive the service truck than the previous white service truck driver. [Id].

Floyd drove the service truck until a more qualified employee, Donald Gantt, was hired on June 5, 2005. [See Ex. "F;" Floyd depo. at p. 120]. Floyd relinquished the service truck position without complaint and returned to driving a tri-axle dump truck. [See Floyd depo. at p. 124]. When Floyd returned to his position as tri-axle dump truck driver, he received a pay raise for driving the dump truck from $10.25 to $10.50 per hour. [See Ex. "F"].

Mr. Gantt, a white male in his 50's, had worked for Southeast in the past as a service truck driver. [Id.] It is undisputed that Mr. Gantt was a more qualified service truck driver than Floyd. [See Floyd depo. at p. 136]. Indeed, Floyd testified (1) that he believes Mr. Gantt had more experience operating the service truck that he did, (2) that he was qualified to perform as

the service truck driver, and (3) that he had no problem with Southeast hiring Mr. Gantt to replace him as the service truck driver in June 2005. [Id. at pp. 136, 304, 305]. Tellingly, Mr. Gantt was paid less money to drive the service truck than Floyd, $12.10 per hour. [See Ex. "F" ]. Mr. Gantt continued to operate the service truck until approximately July 23, 2005 when he quit for health reasons. [Id.]

After Mr. Gantt quit, Floyd was again asked to fill in temporarily as service truck driver until an experienced operator could be hired. [See Floyd depo. at p. 131]. He again agreed to accept the position at the rate of $13.00 per hour. [See Ex. "F"]. It is undisputed that Southeast paid Floyd more than Mr. Gantt, his white counterpart, to do the same job. [Id.]

While Floyd was driving the service truck subsequent to Mr. Gantt leaving, Mr. Bethea was in the process of completing his studies to obtain his CDL and HAZMAT certification. [Id.] Also, during this time period, Southeast ordered a new service truck. [Id.] According to Floyd, the new truck was delivered to Southeast on or about September 14, 2005 and, subsequently, placed in the company garage for modifications. [See Ex. "A"]. Plaintiff has testified that he was not told what modifications were being conducted for the new truck except to say that he believes the modifications were simple in nature. [See Floyd depo. at p. 220]. Floyd continued to operate the service truck until his termination on September 28, 2005. [See Ex. "F"]. Soon thereafter, Mr. Bethea received his CDL license and HAZMAT certification. [Id.] He was hired to operate the service truck after Floyd's termination. [Id.] Mr. Beathea was paid $10.25 per hour to operate the new service truck, substantially less than Floyd.

### Plaintiff's Termination

Vice President Jerry Carter terminated Floyd on September 28, 2005 for a number of legitimate, non-discriminatory reasons, including (1) being repeatedly late for work, (2) being

insubordinate to foremen on job sites, (3) placing grease on areas of equipment that would not take grease, i.e., "faking" his service duties, and (4) driving too fast on job sites. [See Ex. "F"]. Moreover, Plaintiff did not (5) have the proper mechanical training/knowledge necessary to service and/or repair the equipment in Southeast's fleet or (6) the mechanical experience necessary to operate/maneuver the equipment in the fleet for servicing purposes. [Id.] As a result of Floyd's inability to properly operate heavy equipment, he inadvertently caused damage to the service truck by striking its fender with an excavator. [See Floyd depo. at pp. 270-271]. Mr. Carter received multiple complaints from Southeast employees and foremen that Floyd's performance as service truck driver was substandard. [See Ex. "F"].

In addition to issues above, Floyd was ticketed for driving overweight on the interstate. [See ticket, attached to Motion for Summary Judgment as Ex. "G"]. On June 7, 2005, Floyd traveled to Vulcan Materials Company in Calera, Alabama to pick up a load of gravel in a tri-axel dump truck. [See Floyd depo. at p. 245]. After being loaded with gravel, Floyd signed a receipt indicating that his truck weighed a total of 81,740 pounds. [See Floyd depo. at p. 258]. Floyd subsequently drove his truck onto Interstate 65 and was pulled over and ticketed for being overweight. [See Ex. "G"]. Floyd testified that he knew from his CDL training that it was illegal to drive his dump truck on Interstate when loaded in excess of 76,000 pounds but, made the decision to take the risk of being stopped because it was a quicker route to his ultimate destination. [See Floyd depo. at pp. 259, 262].

The day before Floyd was terminated, September 27, 2005, he was operating the service truck at a job site in Montgomery, Alabama. [See Floyd depo. at p. 210]. Floyd was warned by fellow workers to avoid certain areas of the job site as they were extremely wet. [Id. at p. 210-211 and Ex. "F"]. Floyd ignored the warnings, however, and drove the service truck into an area

that was extremely soft (next to a newly poured sidewalk), causing the service truck to sink to its axels. [See Floyd depo. at p. 212 and Ex. "F"].  After bottoming out, the truck leaned over and to the left creating a potentially dangerous HAZMAT situation as related to a fuel spill. [Id. at p. 215].  The service truck had to be pulled out with the use of heavy equipment on the job site. [See Ex. "F"].

The next day, September 28, 2005, Mr. Carter confronted Floyd with regard to the incident (as well as other performance concerns addressed above).  [Id.]  Floyd did not appear to take the incidents seriously and displayed a poor attitude about his job performance.  [Id.] Specifically, when confronted about wiping grease on fittings that would not accept grease, i.e., "faking" service work, Floyd simply smiled and did not deny the allegation.  [Id.]  Mr. Carter subsequently terminated his employment.  [Id.]

## IV.  STANDARD OF REVIEW

Summary Judgment is appropriate if this Court finds that there exists no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Co. v. Catrett, 477 U.S. 317, 322 (1986); Turnes v. AmSouth Bank, 36 F.3d 1057, 1061 (11th Cir. 1994).

In order to prevail on a Title VII claim, Floyd must make the showing set forth in McDonald Douglas Corp. v. Green, 411 U.S. 792 (1973).  In order to survive summary judgment under this approach, Floyd must first set forth a *prima facie* case of illegal discrimination, and, once satisfied, a presumption of illegal discrimination or retaliation arises.  If he establishes a *prima facie* case, the burden then shifts to Southeast to rebut the presumption by articulating a legitimate, non-discriminatory reason for its employment action.  See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000).  Southeast has the burden of production, not of persuasion,

and thus does not have to persuade the Court that it was actually motivated by the reason advanced.  See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-55 (1981).

