## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **2:07-cv-577-MEF** |
| | ) | |
| **SOUTHEAST CHEROKEE** | ) | |
| **CONSTRUCTION, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This is a Title VII race discrimination case brought by Plaintiff Decarey Floyd ("Plaintiff") against his former employer Defendant Southeast Cherokee Construction, Inc., (hereinafter "Southeast"), a corporation located in Wetumpka, Alabama.   Southeast specializes in genera building, contracting, construction, site preparation and improvement. Floyd, a black male, was initially employed by Southeast as a dump truck driver.  He also worked as a service truck driver for the Defendant.  Floyd alleges that he was discharged due to his race which is discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981.  Specifically, Floyd alleges that he performed his job duties in a satisfactory manner, but nonetheless was wrongfully terminated due to his race. There are numerous genuine issues of material fact.  Floyd also has direct evidence of

discrimination.  Therefore, Floyd is entitled to a jury trial in this matter.

## II.    STATEMENT OF FACTS

Floyd was terminated from Southeast on September 28, 2005.  (Pl's Ex. 9).  He subsequently filed a Charge of Discrimination with the EEOC.  (Pl's Ex. 10).  Floyd was hired by Southeast on May 2, 2005 as a tri-axle dump truck driver at the pay rate of $10.25 per hour. (Pl's Ex.9 ¶ 6; Dep of Floyd, p. 77).   On or about May 7, 2005, approximately one week after Floyd was hired, a position became available for a or "service truck" driver. (Pl's Ex. 9; Dep of Floyd, p. 116).  The "service truck" is designed to carry diesel fuel, oil, fluids, water and grease. (Pl's Ex. 9).  The driver of the service truck is responsible for using the service truck to perform mechanical repairs and preventive maintenance duties for Southeast's vehicle and heavy equipment fleet including, but not limited to, dump trucks, backhoes, front-end loaders, bulldozers, excavators and scraper tractors.    (Pl's Ex. 9). Further, since the service truck is designed to carry fuel, its driver must have a Commercial Drivers License (CDL) with HAZMAT certification.    (Pl's Ex. 9).

Donald Gantt, Southeast's service truck driver from August 2004, a white male, went to rehab. (Pl's Ex. 3).   As such, Southeast was put in a position where it needed a driver immediately who had CDL and HAZMAT certification. (Pl's Ex. 9).

Floyd drove the service truck until Donald Gantt came back from rehab.  (Pl's Ex. 9; Dep of Floyd, p. 120).  Floyd relinquished the service truck position and returned to driving a tri-axle dump truck.  (Pl's Ex. 9).  When Floyd returned to his position as tri-axle dump

truck driver, he received a pay rase for driving the dump truck from $10.25 to $10.50 per hour.  (Pl's Ex. 9).

Mr. Gantt, a white male in his 50's, had worked for Southeast in the past as a service truck driver.  (Pl's Ex. 3; Dep of Floyd, p. 117).  After Mr. Gantt quit, Floyd was again asked to fill in permanently as service truck driver.  (Dep of Floyd, p. 127).  Floyd again agreed to accept the position at the rate of $13.00 per hour.  (Pl's Ex. 9).

According to Floyd, the new truck was delivered to Southeast on September 14, 2005 and, subsequently, placed in the company garage for modifications, (Dep of Floyd, pp. 216-217).

**PLAINTIFF'S TERMINATION**

Vice President Jerry Carter terminated Floyd on September 28, 2005, allegedly for (1) being repeatedly late for work, (2) insubordinate to foremen on job sites, (3) placing grease on areas of equipment that would not take grease, i.e., "faking" his service duties, and (4) driving too fast on job sites.  (Pl's Ex. 9).

**A.    Plaintiff's Evidence of Disparate Treatment**

In his Affidavit, Jerry Carter, the Vice President who made the decision to fire Floyd, claims that Floyd was repeatedly late for work.  (Pl's Ex. 9).  Floyd testified that he was late for work only on one occasion.  (Dep of Floyd, p. 347).  The defendant has a progressive disciplinary policy.  (Pl's Ex. 6).  Floyd was never written up for being late for work.  (Dep of Floyd, p. 346).  The defendant has produced no documentary evidence that would suggest

that Floyd was ever late on any occasion, other than the Affidavit of Carter.  (Pl's Ex. 9).
Floyd routinely worked 60 hours per work.  (Pl's Ex. 11).