Once Southeast satisfies this burden of production, the presumption of discrimination is eliminated and Floyd has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact finder to conclude that the reason given by Southeast was not the real reason for the adverse-employment decision.  See Chapman, 229 F.3d at 1074.  Floyd may meet this burden by persuading the Court that a discriminatory reason more than likely motivated Southeast or by demonstrating that the proffered reason for the employment decision is not worthy of belief.  See Burdine, 450 U.S. at 256.

## V.  ARGUMENT

### A.    Floyd's Title VII claim for retaliation is outside the scope of the EEOC charge and, as such, is due to be dismissed.

As discussed above, Floyd filed a charge with the EEOC alleging (1) that he had been subjected to a racially hostile work environment, and (2) that he was wrongfully terminated due to his race.  [See Ex. "A" & "B"].  Floyd claimed, more specifically, (1) that derogatory comments were made during his employment "using racial names referring to [him] as a Black man rather than [his] name as they did for similarly situated White employees," (2) that "the owner's son referred to Black man (who did not work at the company) as a "nigger," (3) that "the owner, on one occasion said he would shoot me if he learned that [he] was ever selling his fuel," (4) that he was "required to service a bush-hog offsite without compensation for the service" and that a "similarly situated White male was compensated for the service."  [See Ex. "A"].  Floyd also alleged that it is his belief that Southeast did not want a black male driving the new service truck.  [Id.]

10

As discussed above, Title VII forbids employment discrimination against "any individual" based on that individual's race, color, religion, sex, or national origin.  42 U.S.C.S. § 2000e-2(a).  A separate section of the Act -- its anti-retaliation provision -- forbids an employer from "discriminating against" an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.  See 42 U.S.C.S. § 2000e-3(a).  See also Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 62 (U.S. 2006).  The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees. Id. The substantive provision seeks to prevent injury to individuals based on *who they are*, i.e., their status.  Id.  The anti-retaliation provision seeks to prevent harm to individuals based on *what they do*, i.e., their conduct.  Id.

"Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court."  See Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001) (citing Francis v. City of New York, 235 F.3d 763, 768 (2d Cir.2000)).  "Claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency."  See Shah v. New York State Dep't of Civil Serv., 168 F.3d 610, 614 (2d Cir. 1999).  "Reasonably related" claims are those which fall within the scope of the EEOC investigation and "would be reasonably expected to grow out of the charge of discrimination."  See Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402-03 (2d Cir. 1993).  Claims alleging retaliation for filing a discrimination charge are "reasonably related" to the underlying discrimination charge if they are based upon

11

discriminatory conduct occurring *subsequent to* the EEOC charge.  See Legnani, 274 F.3d at 686; Shah, 168 F.3d at 614 (quoting Butts, 990 F.2d at 1402), Schiappa v. Brookhaven Sci. Assocs., LLC, 403 F. Supp. 2d 230, 235 (E.D.N.Y. 2005) (In order for a retaliation claim to relate back to a claim included in an EEOC charge, the alleged retaliation must occur after the filing of the charge); and Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208 (2d Cir. N.Y. 1993) ("We see no reason why a retaliation claim must arise before administrative proceedings terminate in order to be reasonably related. Instead, the rule is that a claim must arise only after the EEOC complaint has been filed.")

In his complaint, Floyd attempts to maintain a claim of retaliation, a claim that was not included in his EEOC charge.  [See Ex. "A"].  Since Floyd filed his EEOC charge *after* he was terminated from Southeast, there is no "reasonable relation" between the alleged acts of discrimination and Floyd's new purported claim of retaliation.  See Legnani, supra.  As such, Floyd's retaliation claim is due to be dismissed.

**B.    Plaintiff cannot establish a prima facie case for race discrimination under Title VII as a matter of law.**

Floyd has asserted his claim of race discrimination under both Title VII and Section 1981.  [See Doc. 1].  In cases where Section 1981 is used as a remedy for employment discrimination, the elements required to establish a claim under Section 1981 mirror those required for a Title VII claim.  See Howard v. B.P. Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994) (citing Patterson v. McLean Credit Union, 491 U.S. 164, 109 S. Ct. 2363, L.Ed. 2d 132 (1989)); Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991).  As such, the following discussion of the analytical framework applicable to Title VII cases applies equally to Floyd's claim of race discrimination under Section 1981.

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Importantly, to prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent.  See Hawkins v. Ceco Corp., 883 F.2d 977, 980-981 (11th Cir. 1989); Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); See Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997); and Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1184 (11th Cir. 1984).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 596 (8th ed. 2004); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1993); Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987).  Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence.  See Clark, 990 F.2d at 1226; Carter, 870 F.2d at 581.  Evidence that only suggests discrimination, see Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, see Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  See Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555

(11th Cir. 1990); <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635, 641-42 (11th Cir. 1998).

Direct evidence of discriminatory intent may include, for example, "statements indicating racial bias on the part of a decision maker in an employment setting," See <u>Trotter v. Board of Trustees of Univ. of Alabama</u>, 91 F.3d 1449, 1453 (11th Cir. 1996) (citing <u>Haynes v. W.C. Caye and Co.</u>, 52 F.3d 928, 931 (11th Cir. 1995)), "'statement[s] that members of a [protected class] in general . . . are simply not competent enough to do a particular job,'" <u>Trotter</u>, 91 F.3d at 1453 (quoting <u>Haynes</u>, 52 F.3d at 931); <u>Bell v. Birmingham Linen Service</u>, 715 F.2d 1552, 1556 (11th Cir. 1983)), or other "actions or remarks of the employer reflecting a discriminatory attitude." <u>Williams v. Mead Coated Bd., Inc.</u>, 836 F. Supp. 1552, 1569-70 (M.D. Ala. 1993), *aff'd*, 41 F.3d 668 (11th Cir. 1994). For statements of discriminatory intent to constitute direct evidence of discrimination, "they must be made by a person involved in the challenged decision." <u>See Trotter</u>, 91 F.3d at 1454-54.