Carter's affidavit also states that Floyd was insubordinate to foreman on job sites.
(Pl's Ex. 9).  Floyd denies this.  (Pl's Ex. 5).  There are no affidavits from any foreman and
there has to date been no testimony from any foreman.

Carter claims that Floyd faked his service duties by placing grease on areas of
equipment that would not take grease.  (Pl's Ex. 9).  Floyd denies this.  (Pl's Ex. 5).

Floyd claims that Carter drove too fast on job sites and got the service truck stuck.
(Pl's Ex. 9).  Floyd admits the truck got stuck on one occasion.  (Dep of Floyd, pp.209-211).
However, Floyd asserts that it was not uncommon for the service truck to get stuck, as it was
required to get close to heavy equipment that was on soft ground at construction sites.  (Dep
of Floyd, pp. 211-213).  Donald Gantt has signed a declaration stating that while he worked
as the service truck driver, he got the service truck stuck.  (Pl's Ex. 3).  Deon Daniels has
also signed a declaration stating that it was a frequent occurrence that the service truck got
stuck.  (Pl's Ex. 3).  Carter has also stated that Floyd received a ticket while driving his dump
truck for being overweight on the interstate.  (Pl's Ex. 9).  Floyd did not load the dump truck.
(Dep of Floyd, p. 249).  This ticket occurred on one of the first days of Floyd's work for the
Defendant. (Dep of Floyd, pp. 245-246).  Floyd became separated from the other dump truck
drivers and did not know what route they were going to their destination.  (Dep of Floyd, pp.
256-260).  The truck would have been overweight regardless of which route he took, a state

road, or the interstate.  (Dep of Floyd, p. 263).  The Defendant's complaint with Floyd is

really that he chose a route with more rigid enforcement of the overweight requirements,

namely the interstate.  Plaintiff's counsel has been unable to learn how many other dump

truck drivers have ever been ticketed for being over weight or if the other drivers were also

overweight on the same date as Floyd even though they were on state roads and were not

subject to law enforcement requirements.  (Pl's Ex. 8).

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c):

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed, 2d 265, 106 S. Ct. 2548 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Id. At 323.

> If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the nonmovant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. See *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e).  A dispute of material fact "is genuine... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In deciding a motion for summary judgment, the evidence presented by the non-

movant, here the Plaintiff, must be believed and all justifiable inferences must be drawn in

their favor. *Anderson*, 477 U.S. at 255. Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. *Id*. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . . " *Graham,* 193 F. 3d at 1282. "If the record presents factual issues the court must not decide them; it must deny the motion and proceed to trial". *Herzog*, 193 F. 3d at 1246.

Direct evidence of discrimination, "in the context of employment discrimination law, means evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic". *Wright*, 187 F. 3d at 1293; accord *Carter v. City of Miami*, 870 F. 2d 578, 582 (11th Cir. 1989). ("only the most blatant remarks, whose intent could be nothing other than to discriminate" comprise direct evidence of discrimination). Direct evidence must indicate that the complained of employment decision was actually motivated by animus. *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F. 3d 1354, 1358-1359 (11th Cir. 1999), cert denied, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). A statement merely suggesting discriminatory motive is by definition circumstantial evidence. *Burrell v. Bd of Trs. Of Ga. Military Coll.*, 125 F. 3d 1390, 1393-1394 (11th Cir. 19970. A plaintiff who produces direct evidence of discrimination has stated a valid Title VII claim. *Wright*, 187 F. 3d at 1293.

## III.    ARGUMENT

### A.    Floyd Has Direct Of Evidence Of Discrimination

Floyd claims that when the Defendant fired him from the service truck driver position, it discriminated against him on the basis of his race (black).  Floyd has direct evidence that the Defendant discriminated against him.

Deon Daniels overheard Randy Davis, a management official of the Defendant, state that Floyd would not be permitted to drive the new service truck because he was a black male.  (Pl's Ex. 4).  Daniels also overheard Davis state that the defendant fired Decarey so that it could have a white male drive the service truck.  (Pl's Ex. 4). That statement is direct evidence of discrimination.