When a plaintiff establishes a *prima facie* case of discrimination by direct evidence of an intent to discriminate, the burden then shifts to the defendant to prove by a preponderance of the evidence that it would have made the same employment decision in the absence of any discriminatory motivation. <u>See Wall v. Trust Co.</u>, 946 F.2d 805, 809 (11th Cir. 1991); <u>Hill v. Metropolitan Atlanta Rapid Transit Auth.</u>, 841 F.2d 1533, 1539; <u>Smith v. Horner</u>, 839 F.2d 1530, 1536 (11th Cir. 1988). Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. <u>See Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in <u>McDonnell Douglas Corp. v.</u>

14

Green, 411 U.S. 792, (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). See Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. See McDonnell Douglas, 411 U.S. at 802; see also Jones v. Bessemer Carraway Medical Ctr., 137 F.3d 1306, 1310, reh'g denied and opinion superseded in part, 151 F.3d 1321 (11th Cir. 1998).

Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802; Jones, 137 F.3d at 1310. This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. See Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. See Burdine, 450 U.S. at 253-54; Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. See Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1184 (11th Cir. 1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." Id. (quoting Aikens, 460 U.S. at 713-14); see also Jones, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. See Burdine, supra.

15

Here, Floyd claims (1) that he was repeatedly referred to by employees and "supervisory employees" of Southeast as a "nigger;" (2) that other blacks, who were not employees of Southeast, were repeatedly referred to by employees and "supervisory employees" of Southeast as "niggers;" (3) that the owner of Southeast threatened to shoot him if he ever learned he was selling Southeast's fuel, (4) that he was required to service a bush-hog which was located off the premises of the employer without compensation and that a similarly situated white male was compensated for said work; (5) that when he complained of not being paid he was told "you do what I tell you or you take your ass home;" and (6) that he was not allowed to drive the new fuel truck.    [See Doc. 1].    None of these allegations will support a *prima facie* claim for discrimination. Each allegation is addressed below in turn..

**1.    Floyd claims that he was repeatedly referred to by employees and supervisory employees of Southeast as a "nigger."**

Floyd alleges that while employed at Southeast, he was "repeatedly" referred to by unidentified employees and supervisory employees as "nigger."  [See Doc. 1 at ¶ 7].  However, Floyd testified in deposition directly to the contrary.

> Q:    First and foremost let me do this: I need a detailed explanation from you of every time someone at Southeast Cherokee called you a nigger.
> A:    I never said anyone called me a nigger.
> Q:    Okay.  So that's a good thing.  We can agree on that?
> A:    Yes, sir.
> Q:    No one at Southeast Cherokee ever referred to you as a nigger; is that true?
> A:    I never heard anyone at Southeast Cherokee call me a nigger.

[See Floyd depo. p. 141, l. 18 - p. 142, l. 14].  Since Floyd has testified in direct contradiction to his allegation, it has no factual basis and is due to be disregarded.

16

**2.** **Floyd claims that other blacks, who were not employees of Southeast, were repeatedly referred to by employees and supervisory employees of Southeast as "niggers."**

Floyd has testified, in support of this allegation, that on an unknown date, he and another Southeast employee, Brent Carter, were riding together to a job site.[2]  [See Floyd depo. at pp. 142-144].  Mr. Carter was driving; Floyd was in the passenger seat.  [Id.]  As Floyd and Mr. Carter were traveling together, Floyd claims that a state trooper pulled behind the vehicle and turned on his emergency lights.  [Id. at p. 144].  In response to this action, Floyd claims that Mr. Carter stated, "[T]his nigger's fixing to pull me over."  [Id.]  Apparently, after the alleged statement was made, the state trooper pulled around Mr. Carter's vehicle and did not pull Mr. Carter over or issue a ticket.  [Id.]  When asked how he knew the trooper was black, Mr. Floyd claimed to have seen the trooper's face as he passed by the vehicle on the driver's side, Mr. Carter's side.  [Id. at pp. 147-148].  When asked how Mr. Carter could have known that the trooper was a black male prior to making the alleged statement, Floyd claimed that Mr. Carter could distinguish the trooper's skin color through his rearview mirror. [Id.]

Floyd testified that he did not make any remark in response to Mr. Carter's alleged statement and did not inform Mr. Carter that the alleged statement made him uncomfortable.  [Id. at p. 149-150].  It is undisputed that Mr. Carter's alleged statement was not directed to Mr. Floyd.  [Id.]  Moreover, it is undisputed that Mr. Floyd did not report Mr. Carter's statement to his superiors at Southeast.  [Id. at p. 150].  He does claim, however, to have "mentioned it to a couple of co-workers."  [Id. at pp. 150-151].  Tellingly, Floyd admits that Mr. Carter's alleged statement regarding the state trooper did not negatively impact him.  The following excerpt from Mr. Floyd's deposition is relevant in its entirety:

---

[2] Brent Carter is Jerry Carter's son. [See Floyd depo. p. 143].

> Q: Did you ever report that [the alleged statement] to anyone at Southeast Cherokee after you got back to the office?
>
> A: I mentioned it. I didn't report anybody, but I mentioned it to a couple of -- to a co-worker, but I didn't report it to anybody.
>
> Q: Why didn't you report it?
>
> A: **I just felt like he -- I just -- because it wasn't really a big deal to me because I felt like he was just a misguided young kid -- I mean it wasn't -- I didn't feel like it was anything that needed to be reported.**

[See Floyd depo. p. 150, l. 13 – p. 151, l. 4].

Clearly, Mr. Carter's statement, even if taken as true, does not constitute evidence of racial discrimination on behalf of Southeast. Moreover, Plaintiff clearly was not offended, harmed or injured. [Id.] In Shelton v. University of South Alabama, 1997 U.S. Dist. LEXIS 15684 (S.D. Ala. Sept. 15, 1997), Plaintiff, Shelton, a black woman, was terminated due to her alleged falsification of an employment application. Id. at 11. Plaintiff contended that she was terminated by her supervisor, Ms. Cooper, on the basis of her race and that USA used the alleged application violation as a pretext for her wrongful termination. Id. at 4. In support of this argument, plaintiff claimed, as Floyd does here, that while employed at USA, other black people were called derogatory names. Id. at 5. Plaintiff submitted the affidavit of a co-worker, Ms. Crum, who averred that a charge nurse, Ms. Nichols, referred to black people as "niggers" and "those people," and that she directed black nurses and plaintiff to clean bathrooms, a task never assigned to white nurses. Id. Ms. Crum also claimed that during her employment, Ms. Nichols told her not to associate with black people. Id.