To amount to direct evidence, a statement must (1) made by the decision maker; (2) specifically relate to the challenged employment decisions; (3) reveal blatant discriminatory animus.  *Chambers v. Wal-Disney World Company*, 132 F. Supp. 2nd 1356 (2001 US District Lexis 7159).  Direct evidence of intentional discrimination is evidence which, if believed, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. Able Services Inc.*, 161 F. 3rd 1318 at 1330 (11th Cir. 1998). First and foremost, "the evidence must indicate that the complained of employment decision was motivated by the decision makers' animus." *Damon v. Flemming Supermarkets, Inc.*, 196 F. 3rd 1354. 1358-59 (11th Cir. 1999).  A decision maker is broadly defined as a person involved in the challenged decision. *Trotter v. Board of Trustees*, 91 F.

3rd  1449, 1453-54 (11th Cir. 1996).  Only statements by the persons involved in the decision making process, here the interview panel members, could constitute direct evidence of discrimination. *Bass v. Bd. of Commissioners*, 256 F. 3rd  1095 (11th Cir. 2001).  Davis was one of Floyd's immediate supervisor's (Pl's Ex. 5).

Second, the decision maker's statement must specifically relate to the challenged employment decision.  In the usual case, this requirement also ensures temporal proximately to the adverse decision. *Ross v. Rhodes Furniture Inc.*, 146 F. 3rd  1286 (11th Cir. 1998).

Third, direct evidence includes only the most blatant remarks, whose intent to be nothing other than to discriminate on the basis of a protected trait.  *Carter v. City of Miami*, 870 F. 3rd 578 (11th Cir. 1989).  Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence.  *Taylor v. Runion*, 175 F. 3rd 861, 867 (11th Cir. 1999).

The remarks are not hearsay because they are an exception under F.R.E. 801 (d)(2)(D).  A statement by a party's agent (or employee) can constitute an admission if made concerning a matter within the scope of the agency or employment, if made during the existence of the relationship.  Here, Davis was a  managing employee of the Defendant, who made the statements.  As such, the statements are non-hearsay because they are admissions.

Direct evidence must reflect a discriminatory attitude correlating to the discrimination complained of by the Plaintiff.  *Van Voorhis v. Hillsborough County Bd. Of County Comm'rs*, No. 07-12672, 2008 U.S. App. Lexis 258, 2008 WL 66258, at 3 (11th Cir., Jan. 8,

2008) (statement that the defendant "didn't want any old pilots" qualified as direct evidence of discrimination); *Wilson v. B/E Aerospace, Inc*., 376 F. 3d 1079, 1086 (11th Cir. 2004).

Davis' statement that Southeast fired Floyd so that a white man could drive the service truck is direct evidence, under the holding in *Wilson*.

**B.    Floyd's Prima Facie Case**

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Importantly, to prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. See *Hawkins v. Ceco Corp*., 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); See *Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th Cir. 1997); and *Nix v. WLCY Radio/Rahall Comm.,* 738 F.2d 1181, 1184 (11th Cir. 1984). Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 596 (8th ed. 2004); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir. 1993)*; Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n.6 (11th Cir. 1987).    Only the most blatant remarks whose intent could only be

to discriminate constitute direct evidence. See *Clark,* 990 F.2d at 1226; *Carter,* 870 F.2d at 581. Evidence that only suggests discrimination, see *Earley v. Champion Intern. Comer.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, see *Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." See *Caban -Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641-42 (11th Cir. 1998).

Floyd asserts that he has direct of evidence of discrimination. If this Court rules that the statements are not direct evidence, then he must prove his case using circumstantial evidence within the *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Texas Department of Community Affairs v. Burdine*, 450 U.S 248, 252-253 (1981). Under *McDonnell Douglas*, Plaintiff must establish a prima facie case. For his discharge claim, he must establish:

> 1) that he is in a protected class, (eg, black);
>
> 2) that he was qualified for the job;
>
> 3) that despite his qualifications, he was fired; and
>
> 4) that after his discharge, the position was filled by a person outside the Plaintiff's protected class.

*EEOC v. Joe's Stone Crabs*, 296 F. 3d 1265, 1273 (11th Cir. 2002).

Plaintiff has shown that as a black male, he was discharged and that a white male Justin Bethea, was selected for the position.