The Court held as follows with regard to the applicable legal standard:

> In an action alleging disparate treatment, as in the present case, the plaintiff must prove an intentional discriminatory motive by producing either direct or circumstantial evidence or racial animus. St. Mary's Honor Center v. Hicks 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). Direct evidence of disparate treatment is most often shown by racially derogatory remarks of the defendant. However, not every remark in the workplace is direct evidence of

> discrimination. In fact, stray remarks, statements by non-decision makers or statements made by decision makers unrelated to the decision making process may not justify requiring the employer to prove that his employment decisions were based on legitimate criteria. <u>Allen v. City of Athens</u>, 937 F. Supp. 1531 (M.D. Ala. 1996).

<u>Id</u>. at 12.

In granting USA's motion for summary judgment, the Court determined (1) that Ms. Nichols was not the decision maker in this case, (2) that plaintiff's supervisor, Ms. Cooper, never made any racially derogatory statements to her, and (3) that no one made racially derogatory comments directed specifically to the plaintiff. <u>Id</u>. At best, the Court determined that there may have been "stray remarks" made around the hospital by Ms. Nichols that were not related to the decision to terminate plaintiff. <u>Id</u>. As such, the Court determined that plaintiff failed to meet her burden in proving direct evidence of discrimination. <u>Id</u>.

In applying <u>Shelton</u>, it is clear that any statements made Brent Carter as related to a passing state trooper are, at best, "stray remarks." <u>Id</u>. It is undisputed that the remarks were not directed to Floyd. Moreover, Mr. Carter was not Floyd's supervisor, but, a co-employee. [See Floyd depo. at p. 150]. He was not a decision maker with regard to Floyd's employment and there is no evidence presented that Mr. Carter's alleged statement constituted a factor resulting or contributing to Floyd's termination. As such, Mr. Carter's alleged statement will not support a claim for race discrimination.

### 3. <u>Floyd claims that the owner of Southeast threatened to shoot him if he ever learned he was selling Southeast's fuel.</u>

Mr. Floyd has testified that on an unknown date, a number of Southeast employees including Jerry Carter, Vice President of Operations; Pedro, chief mechanic; and Justin Bethea, an employee, were "standing around at the shop in Wetumpka" having a general conversation with regard to the rising prices of gasoline and diesel fuel. [<u>See</u> Floyd depo. at p. 162]. Mr.

19

Floyd claims that as he entered the conversation, Mr. Carter looked at him, pointed his finger, and said, "[D]ecarey, if I ever catch you stealing some of my fuel, I won't press charges on you, I'll just shoot your damn ass." [See Floyd depo. at pp. 162-163]. Mr. Floyd claims not to have responded to the statement, but testified that there was laughter in the group. [See Floyd depo. at pp. 164-165].

It is well settled that Title VII does not protect against "harsh treatment at the workplace." See Grant v. Bullock County Bd. of Educ., 895 F. Supp. 1506, 1513 (M.D. Ala. 1995). Even assuming that Mr. Carter's remark was not intended in jest (it was), there is no indication that his statement, even if taken as harsh, was racially motivated, or, in the alternative, designed to single Floyd out on the basis of his race. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Mendoza, 195 F.3d at 1246; Faragher, 524 U.S. at 788 (explaining that the objective component of the "severe and pervasive" element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing from falling under Title VII's broad protections). Indeed, "[a]lthough [the Court must] examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature … before they are considered in determining whether the severe or pervasive requirement is met." See Washington v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007) (quoting Gupta v. Florida Bd. Of Regents, 212 F.3d 571, 583 (11th Cir. 2000)). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." Id. "Additionally, teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment." Id. (quoting Mendoza v.

20

Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*)).

This Court has recognized that harsh or unjustified reprimands or other employment actions, which are devoid of any statements that could be construed as racially offensive, are not the type of pervasive discriminatory conduct that Title VII is intended to prevent. See Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1291 (M.D. Ala. 2004), *aff'd*, 133 Fed. Appx. 739 (11th Cir. 2005). "[I]n order to be actionable under the statute, an … objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 1290 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1988)).

It is undisputed that Mr. Carter did not make any racial remarks, slurs or derogatory comments in conjunction with the alleged statement. [See Floyd depo. at pp. 162-163]. The statement was made in the context of rising fuel prices and, obviously, in a harsh manner calculated to send a clear message that theft would not be tolerated. [Id.] It is simply disingenuous for Floyd to argue that he had any reasonable expectation that his safety or life was in danger, or that the statement was designed to be harassing based on his race.

4. **Floyd claims that he was required to service a bush-hog which was located off the premises of the employer without compensation and that a similarly situated white male was compensated for said work.**

Floyd has testified that he was asked by Randy Davis, one of Southeast's foremen, to service his personal equipment during working hours. [See Doc. 1]. Floyd alleges that the request evidenced discriminatory conduct on behalf of Southeast because he believes, Mr. Gantt, the former white service truck driver was paid more to do this "side job." [See Floyd depo. at pp. 176-177]. This allegation will not support a claim for racial discrimination.

Floyd testified that he was asked by Mr. Davis to service personal equipment while he was "on the clock" with Southeast. [See Floyd depo. at pp. 173-174]. Apparently, Mr. Davis would occasionally ask Floyd to service his personal equipment by adding oil, grease, and fuel. [Id.] Mr. Floyd testified that it took him approximately twenty (20) minutes to complete the task. [Id.] It is undisputed that Mr. Floyd was being compensated for his time while servicing Mr. Davis' equipment by Southeast and, as such, did not lose pay. [Id.] Floyd was asked to service the equipment "around lunchtime" and was never asked to conduct these services during days off or holidays. [Id.]

Floyd testified that he serviced Mr. Davis' equipment two or three times before requesting compensation (above and beyond the hourly pay he was receiving from Southeast). After Floyd requested additional pay, Mr. Davis paid him $40.00 for his twenty minutes of labor. [Id. at p. 183]. The basis of Floyd's discrimination claim is twofold: (1) that Mr. Davis later refused to continue to pay him $40.00 each time he serviced his personal equipment, and (2) that said refusal was racially motivated because he was told by former service truck driver, Donnie Gantt, that Mr. Davis paid him $80.00 to service Mr. Davis' equipment sometime in the past. [Id. at p. 177]. According to Mr. Floyd, upon requesting additional compensation for servicing Mr. Davis' equipment, Mr. Davis responded, "[Y]ou do whatever I tell you to do and you do it or you take your ass home." [Id. at p. 186]. Floyd admitted that Mr. Davis did not utilize any racial slur in refusing to pay him for the services rendered. [Id. at p. 187]. It is undisputed that Floyd did not report this alleged discriminatory behavior to any of Mr. Davis' superiors, but, again, claims to have "mentioned" the incident to a couple of Southeast employees. [Id. at p. 189].