Because Plaintiff has made out a prima facie case, a presumption of unlawful discrimination arises, and the burden shifts to the Defendant to articulate some legitimate non-discriminatory reason for not hiring Plaintiff. *Burdine*, 450 US at 254; *Combs v. Plantation Patterns,* 106 F 3d 1519, 1528 (11th Cir. 1997). The Defendant must produce evidence that the Plaintiff was fired, and someone else was selected, for a legitimate non-discriminatory reason. The defendant's burden is of production, not of persuasion. *Burdine*, 450 U.S at 254. It is sufficient if the employer produces admissible evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus. *Combs*, 106, F. 3d at 1528.

Once the Defendant articulates a legitimate, non-discriminatory reason, the presumption of discrimination is eliminated and the burden shifts back to the Plaintiff. Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. *Combs*, 106 F. 3d at 1528. This evidence must show such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions that the employer's proffered legitimate reasons for it's actions that a reasonable fact finder could find them unworthy of credence. *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1528 (11th Cir. 1997).

Defendant has asserted that Bethea was more qualified to drive the service truck. However, there has been no proof of his qualifications. Bethea has not signed an affidavit. His personnel file has not been submitted. And there is nothing more than the conclusion in Jerry Carter's affidavit that Bethea was more qualified. A plaintiff cannot prove his case by asserting that he was more the qualified applicant and fairness dictates that the defendant not be able to do so as well. Plaintiff asserts that the burden has not even been shifted to require him to bring forth evidence to date.

Additionally, even if Bethea is more qualified, the defendant has asserted no legitimate reason why Floyd could not be returned to work as a dump truck driver. He had returned to work as a dump truck driver before when a white male returned from rehab, Donald Gantt.

### C.    Circumstantial Evidence of Discrimination - Disparate Treatment

In addition to Floyd's direct evidence, he has provided numerous evidence of instances of disparate treatment. Floyd contends that blacks were treated much more harshly than whites. The below described incidents are circumstantial evidence of discrimination. The defendant has a written policy of progressive discipline. (Pl's Ex. 6). This policy provides that you go through certain steps regarding discipline, including oral counseling, write-ups, suspension, etc. (Pl's Ex. 6). It also provides that if an employee is discharged, he will be given an opportunity to respond in writing. (Pl's Ex. 6). Floyd was, according to Carter, late for work numerous times. Curiously, Floyd was never written up for being late.

(Dep of Floyd, p. 347). Defendant offers no document, other than Carter's affidavit, to suggest that Floyd was ever late. Plaintiff has demonstrated that he routinely worked overtime. (Pl's Ex. 11). Departure from the normal procedure also might afford evidence that improper purposes are playing a role. Arlington Heights v. Metropolitan Housing, Dev. Corp., 429 US 252 (1977). Carter's affidavit also claims that Floyd was insubordinate to foremen on numerous occasions. Floyd denies that he was insubordinate. (Pl's Ex. 5). Interestingly, Carter does not define Floyd's insubordination nor does he provide any examples. There are no write-ups, no counseling, no affidavits from any foreman, and no further explanation.

Carter asserts that he fired Floyd because the service truck was stuck the day before Floyd was fired. Floyd admits that he got the truck stuck, but asserts that he was required to drive through soft ground at job sites in order to fuel the equipment. (Dep of Floyd, pp. 209-211). The white male who previously drove the service truck, Donald Gantt, also had occasions where he got the stuck truck, but Gantt was never disciplined or counseled. (Pl's Ex. 3). This amounts to disparate treatment of blacks versus whites.

Decarey Floyd did receive a ticket for being overweight in his dump truck. However, Floyd did not load the truck. (Dep of Floyd, p. 249). This incident occurred during one of Floyd's initial days at work. (Dep of Floyd, pp. 245-246). Floyd was on the interstate and received a ticket for being overweight, but he would have been overweight regardless of what road he was traveling. (Dep of Floyd, p. 263). Because defendant has not put any

representatives up for deposition, Plaintiff's counsel cannot prove at this time that the other dump truck drivers were not also overweight but did not receive a ticket. (Pl's Ex. 8).