Again, in order for statements to be "sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature . . . before they are

22

considered in determining whether the severe or pervasive requirement is met." See Washington v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007) (quoting Gupta v. Florida Bd. Of Regents, 212 F.3d 571, 583 (11th Cir. 2000)).   Nothing about Mr. Davis' statement indicated racial condemnation.   Moreover, in applying Shelton, supra., Mr. Davis' statement is, at best, "stray remark" that does not reflect or evidence racial amicus on behalf of Southeast.   Id. Similarly, Mr. Davis' statement has no direct correlation with Jerry Carter's ultimate decision to terminate Floyd weeks or months later.   Indeed, Floyd alleges that the statement was made while he was engaged in an activity *outside of his employment* with Southeast.   While Floyd may have been displeased with Mr. Davis' alleged harsh comment, (and corresponding decision not to pay him $40.00 for twenty minutes of labor) such actions do not translate into evidence -- circumstantial or otherwise -- that the comment was racially motivated.

**5.  Floyd claims to have been discriminated against by not being allowed to drive the new service truck.**

As discussed above, toward the end of Floyd's tenure as a service truck driver, Southeast ordered a new service truck.  [See Floyd depo. at p. 216].  After Southeast received the truck, it was kept out of operation for modifications.  [Id. at p. 217-218].  Floyd asked Southeast's master mechanic why the new service truck was not yet in operation and was told that he did not know. [Id. at p. 218].  Floyd agrees that the new service truck did, indeed, undergo modifications but believes modifications were completed quickly and that Southeast made the decision to keep the new service truck out of operation so that he would not be afforded an opportunity to drive it. [Id. at p. 219].  Floyd believes that Southeast would not allow him to drive the new service truck due to his race.  [See Doc. 1].

Floyd claims that driving the new service truck would have made his job easier, and that the truck "did more."  [See Floyd depo. at p. 224].  He cannot, however, enumerate how the two

trucks were different in terms of what they could and could not do.  [Id.]  Essentially, Floyd wanted to drive the new service truck because it was newer and had more updated amenities. [Id. at pp. 222-224].  There is no evidence that Southeast's decision to keep the new truck out of service for a short period of time was racially motivated, or, further, directed at Floyd. Regardless of Southeast's motive for keeping the new truck out of service, it is undisputed that Mr. Floyd suffered no injury or harm by not being allowed to drive the new truck as his employment and rate of pay continued unchanged after the new truck arrived.

**C.**     **Floyd cannot establish a prima facie case for discrimination in termination.**

A *prima facie* case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protective class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class *or* was discharged while a person outside of the class with equal or lesser qualifications was retained.  See Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982).  Similarly, a *prima facie* case of discriminatory failure to promote requires the plaintiff to show that he is a member of a protected class; he was qualified for and applied for the promotion; he was rejected; and other equally or less qualified employees who were not members of the protected class were promoted.  See Evans v. McClain, Inc., 131 F.3d 957, 963 (11th Cir. Ga. 1997).

Floyd's Title VII claim for race discrimination must fail due to his inability to make out a *prima facie* case that he was either (1) qualified for the service truck position, or (2) that he was discharged and replaced by a less qualified individual, or, in the alternative, passed over for promotion in favor of a lesser qualified individual.

1. **Floyd was not qualified to be a service truck driver.**

First and foremost, in order to make a *prima facie* case for discrimination, Floyd must demonstrate that he possessed the skills, training and experience necessary to qualify as a service truck driver. As stated in McCullough v. Real Foods, Inc., 140 F.3d 1123, 1126 (8th Cir. 1998), "[plaintiff] must demonstrate . . . that [he] met the minimum qualifications . . . for the positions . . . ." and Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944 (8th Cir. 1994) (stating that the district court misstated the second element as "adequate job performance" when it "should have been phrased in terms of whether plaintiff was "qualified" for his position"). The overwhelming weight of the testimony in this action shows that Floyd was not qualified to operate the service truck. [See Ex. "F"].

As discussed above, in order to satisfy the requirements of a service truck driver an individual must have the specific experience and training necessary to (1) monitor/change belts and hoses on the fleet's heavy equipment, (2), maintain/change oil levels, (3) maintain/change fluid levels, (4) change tires, (5) keep heavy equipment fueled, (6) maintain/adjust hydraulic fluid, (7) grease fittings, and (8) be able to work under the master mechanic for starter and alternator repair. [See Floyd depo. at p. 104]. In order to perform services on site, the service truck driver must also have training or experience necessary to operate all of the vehicles and heavy equipment in Southeast's fleet and to maneuver the equipment as needed for servicing. [Id. at p. 106].

Prior to applying for employment at Southeast, Floyd received no formal mechanics training or training with regard to conducting preventive maintenance work on heavy equipment, a key skill for a service truck operator.

Q:    Did you ever bring it to anybody's attention that you might not
have the training to move certain equipment?

A:    No, sir.

Q:    Have you received training at any time in the past with regard to
how to change oil in heavy equipment, front-end loaders,
bulldozers, backhoes?

A:    Have I ever received any training or have I ever done it?

Q:    I'll ask you both ways.  First have you ever received any training --

A:    No, sir.

Q:    -- formal training?

A:    No, sir.

Q:    The same applies for fluid levels, maintaining fluid levels, or
adjusting fluid levels in heavy equipment, have you ever received
any training?

A:    No, sir.

Q:    How about changing tires on the heavy equipment, any training --

A:    Training, no, sir.

Q:    -- in that regard?

A:    No, sir.

Q:    Do you have any training with regard to working on starters or
alternators?

A:    No, sir.

[See Floyd depo. p. 106, l. 19 – p. 108, l. 5].