Carter accuses Floyd of faking service work. Floyd denies this. (Pl's Ex. 5). There is no affidavit from any other employee, and no write-up by the Defendant. The defendant has not shown that they ever trained Floyd to do service work. Furthermore, the Plaintiff's counsel has been unable to take the deposition of any representatives of the defendant, to show that the defendant actually paid for Justin Bethea to study and obtain his CDL and HAZMAT certification. No such opportunity was provided to Floyd.

Randy Harris, a black former employee of Southeast, provided a statement when he was contacted by the EEOC investigator. (Pl's Ex. 7). Harris stated that Floyd could not take the service truck home, while whites who drove the service truck could take it home. (Pl's Ex. 7).

One day while Floyd was riding with the owner's son, Brent Carter, a black state trooper pulled up behind Carter. Carter said to Floyd, "that nigger is fixing to pull me over". (Dep of Floyd, pp. 142-144). Floyd was shocked that Carter referred to the black state trooper as a "nigger" in his presence. (Dep of Floyd, p. 149).

On this same day, Brent Carter asked Floyd "what have you done torn up". (Dep of Floyd, p. 153). Floyd responded that Pedro was changing the tire on his truck. Carter responded "just like a black man". (Dep of Floyd, p. 153).

Jerry Carter had a conversation with Decarey Floyd where he stated that "if I catch

you stealing my gas, I shoot your damn ass". (Dep of Floyd, pp, 162-163). Carter did not tell this to any white employee.

Randy Davis a supervisor directly under Jerry Carter failed to pay Floyd for side jobs that Floyd did personally for Davis but he did pay the white service drivers. (Dep of Floyd, pp. 168-180). When Floyd complained about the disparate treatment, he was told by Davis to "do what I say or take your ass home". (Dep of Floyd, p. 186).

Additionally, Davis required Floyd to do manual laborer with a shovel when heavy equipment was available, as a punishment. (Dep of Floyd, pp. 200-204). There has been no showing that any white employee was ever required to do manual labor with a shovel when heavy equipment was available.

Finally, Carter claims Floyd damaged his service truck. Floyd claims the truck was already damaged. (Dep of Floyd, pp. 260, 270-271). Donald Gantt acknowledged that he damaged the service truck and was never counseled or disciplined. (Pl's Ex. 3).

All of the incidents show that harsh treatment that blacks were subjected to which is disparate treatment and is circumstantial evidence of discrimination. Additionally, it also would be evidence of a hostile work environment based on race.

**D.     Whether Floyd  has demonstrated a prima facie case of a racially hostile work environment?**

Whether a hostile environment exists is a question of fact to be determined upon consideration of the "totality of the circumstances." Mcritor *Savings Bank v. Vinson,* 477 U.S. 57, 69, (1986). *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993), states the factual issue

to be decided in a claim of abusive or hostile work environment is whether the environment, based on all facts and circumstances, was so discriminatory, abusive, or hostile that it altered the terms and conditions of employment for those within the protected class "to make it more difficult to do the job." *Harris,* at 25. *See Vance v. Southern Bell Telephone and Telegraph Company,* 863 F.2d 1503, 1510 (11th Cir. 1989) ("pervasiveness" is not a matter of the number of incidents of harassment involved, but the effect of those incidents). A hostile environment claim is a single cause of action based on the totality of the circumstances, and not a series of causes of actions based on each act of harassing conduct. *Harris v. Forklift Systems, Inc.,* 510 U. S. at 23. Acts predating the statutory claim period, acts of different harassers, and acts not directed specifically at the plaintiff may be considered by the finder of fact as evidence that a hostile environment existed due to racial harassment and that the employer allowed the harassment to continue.

> Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, ***the focus is the work atmosphere as a whole.*** If an employer knowingly (actually or constructively) permits a hostile work environment to exist, ***it is of no import that the collection of incidents comprising the claim were committed by a variety of individuals. ....*** As one court has observed, *"A* hostile work environment is like a disease. It can have many symptoms, some of which change overtime, but all of which stem from the same root".

*West v. Philadelphia Electric* Co., 45 F.3d 744, 756-57 (3d Cir. 1995).

> The analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering to each episode. Rather a ***holistic perspective is necessary, keeping in mind that each successive episode had its predecessors, that***

> *the impact of the separate incidents may accumulate and that*
> *the work environment created thereby may exceed the sum of*
> *the individual episodes.*

*Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1524 (M.D. Fla. 1991).

emphasis added.