Floyd testified that the only experience he had with regard to performing preventive
maintenance or mechanical work was that limited experience gathered as being "self taught"
while working on his personal diesel truck.  [See Floyd depo. at p. 109-110).  Moreover, while
Floyd represented to Southeast in his employment application that he had experience operating
backhoes, bulldozers and front end loaders, he testified that the extent of his "equipment
experience" was driving these types of equipment "every now and again" on his grandfather's
farm as a child.  [See Floyd depo. at pp. 89-90].  Specifically, Floyd testified that his experience
operating heavy equipment consisted of "play[ing] around [on the equipment]" when it was not
being used by his grandfather for legitimate purposes.  [Id. at p. 90-91].  According to Floyd, he
was not paid for his "work" because he was "just a youngster raring to go along with his
granddaddy."  [Id. at p. 95].  He received no further experience or training regarding the

26

operation of heavy equipment between the age of 17 and the time he applied for employment at Southeast. [Id. at p. 95-96].

Floyd did not apply for the service truck driver position when he was hired; he applied for, and was hired as, a tri axle dump truck driver. [See Ex. "E"]. He was only offered the service truck driver position temporarily because he had the necessary CDL and HAZMAT certification during those times when qualified drivers were unavailable. [See Ex. "F"].

## 2. **Floyd was not passed over for the service truck position in favor of a less qualified individual.**

As discussed above, Mr. Gantt, a white male in his 50's, had worked for Southeast in the past as a service truck driver. [See Ex. "F"]. Floyd testified that he does not consider Mr. Gantt to be a less qualified service truck driver than himself. [See Floyd depo. p. 136]. Tellingly, Floyd testified (1) that he believes Mr. Gantt had more experience than he operating the service truck, (2) that Mr. Gantt was qualified to drive the service truck, and (3) that he had no problem with Southeast hiring Mr. Gantt to replace him as the service truck driver in June 2005. [Id. at pp, 136, 304, 305]. Regardless of Mr. Gantt's greater experience as a service truck driver, greater length of service to Southeast, and age he was paid less money than Floyd to drive the service truck, $12.10 per hour. [See Ex. "F"].

It is well settled that not all conduct taken by Southeast that causes a perceived negative or adverse effect on Floyd constitutes an adverse employment action under Title VII; there must be some level of substantiality that must be met for unlawful discrimination to be cognizable. See Sasser v. Ala. Dep't of Corr., 373 F.Supp.2d 1276, 1287-88 (M.D. Ala. 2005). "Title VII is not designed to make federal courts sit as a super-personnel department that re-examines an entity's business decisions." See Taylor v. CSX Transp., 418 F.Supp.2d 1284, 1303 (M.D. Ala. 2006) (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).

With regard to Floyd's transfer to and from the service truck driver position, the Eleventh Circuit has recognized that such position changes do not constitute an "adverse employment action" under Title VII.  To establish an adverse employment action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment … [,]as viewed by a reasonable person in the circumstances."  See Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).  Although proof of direct economic consequences is not required in all cases, the asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  Id.

It is undisputed that Floyd agreed to drive the service truck temporarily from May 7, 2005 to June 5, 2005 when Donald Gantt returned to work.  [See Floyd depo. at p. 120].  During that period of time, Floyd was paid more than his normal pay as a tri axle dump truck driver. [See Ex. "F"].  When Floyd relinquished the service truck driver position to Mr. Gantt -- in favor of returning to the tri-axle dump truck -- he was given a raise from $10.25 to $10.50 per hour. [See Ex. "F"].   Since Mr. Floyd (1) understood that the service truck driver position was temporary, (2) was given additional pay for the temporary assignment, and (3) was given a raise after resuming his usual duties as a tri-axle dump truck driver he cannot show a "serious and material change" in the terms of his employment subsequent to relinquishing the service truck driver position.

To the contrary, Floyd's financial position improved after he returned to driving a tri axle dump truck as he was given a raise.  [See Ex. "F"].  Moreover, strangely, in contradiction to his allegations, Floyd has testified (1) that he had no desire to operate the service truck, and (2) that he had no expectation that the service truck job was anything but temporary.

28

> Q:    What about the condition of the truck justified three dollars more
> an hour, in your opinion – in your mind?
>
> A:    Because in my mind, I knew when I was operating it that it was
> just termporarily, so it didn't really bother me. I was just ready for
> Donnie Gantt to come back so I could get out of that DOT hazard.

[See Floyd depo. p. 131, l. 8 – p. 132, l. 1].

> Q:    Okay. And what did you say when he said it was going to be a
> permanent position? What did you say to Jerry?
>
> A:    I told him that I was going to -- I told him that I really -- I really
> would rather drive my tri-axle dump truck. If I was going to
> exercise my hazardous material license and do all the requirements
> of that service truck, then I would have to have more money.
>
> Q:    And so you told him that you would rather just keep driving the tri-
> axle --
>
> A:    Yes, sir.
>
> Q:    -- that you didn't really want the service truck job --
>
> A:    Yes, sir.
>
> Q:    -- and that if you were going to take it, you were going to need
> more money?
>
> A:    Yes, sir.

[See Floyd depo. p. 127, l. 12 – p. 128 l. 11]. Since Floyd did not wish to drive the service truck

permanently, he cannot legitimately argue that his being transferred back to a tri-axle dump truck

constituted a "serious and material change" in the terms of his employment or that he was

"passed over" for the service truck driver position.

### 3.   Floyd was not discharged in favor of a less qualified individual.

After Floyd was terminated, Southeast hired Justin Bethea to drive the service truck.

[See Ex. "F"]. As discussed above, Mr. Bethea was a long time Southeast employee, having

been employed with the company for approximately three years. [Id.] Prior to being hired by

Southeast, Mr. Bethea received mechanics training, including preventative maintenance training,

with Express Oil Change, a former employer. [Id.] Mr. Bethea had previous experience in small

engine repair and had trained as an equipment operator as well as an assistant to Southeast's

master mechanic. [Id.] Like Floyd, Mr. Bethea had a CDL and HAZMAT certification. [Id.]

When Mr. Bethea was hired to drive the service truck after Floyd's termination he was paid $10.25 per hour, two dollars and seventy five cents **less** per hour than Floyd for performing the same duties.  [See Ex. "F"].  Mr. Floyd was paid more after being employed with Southeast for one week than Mr. Beathea was being paid having been employed with Southeast for three years.  [Id.]  Floyd has failed to set forth *prima facie* evidence showing that he was terminated in favor of a less qualified individual due to his race.