The evidence demonstrates that there is a well established pattern or custom and practice of racial discrimination at Southeast. Floyd's work environment was one that a reasonable person would find hostile.

Employees, including the owner's son, Brent Carter, made numerous derogatory comments concerning blacks. The owner's son referred to a black state trooper, in the presence of Floyd, as a "nigger". (Dep of Floyd, p. 144).

Furthermore, all the incidents of disparate treatment of blacks previously listed in section C also form the basis of Floyd's hostile environment claim.

### E.     Plaintiff cannot respond entirely due to Rule 56(f)

Floyd is unable to completely respond to Defendant's Motion for Summary Judgment because no depositions have been taken to date.

Under Rule 56(f), Plaintiff's counsel has submitted his own affidavit. Jerry Roberson has testified that due to the failure of the defendant to provide substantive discovery, Plaintiff was not deposed until May 19, 2008. On the date of Plaintiff's deposition, Plaintiff's counsel requested dates when the representatives of the Defendant be made available to be deposed.

On May 30, 2008, defense counsel filed their motion for summary judgment. On June

4, 2008, this Court ordered Plaintiff to respond to the defendant's motion for summary judgment by June 17, 2008, even though the Court had previously entered a scheduling order saying the discovery did not close until August 14, 2008.

Plaintiff's counsel filed a motion to extend the deadline from June 17, 2008. At the time of the initial filing, plaintiff had been given a tentative date of June 11, 2008 for depositions of the representatives of the defendant.

The Court denied Plaintiff's motion to extend. Plaintiff was then advised that representatives of the defendant were unable to be deposed until June 17, 2008. Plaintiff's counsel filed a second motion before this Court requesting that the Defendant be compelled to make available representatives prior to June 13, 2008 or that this Court extend the deadline. This Court denied Plaintiff's second motion.

Plaintiff's counsel has had less than thirty days to obtain discovery from the representatives of the defendant. The defendant was unwilling to tender representatives before the plaintiff was deposed. Defendant has not provided the Plaintiff with any date prior to the date his brief was due, to depose representatives of this defendant.

Plaintiff has secured some declarations under oath of some former employees of the defendant. Plaintiff has been unable to take the decision makers regarding Decarey Floyd's discharge. Plaintiff is unable to contradict Defendant's asserted reasons for his discharge, other than through the plaintiff himself. Plaintiff's counsel is requesting additional time to supplement this record before this Court rules on defendant's motion for summary judgment.

Plaintiff's counsel has been diligent in attempting to get this discovery. Plaintiff relies on the affidavit of Jerry Roberson submitted herewith.

Plaintiff is requesting relief pursuant to Rule 56(f) which states:

> "should it appear from the affidavits of a party opposing the motion that the party could not for reasons stated present by affidavit facts essential to justify the party's opposition, the Court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just".

The availability of a continuance is built into the Rules to guard against the premature entry of summary judgment. *Barfield v. Brierton,* 883 F. 2d 923, 931 (11th Cir. 1989). Furthermore, Rule 56(f) allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof. *Id*. Quotations admitted. A party requesting such a continuance, however, is required to present an affidavit containing specific facts explaining his failure to respond to that adverse party's motion for summary judgment via counter affidavits establishing genuine issues of material facts for trial. *Id.*

## IV. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the plaintiff has direct evidence of discrimination. As such, he is entitled to a trial as the defendant may only show that in spite of said direct evidence it would have made the same employment decision anyway. Additionally, there are numerous genuine issues of material fact which preclude the entry of

summary judgment.  Plaintiff has overwhelming circumstantial evidence of discrimination and has a prima facie case of discrimination.

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Telephone:    (205) 981-3906
Fax:             (205) 981-3908
E-mail: **jdratty@charter.net**
             **tlbaker@charter.net**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using the using the Electronic Filing system which will send notification of such filing to the following:

Richard Brett Garrett
Robert A. Huffaker
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270
Phone: 334-206-3100
Fax:   334-262-6277
E-mail: rah@rsjg.com

_____            s/Jerry Roberson
                                            Jerry Roberson (ROB010)