D.  **Floyd cannot rebut southeast's legitimate, non-discriminatory reasons for terminating him.**

Even if Floyd can make a *prima facie* case of an adverse employment action, Southeast is still entitled to summary judgment because he cannot rebut Southeast's legitimate, non-discriminatory reasons for terminating him.  In the context of a Title VII claim, "[a] *prima facie* case of discrimination raises the inference that discriminatory intent motivated the adverse employment action."  See Coutu v. Martin County Board of County Comm'n, 47 F.3d 1068, 1073 (11th Cir. 1995).  "The employer may rebut this inference by 'clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason' for the adverse action."  See Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985).  "The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons."  See Standard v. A.B.E.L. Servs,, Inc., 161 F.3d 1318, 1333 (11th Cir. 1998).  "Once the employer satisfies this burden of production, the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason."  See Coutu, 47 F.3d at 1073.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  See Chapman v. AI Transp., 229 F.3d

1012, 1024, 1025 (11th Cir. 2000) (en banc).

Here, Floyd was terminated for (1) being repeatedly late for work, (2) being insubordinate to foremen on job sites, (3) placing grease on areas of equipment that would not take grease, i.e., "faking" his service duties, and (4) driving too fast on job sites. [See Ex. "F"]. Moreover, Plaintiff did not (5) have the proper mechanical training/knowledge necessary to service and/or repair the equipment in Southeast's fleet or (6) have the mechanical experience necessary to operate/maneuver the equipment in the fleet for servicing purposes. [Id.] Further, Mr. Carter received multiple complaints from Southeast employees related to Floyd's substandard performance as service truck driver. [Id.]

As a result of Floyd's inability to properly operate heavy equipment he inadvertently caused damage to the service truck by striking its fender with an excavator. [See Floyd depo. at p. 270-271]. In addition, he was ticketed for driving a tri axle dump truck overweight on the interstate. [See Ex. "G"]. Floyd testified that he knew from his CDL training that it was illegal to drive overweight on the Interstate, but, made the decision to take the risk of being stopped because it was a quicker route to his ultimate destination. [See Floyd depo. at pp. 259, 262].

The day before Floyd was terminated, September 27, 2005, Floyd ignored warnings by fellow employees and drove the service truck into a dangerous area causing the service truck to become stuck. [See Floyd depo. at p. 212 and Ex. "F"]. After bottoming out, the truck leaned over and to the left creating a potentially dangerous HAZMAT situation as related to a fuel spill. [Id. at p. 215]. When confronted about the incident (and his other performance concerns) Floyd did not take the incidents seriously and displayed a poor attitude about his job performance. [See Ex. "F"]. Specifically, when confronted about wiping grease on fittings that would not accept grease, i.e., "faking" service work, Floyd simply smiled and did not deny the allegation. [Id.]

31

Mr. Carter terminated Floyd's employment for failure to perform his job duties effectively.  [Id.]

It is well established, "Title VII addresses *discrimination*."  See Ferguson v. Veterans Administration, 11 Cir.1984, 723 F.2d 871, 872. "[T]itle VII is not a shield against harsh treatment at the workplace," see Jackson v. City of Kileen, 5 Cir.1981, 654 F.2d 1181, 1186, nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.  See Megill v. Board of Regents, 5th Cir. 1976, 541 F.2d 1073, 1077; Sullivan v. Boorstin, 1980, D.D.C., 484 F. Supp. 836, 842.  "While an employer's  judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve."  See Loeb v. Textron, Inc., 1st Cir. 1979, 600 F.2d 1003, 1012 n. 6.  All of the legitimate, non-discriminatory events discussed above factored into Mr. Carter's ultimate decision to terminate Floyd.

## E.   Floyd cannot demonstrate the existence of a hostile work environment as a matter of law.

Floyd alleges a number of situations/instances he believes to be evident of a racially hostile work environment.  [See Doc. 1].  As noted above, Floyd claims that during the tenure of his employment: (1) he was repeatedly referred to by employees and "supervisory employees" of Southeast as a "nigger;" (2) that an employee of Southeast, Brent Carter, referred to a black state trooper as a "nigger" while in his presence; (3) that the owner of Southeast threatened to shoot him if he was caught stealing fuel, (4) that he was required to service a bush-hog which was located off the premises of the employer without compensation and that a similarly situated white male was compensated for said work; (5) that when he complained of not being paid he

was told "you do what I tell you or you take your ass home;" and (6) that he was not allowed to drive the new fuel truck.  [See Plaintiff's responses to consolidated discovery requests, attached to Motion for Summary Judgment as Ex. "H;" Ex. "A;" Doc. 1].

As a threshold matter, it is well-settled that "[a] hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  To make a *prima facie* case of a hostile work environment, a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin (or race); (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or direct liability.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999).

In determining whether the harassment is "sufficiently severe or pervasive to alter the terms and conditions of employment," the Court must consider the following:  (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. See  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), and Smithers v. Wynne, 2008 U.S. App. LEXIS 167, at *7-*8 (11th Cir. 2008).   In addition, a plaintiff must establish that he perceived the work environment as racially hostile and abusive, and that a reasonable person would also perceive the environment as racially

hostile and abusive.  See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000);

Mendoza, 195 F.3d at 1246; Faragher, supra., (explaining that the objective component of the

"severe and pervasive" element prevents the ordinary tribulations of the workplace, such as the

sporadic use of abusive language, gender-related jokes, and occasional teasing from falling under

Title VII's broad protections). It is well-settled that Title VII is neither a general civility code nor

a statute making actionable the ordinary tribulations of the workplace.  See Davis v. Town of

Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).  Title VII does not protect against "harsh

treatment at the workplace."  See Grant v. Bullock County Bd. of Educ., 895 F. Supp. 1506,

1513 (M.D. Ala. 1995).

Indeed, "[a]lthough [a Court must] examine the statements and conduct complained of

collectively to determine whether they were sufficiently pervasive or severe to constitute [racial]

harassment, the statements and conduct must be of a [racial] nature . . . before they are

considered in determining whether the severe or pervasive requirement is met."  See Washington

v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007) (quoting Gupta v. Florida Bd. Of

Regents, 212 F.3d 571, 583 (11th Cir. 2000)).  "Innocuous statements or conduct, or boorish ones

that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not

counted." Id.  "Additionally, teasing, offhand comments, and isolated incidents (unless extreme)

will not amount to discriminatory changes in the terms and conditions of employment."  Id.

(quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).

Even this Court has recognized that harsh or unjustified reprimands or other employment

actions, which are devoid of any statements that could be construed as racially offensive, are not

the type of pervasive discriminatory conduct that Title VII is intended to prevent.  See Portera v.

State Dep't of Finance, 322 F.Supp.2d 1285, 1291 (M.D. Ala. 2004), aff'd, 133 Fed. Appx. 739

(11th Cir. 2005). As this Court noted, "[i]n order to be actionable under the statute, an … objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 1290 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1988)).

The Eleventh Circuit's recent decisions provide telling insight into the level of conduct necessary for satisfying the "severe or pervasive" prong of the hostile work environment test. For example, in Harrington v. Disney Regional Entertainment, Inc., 2007 U.S. App. LEXIS 24713 (11th Cir. Oct. 19, 2007), the Eleventh Court held that while a "slave driver" screen saver was utterly inappropriate, plaintiff's mere exposure to that image, without more, failed to satisfy the requirement that the defendant's conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. The court went on to add that the "racially offensive conduct [was] not severe or pervasive enough to be actionable under Title VII where plaintiff was called 'ghetto' and once or twice over heard black co-workers being described as 'monkeys.'" Id.

Similarly, in Godoy v. Habersham County, 211 Fed. Appx. 850 (11th Cir. 2006), the Eleventh Court concluded that the "severity and pervasiveness requirement was not satisfied where plaintiff's evidence was that [his] supervisor told him to 'sail back to South Africa where he belongs,' and where he was subject to racial slurs on occasions." Id; see Nije v. Regions Bank, 198 Fed. Appx. 878 (11th Cir. 2007) (affirming summary dismissal of hostile work environment claim despite evidence that claimant had been called a "token", that co-employees stated they did not want to work for a black manager, that they did not respect her, etc.); James v. Montgomery Reg'l Airport Auth., 181 Fed. Appx. 930, 932 (11th Cir. 2007) (affirming dismissal of hostile work environment claim based on allegations that white officers made racial

35

remarks and false accusations where white officers tried to provoke fights, white officers showed a picture and stated that it was picture of one of his ancestors);  Barrow v. Ga. Pacific Corp., 144 Fed. Appx. 54 (11th Cir. 2005) (involving racial slurs and symbols).

Indeed, hostile work environment claims have only been permitted to proceed in cases where egregious and repeated instances of overtly racially motivated conduct occurred.  See, e.g.,  Mack v. ST Mobile Aero. Eng'g, Inc., 195 Fed. Appx. 829 (11th Cir. 2006) (plaintiffs observed seven nooses on the premises, constant presence of racial graffiti; supervisors and co-workers directed racially derogatory comments toward the plaintiffs; the Confederate Flag was repeatedly displayed); Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) (a noose was hung by plaintiff's work station on two occasions); Perkins v. U.S. Airways, Inc., 8 F. Supp. 2d 1343, 1351 (M.D. Fla. 1998) (racial pictures on a bathroom wall, a newspaper article regarding a lawsuit by black employees hung in the break room, and a clay doll with racial overtones); Williams v. Asplundh Tree Expert Co., 2006 U.S. Dist. LEXIS 52197 (M.D. Fla. July 28, 2006) (supervisors constructed a noose and told plaintiff to "try it on, nigger," told plaintiff to run through the woods "like a hog" so that hunting dogs could chase him, and supervisor also threatened injury with a wood chipper).

In short, the well-settled test in this Court, as recently reinforced by the Eleventh Circuit, affirmatively establishes that a plaintiff claiming a hostile work environment bears an extremely difficult burden in making a *prima facie* case.

Here, it is clear that Floyd cannot maintain a *prima facie* case of a hostile work environment. At the outset, Floyd makes no direct reference to a hostile work environment in his EEOC charge. See Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992) (concluding that claims of racial harassment were properly dismissed where the claimant failed to file a

specific charge with the EEOC).  For this reason, Floyd's hostile work environment claim is due to be dismissed.  See Rush, 966 F.2d at 1110.  See also Lieberman v. Miami-Dade County, 2000 U.S. Dist. LEXIS 14789, at *11-*12 (S.D. Fla. 2000) (concluding that employee's vague and brief mention of harassment in EEOC charge was insufficient to maintain a harassment claim under Title VII).

Moreover, when all of Floyd's allegations are taken together as a whole, he has failed to depict an environment of racial hostility, much less an environment with that the degree of hostility necessary to support a claim for hostile work environment in the Eleventh Circuit.  See Washington v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007) (affirming summary dismissal of hostile work environment claim because the conduct alleged to be the basis of the hostile work environment claim was "devoid" of "any racial content"); Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir.  2006) (dismissing hostile work environment claim based, in part, on allegation that supervisor gave out a biased "warning").  Floyd's claims are based solely on suspicions, workplace trivialities, and stray comments that will not support a hostile work environment claim.

## **CONCLUSION**

Floyd cannot establish a *prima facie* case of racial discrimination, retaliation or hostile work environment.  Furthermore, Floyd cannot rebut the legitimate, non-discriminatory reasons for the employment actions at the center of this lawsuit.  For these reasons, Southeast Cherokee Construction, Inc. is entitled to summary judgment in its favor on all claims in the complaint.

Respectfully submitted this the 30th day of May, 2008.

*s/ R. Brett Garrett*
ROBERT A. HUFFAKER (HUF003)
R. BRETT GARRETT (GAR085)
Attorneys for Defendant, Southeast Cherokee
Construction, Inc.

Of Counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
PO Box 270
Montgomery, AL 36101-0270
334-206-3138 (telephone)
334-481-0808 (fax)
bg@rsjg.com (email)

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2008, I have electronically filed and served a copy of the foregoing by placing same in the United States Mail, postage prepaid and properly addressed, upon:

Jerry D. Roberson, Esq.                    jdratty@charter.net
ROBERSON & ROBERSON
PO Box 380487
Birmingham, AL 35238

*s/ R. Brett Garrett*
Of Counsel