**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **2:07-cv-577-MEF** |
| | ) | |
| **SOUTHEAST CHEROKEE** | ) | |
| **CONSTRUCTION, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>PLAINTIFF'S EVIDENTIARY MATERIALS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**COMES NOW** Plaintiff Decarey Floyd and submits the following evidentiary

materials in Opposition to the Defendant's Motion for Summary Judgment:

Exhibit 1.     Deposition transcript of Decarey Floyd

Exhibit 2.     EEOC cause finding

Exhibit 3.     Declaration of Donald Gnatt

Exhibit 4.     Declaration of Deon Daniels

Exhibit 5.     Declaration of Decarey Floyd

Exhibit 6.     Progressive Disciplinary Policy

Exhibit 7.     EEOC statement of Randy Harris

Exhibit 8.     Affidavit of Jerry Roberson

Exhibit 9.     Affidavit of Jerry Carter

Exhibit 10.   Floyd's EEOC charge

Exhibit 11.   Floyd's pay-stub

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Telephone:   (205) 981-3906
Fax:           (205) 981-3908
E-mail: **jdratty@charter.net**
           **tlbaker@charter.net**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using the using the Electronic Filing system which will send notification of such filing to the following:

Richard Brett Garrett
Robert A. Huffaker
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270
Phone: 334-206-3100
Fax:   334-262-6277
E-mail: rah@rsjg.com

_____

                            s/Jerry Roberson
                            Jerry Roberson (ROB010)

# FREEDOM COURT REPORTING

| | 1 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | CASE NUMBER: 2:07-CV-577-MEF |
| 6 | |
| 7 | CURTIS DECAREY FLOYD, |
| 8 | Plaintiff(s), |
| 9 | vs. |
| 10 | SOUTHEAST CHEROKEE CONSTRUCTION, INC., |
| 11 | Defendant(s). |
| 12 | |
| 13 | S T I P U L A T I O N |
| 14 | IT IS STIPULATED AND AGREED |
| 15 | by and between the parties through |
| 16 | their respective counsel, that the |
| 17 | deposition of CURTIS DECAREY FLOYD may |
| 18 | be taken before TAMIE J. STORY, |
| 19 | Commissioner, at the offices |
| 20 | of RUSHTON, STAKELY, JOHNSTON & |
| 21 | GARRETT, 184 Commerce Street, |
| 22 | Montgomery, Alabama 36195, on the 19th |
| 23 | day of May, 2008. |

| | 3 |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION BY:        PAGE NUMBER: |
| 3 | Mr. Garrett        8 |
| 4 | Mr. Roberson        345 |
| 5 | |
| 6 | EXHIBITS: |
| 7 | Defendant's 1 -        80 |
| 8 | Personal Information |
| 9 | Defendant's 2 -        208 |
| 10 | Letter of Determination |
| 11 | Defendant's 3 -        256 |
| 12 | Ticket & Complaint |
| 13 | Defendant's 4 -        258 |
| 14 | Ticket |
| 15 | Defendant's 5 -        265 |
| 16 | Employee Loan Agreement |
| 17 | Defendant's 6 -        266 |
| 18 | Photographs |
| 19 | Defendant's 7 -        274 |
| 20 | Phone Message |
| 21 | Defendant's 8 -        305 |
| 22 | Receipt of Handbook |
| 23 | |

| | 2 |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND |
| 2 | AGREED that the signature to and the |
| 3 | reading of the deposition by the witness |
| 4 | is waived, the deposition to have the |
| 5 | same force and effect as if full |
| 6 | compliance had been had with all laws and |
| 7 | rules of Court relating to the taking of |
| 8 | depositions. |
| 9 | IT IS FURTHER STIPULATED AND |
| 10 | AGREED that it shall not be necessary for |
| 11 | any objections to be made by counsel to |
| 12 | any questions except as to form or |
| 13 | leading questions, and that counsel for |
| 14 | the parties may make objections and |
| 15 | assign grounds at the time of the trial, |
| 16 | or at the time said deposition is offered |
| 17 | in evidence, or prior thereto. |
| 18 | IT IS FURTHER STIPULATED AND |
| 19 | AGREED that the notice of filing of the |
| 20 | deposition by the Commissioner is waived. |
| 21 | |
| 22 | |
| 23 | |

| | 4 |
|---|---|
| 1 | EXHIBITS: |
| 2 | Defendant's 9 -        308 |
| 3 | SJIS Case Detail |
| 4 | Plaintiff's 1 -        345 |
| 5 | Disciplinary Procedure |
| 6 | Plaintiff's 2 -        348 |
| 7 | Interview Statement (Harris) |
| 8 | Plaintiff's 3 -        349 |
| 9 | Interview Statement (Daniels) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

5

1    IN THE UNITED STATES DISTRICT COURT
2         MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-CV-577-MEF
6
7    CURTIS DECAREY FLOYD,
8         Plaintiff(s),
9         vs.
10   SOUTHEAST CHEROKEE CONSTRUCTION, INC.,
11        Defendant(s).
12   BEFORE:
13        TAMIE J. STORY,  Commissioner
14   APPEARANCES:
15        ROBERSON & ROBERSON, by Mr.
16   Jerry D. Roberson, 3765 Kinross Drive,
17   Birmingham, Alabama 35238, appearing on
18   behalf of the Plaintiff.
19        RUSHTON, STAKELY, JOHNSTON &
20   GARRETT, by Mr. R. Brett Garrett, 184
21   Commerce Street, Montgomery, Alabama
22   36195, appearing on behalf of the
23   Defendant.

6

1    ALSO PRESENT:
2         Mrs. Lynn Carter
3         Ms. Mallory Morgan
4
5         * * * * * * * * * * * * * *
6
7         I, TAMIE J. STORY, a Court
8    Reporter of Birmingham, Alabama, acting
9    as Commissioner, certify that on this
10   date, as provided by the Federal Rules
11   of Civil Procedure and the foregoing
12   stipulation of counsel, there came
13   before me at the offices of RUSHTON,
14   STAKELY, JOHNSTON & GARRETT, 184
15   Commerce Street, Montgomery, Alabama
16   36195, beginning at 12:05 p.m., in the
17   above cause, for oral examination,
18   whereupon the following proceedings
19   were had:
20
21        CURTIS DECAREY FLOYD,
22   being first duly sworn, was examined
23   and testified as follows:

7

1         THE REPORTER:  Usual
2    stipulations?
3         MR. GARRETT:  Yes.
4         MR. ROBERSON:  Yes.
5         Before we start, have you
6    got -- what documents did I send you?
7         MR. GARRETT:  When?
8         MR. ROBERSON:  Have you got
9    Donald Gantt's statement?
10        MR. GARRETT:  I do, I do.
11        MR. ROBERSON:  What about
12   Deon Daniels.
13        MR. GARRETT:  Hold on one
14   second.  You said Donald Gantt?
15        MR. ROBERSON:  Yes.
16        MR. GARRETT:  No, I do not
17   have that.
18        MR. ROBERSON:  I have just
19   got two statements, Donald Gantt and
20   Deon Daniels.
21        MR. GARRETT:  I have Deon,
22   I do not have Donald.
23        MR. ROBERSON:  It's a very

8

1    intricate document.  You can have that
2    one (indicating).
3         MR. GARRETT:  Okay.
4         MR. ROBERSON:  I typed it
5    up and sent it to him, but I haven't
6    got it back signed.  I was there when
7    he signed that one (indicating).
8         MR. GARRETT:  When you say
9    "there," did he sign this at your
10   office?
11        MR. ROBERSON:  At his
12   house.
13        MR. GARRETT:  Okay.
14
15   EXAMINATION BY MR. GARRETT:
16   Q.   Mr. Floyd, my name is Brett
17   Garrett.  We met before at the EEOC
18   conciliation in this case.  You're are
19   here today for a deposition, and I'm
20   going to be taking it.
21        In the course of the
22   deposition, I'm going to be asking you
23   a number of questions.  Just a couple

2 (Pages 5 to 8)

**FREEDOM COURT REPORTING**

9

1  of ground rules. Let me ask you this:
2  Have you ever given a deposition
3  before?
4      A.  No, sir.
5      Q.  Is this your first?
6      A.  Uh-huh (nodding head).
7          MR. ROBERSON:  Speak up,
8  she's writing it down.
9      Q.  I'm going to ask you a
10  series of questions. If you'll do me a
11  favor and allow me to finish my
12  question completely before you answer,
13  it will make things go a little
14  smoother, and it will also make our
15  court reporter's job a little easier
16  taking it down.
17         If you don't understand a
18  question that I ask, if you would ask
19  me to clarify that, I'd be happy to do
20  it. I don't want you answering a
21  question that you don't understand.
22  But if you do understand it, I'm going
23  to assume that you understood the

10

1  question I asked. Is that fair?
2      A.  Yes, sir.
3      Q.  Also, this is not a
4  marathon. If you want to take a break
5  for any reason; restroom, water,
6  whatever you want, I want you to be
7  comfortable. You can certainly have
8  that any time you'd like. Is that
9  okay?
10     A.  Yes, sir.
11     Q.  Before we start, do you
12  have any questions of me?
13     A.  No, sir.
14     Q.  Now, I understand you've
15  also given me some interrogatories in
16  this case, some answers to some
17  questions I've asked you. I may ask
18  information multiple times that you've
19  already given me, if you'll bear with
20  me and give me the information again as
21  best you could, I'd appreciate that.
22     A.  Yes, sir.
23     Q.  Let's just start out, give

11

1  me your full name, please.
2      A.  Lacurtis Decarey Floyd.
3      Q.  What's your current
4  address?
5      A.  196 Mount Zion Road,
6  Wetumpka, Alabama 36092.
7      Q.  And do you own that home?
8      A.  No, sir.
9      Q.  Who owns that home?
10     A.  My mom.
11     Q.  What's your mother's name?
12     A.  Linda Merkerson.
13     Q.  Spell -- L-I-N-D-A, Linda?
14     A.  Yes, sir.
15     Q.  How about the last name?
16     A.  M-E-R-K-E-R-S-O-N.
17     Q.  Who else lives in the house
18  besides you and your mother, if anyone?
19     A.  My dad and my younger
20  brother.
21     Q.  What's your dad's name?
22     A.  Randy Merkerson.
23     Q.  And your youngest brother's

12

1  name?
2      A.  Darius Merkerson.
3      Q.  How old is Darius?
4      A.  He's twenty-one.
5      Q.  Okay. How long have you
6  lived at 196 Mount Zion Road?
7      A.  Since 2005.
8      Q.  I'll come back to that in
9  a second.
10        What's your Social Security
11  number?
12     A.  ███████
13     Q.  I'm sorry. One more time.
14     ██-
15     A.  --
16     Q.  And do you have a cell
17  phone number?
18     A.  334-324-9126.
19     Q.  How about a ground line or
20  a home phone number?
21     A.  334-567-6524.
22     Q.  How long have you had that
23  cell phone?

3  (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

13

1    A.   A couple of months.
2    Q.   Who's it with?
3    A.   I'm not for sure.  It's on
4  a family plan with my mom.  I'm not for
5  sure who she has her service with.  I
6  just give her the money and she pays
7  it.  I'm not for sure.
8    Q.   Okay.  Do you mind finding
9  that information out and giving it to
10  your attorney to pass on to me at a
11  later date?
12    A.   No, I don't mind.
13    Q.   Your date of birth, please?
14    A.   10-19-77.
15    Q.   As we sit here today, do
16  you have any plans on leaving the State
17  of Alabama?
18    A.   Maybe one day (nodding
19  head).
20    Q.   Okay.  When I ask you -- I
21  understand, but as we sit here today,
22  do you have plans to leave; be it for
23  employment or personal reasons or

14

1  vacation or anything of that nature?
2    A.   No, sir.
3    Q.   Where did you grow up?
4    A.   A number of different
5  places.
6    Q.   Let me ask you this way:
7  Where were you born?
8    A.   Detroit, Michigan.
9    Q.   How long did you stay in
10  Detroit?
11    A.   Until I was around four.
12    Q.   Where did you move after
13  you turned four?
14    A.   Coco Beach, Florida.
15    Q.   How long did you stay in
16  Coco Beach?
17    A.   Until I was around ten.
18    Q.   And after you left Coco
19  Beach, where did you go?
20    A.   Here.
21    Q.   And when you say "here" --
22    A.   Wetumpka, Alabama.
23    Q.   Do you remember how old you

15

1  were when you moved to Wetumpka?
2    A.   Around ten.
3    Q.   And did you live at the
4  Mount Zion address at the time you were
5  ten?
6    A.   The 196?
7    Q.   Correct.
8    A.   No, sir.
9    Q.   And let me ask you this:
10  Where did you go to high school?
11    A.   Wetumpka.
12    Q.   What year did you graduate?
13    A.   I didn't graduate.
14    Q.   How many levels of school
15  did you go through?
16    A.   To the tenth.
17    Q.   What caused you to leave
18  high school in the tenth grade?
19    A.   Well, I was -- give me a
20  minute.  I want to be specific; I want
21  to be for sure.  It's been a minute
22  ago, it's been over fifteen years.  I
23  believe it was basically I just got --

16

1  just got caught up with the wrong
2  crowd.
3    Q.   Okay.  Was there a specific
4  event that caused you to be expelled
5  from school or did you drop out?
6    A.   I dropped out.
7    Q.   And after you dropped out
8  of high school, did you go on to
9  receive any other kind of training?
10    A.   No, sir.
11    Q.   Let me clarify that.  When
12  I say "training," I mean, any other
13  kind of formal learning; be it through
14  classes or seminars or anything of that
15  nature.
16    A.   No, sir.
17    Q.   Did you ever go back and
18  get your GED?
19    A.   No, sir.
20    Q.   Now, when you dropped out
21  of school in the tenth grade, where
22  were you living?  What address were you
23  at?

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

17

1    A.   I was at 1329 Mount Zion
2  Road.
3    Q.   At that time, who were you
4  living with?
5    A.   My grandfather.
6    Q.   Anyone else?
7    A.   Anyone else staying there
8  with me and my grandfather?
9    Q.   Correct.
10    A.   An aunt, my grandfather, my
11  grandfather's daughter --
12    Q.   Okay.
13    A.   -- and her two kids.
14    Q.   All right.  Let me start
15  with your grandfather.  What was his
16  name?
17    A.   Carey Floyd.
18    Q.   K-E-R-R-Y?
19    A.   C-A-R-E-Y.
20    Q.   Is he deceased?
21    A.   Yes, sir, he's deceased.
22    Q.   How about your grandmother,
23  is she deceased?

18

1    A.   Uh-huh (nodding head).
2    MR. ROBERSON:  Yes.  You
3  need to answer out, don't say "Uh-huh"
4  or "Huh-uh."
5    THE WITNESS:  Okay.
6    Q.   How about the aunt that
7  was living with you at 1329 Mount Zion,
8  what's her name?
9    A.   Brenda.
10    Q.   What is her last name?
11    A.   Floyd.
12    Q.   Is she married?
13    A.   No, sir.
14    Q.   How about her two children;
15  what are their names?
16    A.   Deon Floyd and Dwight
17  Floyd.
18    Q.   How old is Deon?
19    A.   Twenty-two.
20    Q.   How old is Dwight?
21    A.   Twenty-three.
22    Q.   And now when you left
23  school in the tenth grade, did you go

19

1  on to gain employment?
2    A.   No, sir.
3    Q.   Well, what did you -- Let
4  me ask you this:  What was your first
5  job after high school?
6    A.   I don't remember.
7    Q.   Okay.  Let me ask it this
8  way:  What is the first job you recall
9  after high school?
10    A.   The first job I recall is
11  with a temp agency, laying steel.
12    Q.   Are you saying "Lane"?
13  Spell it for me.
14    A.   Setting steel, steel frame
15  buildings.
16    Q.   Okay.  Lane Steel, L-A-N-E?
17    A.   Yeah.
18    Q.   And you were placed with
19  Lane Steel (sic) through a temp agency;
20  is that what you're saying?
21    A.   Uh-huh (nodding head).
22    Q.   Where is Lane Steel (sic)
23  located?

20

1    A.   That's what I was doing.
2    Q.   Oh, laying steel.  I
3  apologize.  What is the -- Who were you
4  laying steel for; what company were you
5  laying steel for?
6    A.   I don't remember.
7    MR. ROBERSON:  Decarey
8  spent seven years in prison.
9    MR. GARRETT:  Okay.
10    MR. ROBERSON:  That's
11  probably --
12    MR. GARRETT:  That may
13  speed things up.
14    Q.   Let me ask you this:  When
15  did you enter prison?  Well, let me ask
16  you first -- strike that.
17    How many -- When did you
18  first enter prison?
19    A.   1995.
20    Q.   And when did you leave --
21  what year did you leave high school in
22  tenth grade; what year was that?
23    A.   1994.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1    Q.   Okay.  And what were you
2  convicted of?
3    A.   Possession of a controlled
4  substance.
5    Q.   What was the controlled
6  substance?
7    A.   Cocaine.
8    Q.   And where were you
9  convicted; what court?
10    A.   Elmore County.
11    Q.   And you were incarcerated;
12  is that correct?
13    A.   Yes, sir.
14    Q.   Where were you
15  incarcerated; what facility were you
16  incarcerated?
17    A.   Limestone.
18    Q.   Okay.  How many years did
19  you stay at Limestone?
20    A.   Three.
21    Q.   And that takes us up to
22  about 1998.  Were you released in 1998?
23    A.   Yes.

23

1  business of doing?
2    A.   They were -- they were
3  manufacturing flower pots.
4    Q.   Manufacturing flower pots?
5    A.   Uh-huh (nodding head).
6    Q.   What kind of work did you
7  do for them?
8    A.   I worked on an assembly
9  line, and when the flower pots came out
10  of the heater and came through a
11  cooling process, I took the rubber
12  molding off of them.
13    Q.   Okay.  And do you recall
14  what you were making at that time per
15  hour?
16    A.   I'm not sure, but I believe
17  it was around six dollars and fifty
18  cents.
19    Q.   Okay.  How long did you
20  stay with -- well, let me ask you
21  this:  When you were working for AAA
22  and Associates, did you ever take
23  another position within the company?

22

1    Q.   And after you got out of
2  prison, what did you do then?  Did you
3  gain employment?
4    A.   Yes, I did.
5    Q.   Let me ask you this first:
6  Where did you reside when you were
7  released from prison?
8    A.   1329 Mount Zion Road.
9    Q.   Okay.  Was your grandfather
10  still alive at that time?
11    A.   Yes, sir.
12    Q.   And after you were released
13  from prison, did you gain employment?
14    A.   Yes, sir.
15    Q.   And where did you go to
16  work?
17    A.   With AAA and Associates.
18    Q.   AAA and Associates?
19    A.   Uh-huh (nodding head).
20    Q.   Where are they located?
21    A.   Off of Highway 231 in
22  Montgomery.
23    Q.   And what are they in the

24

1    A.   Within --
2    Q.   Within that company.
3    A.   No, sir.
4    Q.   How long did you stay with
5  them?
6    A.   A couple of months.
7    Q.   Why did you leave?  When
8  you say a couple of months, do you mean
9  two months, do you mean three months?
10  Do you recall?
11    A.   I don't remember.  I just
12  know it was a few months.
13    Q.   Less than six?
14    A.   Yeah, I would say.
15    Q.   And why did you leave?
16    A.   Young and dumb.  I kind of
17  got in some trouble.
18    Q.   Tell me what kind of
19  trouble you got into.
20    A.   I caught a couple more
21  felonies.
22    Q.   Let me ask you this:  Were
23  you terminated from AAA or did you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

---

**25**

1  resign?
2      A.  I wasn't terminated.
3      Q.  Okay.
4      A.  When I got into trouble, I
5  just -- I just didn't return.
6      Q.  Okay.  So, essentially, you
7  quit the job?
8      A.  Yes, sir.
9      Q.  And you said you got
10  involved in a few more felonies.  Which
11  felonies did you get involved with at
12  that time?
13      A.  The assault; first degree
14  assault.
15      Q.  Okay.
16      A.  First degree burglary.
17      MR. ROBERSON:  Brett, those
18  are Ala court records (indicating).
19      MR. GARRETT:  Off the
20  record one second, if you don't mind.
21
22      (Whereupon, a discussion was held
23      off the record.)

---

**26**

1      Q.  Mr. Floyd, your attorney
2  has provided me with SJYS printoffs of
3  five, I guess I'll say, criminal
4  actions that you were involved with.
5      A.  Uh-huh (nodding head).
6      Q.  I'm going to --
7      MR. GARRETT:  I appreciate
8  you giving me those.
9      Q.  I'm going to kind of pick
10  up where we are and just go through and
11  have you kind of tell me what you
12  recall about them, and I may follow up
13  with those in a second.  Okay?
14      Can you tell me when -- the
15  best of your recollection when you were
16  charged with the first degree assault
17  and first degree burglary charges?
18      A.  Sometime -- it was in
19  1998.
20      Q.  And just very briefly
21  explain to me the basis of the first
22  degree assault charge.
23      A.  No, I'm sorry about that.

---

**27**

1  It was -- I don't remember whether it
2  was 1998 or 1999.
3      Q.  Let me just say this:  The
4  documents will reflect the dates.  I'm
5  not going to hold you to them, I just
6  want to get your best recollection.
7      A.  Yes, sir.
8      Q.  So '98 or '99?
9      A.  Yes, sir.
10      Q.  If you would, give me just
11  a very brief synopsis of what happened
12  with the first degree assault charge.
13      A.  It was in the midst of a
14  burglary.
15      Q.  Okay.
16      A.  And the gentleman that was
17  with me ended up getting into a
18  struggle over a firearm with the
19  gentleman's house who we were
20  burglarizing, and the gentleman ended
21  up being shot.
22      Q.  When you say "the
23  gentleman," do you mean the gentleman

---

**28**

1  that owned the home or the guy you were
2  robbing the house with?
3      A.  The gentleman who owned the
4  home.
5      Q.  Okay.  How did that equate
6  to a first degree assault charge to
7  you?
8      A.  Well, because it was that
9  young stupid people have a so-called
10  oath of not telling on one other, I
11  ended up taking the rap for that
12  because of -- because I was already
13  being charged with the burglary.  And,
14  like I said, again, just young and
15  stupidity, and by me knowing I was
16  already going back to prison for the
17  burglary, I went ahead and I copped out
18  for the whole thing.
19      Q.  Was the gentleman who was
20  shot killed?
21      A.  No, sir.
22      Q.  Okay.
23      A.  No, sir.

---

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

29

1    Q.   I guess you went back into
2  prison?
3    A.   Yes, sir.
4    Q.   Where were you incarcerated
5  the second time?
6    A.   Well, everybody goes
7  through Kilby.
8    Q.   Yeah.  I mean, where did
9  you spend your sentence; do your
10  sentence?
11    A.   A number of different
12  prisons.
13    Q.   Just give me the place.
14  You started at Kilby.
15    A.   And I was sent to Bullock.
16    Q.   Okay.
17    A.   Then from Bullock I was
18  sent to Elmore.  I left Elmore and sent
19  to Red Eagle, left Red Eagle and was
20  sent to Staton.
21    Q.   How long did you serve
22  during your second stint?
23    A.   Almost four years.

30

1    Q.   So that would have taken
2  you to roughly 2003, 2004.  Do you
3  recall when you got out the second
4  time?
5    A.   Yes, I do.
6    Q.   When was that?
7    A.   February the 2nd, 2003.
8    Q.   After you got out February
9  2nd, where did you reside -- I'm sorry,
10  February 2, 2003, where did you reside?
11    A.   I resided at 196 Mount Zion
12  Road.
13    Q.   Now, obviously, that's down
14  the street from the other address;
15  right, the other -- where your
16  grandfather lived?
17    A.   Yes, sir.
18    Q.   Who lived at 196 Mount Zion
19  Road?
20    A.   Who lived there?
21    Q.   Yes.
22    A.   That's where my mother
23  lives.

31

1    Q.   So 196 Mount Zion is your
2  mother's house?
3    A.   Yes, sir.
4    Q.   Have you lived at 196
5  Mount Zion since 2003?
6    A.   No, sir.
7    Q.   When you left prison the
8  second time in February, 2003, did you
9  gain employment?
10    A.   Yes, sir.
11    Q.   Where did you gain
12  employment?
13    A.   I gained employment at a
14  construction company, Hodgson and Blake
15  Construction.
16    Q.   Where is Hodgson and Blake?
17    A.   It was off East Fleming,
18  but they're out of business now, in
19  Montgomery.
20    Q.   In Montgomery?
21    A.   Uh-huh (nodding head).
22    Q.   And what did you do for
23  Hodgson and Blake?

32

1    A.   I was a delivery truck
2  driver/laborer.
3    Q.   So you were a delivery
4  truck driver/laborer?
5    A.   Uh-huh (nodding head), yes,
6  sir.
7    Q.   And explain to me what your
8  duties were.
9    A.   My duties were to go and
10  pick up supplies that we needed for the
11  job and to -- once I went and picked up
12  the supplies that were needed for the
13  job, to help out with the job, which
14  was -- the particular crew that I was
15  on were laying storm drains for doing
16  the cultivation of the community.  We
17  go through first and put in storm
18  drains --
19    Q.   Uh-huh (nodding head).
20    A.   -- so that the water will
21  flow through the community good and so
22  forth; help out with putting in the
23  storm drains.

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

33

1  Q.  Okay.  So you actually did
2  both, you'd pick up and deliver
3  supplies and you'd actually assist in
4  laying the pipe?
5  A.  Yes, sir.
6  Q.  How much were you paid when
7  you started?
8  A.  Seven dollars.
9  Q.  Okay.  And while you were
10  there, were you ever promoted?
11  A.  Yes, sir.
12  Q.  Tell me about the
13  promotion.
14  A.  I believe I was up around
15  -- around eight dollars when I left.
16  Q.  And I understand you got a
17  pay raise, but were you promoted in
18  position or job title?
19  A.  Oh, no, sir.  I wasn't
20  there very long.
21  Q.  How long did you stay?
22  A.  Probably around four months
23  because I was -- I was working during

34

1  the day and going to school at night to
2  get my CDL.  So immediately after I got
3  my CDL, I moved on.
4  Q.  All right.  So you stayed
5  there for four months and you were
6  studying to take your CDL at the same
7  time?
8  A.  Yes, sir.
9  Q.  Where were you studying to
10  take your CDL?
11  A.  At Trenholm.
12  Q.  When did you receive your
13  CDL?
14  A.  July of '03.
15  Q.  How many times did you
16  take the CDL test?
17  A.  How many times?
18  Q.  Yes.
19  A.  Just once.
20  Q.  Did you pass on your first
21  try?
22  A.  Yes, sir.
23  Q.  Aside from taking classes

35

1  to get your CDL license, did you take
2  any other classes at Trenholm?
3  A.  No, sir.
4  Q.  Did you take any special
5  classes with regard to HAZMAT cer-
6  tification?
7  A.  No, sir.  It was all in the
8  same class.
9  Q.  I understand.  What I was
10  asking is if you took any special
11  classes or any additional classes than
12  basic training simply with regard to
13  HAZMAT training?
14  A.  No, sir.
15  Q.  And after you left Hodgson,
16  where were you employed next?
17  A.  MBM Food Corporation.
18  Q.  MBM?
19  A.  Yes, sir.
20  Q.  Where are they located?
21  A.  125 6th Street, Montgomery.
22  Q.  And what kind of job did
23  you take with MBM?

36

1  A.  Truck driver.
2  Q.  Before I move on, were you
3  terminated from Hodgson or did you
4  voluntarily leave?
5  A.  I voluntarily left.
6  Q.  What was the reason for
7  voluntarily leaving Hodgson?
8  A.  I moved on to something
9  better.  I had accomplished -- I had
10  gotten my CDL --
11  Q.  Uh-huh (nodding head).
12  A.  -- and I went on to
13  exercise my trade.
14  Q.  As a truck driver?
15  A.  Yes, sir.
16  Q.  And you started with MBM
17  Food -- do you remember when you
18  started with them?
19  A.  It was around August of
20  '03.
21  Q.  Before I move on, when you
22  were with Hodgson and Blake, did you
23  receive any training -- any mechanical

9  (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

37

1 training or mechanics training?
2     A.   No, sir.
3     Q.   Did you receive any
4 training with regard to preventive
5 maintenance of vehicles; PM maintenance
6 of vehicles?
7     A.   No, sir.
8     Q.   Were you responsible at
9 Hodgson for doing any kind of
10 mechanical work?
11     A.   No, sir.
12     Q.   And you were a truck driver
13 at MBM?
14     A.   Yes, sir.
15     Q.   How much did you start
16 being paid?
17     A.   It varied by the route.  It
18 was around -- around fifty-five
19 thousand a year.
20     Q.   When -- And you say it
21 varied by route?
22     A.   Yes, sir.
23     Q.   And what was your route;

38

1 where would you drive?
2     A.   All over the southeast.
3     Q.   So you were over-the-road?
4     A.   Yes, sir.
5     Q.   You were traveling from
6 state to state?
7     A.   Yes, sir.
8     Q.   What were you delivering
9 and/or picking up?
10     A.   MBM delivers food products
11 to Hardee's, Olive Garden, Red Lobster,
12 Arby's.
13     Q.   Okay.
14     A.   A number of different food
15 chains.  MBM delivers the food and
16 whatnot.
17     Q.   Okay.  And how long did you
18 stay at MBM?
19     A.   I stayed at MBM roughly a
20 year.
21     Q.   Okay.  Why did you leave?
22     A.   I bought my own truck.
23     Q.   Who did you buy it from?

39

1     A.   A Willie Murray out of
2 Macon County, Alabama.
3     Q.   Did you receive financing
4 to purchase that truck?
5     A.   No, sir.  I paid for it
6 cash.
7     Q.   How much did you pay?
8     A.   Forty-five hundred dollars.
9     Q.   All right.  And when you
10 say you bought your own truck, was it
11 your expectation that you would
12 continue to haul for MBM, or was it
13 your intention to go out and do other
14 things?
15     A.   My intention was to go out
16 and do other things.
17     Q.   And you bought your own
18 truck.  What did you do?  How did you
19 use that to gain employment or to make
20 a living?
21     A.   Well, when you have your
22 own truck, you -- you can haul whatever
23 you want to haul whenever you want to

40

1 haul it.  You can be choicey about what
2 you're going to haul, you can be
3 choicey within your pay ranges and
4 whatnot.  You're your own boss.
5     Q.   Right.  I understand that.
6 Let me ask it a different way.  Who did
7 you make runs for or who did you haul
8 for?
9     A.   A large majority of that --
10 a vast majority, I hauled logs.
11     Q.   Who did you haul them for?
12     A.   Different companies,
13 different companies.
14     Q.   Can you give me some of
15 those companies you hauled logs for?
16     A.   Saco Wood, Poole Logging
17 and Trucking.
18     Q.   Did you say Poole?
19     A.   Poole (nodding head).
20     Q.   P-O-O-L (sic)?
21     A.   Yes, sir.
22     Q.   Okay.  Who else?
23     A.   Graham Trucking.

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1    Q.   Okay.  Who else?
2    A.   Just -- it's been more than
3  that over the years, it's just those, I
4  can remember, because how it works is
5  when you're hauling logs, it's just
6  which company is needing a truck to go
7  where at this particular time.  It's
8  not a -- various companies, I hauled
9  logs for various different companies.
10    Q.   But the ones that come to
11  mind that you can recall now that you
12  have hauled for in the past while
13  working in your individual capacity ,
14  and Graham?
15    A.   Yeah.  Those were the ones
16  that I hauled the most with.
17    Q.   Okay.  And I assume you
18  were hauling as an independent
19  contractor?
20    A.   Yes, sir.
21    Q.   How much were you paid to
22  haul those loads?  How was it broken
23  down?

42

1    A.   Well, a load -- anything
2  under fifty miles was automatically a
3  hundred and forty dollars per load.
4    Q.   Okay.
5    A.   Anything over fifty miles
6  was the hundred and forty dollars per
7  load plus two dollars per mile.
8    Q.   Okay.
9    A.   And you probably could get
10  three, four, five loads a day.
11    Q.   How much did you make --
12  were you paid -- Let me ask you this:
13  How much did you average making per
14  week doing that work, if you know?
15    A.   It varied, because when it
16  rains -- I mean, it's outdoor work;
17  it's in the woods hauling logs.
18    Q.   Give me an average.
19    A.   When it rains --
20    Q.   Give me an average.
21    A.   Average between eight
22  hundred and fifteen hundred dollars a
23  week.

43

1    Q.   Between eight and fifteen
2  hundred dollars per week on average?
3    A.   Yeah.
4    Q.   Let me backtrack just a
5  little bit.  While you were working
6  with MBM, did you receive any kind of
7  mechanics training?
8    A.   No, sir.
9    Q.   Did you do any kind of
10  mechanics work?  What I mean by
11  mechanics work, I mean, working on
12  engines, doing preventive maintenance,
13  things of that nature?
14    A.   Yes, sir.  They teach you
15  that in CDL school how to do your PT
16  each morning and afternoon.
17    Q.   I understand that.  What
18  I'm more interested in is mechanics
19  training in terms of -- when I say
20  "preventive maintenance," I mean,
21  changing belts, changing hoses, fluid
22  levels.
23    A.   Not with MBM, no.  I mean,

44

1  PT, your pre-trip inspection, is
2  checking belts, checking fluid levels,
3  checking tire pressure --
4    Q.   Right.
5    A.   -- checking a little
6  tightness (sic) and minor service and
7  whatnot.  But as far as actually having
8  to work on any of it myself, MBM had
9  service technicians to do that.
10    Q.   They had mechanics to do
11  that kind of work?
12    A.   Yeah.  If I -- by me doing
13  my pre-trip inspection found something
14  wrong, then I would notify the service
15  and take the truck in.
16    Q.   Right.  That's the same
17  thing you do with any truck?
18    A.   Uh-huh (nodding head).
19    Q.   Did you ever ask or apply
20  to be a mechanic while you were at MBM?
21    A.   No, sir.
22    Q.   How long did you haul
23  timber as your own company?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

45

1    A.    Around -- around two years
2  -- two-and-a-half years, two years. I
3  can't be -- I'm not for sure. I would
4  have to look at my tax forms or whatnot
5  to be for sure.
6    Q.    Let me ask it this way:
7  When did you quit working for yourself?
8    A.    When I started working with
9  Southeast Cherokee.
10    Q.    Okay. Why did you stop
11  working for yourself?
12    A.    Because I was looking to
13  sell my own truck. I was having a lot
14  of problems with it, I was putting a
15  lot of money in it with breakdowns and
16  whatnot. And at the time, diesel fuel
17  prices started rising, and I was
18  looking to do something else for a
19  while.
20    Q.    Okay. When you say
21  "looking to do something else," what do
22  you mean other than drive a truck?
23    A.    Not necessarily.

46

1    Q.    Okay. Let me do it this
2  way: First of all, did you sell your
3  truck to somebody?
4    A.    Not -- I still had my truck
5  when I started working with MBM.
6    Q.    I understand. After you
7  got done working for MBM and you went
8  out on your own, did you sell your
9  truck at some point in time?
10    A.    Excuse me. Sorry about
11  that. I still had my truck when I
12  started working with Southeast
13  Cherokee.
14    Q.    Okay. Did you sell your
15  truck at some point in time?
16    A.    Yes, I did.
17    Q.    When did you sell your
18  truck?
19    A.    After I started work with
20  Southeast Cherokee.
21    Q.    Can you give me a time,
22  date, anything; month, year?
23    A.    A couple of months

47

1  afterwards.
2    Q.    How much did you sell your
3  truck for?
4    A.    Sixty-five hundred.
5    Q.    Who did you sell it to?
6    A.    I can't remember the guy's
7  name. He was down out of Greenville,
8  Alabama. I can't remember his name.
9    Q.    Okay. Let me ask you this
10  before we go on. If it's a lot of
11  individuals, we may simplify this in
12  some way, but I'm going to list you a
13  number of counties here in Alabama --
14    A.    Uh-huh (nodding head).
15    Q.    -- and what I'm curious
16  about is whether you have family either
17  by blood or marriage living in these
18  counties. Let me list them and we can
19  kind of go back. Okay?
20    A.    Okay.
21    Q.    When I say family, I mean
22  only over the age of nineteen year old,
23  not young, over nineteen. You said

48

1  "counties," so let me list them:
2  Montgomery, Autauga, Barbour, Bullock,
3  Butler, Chilton, Coosa, Covington,
4  Crenshaw, Elmore, Lowndes, and Pike.
5    A.    Uh-huh (nodding head).
6    Q.    Now, what I need is your
7  relatives by blood or marriage in any
8  of those counties over the age of
9  nineteen; I need the names.
10    A.    Even in Elmore County that
11  I live in?
12    Q.    Correct.
13    A.    So to make sure I'm
14  understanding you correct, you want the
15  name of every relative that I have --
16    Q.    Yes.
17    A.    -- in each of these
18  counties?
19    Q.    Yes. Let me ask you this
20  way --
21    A.    Man, I've got a lot of
22  relatives.
23    Q.    Okay. Is it a ton?

12  (Pages 45 to 48)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

49

1     A.   Yeah.
2     Q.   Okay. This is what I'm
3  going to do --
4     A.   Two tons.
5     Q.   Okay. This is what I'm
6  going to do, I'm not going to make you
7  go through that right now. Would you
8  agree with me on the record to submit a
9  list of those individuals to your
10  attorney to be provided to me at a
11  later date?
12         MR. ROBERSON: Yeah.
13     A.   Yes, sir.
14     Q.   Thank you.
15         MR. ROBERSON: But Decarey,
16  do you know their last names?
17         THE WITNESS: Yeah.
18         MR. ROBERSON: I mean, do
19  you know what groups of them there are?
20  Besides Floyd, what are -- tell him
21  their last names, and we'll provide you
22  a list. What are their last names
23  besides Floyd?

50

1         MR. GARRETT: That will be
2  fine.
3     A.   There's a ton of those too.
4     Q.   Just do your best. You can
5  supplement the list later. Just do
6  your best to give me the last names
7  that pop in your mind.
8     A.   Well, actually, the
9  majority of them's last names are
10  Floyd. We've got a real big family.
11  That's the bulk of -- that's going to
12  be the bulk of the ton.
13     Q.   We've got, I guess,
14  Merkerson; right?
15     A.   Merkerson.
16     Q.   Merkerson?
17     A.   Merkerson.
18     Q.   How do you spell that?
19     A.   M-E-R-K-E-R-S-O-N.
20         MR. ROBERSON: What about
21  on your grandmother's side, what was
22  their last name?
23     A.   Harris, Russell. That's

51

1  about -- that's about it.
2     Q.   Okay. I'll take those now,
3  and if you would, just prepare a list
4  for me later on, and I'd appreciate
5  that. Okay?
6     A.   Yes, sir.
7     Q.   Have you ever declared
8  bankruptcy?
9     A.   No, sir.
10     Q.   And I've got the criminal
11  printouts that you provided to me. I
12  want you to, if you would, list every
13  criminal charge you've been charged
14  with and the year that you were charged
15  with it just to make sure I've got them
16  all.
17     A.   Possession of a control
18  substance, two counts; possession of a
19  forged instrument, one count.
20     Q.   Possession of a -- let me
21  stop you. Possession of a controlled
22  substance, you said two counts?
23     A.   Uh-huh (nodding head).

52

1     Q.   What year again? Let's
2  make sure we're on the same page.
3     A.   '95.
4     Q.   Okay. Then you said
5  possession -- what was the next one you
6  said?
7     A.   Possession of a controlled
8  substance, two counts of that. There's
9  five of them. Possession of a
10  controlled substance, two counts;
11  possession of a forged instrument would
12  make the third count.
13     Q.   You say a fourth
14  instrument?
15     A.   Forged instrument.
16         MR. ROBERSON: Forged like
17  a bad check.
18     Q.   Possession of forged
19  instrument?
20     A.   Uh-huh (nodding head).
21     Q.   When did you get that;
22  when did you get that charge? When
23  were you charged?

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

1    A.    That one was in -- that was
2    with along the 1998 or 1999 time.
3    Q.    Okay.  What else?
4    A.    Assault, two counts.  That
5    makes five of them.
6    Q.    And, of course, the
7    burglary; right?
8    A.    No, not the burglary.  Just
9    those five there that you've got.
10    Q.    Well, we've got two counts
11    of possession of a controlled
12    substance, we've got one possession of
13    a forged instrument, assault, you said,
14    times two.
15    A.    Two counts (nodding head).
16    Q.    When was that; when was
17    that assault?  Earlier you told me you
18    had one assault and now you're saying
19    there's two.
20    A.    No, I never told you I had
21    -- the first time -- the first time
22    that I went to prison, it was for
23    possession of a controlled substance.

54

1    Q.    Right.  We talked about
2    that earlier.
3    A.    Two counts and an assault.
4    Q.    Okay.  That's what I was
5    confused on.  So you got an assault
6    charge with the controlled substance
7    charge?
8    A.    Uh-huh (nodding head).
9    Q.    What happened with that
10    assault charge?
11    A.    Me and a gentleman got into
12    a fight, and I picked up a bottle off
13    the ground and started fighting with
14    the bottle.
15    Q.    Okay.  Was the gentleman
16    you fought with the bottle injured?
17    A.    Yes, sir.  His head was
18    bleeding and whatnot.
19    Q.    Okay.  So that was the
20    assault charge?
21    A.    Yes, sir.
22    Q.    And then you got another
23    assault with the burglary --

55

1    A.    Yes, sir.
2    Q.    -- I can't say it --
3    burglary later?
4    A.    Yes, sir.
5    Q.    Anything else?
6    A.    No, sir.  That's all.
7    Q.    Is that it?
8    A.    Yes, sir.
9    Q.    Tell me about traffic
10    citations.
11    A.    Because of the burglary, I
12    wasn't -- it wasn't -- I was charged
13    with it, but it got dropped.  But it
14    was -- I was telling you about the
15    burglary to let you know how I ended up
16    with the other assault.
17    Q.    How did the burglary charge
18    get dropped?
19    A.    As part of a plea; as part
20    of a plea agreement.
21    Q.    So you pleaded out of
22    burglary and accepted the assault
23    one --

56

1    A.    Yes, sir.
2    Q.    -- is that correct?
3    A.    Yes, sir.
4    Q.    Tell me about your traffic
5    violations going back as far as you can
6    emember.  Tell me any and all traffic
7    violations you've received; be it
8    speeding, DUI, running a stop sign,
9    anything of that nature aside from
10    parking.  I don't -- I'm not interested
11    in parking tickets but anything else.
12    A.    As best as I can remember.
13    Q.    Okay.
14         MR. ROBERSON:  I'm glad I
15    don't have to answer this question
16    (laughing).
17    A.    Hum, you might come out
18    better off just putting in my MVR.
19    Q.    Oh, I will.  I just want to
20    know what you remember.
21    A.    Because I want to be honest
22    with you.  I mean, I don't want to tell
23    you anything that's not true.

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

57

1     Q.   Okay. Go ahead.
2     A.   I know I have a speeding,
3  maybe two speedings, as far as I can
4  remember -- as far back as I can
5  remember. A no seat belt. As far as I
6  can remember, like I said -- an over-
7  weight ticket.
8     Q.   Would that be the
9  overweight ticket you got when you were
10 working for Southeast or a different
11 one?
12    A.   It's the same.
13    Q.   Okay.
14    A.   And an accident.
15    Q.   Okay. When did the
16 accident occur?
17    A.   The accident occurred in --
18 I believe around August of 2003.
19       MR. ROBERSON:  Is that
20 while you were working for MBM?
21       THE WITNESS:  Yes, sir.
22    Q.   Okay.
23    A.   I had a motorcycle

58

1  accident.
2     Q.   Do you remember when you
3  had it; the motorcycle accident?
4     A.   May of '07.
5     Q.   Okay.
6     A.   Like I say, you'd be better
7  off pulling my MVR to get better facts.
8     Q.   So what you recall is
9  either one or two speeding tickets?
10    A.   Yes, sir.
11    Q.   What years? Do you have
12 any idea?
13    A.   I got one last year. I
14 can't remember when the other one was,
15 but I know I've had at least two in my
16 lifetime, but I can't remember exactly
17 when.
18    Q.   Okay. What about the no
19 seat belt charge, do you remember when
20 you got that?
21    A.   I got the no seat belt
22 ticket last year.
23    Q.   2007?

59

1     A.   Yes.
2     Q.   Okay. And you said you had
3  an accident in August of '03, to the
4  best of your recollection?
5     A.   Uh-huh (nodding head).
6     Q.   And a motorcycle accident
7  in May of '07?
8     A.   Uh-huh (nodding head).
9     Q.   Now, the motorcycle
10 accident, was that a personal accident
11 on your own time --
12    A.   Personal.
13    Q.   -- riding your motorcycle?
14    A.   Yes.
15    Q.   And you said the August,
16 2003 accident happened when you were
17 working with MBM?
18    A.   Uh-huh (nodding head).
19    Q.   Tell me about that. What
20 happened?
21    A.   Heading south on I-65
22 leaving out of Montgomery about 4:30 --
23 about 4:30 one foggy morning, a

60

1  gentleman -- an older gentleman in a
2  dark blue van was sitting in the middle
3  of the interstate with his lights off
4  in park, and he was thinking that -- he
5  was like in his late eighties or early
6  nineties, and he was thinking he was
7  off the side of the road but he wasn't.
8  He had Alzheimer's.
9         And he was sitting in the
10 middle of the road. It was foggy, and
11 by the time I saw him, it was just
12 about too late. I swerved and ended up
13 clipping the back side of the van, and
14 when the truck clipped the back side of
15 the van, the truck overturned. And
16 come to find out, the older guy was --
17 had a missing peoples pulled out on him
18 from Indianapolis, he done wandered way
19 down here, and he said he was trying to
20 find his way home. But he was way down
21 here sitting in the middle of the
22 interstate at 4:30 in the morning.
23    Q.   Is the truck you over-

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

61

1 turned, was it loaded or unloaded?
2     A.    It was loaded.
3     Q.    What was it loaded with?
4     A.    The type of goods that MBM
5 delivers.
6     Q.    Food products?
7     A.    Yes, sir.
8         MR. ROBERSON:  Restaurant
9 supplies?
10        THE WITNESS:  Yes, sir.
11    Q.    Was there any finding of
12 fault in that accident?
13    A.    No, sir.
14    Q.    Were you reprimanded by
15 your employer with regard to that
16 accident?
17    A.    Do you mean as being at
18 fault or whatnot?
19    Q.    I just mean reprimanded in
20 any way.
21    A.    Yes, sir.
22    Q.    How were you reprimanded?
23    A.    I was fired.

62

1     Q.    Okay.  Why were you fired?
2     A.    Because I had a passenger
3 in the truck with me that I shouldn't
4 have had in the truck with me.
5     Q.    Okay.  Who was that
6 passenger?
7     A.    Timothy Thomas.
8     Q.    Who is Timothy to you?
9     A.    A friend of mine.
10    Q.    Why was he in the truck at
11 4:30 in the morning?
12    A.    He was going with me to
13 make my delivery.
14    Q.    Did he work for the
15 company?
16    A.    No, sir.
17    Q.    Why was he going with you
18 to make a delivery?
19    A.    He was just riding with me,
20 just a passenger friend.  By it being
21 that early in the morning, just someone
22 to talk to me and keep me awake.
23    Q.    I mean, why was he riding

63

1 with you in the truck?
2     A.    He was just a friend that
3 was riding along with me.
4     Q.    So it's your testimony that
5 this friend was just riding along to
6 keep you company on a run --
7     A.    Yes, sir.
8     Q.    -- at 4:30 in the morning?
9     A.    Yes, sir.
10    Q.    Why were you fired for
11 that?
12    A.    Because the company --
13 because he was not supposed to be with
14 me.
15        MR. ROBERSON:  Company
16 policy?
17        THE WITNESS:  Uh-huh
18 (nodding head).
19    Q.    Were there any drugs or
20 alcohol involved in that wreck?
21    A.    No, sir; no drugs, no
22 alcohol, no fault or anything.  He just
23 wasn't supposed to be with me.

64

1     Q.    Have you ever been made a
2 -- have you ever been a defendant or a
3 plaintiff in any other lawsuit other
4 than this one today?  When I say -- do
5 you understand what I mean by plaintiff
6 or defendant?  Have you ever brought a
7 lawsuit -- have you ever sued anybody,
8 one --
9     A.    No, sir.
10    Q.    -- or been sued by anybody
11 else?
12        MR. ROBERSON:  I think we
13 answered in his interrogatories that he
14 may have been a defendant in that
15 lawsuit with MBM.
16        MR. GARRETT:  Okay.
17    Q.    Is that true?
18    A.    Yes, sir.
19    Q.    So, first of all, you've
20 never sued anybody before this case; is
21 that correct --
22    A.    Yes, sir.
23    Q.    -- and you were a named

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1  defendant with regard to that accident;
2  is that true? The MBM accident --
3      A. Yes, sir.
4      Q. -- you were named?
5      A. Yes, sir.
6          MR. ROBERSON: And I
7  understand that was resolved. I mean,
8  I don't --
9      A. Yeah, I never -- I never --
10  I never went to court on it or
11  anything; I never had to go to court or
12  anything. MBM -- that was the
13  situation.
14      Q. Who was the plaintiff in
15  the suit? Who brought the suit?
16      A. I don't remember.
17      Q. You don't remember who sued
18  you?
19      A. No, sir.
20      Q. Do you remember where the
21  lawsuit was? I mean, Montgomery
22  County?
23      A. Again, like I said, I was

66

1  just notified that I was -- I was just
2  notified that I was being a plaintiff
3  (sic) in it, and I was notified if they
4  needed me, they would let me know if
5  they needed me for anything. That's
6  all I was told.
7      Q. The wreck occurred in
8  Montgomery County though; correct?
9      A. Yes, the wreck occurred in
10  Montgomery.
11      Q. And you don't remember who
12  the plaintiff was?
13      A. No, sir.
14      Q. Was it the old man that you
15  hit from behind or somebody related to
16  that person?
17      A. I don't know who the
18  plaintiff was. I was never told.
19          MR. ROBERSON: It may have
20  been the owner of the car.
21      Q. Was the individual in the
22  van injured?
23      A. No, sir.

67

1      Q. Do you attend church?
2      A. Yes, sir.
3      Q. Where do you attend?
4      A. Church of Christ in
5  Wetumpka.
6      Q. Church of Christ in
7  Wetumpka?
8      A. Yes, sir.
9      Q. Does your mother attend
10  church?
11      A. She's a member of the
12  church.
13      Q. The same church --
14      A. Yes, sir.
15      Q. -- Church of Christ in
16  Wetumpka?
17      A. Yes, sir.
18      Q. Any other church that you
19  go to or your mother or father go to
20  besides the Church of Christ in
21  Wetumpka?
22      A. I don't.
23      Q. Who doesn't? Your mother

68

1  or father go to another church?
2      A. She may occasionally.
3      Q. Tell me about that church.
4      A. I don't know much, I don't
5  know much --
6      Q. You don't know the name of
7  the church?
8      A. I believe it's Miracle
9  Valley.
10      Q. Miracle Valley?
11      A. Yes, sir.
12      Q. Where is that located?
13      A. In Wallsboro, Alabama.
14      Q. Say that again.
15      A. In Wallsboro, Alabama.
16      Q. Wallsboro?
17      A. Uh-huh (nodding head).
18      Q. What county is that in?
19      A. Elmore County.
20      Q. Besides the Church of
21  Christ in Wetumpka and Miracle Valley
22  in Wallsboro, any other churches that
23  you or your direct family go to?

17 (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

69

1    A.   No, sir, not that I -- not
2    that I know of.
3    Q.   Okay.  Are you a member of
4    any organizations; clubs, organi-
5    zations?
6    A.   No, sir.
7    Q.   I understand you've never
8    been married; is that correct?
9    A.   Yes, sir.
10    Q.   Have you had a common-law
11    wife at any time or a live-in
12    girlfriend for an extended period of
13    time?
14    A.   Yes, sir.
15    Q.   More than one?
16    A.   No, sir.
17    Q.   Okay.  What is her name?
18    A.   Channing Dejarnett.
19    Q.   Spell that for me.
20    A.   C-H-A-N-N-I-N-G.
21    Q.   Okay.  Last name.
22    A.   D-E-J-A-R-N-E-T-T, I
23    believe, is how you spell it.

71

1    A.   Yes, sir.
2    Q.   Have you ever owned a
3    house?
4    A.   No, sir.
5      MR. GARRETT:  Let's take a
6    break, and we'll move into another
7    topic.
8
9    (Whereupon, a brief recess was
10    taken.)
11
12    Q.   Mr. Floyd, do you currently
13    have a CDL --
14    A.   Yes, sir.
15    Q.   -- as we sit here today?
16    A.   Yes, sir.
17    Q.   Do you currently have your
18    HAZMAT certification as we sit here
19    today?
20    A.   No, sir.
21    Q.   Why don't you have your
22    HAZMAT?
23    A.   Every two years you have to

70

1    Q.   Channing Dejarnett?
2    A.   Uh-huh (nodding head).
3    Q.   And do you have any
4    children together?
5    A.   Yes, sir.
6    Q.   How many?
7    A.   One.
8    Q.   How old is that child?
9    A.   He's three.
10    Q.   Any other long-time
11    girlfriends?
12    A.   Yes, sir.
13    Q.   Who's the other one?
14    A.   Lisa Russell.
15    Q.   All right.  And did y'all
16    have any children together?
17    A.   No, sir.
18    Q.   Any other long-time girl-
19    friends besides Lisa and Channing?
20    A.   Lashay Jones.
21    Q.   Anyone else?
22    A.   No, sir.
23    Q.   Is that it?

72

1    go through a process of -- a long
2    process of restoring it, and I haven't
3    been using them much.  I haven't used
4    them much since I had them.  In fact,
5    Southeast Cherokee was the only company
6    that I had a chance to exercise them
7    with, so I dropped them.
8    Q.   So you dropped your HAZMAT
9    certification?
10    A.   Yes, sir.
11    Q.   Was your HAZMAT certi-
12    fication ever terminated?
13    A.   Excuse me?
14    Q.   Was it ever terminated or
15    cancelled; your HAZMAT certification?
16    A.   If you do not every two
17    years go and re-certify them, then they
18    will automatically be terminated.
19    That's what I mean by just letting them
20    go.  I just dropped them.  That's what
21    you call dropped.
22    Q.   Okay.  And the reason you
23    dropped that being you just felt like

18  (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

73

1  it wasn't a necessity for you anymore?
2      A.  Yes, sir.
3      Q.  What does having the HAZMAT
4  certification allow you to drive?  What
5  kind of trucks does that allow you to
6  drive?
7      A.  Trucks carrying fuel,
8  oil, any kind of hazardous material,
9  chemicals and whatnot.
10      Q.  So you understand that
11  allowing that to lapse that you can no
12  longer drive trucks that carry fuel,
13  oil, or chemicals; correct?
14      A.  Yes, sir.
15      Q.  No plans in the future to
16  ever drive those kind of trucks?
17      A.  Well, it's not -- it's not
18  -- if I have plans -- most companies,
19  if you have a CDL and you have let them
20  drop, they'll send you through a course
21  to get them back, so it wouldn't be a
22  problem to get them back.
23      Q.  Who has told you that?

74

1      A.  That's a fact.
2      Q.  Well, how do you know that?
3  I mean, what companies will do that for
4  you?
5      A.  Just about any company that
6  requires a HAZMAT material endorsement.
7      Q.  So it's your testimony
8  that any company that requires a HAZMAT
9  endorsement will send you back to get a
10  HAZMAT certificate that's been
11  terminated?
12      A.  Either or require you to go
13  back and get them, which only requires
14  you going down to the Department of
15  Transportation, getting on the
16  computer, taking the test, passing the
17  test, and they replace it.
18      Q.  Do you know if the FBI does
19  a background search and you have to be
20  fingerprinted before you can get a
21  HAZMAT recertification?
22      A.  I don't believe so.  I'm
23  not sure, but I don't believe so.

75

1      Q.  How did you come to be
2  aware that there was a position open at
3  Southeast Cherokee?
4      A.  I just stopped by; I just
5  stopped by one day to fill out an
6  application.
7      Q.  Okay.  Why did you just
8  stop -- I mean, how did you know to
9  stop by?
10      A.  I didn't know.  I just
11  stopped by because I was looking to do
12  something else.  I was looking to do
13  something else, and I wanted to sell my
14  truck, so -- and before I sold my
15  truck, I was making sure that I had
16  something stable somewhere else.
17      Q.  My question is:  Is there
18  any specific reason why you went to
19  Southeast Cherokee looking for
20  employment?
21      A.  No, sir.
22      Q.  Do you have any family that
23  was employed at Southeast Cherokee?

76

1      A.  No, sir.
2      Q.  Any friends at Southeast
3  Cherokee?
4      A.  No, sir.
5      Q.  When you first went in that
6  first day to apply for a job, what did
7  you do exactly?
8      A.  I said that I wanted to
9  fill out an application.  And Mr. -- I
10  spoke to a Mr. Randy Davis, and he
11  asked me did I have a CDL.  I told him
12  yes, and he hired me that day.  He
13  hired me -- he told me I was hired that
14  day.
15      Q.  Okay.  And what position
16  were you applying for?
17      A.  I was just -- anything --
18  anything dealing with driving, and it
19  turned out to be a dump truck.
20      Q.  So when you went in and
21  asked for a job, what did you tell them
22  you were looking to do?  What did you
23  say you wanted to do for the company?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

77

1    A.   I didn't say anything in
2  particular or specific.
3    Q.   Okay.  Did you request to
4  be a truck driver?
5    A.   Yes, sir.
6    Q.   Okay.
7    A.   I mean, I presented myself
8  as CDL truck driving is my trade, but
9  anything in particular around truck
10  driving, no.
11    Q.   Let me just ask you -- I
12  mean, I'm just trying to get a simple
13  answer.  Did you apply to be a truck
14  driver?
15    A.   Yes, sir.
16    Q.   You didn't apply to be a
17  mechanic?
18    A.   No, sir.
19    Q.   You didn't apply to be a
20  laborer?
21    A.   No, sir.
22    Q.   You applied to be a truck
23  driver?

78

1    A.   Yes, sir.
2    Q.   Okay.  Let me backtrack.
3  When you were with Hodgson, what type
4  of trucks were you driving back then?
5    A.   A flatbed truck -- a
6  flatbed -- it wasn't a --
7    Q.   A flat -- I'm sorry, a
8  flatbed?
9    A.   A flatbed truck with a
10  diesel engine that didn't require a
11  CDL.
12    Q.   So you were driving -- is
13  that, for the jury, like a semi with a
14  flatbed on it like a diesel truck?
15    A.   No.  It's something like a
16  -- something like a dually with a
17  flatbed on the back of it.
18    Q.   So that's just -- you just
19  mean like a big pickup with a flatbed
20  on the back?
21    A.   Yes, sir.
22    MR. ROBERSON:  How many
23  wheels?

79

1    THE WITNESS:  Six.
2    MR. ROBERSON:  Six wheels.
3    THE WITNESS:  Yes, sir.
4    Q.   Were you driving dump
5  trucks?
6    A.   With Hodgson and Blake?
7    Q.   Correct.
8    A.   No, sir.
9    Q.   Before you applied to be a
10  truck driver with Southeast Cherokee,
11  had you ever driven a dump truck?
12    A.   No, sir.
13    Q.   What kind of materials were
14  you hauling at Hodgson on the flatbed?
15    A.   Storm drain pipes.
16    Q.   So you were actually -- you
17  were driving pipes to and from the work
18  scenes?
19    A.   If need be, yes, sir.
20    Q.   When you went in that
21  day, do you recall filling out an
22  application?
23    A.   No, sir, I didn't.  It was

80

1  a couple of days later before I was
2  actually required to fill out an
3  application.
4    Q.   Okay.  Do you recall at
5  some point in time filling out an
6  application for employment?
7    A.   Yes, sir.
8
9    (Whereupon, Defendant's Exhibit 1
10    was marked for identification and
11    same is attached hereto.)
12
13    Q.   I'll show you what I'm
14  going to mark as Defendant's Exhibit 1
15  to your deposition.  I'll let you take
16  a look at that and see if you recall
17  filling out that material -- that
18  application.
19    A.   I did receive some
20  material to take home that day to
21  fill out.
22    Q.   Right.  My question is:  Do
23  you recall filling those materials out,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1  what's been marked as Defendant's
2  Exhibit 1?
3      A.   (Witness reviews document).
4      Q.   I'm sorry.  Did you
5  understand my question?
6      A.   Could you ask it again?
7      Q.   Yeah.  I just want to know
8  if you filled these forms out.
9      A.   Yes, sir, I did --
10     Q.   Hold on --
11     A.   -- except for the Hodgson
12 and Blake.
13     Q.   I'll ask you questions.  I
14 just want to know if you filled it out.
15     A.   Okay.
16     Q.   Hold on to it.  I'm going
17 to ask you questions about it.
18 Underneath there where it says
19 "Position" -- read along with me, if
20 you want to -- "Position for which you
21 were hired, example, truck driver,
22 dozer, scraper, laborer," it says
23 "truck driver" there; correct?

82

1      A.   Uh-huh (nodding head).
2      Q.   So you were hired as a
3  truck driver?
4      A.   Uh-huh (nodding head).
5      Q.   You would agree with that?
6      A.   Yes, sir.
7      Q.   Now, if you'd flip over to
8  the second page there, it says again
9  position applying for is driver;
10 correct?
11     A.   Uh-huh (nodding head).
12     Q.   It says "Salary desired,
13 ten fifty an hour."
14     A.   Uh-huh (nodding head).
15     Q.   Now, where did that amount
16 come from?
17     A.   Salary desired?
18     Q.   Yes.
19     A.   That's what -- that's what
20 Mr. Davis told me that he would pay me.
21     Q.   And under that it says
22 "Work experience," you've got "Dump
23 truck driver" underneath there; right?

83

1      A.   Uh-huh (nodding head).
2      Q.   But you just told us that
3  you had never driven a dump truck
4  before; correct?
5      A.   Well, the flatbed had dump
6  bed ability, so you can call it a
7  flatbed or dump truck.
8      Q.   Okay.  So it's your
9  testimony today that the flatbed truck
10 that you were driving without a CDL is
11 the exact same thing as a dump truck?
12     A.   No.  What I'm saying is
13 that the flatbed -- that the flatbed
14 had dump capability letting up like a
15 dump.
16     Q.   So -- I'm sorry, I miss
17 -- I understand the flatbed truck that
18 you drove, that the back can be raised
19 and lowered, I understand that.
20     A.   Uh-huh (nodding head).
21     Q.   But it is true that you've
22 never driven any dump truck before you
23 -- before Southeast Cherokee; correct?

84

1      A.   Not a dump truck like
2  Southeast Cherokee had, no.
3      Q.   Or like a juror might
4  understand to be a dump truck with the
5  big payload in back that you can load
6  gravel and sand in, things of that
7  nature?
8      A.   Well, we did -- we did --
9  we did carry some sand and some gravel
10 on the back of the truck I drove at
11 Hodgson and Blake.  It had dump
12 capabilities, but it was not -- there's
13 different kind of dump trucks.  There's
14 a dump truck that requires a CDL --
15     Q.   Uh-huh (nodding head).
16     A.   -- and a dump truck that
17 don't require a CDL.
18     Q.   Right.  Is there any reason
19 why you didn't tell them you were a
20 flatbed driver instead of a dump truck
21 driver?
22     A.   Well, I worked at Hodgson
23 and Blake long before I ever got my --

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1   I worked at Hodgson and Blake long
2   before --
3       Q.   Uh-huh (nodding head).
4       A.   -- Southeast Cherokee --
5       Q.   Right.
6       A.   -- before I ever had a CDL.
7       Q.   No, I didn't ask you that.
8   I was asking why you didn't tell them
9   you drove a flatbed instead of a dump
10  truck on your application here.
11      A.   I didn't think anything
12  of it.  Both of them had dump
13  capabilities.
14      Q.   Okay.  If that's your
15  testimony, that's fine.
16           Let me ask you about this
17  equipment experience.  It says "backhoe
18  bulldozer, front-end loader."
19      A.   Uh-huh (nodding head).
20      Q.   Where had you got -- where
21  did you get that experience operating
22  a backhoe -- let's start with a
23  backhoe.   Where did you get your

86

1   backhoe experience?  Who did you
2   operate a backhoe for in the past
3   before Southeast Cherokee?
4       A.   Well, my granddad -- my
5   granddad had a lot of -- on the farm,
6   he had a lot of equipment around, and
7   my uncle, they had a lot of equipment
8   around the farm and -- basically around
9   the farm.
10      Q.   Okay.  So it's your
11  testimony your granddad and your uncle
12  own a farm?
13      A.   Yes, sir.
14      Q.   Where is the farm?
15      A.   It's in Wetumpka, Alabama.
16      Q.   Where in Wetumpka?
17      A.   Mount Zion Road.
18      Q.   How many acres?
19      A.   Eighty-eight.
20      Q.   Do they farm it?
21      A.   Once upon a time, they did.
22  They don't anymore.
23      Q.   When did they stop farming?

87

1       A.   Well, my granddad's been
2   dead for a number of years now.  I
3   think my granddaddy died in 1997.
4       Q.   So they haven't farmed it
5   since '97?
6       A.   Yes, sir.
7       Q.   Before he died, what did
8   they farm on the eighty-eight acres?
9       A.   Um, different things.
10  Mostly cattle, crops, pigs, chickens,
11  you know, that kind of thing.  And he
12  and my uncle -- he and my uncle did
13  side work with this kind of equipment.
14      Q.   Okay.  Tell me about the --
15  first of all, you say you operated a
16  backhoe on your grandfather's farm.  Is
17  that what you're testifying to?
18      A.   Uh-huh (nodding head).
19      Q.   What kind of backhoe was
20  it?
21      A.   A backhoe -- regular
22  backhoe.
23      Q.   Well, you have to be a

88

1   little more specific.  Can you describe
2   it; what kind of backhoe it was, the
3   size --
4       A.   With a bucket on the front
5   and a bucket on the back.
6       Q.   Okay.  And what kind of
7   brand was it?  Who made the tractor;
8   what brand was it?
9       A.   Caterpillar.
10      Q.   Is this a piece of
11  equipment your grandfather owned?
12      A.   Yes, sir, he and my uncle.
13      Q.   Okay.  And what kind of
14  things would you do on the backhoe?  I
15  mean, did you work for them?
16      A.   I helped them out (nodding
17  head).
18      Q.   What would you do with the
19  backhoe?
20      A.   I helped them out
21  occasionally load -- load dirt and
22  gravel and whatnot.
23      Q.   You would load dirt and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

89

1 gravel?
2     A.   Uh-huh (nodding head).
3     Q.   What do you mean?  Load
4 dirt and gravel, what do you mean?
5     A.   I mean, the kind of work
6 that is generally used for a backhoe.
7 I mean, a backhoe can be used for many
8 different things.
9     Q.   When you say "load dirt and
10 gravel," what do you mean?  I'm
11 confused.  What were you loading from
12 and to?  I mean, what were you loading?
13     A.   Loading dirt from -- or
14 transporting dirt from one place to
15 another.
16     Q.   Okay.  How often would you
17 do this kind of work with the backhoe?
18     A.   They did -- they did it --
19 they did it.
20     Q.   I know they did it.  I'm
21 interested in what you did with this
22 piece of equipment.
23     A.   I'd do it every now and

90

1 again.  I would go along with them, but
2 I did -- I would get up on the
3 equipment.  I knew how to operate it,
4 I never said that I was a specialist.
5 I knew -- I knew how to operate it.
6     Q.   How did you know how to
7 operate the machinery?
8     A.   Past experience.
9     Q.   Well, who taught you?
10     A.   My granddaddy, my uncle.
11     Q.   They taught you how to run
12 a backhoe?
13     A.   Yes, sir.  It's real
14 simple.  I mean, it's not --
15     Q.   Hold on.  Who taught them?
16     A.   I don't know.
17     Q.   You say every once in a
18 while you'd hop up there and move some
19 stuff around?
20     A.   Yes, sir.  And even like
21 when they were around the farm and they
22 were just sitting there not being
23 needed, I would get on it and play

91

1 around with them and whatnot.
2     Q.   Just for fun?
3     A.   Yes, sir.
4     Q.   What years would you
5 operate that backhoe; how old were
6 you?  Give me the years you did it.  I
7 know you were --
8     A.   Young, young, extremely
9 young.
10     Q.   Give me the dates.  How old
11 were you when you were playing on the
12 backhoe?
13     A.   Between eleven and
14 seventeen.
15     Q.   Okay.  Since you were --
16 between the time you were seventeen and
17 the time you went to apply for a job at
18 Southeast Cherokee, had you had any
19 other experience operating a backhoe?
20     A.   No, sir.
21     Q.   All right.  Tell me about
22 the bulldozer.
23     A.   The same --

92

1     Q.   What experience did you
2 have with the bulldozer?
3     A.   The same type of
4 experience.  Just by them being around
5 the farm, just playing around on them
6 and occasionally going to work with my
7 granddaddy and my uncle and whatnot,
8 the same type of experience.
9     Q.   Let me back up.  Did they
10 own a bulldozer?
11     A.   Yes, sir.
12     Q.   What kind of -- who made
13 the bulldozer?
14     A.   Who made it?
15     Q.   Yeah, who made it.
16     A.   They were all Cat.
17     Q.   And then you used it the
18 same time period, eleven to seventeen?
19     A.   Yes, sir.
20     Q.   Tell me about how often a
21 week you would operate that backhoe.
22     A.   Just sometime on the
23 weekends when I weren't at school or --

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

93

1    Q.   Give me an average.  How
2  many times, say, every -- how many
3  times a year would you do it; would you
4  actually be up there and riding on the
5  backhoe and bulldozer?
6    A.   How many times a year?
7    Q.   Yes, just on average.
8    A.   I don't know, I don't know.
9    Q.   I mean, less than five?
10   A.   More than five; it would be
11 more than five.
12   Q.   More or less than ten?
13   A.   In a year's time?
14   Q.   Yes.
15   A.   It would be more than ten.
16   Q.   Ten to twenty, twenty to
17 thirty, forty to fifty, a hundred?  I
18 mean, you tell me.  I don't know, I
19 wasn't there.
20   A.   Twenty or thirty times a
21 year.
22   Q.   Twenty or thirty times a
23 year?

95

1  mean -- yes, sir.
2    Q.   Well, were you paid for
3  this work?
4    A.   No, sir.  I was just a
5  youngster raring to go along with his
6  granddaddy.
7    Q.   The same question on the
8  front-end loader.
9    A.   The same type, the same
10 thing.  That question, the answer to
11 each one of those --
12   Q.   So did your uncle and
13 grandfather own a front-end loader?
14   A.   Yes, sir.
15   Q.   The same thing, the
16 Caterpillar brand?
17   A.   Yes, sir.
18   Q.   Okay.  The same deal, you
19 would have had some experience with it
20 between the time you were eleven and
21 seventeen?
22   A.   Yes, sir.
23   Q.   No experience between

94

1    A.   (Witness nodding head).
2    Q.   Any of those twenty or
3  thirty times a year, what were you
4  moving with the bulldozer?  What kind
5  of work were you doing with it?
6    A.   The majority of the time, I
7  would just be playing around the farm
8  on it.
9    Q.   So you weren't really
10 working it, you were just kind of
11 playing around on it?  You weren't
12 actually working with it, you were just
13 kind of playing with it?
14   A.   Well --
15   Q.   Well, you tell me.  Again,
16 I wasn't there.
17   A.   I would -- I would --
18 occasionally, when I went to work with
19 them, they would have me to move some
20 dirt or gravel from this area and put
21 it at this area so it would be close to
22 where they were working at and whatnot;
23 go get them some dirt in this area.  I

96

1  seventeen and the time you applied for
2  Southeast Cherokee?
3    A.   No, sir.
4    Q.   And that would be the same
5  -- true for the bulldozer; correct?
6    A.   Yes, sir.
7    Q.   You were never paid for
8  moving the front-end loader -- using
9  the front-end loader, either, I assume?
10   A.   No, sir.
11   Q.   What was the -- Did they
12 have a corporation or some kind of name
13 for the farm that your granddad and
14 uncle were --
15   A.   No, sir.  They just -- I
16 guess you could call it -- well, I
17 don't know.  If they had a name for it,
18 I was too young to know what it was.
19   Q.   You were seventeen --
20 eleven to seventeen, you never knew it
21 to have a name?
22   A.   No, sir.
23   Q.   Was that their primary

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

97

1  source of income; your grandfather and
2  your uncle, or did they do other
3  things?
4       A.   Yeah.  They used the
5  equipment to do a lot of different
6  things.  I mean, to do some
7  landscaping, clearing off property,
8  just a lot of different things.  I
9  don't even know if it was ever legal, I
10 just know that they had the equipment
11 that they would do jobs with.  I don't
12 know, I don't know.
13      Q.   Okay.  Aside from whenever
14 you would ride the equipment on your
15 family farm, did you ever go with your
16 uncle or your grandfather on what I
17 would call a paid outside job?
18      A.   Excuse me?
19      Q.   Aside from when you would
20 do whatever you did with the equipment
21 that your family -- the eighty-eight
22 acres, aside from that, did you ever go
23 with your grandfather or uncle to work

98

1  this equipment on an outside job for
2  pay?  These other clearing jobs that
3  you were talking about they would do,
4  did you ever go work with them in doing
5  these other jobs?
6       A.   Occasionally (nodding
7  head).
8       Q.   Okay.  And you were paid
9  for that work?
10      A.   No, sir.
11      Q.   Why weren't you paid?
12      A.   Again, I was just a
13 youngster, just raring to be going
14 along with his granddaddy and his
15 uncle.
16      Q.   So you would just kind of
17 ride with your granddad on the
18 equipment?
19      A.   Sometimes (nodding head).
20      Q.   Now, when you filled out
21 this application with your work
22 experience, did you ever explain to Mr.
23 Davis the extent of your expertise in

99

1  this equipment?
2       A.   I was never asked.
3       Q.   Okay.  I mean, did you ever
4  explain it to him?
5       A.   I was never asked (shaking
6  head).
7       Q.   Is the answer no?  I
8  understand what you're saying, but if
9  you'll answer my question, we can move
10 on.
11      A.   No, sir.
12      Q.   Did you ever explain to him
13 the extent of your experience?
14      A.   No.
15      Q.   Now, I've got your
16 Complaint here kind of going over the
17 things that you're going to allege in
18 this case, and I want to cover some of
19 this stuff for you.  Okay?  I mean, I
20 want to cover some of this stuff in
21 some detail and help you kind of
22 explain some things to me.
23           It's got in your Complaint

100

1  that you began your employment May 2,
2  2005.  I've got May 10, 2005.  Would
3  you dispute that in terms of your hire
4  date?
5       A.   I don't know how that could
6  be.
7       Q.   Okay.  Well, where did you
8  get May 2, 2005 as your hire date?
9           MR. GARRETT:  Off the
10 record.
11
12           (Whereupon, a discussion was held
13           off the record.)
14
15      Q.   Do you know where May 2nd
16 came from?
17      A.   (Witness shrugs shoulders).
18           MR. ROBERSON:  It came from
19 -- in the Complaint, it came from his
20 EEOC charge, which I didn't represent
21 him when he filed.
22           MR. GARRETT:  That's fine.
23      Q.   I just want to know.

25  (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**101**

1     A.   I don't know.  It may have
2  been a misprint on there.  I don't
3  know.
4     Q.   That's a good --
5          MR. ROBERSON:  Did they
6  hire you the date you filled this out
7  (indicating)?  Did you start working
8  that day, or did you start working the
9  next day?
10         THE WITNESS:  I believe it
11 was the next day; it was the next day.
12    Q.   Okay.
13         MR. ROBERSON:  Were you
14 paid on Fridays?
15         THE WITNESS:  I was paid on
16 Fridays (nodding head).
17         MR. ROBERSON:  Look at a
18 calendar and see.
19         MR. GARRETT:  Okay.
20    Q.   Let's go through some of
21 these allegations.  When you started as
22 a dump truck driver, what was your rate
23 of pay?

**102**

1     A.   Ten dollars and fifty
2  cents.
3     Q.   Okay.  And sometime after
4  you had been hired, you were approached
5  to temporarily take the position of a
6  service truck driver; is that correct?
7     A.   Yes, sir.
8     Q.   What are your understanding
9  -- what's your understanding of the
10 duties of a service truck driver?
11    A.   What are my understandings
12 of it?
13    Q.   Correct.  I mean, what is a
14 service truck driver responsible for?
15    A.   A service truck driver is
16 responsible for service type duties;
17 service as in changing the oil,
18 changing fluids, minor -- minor --
19 minor stuff.  It's not the same as the
20 master mechanic.  It's minor stuff;
21 changing tires, changing the oil,
22 changing -- minor service work, minor
23 service work.

**103**

1     Q.   Okay.  I just need you to
2  explain.  In the best detail you can,
3  you tell me what the duties of a
4  service truck driver are.  We've got
5  changing oil.
6     A.   (Witness nodding head).
7     Q.   Changing oil on what?
8     A.   Any of the equipment.
9     Q.   Any of the equipment in the
10 entire fleet?
11    A.   Uh-huh (nodding head), yes,
12 sir.
13    Q.   Okay.  You said changing
14 fluids?
15    A.   Yes.
16    Q.   Is that fluids on any of
17 the equipment in the entire fleet?
18    A.   Yes, sir.
19    Q.   Changing tires?
20    A.   Yes, sir.
21    Q.   What does that encompass?
22 What tires would you be responsible for
23 changing?

**104**

1     A.   If -- I was told -- I was
2  told by Mr. Davis that -- just minor
3  service work; changing fluids; changing
4  tires like on a truck or something;
5  putting fluids into the machines, gas,
6  oil, hydraulic fluid; keeping a check
7  on the fluids making sure they stay up
8  around where they supposed to be and
9  whatnot.
10    Q.   All right.  I've got
11 changing oil, changing fluids, changing
12 tires, putting gas in the equipment.
13 You said putting hydraulic fluid?
14    A.   Uh-huh (nodding head),
15 yes, sir.
16    Q.   Okay.  What else?
17    A.   That's all I was told that
18 I was required to do.
19    Q.   Okay.  Do you recall being
20 told that you might have to change
21 belts and hoses?
22    A.   Yes, I may have -- yes,
23 yes.  I believe I do recall belts and

26  (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

105

1    hoses, yes, sir.
2        Q.   How about being able to
3    work on starters or alternators?
4        A.   No, sir.
5        Q.   How about being able to
6    move and operate the entire fleet
7    equipment for servicing?
8        A.   No, I wasn't -- I wasn't
9    told that.
10       Q.   So you say you were not
11   told you'd have to move the equipment
12   you were servicing?
13       A.   Not upon hiring, I wasn't.
14       Q.   Okay.  Hiring when?
15       A.   My first day when I got
16   hired, I wasn't told that I would have
17   to do that then.
18       Q.   Well, yeah, but you didn't
19   apply for the service truck driver when
20   you were first hired; right, you
21   applied for a truck driver?
22       A.   This is what I was told --
23       Q.   Okay.

106

1        A.   -- if I knew how to operate
2    a piece of equipment, then if there
3    wasn't anyone else around, then -- if
4    there wasn't anyone else around that
5    did operate that equipment, then I
6    would have to move it myself because
7    the equipment still had to be seen
8    about.
9        Q.   Right.  So you were told
10   that you might have to move equipment
11   to service it; correct?
12       A.   From time to time (nodding
13   head).
14       Q.   Okay.  Upon being told that
15   you were going to have to be able to
16   move equipment from time to time, did
17   you ever voice any concern that you
18   might not have the knowledge to move
19   any equipment?  Did you ever bring it
20   to anybody's attention that you might
21   not have the training to move certain
22   equipment?
23       A.   No, sir.

107

1        Q.   Have you received training
2    at any time in the past with regard to
3    how to change oil in heavy equipment,
4    front-end loaders, bulldozers,
5    backhoes?
6        A.   Have I ever received any
7    training or have I ever done it?
8        Q.   I'll ask you both ways.
9    First, have you received any
10   training --
11       A.   No, sir.
12       Q.   -- formal training?
13       A.   No, sir.
14       Q.   The same applies for fluid
15   levels, maintaining fluid levels, or
16   adjusting fluid levels in heavy
17   equipment, have you ever received any
18   training?
19       A.   No, sir.
20       Q.   How about changing tires on
21   the heavy equipment, any training --
22       A.   Training, no, sir.
23       Q.   -- in that regard?

108

1        A.   No, sir.
2        Q.   Do you have any training
3    with regard to working on starters or
4    alternators?
5        A.   No, sir.
6        Q.   And you said earlier that
7    you had experience moving backhoes,
8    bulldozers, front-end loaders when you
9    were a kid with your granddad.
10       A.   Yes, sir.
11       Q.   Aside from that, have you
12   had any training with regard to moving
13   the equipment that was utilized in the
14   Southeast Cherokee's heavy equipment
15   fleet?
16       A.   Excuse me?
17       Q.   Aside from what you told me
18   about riding around with your granddad
19   on the farm on the backhoe and the
20   bulldozer and the front-end loader,
21   aside from that, have you had any
22   training with regard to how to move
23   heavy equipment?

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1    A.    Aside from that?
2    Q.    Right, aside from that.
3    A.    No, sir.
4    Q.    Well, with that
5    established, tell me how you knew how
6    to change oil on the heavy equipment at
7    Southeast Cherokee -- I mean, change
8    oil, change oil filters, check levels,
9    who taught you -- how did you have that
10   knowledge?
11   A.    When I owned my own truck,
12   I did all the service work on it
13   myself; changed the oil, the filters,
14   the brakes, the tires, the hoses, the
15   belts.  And this is what I informed Mr.
16   Davis.  And they're basically all the
17   same thing, you take the bolt out and
18   let the oil out and put the oil back in
19   and put the bolt back on it and change
20   the filter -- replace the filter.
21   Changing oil is real simple.
22         And all of them -- heavy
23   equipment has diesel engines.  My

110

1    eighteen-wheeler had a diesel engine in
2    it.  They're just the same thing; a
3    diesel engine.  I did the service work
4    on my own diesel engine, and it would
5    be the same process of doing the
6    service work on another diesel engine.
7    Q.    So it's your opinion in --
8    just to make sure I've got this
9    straight, you did -- well, first of
10   all, let me break that down.
11         Tell me the extent of the
12   preventive maintenance work you did on
13   your own truck when you owned it.
14   Start there and tell me everything you
15   did on that truck by yourself with
16   regard to mechanical work.
17   A.    I greased it, I greased the
18   grease fittings --
19   Q.    Uh-huh (nodding head).
20   A.    -- I changed the oil in it,
21   I changed the oil filters, I changed
22   the belts on it, I replaced the grease
23   fittings on it, I changed the brakes on

111

1    it, I changed tires on it.  I -- I kept
2    a check on the fluid -- I kept a check
3    on the fluid levels and made sure the
4    fluid levels were -- made sure there
5    wasn't any leaks on anything that
6    contained fluids.  Just minor service
7    work.
8    Q.    Okay.  And where did you go
9    to get your supplies to do all that?
10   Where did you purchase your supplies?
11   A.    I had a Caterpillar engine
12   in my truck, which is the majority of
13   what Southeast Cherokee had; Cater-
14   pillar.
15   Q.    I just asked where you
16   purchased your stuff.
17   A.    From Caterpillar.
18   Q.    Which Caterpillar?
19   A.    The Caterpillar off I-85
20   here in Montgomery.  I can't think of
21   the name of it, I can't think of the
22   name of it.  Something like Truck
23   Equipment Supply or something like

112

1    that.  I can't think of the name of it.
2    Q.    Okay.  Did you ever at any
3    time when you owned your own truck take
4    it in to have it serviced by another
5    individual or entity?
6    A.    No, sir.
7    Q.    Not one time?
8    A.    No, sir.
9    Q.    Aside from working on your
10   truck, did you ever have the
11   opportunity to change the oil, change
12   the belts, change the filters, work on
13   the brakes, tires, or do fluid levels
14   for any other kind of equipment at
15   Southeast Cherokee?
16   A.    For any --
17   Q.    Any of the equipment out
18   there.
19   A.    I don't understand what
20   you're asking.
21   Q.    I'm asking -- I understand
22   you're saying you used to do your own
23   PM work on your own truck.  I got that.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

113

1   What I'm saying is aside from that, had
2   you ever done PM work, and when I say
3   PM, preventive maintenance work, with
4   regard to changing oil, oil filters,
5   fluid levels, belts, brakes, tires on
6   any of the other equipment in the
7   Southeast Cherokee fleet; that type of
8   equipment?
9       A.   What you're asking me is
10   did I -- did I --
11       Q.   All right.  I'll break it
12   down.
13       A.   Yes, sir.
14       Q.   Have you ever done PM
15   maintenance on a bulldozer before going
16   to work for Southeast Cherokee?
17       A.   No, sir.
18       Q.   Have you ever done PM
19   maintenance on a front-end loader
20   before going to Southeast Cherokee?
21       A.   No, sir.
22       Q.   Have you ever done PM
23   maintenance on a dump truck before you

114

1   went to Southeast Cherokee?
2       A.   No, sir.
3       Q.   Have you ever done PM
4   maintenance on a backhoe before you
5   went to Southeast Cherokee?
6       A.   Yes, sir.
7       Q.   You did -- you have done PM
8   maintenance on a backhoe?
9       A.   Yes, sir.
10       Q.   Okay.  Tell me about that.
11   When did you do that work?
12       A.   Like I'm saying, around the
13   farm, heavy equipment, they all have
14   diesel engines, they all have grease
15   fittings and whatnot.  I have done
16   small things like -- I have done small
17   things to them like putting grease in
18   the grease fittings, just a number of
19   little minor stuff that I -- that I saw
20   my granddaddy and my uncle doing over
21   the years, I had -- and by me having my
22   own truck, I had knowledge of minor
23   service work.

115

1       Q.   Okay.  So what you're
2   saying is any experience or knowledge
3   you have with regard to doing
4   preventive maintenance work on
5   equipment was self-taught based upon
6   what you did on your own truck or what
7   you did watching your granddad back on
8   the farm?
9       A.   Yes, sir.
10       Q.   Okay.  Now, how long were
11   you driving the dump truck before you
12   were offered the service truck driver
13   position the first time?
14       A.   A couple of weeks.
15       Q.   Okay.  This is a good time
16   -- let me stop here.  How long were you
17   employed total with Southeast Cherokee;
18   how many total?
19       A.   Six months maybe.
20       Q.   Okay.  I've got about four.
21   I mean, does that sound about right;
22   four months, from May until September?
23           MR. ROBERSON:  Five.

116

1       Q.   Five months.  I apologize.
2       A.   Five months.
3       Q.   Okay.  You say you were
4   working a couple of weeks before you
5   were offered the job of being the
6   service truck driver?
7       A.   Before I -- I was working
8   there a couple of weeks -- I said I was
9   working there a couple of weeks --
10       Q.   Uh-huh (nodding head).
11       A.   -- before I was -- before I
12   was asked to operate the service truck
13   temporarily.
14       Q.   Yeah.  I was getting to
15   that.  So is that a "Yes"?
16       A.   Yes, sir.
17       Q.   Okay.  So you were working
18   there a couple of weeks, and you were
19   approached to temporarily take the
20   position of the service truck driver?
21       A.   Yes, sir.
22       Q.   Okay.
23       A.   Yes, sir.

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

117

1    Q.    Who was driving the service
2  truck before you were asked to take the
3  temporary job?
4    A.    Donnie Gantt.
5    Q.    And did you have an
6  opportunity to work with Donnie Gantt
7  prior to being asked to take his
8  position?
9    A.    Excuse me?
10    Q.    Did you have an opportunity
11  to work with Mr. Gantt before being
12  asked to take his position as a service
13  truck driver?
14    A.    To work with him?
15    Q.    Yeah, to work with him.
16    MR. ROBERSON:  Do you mean
17  like ride with him?
18    MR. GARRETT:  I mean, just
19  -- any way; just work with him.
20    Q.    Did you have a chance to
21  work with him?
22    A.    I mean, we were both in the
23  same company.  Do you mean like that.

118

1    Q.    Yeah.  But on a day-to-day
2  basis, did you have a chance to work
3  with him doing what he did?
4    A.    Did I have a chance to work
5  with him doing what he did as a service
6  truck driver while he was there?
7    Q.    Correct.
8    A.    No, sir.
9    Q.    Before being asked that
10  first time to work as a service truck
11  driver, had you done any kind of
12  mechanical work at Southeast Cherokee?
13    A.    No, sir.
14    Q.    Well, tell me what you
15  recall -- how you recall being
16  approached to take the service truck
17  position.
18    A.    To take the --
19    Q.    How did it come to be?
20  Tell me -- give me the story.
21    A.    To take the service truck
22  position or to operate it temporarily?
23    MR. ROBERSON:  Temporarily,

119

1  the first time.
2    Q.    Yeah, the first time;
3  temporarily.
4    A.    I was approached by Mr.
5  Jerry Carter, and he asked me would I
6  operate it temporarily until Mr. Donnie
7  Gantt came back.
8    Q.    Okay.  What did you tell
9  him?
10    A.    I told him yes, sir, I
11  would.
12    Q.    Okay.  And what else was
13  said during that initial conversation,
14  if anything?
15    A.    Other than that, I don't
16  recall -- other than that -- other than
17  that, nothing.
18    Q.    Did you discuss how much
19  you'd be paid?
20    A.    Yes, sir, that was in the
21  discussion.
22    Q.    How did that -- what was
23  said about how you'd be paid?

120

1    A.    After Mr. Jerry Carter
2  asked me would I operate it until
3  Donnie Gantt gets back, just
4  temporarily, I just need you just to do
5  this for me, your pay is going to stay
6  the same, your ten dollars and fifty
7  cents, your pay is going to stay the
8  same until Donnie Gantt gets back, and
9  then I'm going to put you back in the
10  dump truck.
11    Q.    And he said this is going
12  to be a temporary position until Donnie
13  Gantt gets back, your pay is going to
14  remain the same --
15    A.    Yes, sir.
16    Q.    -- and that was at ten
17  dollars and fifty cents?
18    A.    Yes, sir.
19    MR. ROBERSON:  Did he tell
20  you where Donald Gantt was going?
21    MR. GARRETT:  Hold on a
22  minute.  You aren't going to sit here
23  and ask questions in the deposition.  I

30  (Pages 117 to 120)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

121

1  mean, you can get that out any way you
2  want, but don't ask questions in the
3  deposition. It's completely improper.
4  Do you agree with me?
5      MR. ROBERSON: I don't, but
6  go ahead.
7      MR. GARRETT: Thank you.
8      Q. Now, he said your pay was
9  going to stay the same at ten dollars
10 and fifty cents an hour?
11     A. Yes, sir.
12     Q. And when did you start
13 driving the service truck? The same
14 day, the next day?
15     A. That same day.
16     Q. Same day?
17     A. The same day he approached
18 me.
19     Q. About what time of the day
20 did he approach you?
21     A. It was in the morning
22 hours.
23     Q. Okay. And were you

122

1  provided any training with regard to
2  the truck at all?
3      A. No, sir.
4      Q. No training?
5      A. No, sir.
6      Q. They just handed you the
7  keys and said here's your truck?
8      A. What do you mean when you
9  say "training"?
10     Q. I mean, obviously, they're
11 asking you to take another job --
12     A. Uh-huh (nodding head).
13     Q. -- right?
14     A. Yes, sir.
15     Q. And it's on a temporary
16 basis?
17     A. Yes, sir.
18     Q. And I want to know what
19 they told you about the job you were
20 going to be taking.
21     A. That -- just like I told
22 you earlier, that you would need to put
23 gas in the equipment, put oil in the

123

1  equipment, put hydraulic fluid in the
2  equipment, check the oil, check the
3  fluid levels, whatnot; just minor
4  service work, just until Donnie gets
5  back.
6      Q. Okay. And did you tell
7  them that you were capable of doing all
8  those things?
9      A. Yes, sir.
10     Q. And how long did you drive
11 the service truck the first time while
12 Donnie was out?
13     A. I can't remember. It
14 should be -- it should be in my EEOC
15 complaint. I can't remember exactly.
16     Q. Okay. Give me your best
17 estimate how long you drove your
18 truck.
19     A. I can't remember. I would
20 hate to try to just throw you something
21 off the top of my head and it be a wild
22 number. You know, I can't remember.
23     Q. Okay. Let me ask you

124

1  this: When Donnie came back,
2  obviously, he took the position back;
3  correct --
4      A. Yes, sir.
5      Q. -- and you went back to
6  driving the dump truck?
7      A. Yes, sir.
8      Q. And how long did you drive
9  the dump truck before you were asked to
10 again fill in as the service truck
11 driver?
12     A. I think -- I believe Donnie
13 only stayed a couple of weeks before he
14 quit permanently this time.
15     Q. All right. So you drove
16 the tri-axle again for a couple of
17 weeks?
18     A. Uh-huh (nodding head).
19     Q. And were you again
20 approached about taking the service
21 truck position?
22     A. Yes, sir.
23     Q. Who approached you?

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

125

1     A.   Me and Randy Davis -- me
2  and Mr. Randy Davis had the discussion
3  about -- he said he needed me to
4  operate the service truck full-time.
5     Q.   Okay.  Now, let me back up.
6  Let me make sure I've got this.  It's
7  your testimony that Randy Davis
8  approached you with regard to taking
9  the service job position the second
10  time -- the service truck driver
11  position the second time?
12     A.   Yes, sir.
13     Q.   Where did he approach you
14  about that?
15     A.   At a job site in
16  Prattville.  I was already there
17  servicing a piece of equipment -- I was
18  already there servicing a piece of
19  equipment -- actually, how it went is
20  like this:  That morning, Mr. Jerry
21  Carter told me that he needed me to
22  fill in.
23     Q.   First let me ask you:  Do

126

1  you know what morning it was, what day,
2  morning?
3     A.   The same day.
4     Q.   Well, do you know what day
5  that was?
6     A.   The same day that Randy
7  Davis approached me and said I needed
8  to be permanent.
9     Q.   Right.  I'm asking what day
10  that was.  Do you know what day it was?
11     A.   No, sir.
12     Q.   So Jerry -- did Jerry
13  approach you?
14     A.   Yes, he did.
15     Q.   When did he approach you
16  that day, whatever day it was?
17     A.   I can't remember -- I can't
18  remember -- I can't remember whether or
19  not he called me on my two-way and said
20  Decarey, I need you in the service
21  truck this morning, but I know he told
22  me that day he needed me in the service
23  truck that morning.  And he said, this

127

1  time, it's going to be permanent.
2  Later on that day --
3     Q.   Hold on, hold on, let me
4  stop you there.  So Jerry approached
5  you in the morning and told you that he
6  needed you on the service truck?
7     A.   Yes, sir, correct.
8     Q.   And is it your testimony
9  that Jerry then told you it was going
10  to be a permanent position?
11     A.   That's correct.
12     Q.   Okay.  And what did you say
13  when he said it was going to be a
14  permanent position?  What did you say
15  to Jerry?
16     A.   I told him that I was going
17  to -- I told him that I really -- I
18  really would rather drive my tri-axle
19  dump truck.  If I was going to exercise
20  my hazardous material license and do
21  all the requirements of that service
22  truck, then I would have to have more
23  money.

128

1     Q.   And so you told him that
2  you would rather just keep driving the
3  tri-axle --
4     A.   Yes, sir.
5     Q.   -- that you didn't really
6  want the service truck job --
7     A.   Yes, sir.
8     Q.   -- and that if you were
9  going to take it, you were going to
10  need more money?
11     A.   Yes, sir.
12     Q.   What was -- in your mind,
13  what was the basis of the additional
14  money?
15     A.   Excuse me?
16     Q.   What was the basis for the
17  -- Well, first of all, let me ask you
18  this:  How much did you demand?
19     A.   Well, I didn't demand
20  anything to Jerry because me and him
21  didn't discussed price.  It was later
22  on that afternoon when Randy -- when
23  I was already in the service truck,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

129

1  Randy Davis came to me while I was in
2  Prattville.
3      Q.  Okay.  Let me stop you.  So
4  that morning you either got a call or
5  called in to talk to Jerry saying we
6  need you back in the service truck?
7      A.  Uh-huh (nodding head).
8      Q.  Is it your testimony that
9  you did not discuss pay?
10     A.  Not with Jerry, no.
11     Q.  Not with Jerry?
12     A.  No.
13     Q.  So did you pick up the
14 truck that morning --
15     A.  Yes.
16     Q.  -- the service truck?
17     A.  Yes, sir.  I got on in the
18 service truck and went and started
19 doing the duties of the service truck.
20     Q.  Where did you drive to?
21     A.  I was in Prattville when
22 Randy Davis approached me about it.
23     Q.  Okay.  What time of day did

130

1  you speak to Randy?
2      A.  It was later on that
3  afternoon -- well, afternoon meaning
4  somewhere around lunchtime.
5      Q.  Okay.
6      A.  It was earlier in the
7  morning when I spoke with Mr. Carter
8  about it.
9      Q.  Okay.  So about lunchtime
10 you were out in Prattville at a site?
11     A.  Uh-huh (nodding head),
12 servicing a piece of equipment.
13     Q.  And you say Randy called
14 you, drove up?  What happened?
15     A.  Mr. Davis pulled up and
16 said, "Come here, Decarey, let me talk
17 with you for a minute."  I left the
18 piece of equipment I was servicing, I
19 walked out to his truck, and he said,
20 "Get in."  I got in and sat down with
21 him, and he said, "Look, I need you to
22 operate the service truck permanently,"
23 and I told him that in order for me to

131

1  operate that service truck with it
2  being raggedy and beat down and leaking
3  fluids and whatnot like it was --
4      Q.  Uh-huh (nodding head).
5      A.  -- that I would have to
6  have at least thirteen dollars, and he
7  agreed.
8      Q.  Okay.  So you said -- you
9  told Randy look, this truck is old and
10 beat up --
11     A.  (Witness nodding head).
12     Q.  -- and because of that, I'm
13 going to need thirteen dollars?
14     A.  (Witness nodding head).
15     Q.  What about the condition of
16 the truck justified three dollars more
17 an hour, in your opinion -- in your
18 mind?
19     A.  Because in my mind, I knew
20 when I was operating it that it was
21 just temporarily, so it didn't really
22 bother me.  I was just ready for Donnie
23 Gantt to come on back so I could get

132

1  out of that DOT hazard.
2      Q.  Yeah, that wasn't what I
3  asked you.  What about the truck being
4  old and what you're saying, quote,
5  "beat down," end quote, justified three
6  dollars more an hour?
7      A.  In order for me to
8  jeopardize my CDL and operate a truck
9  that does not pass DOT standards, I
10 would have to have more -- I would have
11 to have more money in order for me to
12 do that or else I wouldn't have -- I
13 wouldn't have jeopardized my license to
14 even operate it permanently.
15     Q.  Okay.  So your testimony is
16 that the truck wouldn't have passed DOT
17 standards?
18     A.  That's correct.
19     Q.  Where did you get that
20 information?  How do you know that?
21     A.  I have a CDL.  I mean, you
22 have to inspect a vehicle before --
23 before -- and based on -- based on my

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

133

1 inspection, the head mechanic's
2 inspection, the truck -- the truck was
3 leaking hydraulic, had three big tanks
4 on the back of it, each oil a different
5 kind of weight of oil, forty-weight oil
6 or something like that, and a lower
7 grade oil in the hydraulics. Each one
8 of these tanks is leaking --
9    Q.  Uh-huh (nodding
10 head).
11    A.  -- and one of them is
12 leaking so bad it was leaking down on
13 the brake pedal. That's dangerous.
14    Q.  So it's your opinion that
15 the truck -- had there been an
16 inspection whenever you took it back
17 over the second time, it's your opinion
18 that it would not have based DOT
19 inspection?
20    A.  That's not my opinion,
21 that's a fact.
22    Q.  Okay. Have you seen the
23 DOT inspections on this vehicle?

134

1    A.  Have I seen the DOT
2 inspections on that vehicle?
3    Q.  Correct.
4    A.  I know that --
5    Q.  Hold on. Let me ask it --
6 Have you seen the DOT inspections on
7 this vehicle, yes or no?
8    A.  I am -- when you have a CDL
9 license, you are a DOT inspector of the
10 piece of equipment you're using.
11    Q.  I understand. My question
12 is very simple: Have you seen the DOT
13 inspections on this vehicle, yes or
14 no?
15    A.  I have not seen them, but
16 I know what they are. I have not seen
17 any paperwork, no, but I know what they
18 are. I know the standards that they're
19 supposed to stand up by. I know that.
20    Q.  Okay. But you haven't seen
21 any of the inspections; correct? You
22 haven't seen the state --
23    MR. ROBERSON: Objection.

135

1 Asked and answered.
2    MR. GARRETT: Well, he
3 hasn't answered it yet. I just want a
4 simple answer.
5    MR. ROBERSON: He's
6 answered three times.
7    Q.  You have or you haven't.
8 You haven't seen the state DOT
9 inspections on this vehicle, have you?
10    A.  But I am answering the
11 question, I am answering the question.
12    Q.  Right. I understand your
13 opinion is that because you have a CDL,
14 that makes you an equivalent, that
15 makes you an ADOT inspector. I
16 understand that. What I'm asking is:
17 Have you seen the state inspections --
18    A.  Have I seen the actual --
19    Q.  Correct.
20    A.  -- paperwork?
21    Q.  Have you seen that?
22    A.  Well, DOT don't issue
23 paperwork for each specific -- I

136

1 mean --
2    Q.  I'm just asking if you've
3 seen it, yes or no?
4    A.  No, sir, I have not seen
5 any paperwork of such.
6    Q.  Okay. Thank you.
7    Now, do you know how much
8 -- well, strike that.
9    Was Mr. Gantt a white
10 driver?
11    A.  Yes, sir, he is.
12    Q.  Would you agree that he had
13 more experience on that truck than you
14 did?
15    A.  Yes, sir, I would.
16    Q.  Do you know how much he got
17 paid an hour to do his job?
18    A.  No, sir, I don't.
19    Q.  Do you know if he got more
20 or less than you did?
21    MR. ROBERSON: Object to
22 the form.
23    Q.  You can answer.

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

137

1    A.   No, sir, I never asked Mr.
2  Gantt what he got paid.
3    Q.   Okay.  Let's go back to the
4  truck.  You're speaking with Randy and
5  he said "Decarey, I want you to take
6  this job permanently," is that your
7  testimony?
8    A.   Yes, sir, it is.
9    Q.   And you said "Look, in
10  order for me to drive this thing, I'm
11  going to need thirteen dollars an
12  hour"?
13    A.   Yes, sir.
14    Q.   Is it your testimony that
15  Randy Davis told you that's what you
16  were going to get paid?
17    A.   Yes, sir.
18    Q.   Did Jerry Carter ever have
19  a conversation with you at any time
20  about what you would be paid to drive
21  the service truck the second time?
22    A.   No, sir.  It was Randy that
23  I spoke with that gave me the thirteen

138

1  dollars to drive it.
2    Q.   All right.  In fact,
3  Southeast paid you that thirteen
4  dollars, didn't they?
5    A.   Yes, sir.
6    Q.   And that's, in fact, more
7  money than you were making as a
8  tri-axle driver; correct?
9    A.   Yes, sir.
10    Q.   Do you have any knowledge
11  of what Mr. Gantt's mechanical
12  experience was; mechanical training?
13    A.   No, sir, I don't.
14    Q.   Do you have any evidence or
15  any knowledge of what Mr. Gantt's
16  preventive maintenance training was?
17    A.   Excuse me?
18    Q.   What his preventive
19  maintenance training was; Mr. Gantt.
20    A.   No, sir.
21    Q.   Were there any witnesses to
22  that conversation between you and Mr.
23  Davis?

139

1    A.   No, sir.
2    Q.   Now, the second time you
3  were driving the truck, how long did
4  you drive the service truck the second
5  time?
6    A.   Until the time that I was
7  terminated.
8    Q.   Okay.  Who replaced you as
9  the service truck driver?
10    A.   Justin.
11    Q.   Justin, do you know his
12  last name?
13    A.   No, sir, I don't.
14    Q.   Do you have any knowledge
15  about Justin's mechanical training or
16  experience?
17    A.   Training or mechanical
18  experience?
19    Q.   Uh-huh (nodding head),
20  Justin's.
21    A.   Well, Justin was an
22  operator; equipment operator.
23    Q.   Okay.

140

1    A.   I have no knowledge of him
2  being -- having any training of
3  mechanics.
4    Q.   Okay.  How about preventive
5  maintenance, any training in that
6  regard that you know of?
7    A.   I have no knowledge of it.
8    Q.   Do you know what Justin was
9  offered to drive the truck after you?
10    A.   No, sir, I don't.
11    Q.   Do you know if it was more
12  or less than what you were being paid?
13    A.   No, sir, I don't.
14    Q.   Now, you've got some claims
15  in your case about some -- what I'll
16  call profane language being used
17  against you while you were working
18  during your four-month tenure at
19  Southeast Cherokee, and I need to go
20  through that, okay, in detail.
21    Now, you know, you're
22  claiming -- I'm sorry.  Have you got
23  something to say?

35 (Pages 137 to 140)

## FREEDOM COURT REPORTING

141

1    A.  Go ahead.
2    Q.  Now, you're claiming that
3  the word "nigger" was used around
4  you --
5    A.  Uh-huh (nodding head).
6    Q.  -- and nobody likes that
7  word --
8    A.  Yes, sir.
9    Q.  -- but I'm going to use it
10  in this deposition --
11    A.  Yes, sir.
12    Q.  -- because it's the word
13  you're saying was used. I don't mean
14  anything by it. I'm just using the
15  word.
16    A.  Yes, sir, I understand, I
17  understand.
18    Q.  First and foremost, let me
19  do this: I need a detailed explanation
20  from you of every time someone at
21  Southeast Cherokee called you a nigger.
22    A.  I never said anyone called
23  me a nigger.

142

1    Q.  Okay. So that's a good
2  thing. We can agree on that?
3    A.  Yes, sir.
4    Q.  No one at Southeast
5  Cherokee ever referred to you as a
6  nigger; is that true?
7    A.  I never heard anyone at
8  Southeast Cherokee call me a nigger.
9    Q.  Okay. Good. All right.
10  Now, the second step, you say that you
11  were a witness to persons at Southeast
12  Cherokee referring to other black men
13  as niggers?
14    A.  Yes, sir.
15    Q.  I need -- I need those
16  conversations; I need every one of
17  them. So you can start with the first
18  one you remember, and I'll go from
19  there.
20    A.  Me and Mrs. Carter's son,
21  he was taking me to Montgomery to the
22  job site down there. I was driving the
23  tri-axle dump truck, and it was getting

143

1  a tire change.
2    Q.  Okay. Now that I've got my
3  reference, do you know what day that
4  was?
5    A.  No, sir, I can't remember.
6    Q.  How long after you first
7  started?
8    A.  It was during the time I
9  was driving the tri-axle dump truck. I
10  can't remember.
11    Q.  So you were driving the
12  dump truck?
13    A.  Yes, sir.
14    Q.  Was it Brent Carter?
15    A.  Yes, sir.
16    Q.  Okay.
17    A.  Yes, sir.
18    Q.  And you and Brent Carter
19  were driving a dump truck from --
20    A.  No, sir, I didn't say that.
21    Q.  Okay. Tell me.
22    A.  I said that me and Brent
23  Carter were driving to Montgomery to

144

1  pick up my dump truck that was getting
2  the tire changed. We were riding in
3  Brent's truck, the truck that Brent
4  drives.
5    Q.  Okay. He was giving you a
6  ride?
7    A.  Yes, sir.
8    Q.  Okay. Got you. Go on.
9    A.  And as we were headed to
10  Montgomery, Brent was kind of speeding
11  a little bit, and a state trooper
12  jumped in behind him and hit his
13  lights. And when he hit his lights,
14  Brent said, "This nigger's fixing to
15  pull me over." But the state trooper
16  didn't pull him over, he went on
17  around, he was after somebody else.
18  But he didn't pull Brent over. He said
19  it so easily just as if I wasn't even
20  there.
21    Q.  So you were riding along
22  and Brent made the statement, quote --
23  in reference to a police officer?

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

145

1    A.    Yes, sir.
2    Q.    First, was it a trooper?
3    A.    State trooper, yes, sir.
4    Q.    Was he on a bike or
5    something; a motorcycle?
6    A.    No, sir, he was in a car.
7    Q.    How did he know he was
8    black or white?
9    A.    Because you can see in the
10   rear-view mirror; you can see in the
11   rear-view mirror that he was black. I
12   mean, if you're driving, you can look
13   in the car behind you and tell whether
14   someone is black or white in the
15   daytime.
16   Q.    So you think Brent looked
17   in his rear-view mirror and saw that
18   the trooper was black?
19   A.    Yes, sir, that's what he
20   did.
21   Q.    You don't think he was
22   making a statement, you know, referring
23   to anyone using the parlance, "I just

146

1    know he's about to pull me over,"
2    you're saying he saw the guy in the
3    rear-view and saw that he was black and
4    intentionally referred to him as a,
5    quote, "nigger"?
6    A.    Intentionally referred to a
7    black state trooper after he hit his
8    lights "This nigger's fixing to pull me
9    over."
10   Q.    Okay.  Now, how do you know
11   the trooper was black?
12   A.    I saw him.
13   Q.    When?
14   A.    I saw him as he passed by.
15   As he passed by and went around us, I
16   looked over into his car, and he was a
17   black state trooper.
18   Q.    Did he pass on your side of
19   the dump truck?
20   A.    He passed on Brent's side.
21   We were on a two-lane, he passed on
22   Brent's side.  We were in the right-
23   hand lane and he passed on the

147

1    left-hand side.
2    Q.    So it's your testimony that
3    as the trooper was pulling around you
4    on the left, that you could see into
5    the trooper's car and determine that he
6    was a black male?
7    A.    Yes, sir, that's my
8    testimony.
9    Q.    It's your testimony that
10   you could see -- was the black trooper
11   driving?
12   A.    Excuse me?
13   Q.    Was the black trooper
14   driving his car?
15   A.    His car, yes, sir.
16   Q.    So it's your testimony
17   that, from your position in the
18   passenger seat of the dump truck, that
19   you were able to look at the trooper's
20   car --
21        MR. ROBERSON:  Object to
22   the form.
23   Q.    -- as it passed on your

148

1    left, and you could tell that he was a
2    a black male?
3        MR. ROBERSON:  Object to
4    the form.  It's not a dump truck.  It's
5    Brent Carter's truck.
6        MR. GARRETT:  He said it
7    was a dump truck.
8    A.    No, sir.  I said that we
9    were in Brent Carter's truck.
10   Q.    Okay.  I'm sorry.  I
11   misunderstood.
12       MR. ROBERSON:  Three times
13   he said it.
14   Q.    What kind of truck were you
15   in; clarify it for me, what kind of
16   truck were you in?
17   A.    It was a small white Ranger
18   or something.
19   Q.    A small white Ranger?
20   A.    Ford Ranger.
21   Q.    Was it a Southeast Cherokee
22   vehicle or his personal vehicle?
23   A.    It was a Southeast Cherokee

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

149

1  vehicle.
2      Q.   Okay.  But I am correct in
3  that Brent was driving?
4      A.   Brent was driving (nodding
5  head).
6      Q.   You were sitting in the
7  passenger seat?
8      A.   Yes, sir.
9      Q.   And you claim to have seen
10  the trooper's race as he passed by you
11  on the left?
12      A.   Yes, sir, he was a black
13  man.
14      Q.   On Brent's side?
15      A.   Yes, sir.
16      Q.   Okay.  And after he made
17  that statement, what did you say?
18      A.   I didn't say anything.  I
19  was shocked that he could just refer to
20  that guy like that just in my presence
21  just with no regard like that.  I was
22  shocked.  I didn't say anything.
23      Q.   Okay.  Is it your testimony

150

1  that you didn't say anything at all?
2      A.   I didn't say anything.
3      Q.   Okay.  Did you make any
4  reference to the officer?
5      A.   Did I make any reference to
6  the officer?
7      Q.   (Nodding head).
8      A.   No, sir.
9      Q.   Did you ever tell Brent
10  that his statement had made you
11  uncomfortable?
12      A.   No, sir, I didn't.
13      Q.   Did you ever report that to
14  anyone at Southeast Cherokee after you
15  got back to the office?
16      A.   I mentioned it.  I didn't
17  report it to anybody, but I mentioned
18  it to a couple of -- to a co-worker,
19  but I didn't report it to anybody.
20      Q.   Why didn't you report it?
21      A.   I just felt like he -- I
22  just -- because it wasn't really a big
23  deal to me because I felt like he was

151

1  just a misguided young kid that -- I
2  mean, it wasn't -- I didn't feel like
3  it was anything that needed to be
4  reported.
5      Q.   Okay.  That's number one,
6  give me number two.  That's the first
7  incident, give me the second.
8      A.   A second time Brent -- a
9  second time, Brent -- as a matter of
10  fact, it was the same day.  When we
11  finally got to Montgomery, I was over
12  at my dump truck watching Pedro, the
13  master mechanic, he was fixing my tire.
14  And after Brent dropped me off, he
15  left there, and when he came back, he
16  said --
17      Q.   Hold on.  I'm a little
18  confused.  This is later the same
19  day --
20      A.   (Witness nodding head).
21      Q.   -- and you're in
22  Montgomery --
23      A.   Uh-huh (nodding head).

152

1      Q.   -- at your dump truck?
2      A.   Uh-huh (nodding head).
3      Q.   And Pedro is changing the
4  tire?
5      A.   Uh-huh (nodding head).
6      Q.   And I understand Pedro, it
7  sounds like a Hispanic name, but he's
8  actually a white guy?
9      A.   He's actually a white guy,
10  yes, sir.
11      Q.   And you were standing there
12  with him; with Pedro?
13      A.   Yes, sir.
14      Q.   Okay.  And Brent approached
15  y'all?
16      A.   Yes, sir.
17      Q.   Why was he there?  Do you
18  know?  Was he delivering something or
19  helping y'all, or what was he doing?
20      A.   I don't know.  He just
21  pulled up.  I don't know what his
22  intentions were.  I don't know.  He
23  just pulled up.

38  (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

153

1    Q.    Okay.  He pulled up in the
2    same truck y'all were driving earlier?
3    A.    In the same truck that he
4    was driving earlier, yes.
5    Q.    Right.  Okay.  Got out of
6    the truck --
7    A.    Yes, sir.
8    Q.    -- and walked over to you?
9    A.    Walked over to where me and
10   Pedro was, yes, sir.
11   Q.    And what did he say
12   exactly?
13   A.    "What you done tore up now,
14   Decarey?"  I said, "Pedro's just
15   changing my tire."  He said, " Guys,
16   just like a black man."
17   Q.    Okay.  You just chuckled.
18   I mean, was he laughing when he -- was
19   he laughing when he said that?
20   A.    With a straight face he
21   said it.
22   Q.    And what did Pedro -- what
23   was Pedro's reaction?

154

1    A.    Pedro chuckled.
2    Q.    Okay.  So Pedro laughed.
3    What was your reaction?
4    A.    I was kind of -- I was kind
5    of upset because it was the second time
6    -- it was the second time that this
7    young man had just disregarded me like
8    this.  I mean, I understand you believe
9    how you believe, but to force it over
10   on me, I didn't -- by that time -- the
11   first time, I played it off, but the
12   second time, it kind of upset me.  But
13   I didn't react or anything, I didn't
14   say nothing about it.
15   Q.    You would disagree that you
16   laughed or smiled along with it?  You
17   didn't laugh or smile?
18   A.    No, sir, I didn't.
19   Q.    If someone said that, they
20   would be mistaken or lying; correct?
21   A.    Yes, sir, they would be.
22   Q.    Okay.  Now, did you report
23   the second incident?

155

1    A.    No, sir, I didn't.
2    Q.    Why not?  Why didn't you
3    report the second incident?
4    A.    Because it's -- because the
5    fact of the matter is racism is --
6    is -- I'm not saying everybody is
7    racist, I know everybody isn't a
8    racist, but I have dealt with racism
9    before, so I just didn't think nothing
10   of it because it wasn't anything new.
11   Q.    Okay.  Did you tell that to
12   any of your co-workers about the second
13   incident?
14   A.    I mentioned it (nodding
15   head).
16   Q.    What co-workers did you
17   mention it to?
18   A.    I mentioned it to -- I
19   mentioned it to one or two of the
20   fellows that were also dump truck
21   drivers.
22   Q.    Okay.  Who were they?
23   A.    Tyrone, I mentioned it to

156

1    Tyrone.
2    Q.    What's Tyrone's last name?
3    A.    I'm not for sure what
4    Tyrone's last name is.
5    Q.    But he's a dump truck
6    driver?
7    A.    Yes, sir.
8    Q.    Okay.  Who else?
9    A.    There was another fellow as
10   I was out in the field.  He was -- he
11   was a bulldozer operator, and as I was
12   fueling him up, me and him was just
13   having a small conversation, and I
14   mentioned it to him, "Man" -- I was
15   telling him, "Man, you know, Brent was
16   taking me to Montgomery this morning"
17   and he said such and such.  I mentioned
18   it to him, but I didn't report it or
19   anything like that.
20   Q.    You can't give me his name?
21   A.    I can't -- I can't -- I
22   never -- as a matter of fact, I never
23   knew his name.  They called him by a

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

157

```
 1   nickname or something or another, but I
 2   can't even remember it. They didn't
 3   call him by -- the guys on the job
 4   didn't call him by his real name, they
 5   called him by a nickname. I never
 6   really knew.
 7       Q.   And where would you have
 8   talked to these two gentlemen about
 9   this? I mean, where were you? When
10   was it; the same day, a couple of days
11   later?
12       A.   I can't -- I can't remember
13   what day, but I remember having a
14   conversation with these two gentlemen
15   about it.
16       Q.   And was it the same day
17   of the incident or later on?
18       A.   I can't remember.
19       Q.   And where would you have
20   had these conversations?
21       A.   I remember it being in the
22   morning time when I talked to Tyrone
23   about it because he was also a truck
```

158

```
 1   driver -- dump truck driver. So all us
 2   truck drivers get there in the morning
 3   to go over the equipment, check the
 4   oil, crank them up, warm them up and
 5   whatnot. I remember talking to Tyrone
 6   about it, it was morningtime. But the
 7   gentleman driving -- operating the
 8   bulldozer, it was over in the
 9   afternoon, but, again, I can't remember
10   whether it was -- I can't remember.
11   It's been some time. It's been a
12   couple of years ago, I can't remember
13   exactly.
14       Q.   Okay. And that was with
15   regard to the second statement of the
16   day; right?
17       A.   Both statements.
18       Q.   Oh, you talked to them
19   about both statements?
20       A.   Yes, sir.
21       Q.   Aside from Tyrone or the
22   other guy that drove the bulldozer,
23   anyone else you spoke to at all about
```

159

```
 1   Brent's alleged statements?
 2       A.   At Southeast Cherokee?
 3       Q.   Correct.
 4       A.   I don't believe so.
 5       Q.   What was Tyrone's
 6   response? What did he say --
 7       A.   I can't remember.
 8       Q.   -- when you told him?
 9       A.   I can't remember.
10       Q.   How about the other guy
11   driving the bulldozer, what was their
12   response to your statement?
13       A.   His response was -- he was
14   even surprised that I was even being
15   allowed to operate the service truck
16   because he was saying there had never
17   been a black man to operate a service
18   truck before; "You the first black man
19   and it surprised" -- he was saying that
20   "it surprised me, man, that you are
21   even allowed to operate that service
22   truck."
23       Q.   Okay. With regard to the
```

160

```
 1   -- Is that how he responded to the
 2   statement?
 3       A.   Yes, sir.
 4       Q.   Anything else, any other
 5   way he responded?
 6       A.   Not that I remember, but I
 7   remember that he made that statement.
 8       Q.   Okay. Has there ever been
 9   any occasion -- Well, let me ask you
10   this: Besides those two incidents, any
11   other with regard to any other --
12       A.   Racial --
13       Q.   -- racial slurs?
14       A.   Yes, sir.
15       Q.   Tell me. I need to know.
16       A.   Jerry Carter, one day he
17   and myself, Pedro, and Justin were
18   standing around at the shop there in
19   Wetumpka --
20       Q.   Uh-huh (nodding head).
21       A.   -- and they were having a
22   conversation about --
23       Q.   Let me stop you. When was
```

40  (Pages 157 to 160)

# FREEDOM COURT REPORTING

161

1    this?  What day?
2        A.   I can't remember what day,
3    what date.
4        Q.   Go ahead.
5        A.   But I was operating the
6    service truck at this time --
7        Q.   Okay.
8        A.   -- I was operating the
9    service truck at this time.
10       Q.   And this was where?  Where
11   was this conversation held?
12       A.   At the shop in Wetumpka.
13       Q.   Okay.  And the individuals
14   who were present were Jerry Carter,
15   Pedro, Justin --
16       A.   And myself, yes, sir.
17       Q.   And that's Justin Bethea?
18   Which Justin -- I mean --
19       A.   Justin that's the service
20   truck operator now, is that his name,
21   Bethea?
22       Q.   Bethea.
23           And when did the meeting

162

1    occur?
2        A.   Do you mean date, time of
3    day?
4        Q.   Time of day; morning,
5    afternoon?
6        A.   I think it was after
7    lunch -- I believe it was going to be
8    after lunch.
9        Q.   All right.  Tell me about
10   it.
11       A.   Well, the conversation was
12   going on about how gasoline had just
13   started to rise quickly and diesel
14   fuel, and Mr. Jerry and Pedro and
15   Justin, they were having a conversation
16   about a guy that had pulled off with
17   some gas.  And each one -- and Pedro
18   and Jerry, they were exchanging stories
19   about recent -- guys recently pulling
20   off with some gas.  And Mr. Jerry
21   Carter looked at me and pointed his
22   finger and told me, he said, "Decarey,
23   if I ever catch you stealing some of my

163

1    fuel, I won't press charges on you,
2    I'll just shoot your damn ass."
3        Q.   Anything else?
4        A.   No, sir.
5        Q.   So we had Pedro, Jerry, and
6    -- was Justin there talking about the
7    fuel?
8        A.   Justin was there, yes, sir.
9        Q.   So Pedro, Jerry, and Justin
10   were standing around in the Wetumpka
11   location?
12       A.   Yes, sir.
13       Q.   And they were exchanging
14   stories about people who drive off and
15   don't pay for gas; is that correct?
16       A.   Yes, sir.  We were talking
17   about the rising cost of gasoline and
18   diesel fuel.
19       Q.   Y'all were talking about
20   how gas and diesel fuel was getting
21   real expensive?
22       A.   Yes, sir.
23       Q.   And it's your testimony --

164

1    or is it your testimony that he pointed
2    to you --
3        A.   (Witness nodding head).
4        Q.   -- and said "Decarey, if I
5    find out you've been selling my fuel,
6    I'm not going to report you, I'm going
7    to shoot your ass"?
8        A.   Yes, sir, "your damn ass"
9    to be exact.
10       Q.   Okay.  "Shoot your damn
11   ass"?
12       A.   Yes, sir.
13       Q.   When he said that, what
14   were the reactions of the group?
15       A.   I can't remember because I
16   kind of looked off; I kind of looked
17   off the other way.
18       Q.   Okay.  Did you respond?
19       A.   No, sir.
20       Q.   Did anybody else respond or
21   say anything?
22       A.   I believe -- I believe -- I
23   can't -- I can't remember any facial

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

165

1  expressions because I kind of looked
2  off, but I believe I heard a snicker or
3  two or a little laugh or two, but I
4  couldn't determine who it was coming
5  from because I wasn't looking that way.
6      Q.  Okay.  So there was like a
7  little laughter in the crowd?
8      A.  Yes, sir.
9      Q.  Now, when Jerry said this,
10 was he being in gest or laughing?
11     A.  No, sir, not at all.  You
12 don't say a thing and point your finger
13 at someone and be -- and be -- you
14 don't -- with a straight face, serious
15 face.  If he had started laughing
16 behind it or something, I would have
17 just -- but he was --
18     Q.  Is it your testimony that
19 he was addressing anyone else in the
20 group beside yourself?
21     A.  No, sir.  He called me by
22 name.
23     Q.  Okay.  Obviously, he didn't

166

1  make any racial remarks at that point
2  in time; correct?
3      A.  No, sir.
4      Q.  Now, any other instances?
5      A.  Yes, sir.
6      Q.  Okay.
7      A.  What do you mean?  Can you
8  clarify --
9      Q.  I just need to know them
10 all.
11     A.  Do you mean toward myself
12 or toward others?
13     Q.  All of them.
14     A.  Okay.
15     Q.  We've talked about the two,
16 about the trooper comments -- we've
17 talked about the trooper comments.  Are
18 there other instances?
19     A.  Randy Davis.  Randy Davis
20 had a side job in Prattville, and I
21 also had a job in Prattville that was
22 part of my service man job.
23     Q.  Let me stop you.  When did

167

1  this occur?  What day, date?
2      A.  I'm going to be hard
3  pressed with dates because it's been a
4  minute ago.  I'm sorry about that.
5      Q.  Okay.  Go ahead.
6      A.  But Mr. Randy Davis had a
7  side job that he had a bush hog service
8  in Prattville.  It had nothing to do
9  with Southeast Cherokee, it wasn't on
10 the work order --
11     Q.  Okay.
12     A.  -- and --
13     Q.  When you say "a side job,"
14 I mean, is this --
15     A.  His own personal job.
16     Q.  Okay.  Well, let me
17 clarify.  Personally, you mean he was
18 being paid by others to perform work?
19     A.  Yes.
20     Q.  What kind of work?  I know
21 it's a bush hog.  Is he cutting grass
22 or what?
23     A.  His bush hog -- his bush

168

1  hog was being used to do another job;
2  not Southeast Cherokee's job, another
3  job.
4      Q.  Let me ask you this:  Was
5  it Randy's bush hog?
6      A.  Yes, sir.
7      Q.  Personal bush hog --
8      A.  Personal.
9      Q.  -- not Southeast
10 Cherokee's?
11     A.  No, sir.  Randy's personal
12 bush hog.
13     Q.  All right.  Got you.  So he
14 had a side job in Prattville.
15     A.  Yes, sir.
16     Q.  What was the job?
17     A.  It was being used -- it was
18 being used to cut -- to cut grass.
19 The place was right across the street
20 from the place where -- it has a golf
21 course and whatnot.  I can't think of
22 the name of it.
23     Q.  In Prattville?

42 (Pages 165 to 168)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

169

1    A.    In Prattville (nodding
2   head).
3    Q.    Okay.
4    A.    Right at the intersection
5   of Cobbs Ford Road and -- I think
6   that's 82, right at the intersection.
7    Q.    Okay.  That's fine.
8    A.    But I can't think of the
9   name of it.
10    Q.    So he had a side job to cut
11   some grass?
12    A.    Yes, sir.
13    Q.    Okay.  What happened?
14    A.    I was made -- I was made to
15   leave my job, leave my service job, and
16   go and service his equipment that
17   didn't have anything to do with my job
18   without compensation.  Once he asked me
19   to go do it for him, and by him, I
20   didn't think anything of it.  He's the
21   head bossman, and I didn't think
22   anything of it.
23    Q.    Let me stop you real quick.

170

1   I think maybe I can direct you a little
2   better to the questions.
3        But before I get off track,
4   did you report to anyone at Southeast
5   Cherokee about Jerry's alleged
6   statement pointing to you about the
7   fuel?  Did you report that to anybody?
8    A.    Report it to who?  He's the
9   -- report it to who?
10    Q.    Anybody else at the
11   organization.
12    A.    I mean, it wouldn't be --
13   who else would I report anything to?
14    Q.    Lynn (indicating).  I mean,
15   I don't know.  I mean, there's --
16   anyone.
17    A.    That's Ms. Lynn's husband.
18    Q.    I understand.  I'm asking
19   you if you reported it to anyone.
20    A.    No, sir, I didn't.
21    Q.    Did you tell anyone what
22   had happened to anyone else or discuss
23   it with anybody else?

171

1    A.    Um, I believe I discussed
2   it with Deon.
3    Q.    With Deon?
4    A.    Yes, sir.
5    Q.    Tell me what you told Deon
6   about the statement.
7    A.    I can't remember exactly
8   what I told him, but I believe I had a
9   discussion with Deon about it.
10    Q.    The same day, later?
11    A.    I can't remember, but I --
12   I can't remember.
13    Q.    That's Deon Daniels;
14   correct?
15    A.    Deon Daniels, yes, sir.
16    Q.    What did Deon say about --
17   when you told him about the statement?
18    A.    In fact, Deon was also
19   surprised that it was a black guy
20   operating the service truck.
21    Q.    Okay.  But what was his
22   response to the statement about you
23   selling fuel?  What was his response to

172

1   that statement?
2    A.    I can't remember his exact
3   response, but I know he was -- he also
4   -- he also was expressing his -- Deon
5   also was kind of saying he was
6   surprised that a black guy was
7   operating the service vehicle.
8    Q.    Okay.  Aside from that, any
9   specific comment about the fuel
10   statement?  I mean, I understand what
11   you're saying, but anything else he
12   said in response?
13    A.    I can't remember.
14    Q.    Okay.  I'm sorry, let's get
15   back to the bush hog thing.  So what
16   day -- if I'm understanding this, it's
17   your testimony that you were servicing
18   some equipment in Prattville on a
19   Southeast Cherokee job and Randy asked
20   you to service some of his personal
21   equipment at another job.
22    A.    A separate job that was not
23   Southeast Cherokee's.

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

173

1    Q.   Correct, his own -- a side
2  job; what you called a side job.
3    A.   Yes, sir.
4    Q.   What time of the day was
5  that?
6    A.   Around lunchtime give or
7  take.
8    Q.   Okay.  I mean, was it
9  during the work week or was it on the
10  weekend or a holiday?
11    A.   It was during the work
12  week.
13    Q.   So you were on the clock
14  getting paid by Southeast Cherokee at
15  that time?
16    A.   Yes, sir.
17    Q.   So your time was being
18  paid?
19    A.   Yes, sir.
20    Q.   And at that time --
21    A.   Well, my time -- I wasn't
22  being paid to service -- I wasn't being
23  paid to service -- to do work that was

174

1  not Southeast Cherokee, I wasn't being
2  paid to do that.
3    Q.   Right.  I understand what
4  you're saying, but you were on the
5  clock is what I'm saying?
6    A.   Yes, sir, I was on the
7  clock.
8    Q.   So your time was being paid
9  by Southeast Cherokee because you were
10  on the clock?
11    A.   Yes, sir.
12    Q.   So you go over to the --
13  you go across the road to this other
14  job?
15    A.   Yes, sir.
16    Q.   And what does Randy ask or
17  tell you?
18    A.   Well, once Mr. Davis --
19  once Mr. Davis gave me forty dollars to
20  go and service his bush hog --
21    Q.   Okay.
22    A.   -- because he knew that it
23  wasn't a part of my work order.  Once

175

1  he gave me forty dollars.
2    Q.   Let me stop you.  What did
3  you service?  What did you do?
4    A.   I put -- I put fuel in it.
5    Q.   Okay.
6    A.   I -- oil, whatnot, grease,
7  any grease fittings.
8    Q.   Okay.  Anything else?
9    A.   No, sir.
10    Q.   So did you add oil?
11    A.   Yes, sir.
12    Q.   And you greased some
13  fittings --
14    A.   Yes, sir.
15    Q.   -- and you put some fuel in
16  it, gas in it?
17    A.   Yes, sir.
18    Q.   Okay.  And he paid you
19  forty dollars for that?
20    A.   Yes, sir, once.
21    Q.   Okay.  One time.  And that
22  was in addition to what you were
23  getting paid from Southeast Cherokee?

176

1    A.   Yes, sir.
2    Q.   Okay.  And how long did it
3  take you to do that work, just out of
4  curiosity?
5    A.   Depending on what all I had
6  to do.
7    Q.   I mean, how long did it
8  take you to do -- the first time we are
9  talking about, how long did it take you
10  to do -- put the gas in, put the oil
11  in, and do some greasing?
12    A.   Maybe twenty minutes.
13    Q.   And then you went back to
14  work over at Southeast?
15    A.   Yes, sir.
16    Q.   And I got from your
17  interrogatory responses that there was
18  another person that also helped in that
19  fashion?
20    A.   Yes, sir, Donnie Gantt.
21  Donnie Gantt.
22    Q.   So Donnie Gantt had also at
23  some time in the past done that kind of

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

177

1    work for Randy?
2        A.    Yes, sir, he did.
3        Q.    And Donnie is a white guy;
4    right?
5        A.    Yes, sir.
6        Q.    How much did he get paid to
7    do it?
8        A.    I believe Donnie told me
9    that he was getting paid eighty dollars
10    to do it; eighty dollars per day.
11        Q.    Eighty dollars per day?
12        A.    (Witness nodding head).
13        Q.    And who told you that?
14        A.    Donnie.
15        Q.    Okay.
16        A.    And also others, also
17    others because I --
18        Q.    Well, tell me what others.
19        A.    Pedro told me that Donnie
20    was getting paid.  Pedro told me that
21    Donnie was getting paid to go over and
22    service that equipment.
23        Q.    So Pedro told you that

178

1    Donnie was getting paid by Randy to --
2        A.    To go service --
3        Q.    -- go service his personal
4    equipment?
5        A.    To go service his personal
6    equipment.
7        Q.    And Pedro told you he
8    thought that was an eighty dollar
9    amount?
10        A.    Yes, sir.
11        Q.    Okay.  And you said per
12    day?
13        A.    Yes, sir.
14        Q.    I mean, what does that mean
15    "per day"?  Do you mean for twenty
16    minutes or like was he over there for
17    twelve hours or what is going on?
18        A.    Each time he went to
19    service that equipment, he was given
20    eighty dollars.
21        Q.    Okay.  And that was just
22    what -- that's just what Randy was
23    paying him out of his personal

179

1    checkbook?
2        A.    Out of his pocket, yes,
3    sir.
4        Q.    Out of his pocket?
5        A.    Yes, sir.
6        Q.    And then you were called
7    over a second time; is that correct?
8        A.    Yes, sir.
9        Q.    And when was that?
10        A.    Well, actually -- actually
11    how it was, that wasn't the first time
12    that I had done it when he gave me
13    those -- that first time he gave me
14    that forty dollars.  That wasn't the
15    first time I had done it.  The only
16    reason he did it then was because I
17    brought it up to his attention that,
18    "Hey, look, you was paying Donnie Gantt
19    to do this, now I've got to do it for
20    nothing; now you're making me do it for
21    nothing," and he shoved me forty
22    dollars.
23        Q.    So after you asked him to

180

1    compensate you, he compensated you?
2        A.    Yes, sir.
3        Q.    And then you went to do it
4    again a second time, service it again?
5        A.    Yes, sir.
6        Q.    And the second time you
7    went to service it, what did you do for
8    it that time?
9        A.    I did the same -- I did the
10    same -- to service it means everything
11    I named each time.
12        Q.    You added fuel, added
13    oil --
14        A.    If oil was needed.
15        Q.    If oil was --
16        A.    Fuel and greased the grease
17    fittings were daily.
18        Q.    So each -- so each time you
19    went over -- the second time you went
20    over to work on Mr. Davis' equipment,
21    do you recall what you did?
22        A.    The same thing.
23        Q.    Well, tell me, what did

45  (Pages 177 to 180)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

181

1  you do?
2      A.  Fuel, greased the
3  fittings --
4      Q.  Uh-huh (nodding head).
5      A.  -- whatnot.
6      Q.  You added fuel and greased
7  the fittings?
8      A.  Yes, sir.
9      Q.  Anything else the second
10  time?
11      A.  If there was anything else,
12  I can't remember, but I know that was
13  the most basic thing that I did to that
14  piece of equipment.
15      Q.  How long did it take you to
16  do that work?  The same thing, twenty
17  minutes; longer, shorter?
18      A.  Yeah.  It varied, around
19  there.
20      Q.  Best estimate, twenty
21  minutes?
22      A.  Yes, sir, we can say twenty
23  minutes.

182

1      Q.  Okay.  And was he there
2  while you did the work?
3      A.  No, sir.
4      Q.  Was he there the first time
5  you did the work?
6      A.  Sometimes -- the first
7  time, no, sir.
8      Q.  So he was not actually
9  present watching you either the first
10  or second time; is that correct?
11      A.  It was -- I had been there
12  a couple of times before he ever gave
13  me the forty dollars the first time.
14      Q.  Well, I'm just going off
15  your interrogatories.  If you want to
16  add to it, that's fine, but in here
17  (indicating) you said there were just
18  two.  Are there more than two now?
19      A.  I mean, I don't know what
20  that -- it may have been a mis-
21  understanding or something there.  What
22  I'm telling you is the fact of the
23  thing.

183

1      Q.  Okay.  Well, tell me.  I
2  want to know.
3      A.  I had been there previously
4  before -- before he ever gave me the
5  forty dollars the first time, and that
6  was only because I brought to his
7  attention, "Hey, look, you've been
8  paying Donnie to come over here and
9  service your equipment" --
10      Q.  Okay.
11      A.  -- "why am I made to do it
12  for nothing," and he shoved me forty
13  dollars.
14      Q.  So how many times did you
15  service it before the time when you
16  requested the forty dollars?
17      A.  I had serviced it a couple
18  of times.
19      Q.  How many times?
20      A.  I can't remember just how
21  many, but I had -- a couple of times I
22  know.
23      Q.  When you say a couple, two,

184

1  three?
2      A.  Yeah.
3      Q.  Two times?
4      A.  Two or three times.
5      Q.  So you had actually been
6  over there to service it two or three
7  times for Randy?
8      A.  (Witness nodding head).
9      Q.  And then you came back on
10  the fourth time and requested to be
11  paid; correct?  I think that's what you
12  said.  If I'm wrong, tell me.  I don't
13  want to misrepresent anything.
14      A.  What I said is I had
15  serviced the equipment a couple of
16  times, a few times before he ever paid
17  me.
18      Q.  Yeah, I got that.  I
19  know.  You said two or three times.
20      A.  Yes, that's what I'm
21  saying.
22      Q.  And you said on the fourth
23  time you showed up and did the service

46  (Pages 181 to 184)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

185

1    work and asked to be compensated;
2    correct? You did the work the fourth
3    time and you asked him for money;
4    right?
5        A.    I don't know whether it was
6    the fourth time -- it was -- I had done
7    it a couple times.
8        Q.    Right.
9        A.    Whether it was the third or
10   fourth time, I can't remember.
11       Q.    Okay. Either one. You did
12   it two or three times, then you did it
13   and asked for -- to be paid --
14       A.    Yes, sir.
15       Q.    -- correct?
16       A.    Yes, sir.
17       Q.    And he compensated you;
18   correct?
19       A.    Yes, sir.
20       Q.    And then you came back at a
21   later date and did the service again?
22       A.    Yes.
23       Q.    And at that point, is it

186

1    your testimony he didn't pay you?
2        A.    Yes, sir.
3        Q.    Okay. At that time, did
4    you ask him to be paid?
5        A.    Yes, sir, I did.
6        Q.    What did you say exactly?
7        A.    I can't remember exactly
8    what I said, but I remember his
9    statement after I said what I said.
10       Q.    You can't remember what you
11   said, you remember the statement. What
12   do you recall saying to him?
13       A.    I can't remember exactly
14   how -- I can't remember exactly how I
15   asked him.
16       Q.    Uh-huh (nodding head).
17       A.    I can't remember that.
18       Q.    Okay. Well, how did he
19   respond to you asking him to be
20   compensated?
21       A.    He responded "You do
22   whatever I tell you to do and you do it
23   or you take your ass home."

187

1        Q.    Okay. Did he compensate
2    you?
3        A.    No, sir, he didn't. He put
4    it in reverse and backed out after he
5    said that and left.
6        Q.    Okay. Did he use any
7    racial slurs?
8        A.    No, sir.
9        Q.    I don't see it in here
10   (indicating).
11       A.    No, sir.
12       Q.    No?
13       A.    No, sir.
14       Q.    Okay. And at any time did
15   you report any of this working for
16   Randy to anybody, working on his side
17   job? Did you tell anybody this was
18   going on? Did you report it to anybody
19   at Southeast Cherokee?
20       A.    I mean, Randy is -- if it's
21   a job -- if Southeast Cherokee's got a
22   job going on, Randy is over it. Randy
23   is like the head foreman over each

188

1    different job.
2        Q.    I know. But my question
3    is: Did you report it to anyone? Did
4    you tell anybody about it? Did you
5    report it to anyone? Did you report it
6    to Jerry Carter?
7        A.    I don't believe that I did.
8        Q.    Did you report it to Lynn
9    Carter?
10       A.    No, sir, I didn't.
11       Q.    Okay. Did you report it to
12   anyone?
13       A.    Do you mean --
14       Q.    I mean, did you report it
15   to anyone at Southeast Cherokee?
16       A.    There's no one else to
17   report it to besides --
18       Q.    I'm just asking if you did.
19       A.    Did I mention it to anyone?
20       Q.    We can go there too.
21           First, did you report it to
22   anyone, any of your supervisors,
23   anybody higher than you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

189

1    A.    Randy is my supervisor.
2    Q.    Right.  Did you report it
3  to anybody higher than Randy?
4    A.    No, sir, I didn't.
5    Q.    Okay.  Did you mention it
6  to anyone else just around?
7    A.    Yes, sir, I did.
8    Q.    Okay.  Who did you mention
9  it to?
10    A.    I mentioned it to -- I
11  mentioned it to Pedro, I mentioned it
12  to Deon, I mentioned it to Tyrone, I
13  mentioned it to that bulldozer driver
14  too.  I can't think of his name.  I
15  never knew his real name, only his
16  nickname.
17    Q.    Okay.  Anyone else?
18    A.    Not that I can remember.
19    Q.    Okay.  I mean, what did you
20  tell these folks?
21    A.    I told them that Mr. Randy
22  Davis was making me go service his
23  personal equipment without being

190

1  compensated for it, and I was told that
2  I could do it or I could take my ass
3  home or, basically, in other words, I
4  could do it or I could be without a
5  job.  So, basically, I was forced to do
6  this.
7    Q.    Okay.  What did they say?
8  I mean, how did they respond?
9    A.    Various different ways.  I
10  really can't remember.
11    Q.    Can you remember what any
12  one of the individuals said in
13  response; be it Pedro, Deon, Tyrone, or
14  the mystery bulldozer driver?
15    A.    I can remember Pedro kind
16  of laughing and saying "Man, that ain't
17  right."
18    Q.    Anyone else?
19    A.    That's as far as I can
20  recall right now.
21    Q.    Okay.  Did Randy ever ask
22  you to do work on his personal vehicles
23  on weekends or holidays?

191

1    A.    I worked on weekends.
2    Q.    Well, strike that.  Bad
3  question.
4          On your days off or
5  holidays?
6    A.    Days off and holidays?
7    Q.    (Nodding head).  Did you
8  ever have to come in specifically to
9  work on one of your days off --
10    A.    No, sir, I didn't.
11    Q.    Just because I didn't get
12  the question out, let me make sure.
13  Randy never asked you to come in and
14  service his -- strike that.
15          Did Randy ever ask you to
16  come in on either your day off or a
17  holiday to service his personal
18  equipment?
19    A.    No, sir, he didn't.
20    Q.    Okay.  And you've got in
21  your Complaint that you were retaliated
22  against and being terminated for
23  reporting some of these racial

192

1  conversations we've been talking about.
2          Who did you -- how do you
3  believe you were terminated for
4  reporting -- well, first of all, did
5  you report any of this to anyone at
6  Southeast Cherokee higher than Randy
7  Davis?
8    A.    First of all, I don't
9  remember saying anything about being
10  retaliated against.
11    Q.    Okay.
12    A.    You just stated that I got
13  it in my statement.
14    Q.    Yes, I'm just reading.
15  It's Number 11 in your Complaint.
16    A.    Of being retaliated
17  against?
18    Q.    Yes.  It doesn't matter to
19  me, you've just got -- I mean, do you
20  believe you were retaliated against due
21  to your race in being terminated?
22          MR. ROBERSON:  Object to
23  the form.  You can't be retaliated for

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

193

1  your race, you can be retaliated
2  against for engaging in protected
3  activity which is making a complaint.
4      MR. GARRETT: If you want
5  that, that's fine.
6      A.  I don't understand what
7  you're saying. You're asking two
8  questions in one. I don't understand.
9  Would you clarify?
10     Q.  Sure. This is what it's
11  got, Number 11, "Plaintiff alleges that
12  Southeast Cherokee retaliated against
13  him," that's you, because of his
14  engaging in protected activities by
15  reporting racially disparate treatment
16  which means essentially that they have
17  fired you because you reported being
18  treated differently because of your
19  race.
20         I mean, are you alleging
21  that?
22     MR. ROBERSON: Did you ever
23  tell anyone at Southeast that you were

194

1  being treated differently because you
2  were black because of your race?
3      Q.  Right, or that you were
4  terminated --
5      MR. ROBERSON: And you've
6  already testified that you have be-
7  cause --
8      MR. GARRETT: He can answer
9  it. I mean --
10     Q.  Do you believe you were
11  fired because you reported racially
12  disparate treatment, that you were
13  treated differently because you were
14  black?
15     A.  Yes, sir.
16     Q.  You believe you were
17  terminated for that reason?
18     A.  Yes, sir.
19     Q.  What do you base that on?
20     A.  I base that on the fact of
21  -- I base that on all of the -- all of
22  the different racially motivated
23  incidents that I had experienced

195

1  already.
2      Q.  This is talking about
3  report -- first of all, what racial
4  disparate treatment did you report to
5  anyone at Southeast Cherokee? What did
6  you report?
7      MR. ROBERSON: Object to
8  the form. He's already told you about
9  it; he's already told you about telling
10  Pedro that stuff about getting paid and
11  not getting paid. It's --
12     MR. GARRETT: Pedro.
13     MR. ROBERSON: Excuse me.
14  That's his supervisor who he would
15  report it to.
16     Q.  You tell me. Is it your
17  belief that you were fired because
18  someone told -- strike that.
19         Do you believe somebody
20  told either Lynn or Jerry Carter or
21  anyone in upper management that you
22  were making complaints about being
23  treated differently because you were

196

1  black? Who do you think --
2      A.  Excuse me?
3      Q.  Who do you think, if
4  anyone, told Lynn or Jerry Carter or
5  Randy Davis that you were complaining
6  about being treated differently for
7  being black?
8      A.  Now, I have no knowledge of
9  anything like that.
10     Q.  So as we sit here today,
11  you don't have any evidence that anyone
12  communicated your concern that you were
13  being treated differently because you
14  were a black male to either Randy
15  Davis, Lynn Carter, or Jerry Carter; is
16  that true?
17     A.  Excuse me?
18     Q.  Do you have any evidence or
19  can you tell me about any -- strike
20  that.
21         Do you have any evidence as
22  we sit here today that any individual
23  communicated or told either Lynn or

49  (Pages 193 to 196)

# FREEDOM COURT REPORTING

197

1  Jerry or Randy that you were
2  complaining about being treated
3  differently because you were a black
4  male?
5      A.   I have no knowledge of
6  anyone going to Lynn or Jerry on behalf
7  of saying that I was complaining.
8      Q.   Okay.
9          MR. GARRETT:  Let's take a
10  break.
11
12      (Whereupon, a brief recess was
13      taken.)
14
15      Q.   Also, in looking at your --
16  we're back on the record.
17      In looking at your
18  Complaint, Decarey, it looks like
19  you're going to attempt to bring a
20  claim that you were forced to work in a
21  hostilely racial environment.  What, if
22  any -- are there any separate claims
23  with regard to the hostile work

198

1  environment that we haven't already
2  talked about in terms of the work
3  environment being racially hostile,
4  anything else I need to know about
5  besides the incidents we've already
6  talked about?
7      A.   Well, earlier you asked me
8  a question, and I don't think I had a
9  chance to clarify myself.  Do you mind?
10      Q.   Do what?
11      A.   Earlier you asked me a
12  question, and I don't think I had a
13  chance to fully clarify myself.
14      Q.   Let's stick to this first.
15  I mean, is there anything --
16      A.   Could you ask your question
17  again, please?
18      Q.   Yes.  Besides what we've
19  already talked about to this point, are
20  there any other claims or charges or
21  factual bases or allegations with
22  regard to you having to work in a
23  racially hostile environment?

199

1      A.   Besides that that's in the
2  paper that you have, no, sir.
3      Q.   Which paper?  You said in
4  the paper I have?
5      A.   Besides that in the
6  paperwork we have submitted to you, no,
7  sir.
8          MR. ROBERSON:  The EEOC
9  paperwork or what are you talking
10  about?
11          THE WITNESS:  Yes, sir, the
12  EEOC.
13      Q.   That brings me to this.
14  Let me show you what's been marked --
15      A.   Could you clarify your
16  question again?  Maybe I'm not
17  understanding your question?  Could you
18  clarify your question again?
19      Q.   Sure.
20          MR. ROBERSON:  Do you want
21  to go off the record for a second and
22  let me explain something to him?
23

200

1      (Whereupon, a discussion was held
2      off the record.)
3
4      Q.   Go ahead.
5      A.   Could you ask the question
6  again, please.
7      Q.   The question was:  Other
8  than what we've talked about thus far
9  today, is there anything else that
10  you're going to offer as testimony that
11  you were forced to work in a racially
12  hostile environment?
13      A.   Yes, sir, it is.
14      Q.   Tell me about it.
15      A.   Sorry about that.  I mean,
16  I just wanted to be clear.
17      Q.   I understand.  Go ahead.
18      A.   Being a service truck
19  operator, you have to service the
20  equipment -- well, you have to check
21  on the equipment whether it's being
22  used when you pull up or not.  So,
23  basically, I got -- I'm to check the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

201

1    equipment to see whether it have been
2    used or not, and sometimes that means
3    -- sometimes that means driving in
4    muddy areas and whatnot.
5        And I drove -- it had
6    rained real hard, it had rained pretty
7    good, but my job is to service the
8    equipment, so rain or dry, I still got
9    to get to the equipment to service it.
10   I've got to drive to the equipment to
11   service it. And I went through an
12   area -- I went through an area where
13   the truck got stopped, the truck got
14   stuck, and Mr. Randy Davis -- Mr. Randy
15   Davis -- and the truck had to be pulled
16   out by a piece of equipment.
17       Mr. Randy Davis pulled up
18   and told me to get a shovel and go all
19   the way back down through there and
20   smooth that spot out with a shovel.
21   Now, that's the job of the heavy
22   equipment. I told him that I would --
23   I told him that I would get on the

202

1    backhoe and smooth -- I told him that I
2    would get on the backhoe and smooth the
3    spot back out, and he said, "Huh-uh,
4    you get that shovel and you smooth
5    that spot back out."
6        Q.   Okay.
7        A.   And he stated again "or you
8    can take your ass home." And as he was
9    backing up, he stated under his voice
10   "and you can take your ass home anyway
11   whether you know it or not."
12       Q.   Uh-huh (nodding head).
13       A.   So I got the shovel and I
14   smoothed the spot back out, to the best
15   of my ability, with a shovel where a
16   piece of equipment could have just
17   wiped over it one time and that been
18   that.
19       Q.   Where is the racial --
20   where is the racial aspect?
21       A.   Where's the racial?
22       Q.   Yeah, what's racial about
23   that?

203

1        A.   Considering the fact --
2    considering the fact of all these other
3    racial incidents of how Mr. Davis was
4    forcing me to go and service a piece of
5    his equipment, considering the other
6    facts -- considering the other facts
7    when I told him that I would use a
8    piece of equipment to smooth this place
9    back out but he -- he wanted me to do
10   it manually with a shovel, and it
11   wasn't just a small place, it was a --
12   it had been -- it had rained and it had
13   been muddy, and it was a pretty long
14   place, but, yet, I was made to do it
15   with a shovel or I can take my ass
16   home, so he said.
17       Q.   Right. But, I mean, do you
18   know if he's ever made another white
19   employee do the same thing?
20       A.   Not when that particular
21   job is to be done with a piece of
22   equipment, no.
23       Q.   I know. But my question

204

1    is: Do you know if Randy's ever had
2    another white employee do the same
3    thing; to shovel to teach him a lesson
4    about staying on the road?
5        A.   To teach him a lesson?
6        Q.   Yes.
7        A.   When that's not even his
8    job?
9        Q.   I'm asking about -- you're
10   making a race statement now. I'm
11   talking about race. I mean, what about
12   that statement or anything in that
13   situation that has anything to do with
14   you being a black male? I mean, I
15   understand you're upset because he made
16   you do it.
17       A.   Let's look at the facts,
18   just look at the facts.
19       Q.   All right. Let me ask you
20   this -- I don't want to get off on a
21   tangent. Do you have any evidence that
22   Randy has ever asked a white man to do
23   the same thing?

51 (Pages 201 to 204)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

205

1    A.    I don't have any evidence
2  of it.
3    Q.    Okay.  So, I mean, it's
4  completely possible that maybe he does
5  that to everyone; is that true?
6    A.    No, sir, it's not.
7    Q.    How do you know that?
8    A.    When the simple thing would
9  be -- when the simple thing and the
10 most common thing, the right way to
11 do it would be to get a piece of
12 equipment --
13    Q.    Sure.  I understand you're
14 upset you had to do it with a shovel,
15 but I'm saying how do you -- what do
16 you base the racial aspects of that on?
17    MR. ROBERSON:  Besides
18 being black?
19    MR. GARRETT:  Correct,
20 yeah.
21    Q.    I mean, what are you --
22 right.  What do you think -- where are
23 you getting a racial -- what about that

206

1  is racial to you?
2    A.    Because his intent were --
3  his intentions were --
4    MR. ROBERSON:  It was
5  punishment.
6    Q.    Well, even if it was, do
7  you have any evidence that white folks
8  in the same position you were in didn't
9  have to do the same kind of work with a
10 shovel?
11    A.    I never -- I never saw one
12 have to smooth over a place with a
13 shovel.
14    Q.    Okay.  Do you have any
15 evidence that that wasn't the case;
16 that he didn't make other white
17 workers --
18    A.    I never saw any other
19 workers having to.
20    Q.    In asking that you do that
21 work, did he use any racial slurs?
22    A.    I considered that a racial
23 slur.  To tell someone no, you can't

207

1  use a piece of equipment which should
2  be done for that but you've got to use
3  a shovel or take your ass home, then I
4  consider that -- coming from the same
5  individual that -- coming from the same
6  individual that previously -- that I
7  was being forced to leave the job, go
8  and do service on another piece of
9  equipment --
10    Q.    Right.  I understand how
11 you took it.  My thing is did he use
12 any racial slurs?  Did he refer to you
13 in that context as being a black male
14 or refer to you in that context as
15 being a, quote, "nigger," end quote, or
16 any other racial slur that would have a
17 racial connotation?
18    A.    At that time, no.
19    Q.    I understand you brought an
20 EEOC complaint in this case; is that
21 correct?
22    A.    Yes, sir.
23    Q.    And the EEOC issued a

208

1  Letter of Determination.  I'll show you
2  a copy of that; I'll show it to you.
3  Have you seen that document before
4  (indicating)?
5    A.    (Witness reviews document).
6  Yes, sir, I have a copy of mine.
7    Q.    Well, my question was:
8  Have you seen the letter before?
9    A.    Yes, sir, I've seen the
10 letter from the EEOC.
11
12    (Whereupon, Defendant's Exhibit 2
13    was marked for identification and
14    same is attached hereto.)
15
16    Q.    I'm going to mark as
17 Defendant's Exhibit 2 the Letter of
18 Determination dated January 12, 2007.
19 How have you seen that letter?
20    A.    Excuse me?
21    Q.    How have you seen that
22 letter?  How did that come to be in
23 your possession?

52  (Pages 205 to 208)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

209

1    A.    Okay. I was -- it was sent
2    to me by the EEOC.
3    Q.    So you received that in the
4    mail from the EEOC?
5    A.    Yes, sir.
6    Q.    Can we agree in reading
7    that letter that the EEOC determined
8    that there was insufficient evidence to
9    support your allegation that you were
10   subjected to a racially hostile work
11   environment? Can we agree to that?
12   A.    Yes, sir, we can.
13   Q.    Thank you. Now, let's go
14   back and talk about this day where you
15   say you ran off the road. What date
16   was that? Do you recall?
17   A.    That I said I ran off the
18   road?
19   Q.    Yes.
20   A.    I never said I ran off the
21   road.
22   Q.    Or when you got stuck.
23   A.    Can I recall what date?

210

1    Q.    Yes.
2    A.    It was the day before I was
3    fired.
4    Q.    Okay. Where were you at;
5    what job? Where was the job?
6    A.    I was on the job in
7    Montgomery.
8    Q.    Do you remember where in
9    Montgomery?
10   A.    Off of -- a job off of
11   Vaughn Road down -- I can't remember
12   exactly the name of it, but it was in
13   Montgomery off of Vaughn Road.
14   Q.    And you were in the service
15   truck?
16   A.    Yes, sir.
17   Q.    I'm sorry, is that correct?
18   A.    Yes, sir.
19   Q.    And what happened? How did
20   you get the truck stuck?
21   A.    I was going to service a
22   piece of equipment, it had rained
23   previously, and it was real muddy;

211

1    which is real common; muddy or dry. If
2    it's muddy, I've got to spin through
3    the mud to get to the equipment. And
4    this particular time, I got stuck.
5    And --
6    Q.    Let me stop you there.
7    How did you get stuck?
8    A.    It was muddy.
9    Q.    What happened? What part
10   of your truck got stuck?
11   A.    The back tires.
12   Q.    The back tires. The right
13   or the left?
14   A.    The left.
15   Q.    So the left rear tire was
16   in the mud?
17   A.    The left rear tire was
18   stuck.
19   Q.    And it was -- was it
20   spinning?
21   A.    It was spinning (nodding
22   head).
23   Q.    Were the other three wheels

212

1    on the ground or were they stuck as
2    well?
3    A.    They were on the ground
4    stuck as well.
5    Q.    They were all stuck?
6    A.    I mean, the whole truck was
7    stuck.
8    Q.    Okay.
9    A.    The whole truck was stuck,
10   but the left rear tire was spinning.
11   Q.    Okay. You said all four
12   tires of the truck were sunk in the
13   mud; is that correct?
14   A.    That's correct.
15   Q.    How deep were you sunk?
16   Was it to the axle? I mean, I don't
17   know.
18   A.    It was to the axle.
19   Q.    So you were stuck pretty
20   good?
21   A.    I was stuck pretty good.
22   Q.    Were you near or on a road?
23   A.    I had almost made it to the

53  (Pages 209 to 212)

# FREEDOM COURT REPORTING

213

1  road. I was -- I was -- I had almost
2  made it to a road, so near a road.
3      Q.   Okay. Where were you
4  going? Where were you trying to go to?
5      A.   I was trying to go service
6  a piece of equipment.
7      Q.   And were you on a paved
8  road or a roughed-in road or a dirt
9  road or asphalt? I mean, what kind of
10  road were you following?
11      A.   It wasn't -- the majority
12  of the time, you don't have a road,
13  it's just a path; it's just a path that
14  you take or you just take any path to
15  get to the equipment. You don't be on
16  a road the majority of the time. You
17  are putting it over here (indicating)
18  or putting it over there (indicating)
19  or the putting it over there
20  (indicating), you have just got to get
21  to the equipment.
22      Q.   When you were out there on
23  your way to this equipment, did you ask

214

1  anybody or receive directions from
2  anybody with regard to how to approach
3  the equipment?
4      A.   No, sir.
5      Q.   If a number of individuals
6  in this case are willing to testify
7  that they instructed you to go a
8  certain way to the equipment and that
9  you did not, would you disagree with
10  them?
11      A.   I would tell them that they
12  were lying --
13      Q.   Okay.
14      A.   -- to their face.
15      Q.   Okay.
16      A.   Yes, sir.
17      Q.   And did the truck turn
18  over; did the truck turn over?
19      A.   Do you mean bottom side up?
20      Q.   Bottom side up.
21      A.   No, sir.
22      Q.   It didn't turn over on the
23  side?

215

1      A.   No, sir.
2      Q.   Was it leaning?
3      A.   I mean, it was stuck.
4      Q.   Was it leaning to one side
5  or the other?
6      A.   One side was maybe leaning
7  a little more than the other.
8      Q.   Which side?
9      A.   The left side.
10      Q.   Did you spill any fuel?
11      A.   No, I didn't.
12      Q.   And you have HAZMAT
13  certification; correct?
14      A.   Yes, sir.
15      Q.   And you understand that --
16  through that training, I guess, and in
17  receiving your CDL, that fuel spills
18  have to be taken very seriously? You
19  agree with me; right?
20      A.   Yes, sir.
21      Q.   And that a fuel spill can
22  be a pretty bad environmental problem,
23  do you agree with me?

216

1      A.   Yes, sir.
2      Q.   And specialized steps and
3  methods have to be utilized in cleaning
4  up fuel spills; correct?
5      A.   Yes, sir. The truck itself
6  had a fuel leak itself. The truck was
7  in extremely bad shape. The truck
8  shouldn't even have been on the road.
9  That's why another one was on order. A
10  new one was on order because that truck
11  had had it. That truck was leaking
12  everything that was in it.
13      Q.   I believe you said in your
14  interrogatory responses that, in fact,
15  Southeast Cherokee received a new fuel
16  truck while you were still operating
17  the old one; is that correct?
18      A.   That's correct.
19      Q.   And that it actually stayed
20  up at the shop for some period of time;
21  is that correct?
22      A.   That's correct.
23      Q.   How long did the new fuel

54  (Pages 213 to 216)

# FREEDOM COURT REPORTING

217

1 truck stay up at the shop while you
2 were operating the old one?
3      A.    Two, three weeks.
4      Q.    And what were they doing to
5 the fuel truck during that two to
6 three-week period?
7      A.    What were they doing?
8      Q.    Yeah, what were they doing
9 to it?
10      A.    Every time I saw it, they
11 wasn't doing nothing to it.  It was
12 just there parked in the shed.  When it
13 came from the factory, it came ordered
14 -- specially ordered ready for the job.
15      Q.    Okay.  Do you disagree that
16 they were making modifications to that
17 truck during the two or three-week
18 period?
19      A.    Not according to Pedro.
20      Q.    Well, I'm asking if you
21 disagree or agree.
22      A.    I disagree; yes, I
23 disagree.

218

1      Q.    Okay.  And you had a
2 conversation with Pedro about the new
3 fuel truck?
4      A.    Yes, I did.
5      Q.    What was that conversation
6 about?
7      A.    The conversation that I and
8 Pedro had was Pedro was -- I was asking
9 him was the fuel truck ready, he said
10 yeah, and I asked, "Well, why ain't I
11 in it, why am I still having to drive
12 this old raggedy one that's leaking
13 this fuel?"  And he kind of laughed and
14 said, "Man, I don't know."
15      Q.    So he told you he didn't
16 know why it wasn't in operation yet?
17      A.    Yes, sir.
18      Q.    Any other statements about
19 the new fuel truck?
20      A.    Between me and Pedro?
21      Q.    Or anyone.
22      A.    I mean -- I mean, sure, I
23 was being told that the new service

219

1 truck still needed modifications, but
2 that wasn't the case.  It wasn't a
3 thing in the world wrong with the new
4 fuel truck.  I was there every morning
5 and every afternoon where the new fuel
6 truck was.  That's where I left the old
7 fuel truck at, I parked the old fuel
8 truck right in there beside it each
9 night and I pulled it out of there each
10 morning.
11      Q.    And who told you the fuel
12 truck was undergoing modifications?
13      A.    At first, when it first
14 got there, the first couple of days it
15 did undergo modifications, but not the
16 whole -- but not the whole couple of
17 weeks it was there; it did not.
18      Q.    That wasn't my question.
19 My question was:  Who told you?
20      A.    Pedro; Pedro did.
21      Q.    So now Pedro has told you?
22      A.    And after the modifications
23 were finished, he also told me that --

220

1 that they wasn't doing any more
2 modifications on it.
3      Q.    Well, let me ask you this:
4 What modifications did Pedro tell you
5 they were doing?
6      A.    He didn't tell me.
7      Q.    Did you ask?
8      A.    No, I didn't.
9      Q.    Any reason why not?
10      A.    As a matter of fact -- as a
11 matter of fact, to be exact, he did
12 tell me about what modifications, but I
13 can't remember.  It was something real
14 simple though; it was something
15 extremely simple.  I can't remember
16 exactly what, but I know it was
17 something extremely simple, that in a
18 couple of days' time, Pedro had already
19 done.
20      Q.    Okay.  So it's your belief
21 that it took two days to modify the
22 truck?
23      A.    It's my belief that in a

55  (Pages 217 to 220)

# FREEDOM COURT REPORTING

221

1  few days' time, the truck was
2  operationally ready.
3      Q.   In two days' time, the
4  truck was operationally ready?
5      A.   I didn't say two days.
6      Q.   Okay.
7      A.   I said a few days.  The
8  truck came -- the truck came from --
9  where it was ordered off, when the
10  truck came, it was ready when it came.
11  Now, the modifications that Southeast
12  Cherokee wanted to put on the truck
13  only took a few days.
14      Q.   Well, what were they?  You
15  don't know?  Do you know?
16      A.   It was something real
17  simple.  I can't remember exactly what
18  it was, but it was something extremely
19  simple.
20      Q.   Something you considered to
21  be simple?
22      A.   (Witness nodding head).
23      Q.   Okay.  In your

222

1  interrogatory responses, you say that
2  the new fuel truck had certain things
3  on it that were going to make your job
4  easier.
5      A.   Uh-huh (nodding head).
6      Q.   What are those?
7      A.   Well, the new fuel truck
8  had state of the art updated
9  modifications, like hoses that would
10  unwind and would lock, and then you'd
11  pull them, and they'd wind itself back
12  up.  It had -- it was bigger.  It was
13  bigger, it had a better tool -- it had
14  a better -- the place where you placed
15  the tools on the side, they were
16  better.  It was just a totally -- it
17  was a better -- all around better truck
18  that would make life as a service man a
19  lot easier.
20      Q.   So it's your belief the new
21  truck would have made your job easier?
22      A.   Yes, sir.
23      Q.   Is there anything on the

223

1  truck that the new truck could do that
2  the old truck could not do?
3      A.   A lot of things (nodding
4  head).
5      Q.   I Need to know about
6  them.  I don't mean to make your life
7  easier, I mean things it could do that
8  the old one could not; capability --
9      A.   Well, for one, the new
10  truck wasn't leaking all different kind
11  of fuels.
12      Q.   I understand you on that.
13  I'm saying what could the new truck do
14  that the old truck could not do?
15      A.   The new truck had -- like I
16  say, it had hoses that would stretch a
17  lot farther so you wouldn't have to get
18  so close to the equipment; the hoses
19  would stretch a lot farther.
20      Q.   Maybe I can simplify it.
21  Is your testimony that this new truck
22  was just going to make your job easier
23  but it did the same things as the old

224

1  job (sic); is that true?
2      A.   No, it did more than the
3  old truck would.  Now, I don't have
4  both of the paperworks here in front of
5  me to see what this truck had that this
6  truck doesn't, but now the new truck
7  was a heck of a lot better truck and
8  more qualified and more suitable for
9  that job.
10      Q.   Okay.  But sitting here,
11  you can't tell me what it could do?
12      A.   No, sir, I can't, because I
13  was never allowed to drive the truck.
14  I just saw the truck as I was pulling
15  in beside it and pulling out beside it.
16      Q.   I mean, do you know -- I
17  mean, you know, do you know what
18  specifications were made for the new
19  truck versus the old one?
20      A.   No, I can't be for sure.
21      Q.   Is there any aspect of -- I
22  understand that you're claiming in the
23  case that you were made to work in a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

225

1  hostile racial work environment. Were
2  you ever -- did any of the allegations
3  you made with regard to the racial
4  slurs and what you consider to be
5  disparate treatment, did any of those
6  things --
7      A.   Disparate treatment?
8      Q.   -- make it -- yeah.
9  Scratch that -- strike that. I'll
10 start over.
11         Obviously, you're making
12 claims in this case that you had to
13 work in a racially hostile environment.
14 Did any of the aspects of the
15 environment keep you from doing your
16 job?
17     A.   Other than the mental
18 anguish --
19     Q.   Yeah.
20     A.   -- of having to --
21     Q.   I mean -- right.
22     A.   Other than the mental
23 anguish of me being a man that needs a

226

1  job and wants a job and being forced to
2  do things that he was not compensated
3  for and being forced to deal with
4  humiliation and just the mental anguish
5  of dealing with that was hostile.
6      Q.   That wasn't my question
7  though. I'm saying did any -- I hear
8  what you're saying, but what I'm asking
9  is: Did any of the treatment you
10 received or the -- strike that.
11         I'm trying to put this
12 concise for you. Did any of the
13 things that you're alleging with regard
14 to racial treatment keep you from doing
15 your job?
16     A.   Yes.
17     Q.   How so?
18     A.   When I was forced by Mr.
19 Randy Davis to leave my job, him being
20 the head supervisor, when I was forced
21 by him to leave my job and to go do a
22 job that did not have anything to do
23 with the company that had hired me,

227

1  yes.
2      Q.   How so?
3      A.   I was forced to leave my
4  job; I was forced to leave my job to go
5  to another job that I was not getting
6  compensated for that I should not have
7  been doing, but by him being my
8  supervisor, I was made to do.
9      Q.   How did that impact your
10 ability to do your work?
11     A.   It was getting in the way
12 of my work.
13     Q.   I mean, did you get
14 reprimanded for that? Did you get in
15 trouble for any of that?
16     A.   How could I get in trouble
17 for it when he's the head bossman when
18 he's telling me to do it?
19     Q.   Right. That's what I'm
20 saying. I mean -- my question is: If
21 what -- I'm hearing you right is that
22 you're saying, "Look, I had to leave my
23 Southeast Cherokee jobs to go and

228

1  service Randy's bush hog on the side,"
2  okay, I've got that. What you're
3  saying is that was an interruption of
4  my job?
5      A.   Uh-huh (nodding head), yes,
6  sir.
7      Q.   Right. I understand what
8  you're saying there, but what I'm
9  saying is how did that negatively
10 affect you?
11     A.   Because of the mental
12 anguish. It negatively affected me
13 because of the mental anguish of me
14 being a man --
15     Q.   I understand.
16     A.   -- and being subject to
17 this type of treatment, that's how it
18 affected me.
19     Q.   Okay. How did it affect
20 your ability to do your job, if at
21 all? What did it stop you from doing
22 in taking that twenty minutes or
23 whatever it is to go do that job, what

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

229

1  did that stop you from doing on your
2  own? How did that stop you from doing
3  your job, if at all? It may not have,
4  I don't know.
5      A.   Could you ask that question
6  again, please?
7      Q.   In having to take the
8  twenty minutes or whatever it is or
9  however many occasions it was to go
10  across the street in Prattville and
11  service Randy's bush hog, how did that
12  interruption keep you from doing your
13  job effectively?
14      A.   I don't know what kind of
15  answer you're looking for, sir. I
16  answered to the best of my ability. I
17  don't know what kind of answer you're
18  looking for. I'm sorry.
19      Q.   Well, I'm not looking -- I
20  just want to know if you have one. If
21  you're going to claim that, hey, you
22  know, I had to leave my job to go do
23  this work on the side, and that

230

1  negatively impacted my employment, I
2  just need to know how. If you are not
3  going to claim it, that's fine too.
4  But, I mean, it's a trick question.
5  I'm just saying what's the negative
6  repercussions of you having to go and
7  work on Randy's bush hog? That's all
8  I'm looking for -- if any. I don't
9  know.
10      A.   Other than the answer
11  that I've already -- I've already given
12  you --
13      Q.   I don't think you've given
14  me one. Did you ever get in trouble
15  for going -- I'll ask it that way: Did
16  you ever get in trouble for going to
17  work on Randy's bush hog?
18      A.   No, sir.
19      Q.   Were you ever reprimanded?
20      A.   Excuse me?
21      Q.   Were you ever reprimanded
22  for going to work on Randy's bush hog?
23      A.   Reprimanded?

231

1      Q.   Reprimanded.
2      A.   What do you mean?
3      Q.   Were you ever written up;
4  were you ever written up for that?
5      A.   No, sir.
6      Q.   Did anybody ever say to
7  you, Decarey, had you not gone to work
8  on the bush hog, you would have been
9  able to do this job faster or some
10  other job faster or better maybe?
11      A.   Nobody ever said that to
12  me, no.
13      Q.   All right. Let's talk
14  about -- you're claiming a number of
15  damages in the case. Let's talk about
16  some of those before we move on before
17  I get side-tracked. You're claiming
18  mental distress damages, I assume?
19      A.   Yes, sir.
20      Q.   Mental anguish damages?
21      A.   Yes, sir.
22      Q.   What are the bases of those
23  damages?

232

1      A.   The bases of those damages
2  are upon -- do you mean while working
3  with Southeast Cherokee or after?
4      Q.   I want all of them. Start
5  with while at Southeast and then take
6  me afterwards and let me know how --
7  tell me about your mental anguish.
8      A.   While with Southeast
9  Cherokee, basically the same answer I
10  just gave you for the last question.
11      Q.   Which is? Give me the
12  basis of your mental anguish.
13      A.   The basis of my mental
14  anguish is -- me losing an apartment
15  and everything in it; a bedroom suit,
16  living room suit, and everything in it.
17  The anguish of going through losing a
18  2004 F150 super crew cab because now I
19  can't meet my obligations of paying for
20  these things. The anguish of having to
21  go back home and live with my parents,
22  me being fixing to turn thirty-one, the
23  anguish of because I lost my vehicle, I

58 (Pages 229 to 232)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

233

1 can't really move around like I need to
2 to be able to find a job that can
3 compensate for that.
4        So having to -- so having
5 to take a very lesser paying job and to
6 do something that I really don't enjoy
7 doing, the anguish of financial
8 difficulties and the strain -- and the
9 anguish that financial difficulties
10 places on a relationship which causes
11 -- which causes arguments and things of
12 this nature.
13     Q.   Anything else?
14     A.   Not that I can think of
15 right now, sir.
16     Q.   I'm going to go back into
17 some of those a little bit later.  If
18 you think of anything else, let me
19 know.
20        Have you had to seek any
21 counseling?
22     A.   I haven't been able to
23 afford any counseling.

234

1        Q.   Have you sought any
2 counseling?
3     A.   I haven't been able to
4 afford any counseling.
5     Q.   Did you go see your priest
6 or a preacher?
7     A.   Yes, I have.
8     Q.   Who?
9     A.   Apostle; Apostle Pastor
10 Kevin Hunter.
11     Q.   Pastor Kevin Hunter?
12     A.   Apostle.
13     Q.   What is that?  What is an
14 apostle?
15     A.   He's a pastor.
16     Q.   Kevin Hunter?
17     A.   Yes, sir.
18     Q.   And who is he with?
19     A.   He's with another
20 dimension, World Outreach.
21     Q.   I asked you about all your
22 churches earlier, and you didn't say
23 anything about another -- what are you

235

1 calling this, another what?
2     A.   I never -- I said I spoke
3 with him.
4     Q.   Well, you said you
5 counseled with him.
6     A.   The same thing.
7     Q.   You received counseling.
8 He's in another -- what's it called?
9     A.   Another dimension, World
10 Outreach Center.
11     Q.   Word or world?
12     A.   World Outreach.
13     Q.   Where is he?  Where's that
14 located?
15     A.   He's out of -- he's out of
16 Montgomery.
17     Q.   Kevin Hunter?
18     A.   Yes, sir.
19     Q.   And did you set up an
20 appointment to go speak with him?
21     A.   (Witness shaking head).  He
22 came to my house.
23     Q.   He came to your house?

236

1     A.   (Witness nodding head).
2     Q.   Why did he do that?  Why
3 was he at your house?
4     A.   To speak with me.
5     Q.   Specifically only for that
6 purpose?
7     A.   He came to speak with me
8 about the trauma -- the trauma and the
9 mental anguish.
10     Q.   Answer my question; answer
11 my question before we move on now.  Are
12 you testifying that he came to your
13 house solely to speak with you?
14     A.   That's what I'm testifying
15 to.
16     Q.   Not to speak to anybody
17 else --
18     A.   To speak with me (nodding
19 head).
20     Q.   -- about anything else; is
21 that correct?
22     A.   That's correct.
23     Q.   Okay.  Did you call him?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

237

1  A.  Yes, I did.
2  Q.  How did you know about him?
3  A.  I was -- I was -- my aunt
4  -- my aunt told me about him.
5  Q.  Did you ask your aunt about
6  him? How did that come about?
7  A.  She told me about him. I
8  was telling her that I would like to
9  speak with him, and she got in touch
10  with him, he called me, and he said he
11  would come out to see me.
12  Q.  And what did you tell your
13  aunt you wanted to talk to him about?
14  A.  Personal things.
15  Q.  I've got to know.
16  A.  Personal things about
17  salvation.
18  Q.  I'm not interested in your
19  conversations with regard to your
20  racial belief -- I mean, excuse me,
21  strike that -- religious belief, I want
22  to know what you talked to him about
23  about this case (indicating).

238

1  A.  I never said I talked to
2  him about anything about this.
3  Q.  That's exactly what you
4  said. You said you received counseling
5  from this minister about these things
6  that make up your mental anguish, and
7  that's what I want to know about.
8  MR. ROBERSON: Come on,
9  Brett. I'm going to object to this
10  line of questioning. Number one, first
11  of all, there is a priest privilege, so
12  you wouldn't be entitled to know what
13  he spoke with him about or counseled
14  with him about. We would assert that.
15  And, secondly, what does this have to
16  do with anything?
17  MR. GARRETT: It's
18  treatment because what he's -- off
19  the --
20  MR. ROBERSON: It's not a
21  charge; he hasn't made any claim for a
22  charge.
23  MR. GARRETT: He just said

239

1  it, I'm not putting it in his mouth. I
2  asked him if he went and sought
3  counseling, and he said, yeah, I went
4  and saw this preacher for this specific
5  reason, he came to my house and talked
6  about --
7  MR. ROBERSON: So?
8  MR. GARRETT: He brought it
9  up. I can ask him about it, obviously.
10  MR. ROBERSON: He didn't
11  charge him; he's not making a claim for
12  reimbursement so it's irrelevant.
13  MR. GARRETT: All right.
14  Let's go on the record.
15  THE REPORTER: Leave it off
16  the record?
17  MR. GARRETT: Correct.
18  MR. ROBERSON: Leave it on.
19  MR. GARRETT: Either way.
20  Put in on.
21  MR. ROBERSON: I'm telling
22  you you don't have to answer that. You
23  can call the judge. You don't have to

240

1  answer what you spoke with this priest
2  about to counsel with him.
3  Now, next question.
4  MR. GARRETT: So you're not
5  going to be claiming charges for
6  counseling?
7  MR. ROBERSON: Exactly.
8  MR. GARRETT: That's all I
9  need to know.
10  MR. ROBERSON: It's in the
11  interrogatories, garden variety mental
12  anguish; just that.
13  MR. GARRETT: Well, I mean,
14  you know, he said it, and I have every
15  right to ask him.
16  MR. ROBERSON: And I have
17  every right to object and instruct him
18  not to answer because it's privileged.
19  MR. GARRETT: I think you're
20  doing a fine job. It's on the record,
21  we've got it.
22  Q.  Anyone else you sought
23  counseling from besides Mr. Hunter?

60 (Pages 237 to 240)

# FREEDOM COURT REPORTING

241

1  A.  No, sir.
2  Q.  Is it going to be your
3  testimony that you sought -- without
4  getting into what you talked about
5  because I don't really want to know,
6  without getting into specifics, are you
7  going to testify that you counseled
8  with him about events based on this
9  lawsuit or about salvation in general?
10  A.  Salvation in general.
11  Q.  Have you sought any other
12  kind of medical treatment for your
13  mental anguish?
14  A.  I haven't been able to
15  afford it.
16  Q.  Okay.  Have you sought any?
17  A.  No, sir.
18  Q.  Have you lost sleep?
19  A.  Yes, sir.
20  Q.  Have you sought any
21  treatment for your sleep loss?
22  A.  No, sir.
23  Q.  Any other physical ailments

242

1  you're going to be attempting to tie
2  into this case that you've suffered;
3  physical ailments?
4  A.  No, sir.
5  Q.  You said earlier that -- to
6  give you a little bit of detail, but
7  you said earlier along those lines that
8  your relationship with -- I know you're
9  not married, but I guess your long time
10  girlfriend has been -- was affected by
11  your being terminated; is that true?
12  A.  Yes, sir.
13  Q.  Tell me about that.  I've
14  got to know about that.  What are you
15  talking about there?
16  A.  Well, after I was
17  terminated from Southeast Cherokee, my
18  son was real young, he's only three
19  now, he was real young so she wasn't
20  working, and I was being the
21  breadwinner.  And after we got kicked
22  out of our apartment, she went back
23  home to her parents to stay with her

243

1  parents and I went back home to stay
2  with my parents.  And all hell broke
3  out when that happened.  We were
4  engaged, and we're not anymore.
5  Q.  Who is this lady?  Which
6  one is this?
7  A.  Channing Dejarnett.
8  Q.  Are you going to claim in
9  this case that being terminated from
10  Southeast Cherokee caused your
11  engagement to break off?
12  A.  Well, it caused my family
13  to split up (nodding head).
14  Q.  Okay.  I mean, you tell me.
15  I mean, are you going to go in front of
16  a jury and say my engagement to this
17  woman was broken off because I was
18  terminated from Southeast Cherokee?
19  A.  Because I was not able to
20  meet my financial obligations, yes.
21  Q.  Okay.  Have you gotten back
22  together, reengaged?
23  A.  No, sir.

244

1  Q.  Why?
2  A.  She moved on.
3  Q.  She moved on?
4  A.  Uh-huh (nodding head).
5  Q.  Is that Southeast
6  Cherokee's fault?
7  A.  Because we lost our
8  apartment, it opened the door to other
9  things that -- it caused the door for
10  other things that were -- a door should
11  have never been -- where a door should
12  have never been opened at.
13  Q.  What door?  What are you
14  talking about?
15  A.  By us being separated and
16  living in two different homes, it
17  caused her to be more susceptible to
18  outside influences.
19  Q.  Okay.  Are you trying to
20  say that she found someone else?
21  A.  That's what I said, yes.
22  Q.  Okay.  I understand there
23  was an incident when you were driving

61 (Pages 241 to 244)

**FREEDOM COURT REPORTING**

245

1 the tri-axle truck for Southeast
2 Cherokee where you got a ticket in
3 Calera; is that correct?
4    A.   That is correct.
5    Q.   And you were actually cited
6 for being overweight; is that correct?
7    A.   That's correct.
8    Q.   Give me your story on
9 that --
10   A.   Well --
11   Q.   -- as best you can.
12   A.   -- I -- they overweight --
13 they overloaded me at the mill in
14 Calera, and it's cited for being
15 overweight because they overloaded me.
16   Q.   Okay.  Let's kind of start
17 there.  Let's start at the beginning.
18 Do you know the date of this?  I mean,
19 it's on this ticket (indicating).
20   A.   It should be on the ticket.
21   Q.   I'm just wondering is it
22 toward the beginning or end of your
23 tenure.

246

1    A.   It was toward the very
2 beginning.
3    Q.   Very beginning?
4    A.   Very beginning (nodding
5 head).
6    Q.   Okay.  And it appears from
7 the interrogatories you and another
8 group of trucks went to Calera to get
9 some gravel.  Does that sound right?
10   A.   That's correct.
11   Q.   What does your CDL train
12 you about operating tri-axle dump
13 trucks on the interstate?
14   A.   It don't.
15   Q.   So it's your testimony that
16 there's no training in receiving your
17 CDL that deals with --
18   A.   A tri-axle dump truck?
19   Q.   -- yeah, operating a
20 tri-axle dump truck on the interstate?
21   A.   None.
22   Q.   The same question with
23 regard to your CDL training with regard

247

1 to operating a loaded truck of any
2 kind.
3    A.   I mean, there's weight
4 stipulations; there's weight
5 stipulations.
6    Q.   There are weight
7 stipulations?
8    A.   There are weight
9 stipulations.
10   Q.   What's your understanding
11 of those weight stipulations with
12 regard to how much you can ride on an
13 interstate with?
14   A.   I think it's like seventy-
15 six thousand pounds.
16   Q.   So it's your understanding
17 that you can ride on an interstate with
18 a loaded truck so long as it doesn't
19 exceed seventy-six thousand pounds?
20   A.   Yes, sir.
21   Q.   Does it matter what kind of
22 truck it is?
23   A.   I believe that's what the

248

1 weight requirement is.
2    Q.   Does it matter what kind of
3 truck it is?
4    A.   It don't matter what kind
5 of truck -- well, the axles -- the
6 axles and the -- it goes -- the
7 stipulations are how many axles, how
8 many axles and how many tires on the
9 truck.  The more axles and the more
10 tires you have on the truck, the more
11 weight you can carry.
12   Q.   Okay.  How much weight
13 could you carry on the interstate with
14 the tri-axle truck you were driving?
15   A.   I had no idea; I had no
16 idea.
17   Q.   Is that something they
18 trained you about in your CDL training?
19   A.   (Witness shaking head).
20       MR. ROBERSON:  No.
21   A.   Not by the tri-axle -- I
22 mean, the axle, yeah, but I was
23 overweight no matter -- I was

62 (Pages 245 to 248)

# FREEDOM COURT REPORTING

249

1  overweight at the mill.
2      Q.   Okay.
3      A.   I didn't load the truck or
4  anything.
5      Q.   Let me take one step at a
6  time. I know what you're going to say.
7  I've already seen it. What I want to
8  know is in your training to get your
9  CDL, did they train you how much you
10  could carry on an interstate in a
11  tri-axle dump truck? Was that part of
12  your training?
13      A.   Part of my training is --
14  my training hasn't got anything to do
15  with a tri-axle dump truck. I have a
16  -- tri-axle dump truck is a Class B
17  CDL. I have a Class A CDL. It only
18  requires a Class B CDL to drive a
19  tri-axle dump truck. I have a Class A.
20      Q.   That's not my question. My
21  question is: Did they train you in
22  your CDL training about how much you
23  could ride with loaded on the

250

1  interstate in a tri-axle vehicle, a
2  tri-axle dump truck? Was that part of
3  your training?
4      A.   Not specifically, no; not
5  specifically for a tri-axle dump truck,
6  no.
7      Q.   Okay. What is your
8  understanding of the amount of weight
9  you can haul down an interstate in a
10  truck, period? What's your under-
11  standing?
12      A.   It's around seventy-six
13  thousand pounds.
14      Q.   Okay. And did your
15  training in getting your CDL
16  differentiate between vehicles in terms
17  of what could carry that amount?
18      A.   Yes, it did.
19      Q.   How so?
20      A.   By the tires and the axles
21  on the truck.
22      Q.   Well, I just asked about a
23  tri-axle dump truck, and you said not

251

1  specifically; but a tri-axle truck,
2  you'd agree there was training?
3      A.   I answered not specifically
4  a tri-axle dump truck.
5      Q.   How about a tri-axle?
6      A.   A tri-axle what?
7      Q.   Anything.
8      A.   I don't understand that
9  question.
10      Q.   Well, I mean, you said
11  there's no training, and I'm just
12  trying to figure out what the training
13  is because you took the test and I
14  didn't. What I asked you was is there
15  any training in getting a CDL that says
16  how much weight you can carry down an
17  interstate driving a tri-axle dump
18  truck, and you said, "No, not
19  specifically."
20      A.   Seventy-six thousand
21  pounds.
22      Q.   Well, let me make sure I've
23  got it for the record. In your CDL

252

1  training, how much weight did they
2  teach you you could carry down an
3  interstate in a tri-axle dump truck?
4      A.   Anything on the interstate,
5  any eighteen-wheeler, eighteen wheels
6  and below can only carry seventy-six
7  thousand pounds. If you have
8  additional axles or additional tires,
9  more than eighteen, then the weight
10  requirement goes up according to the
11  additional axles, the additional tires.
12  Eighteen wheels and under, seventy-six
13  thousand pounds.
14      Q.   You said seventy-eight a
15  minute ago. Do you mean seventy-six?
16      A.   I only recall ever saying
17  seventy-six.
18      Q.   Okay. Well, what is it?
19  What do you think it is?
20      A.   I'm not sure. It's
21  somewhere around seventy-six thousand
22  pounds.
23      Q.   So what you're saying is

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

253

1 the way you recall your training is if
2 it's got eighteen wheels or less, it
3 can only carry seventy-six thousand
4 pounds?
5     A.    That's correct.
6     Q.    How did the axles work in
7 the equation?
8     A.    Do you mean in the eighteen
9 wheels or less equation?
10    Q.    Yes.
11    A.    Eighteen wheels or less,
12 around seventy-six thousand pounds.
13 Anything over seventy-six thousand
14 pounds and eighteen wheels or less,
15 you're over.
16    Q.    I just want an answer to my
17 question. You said that, you said
18 eighteen wheels or below, you could
19 carry seventy-six thousand pounds on
20 the interstate. You said that. And
21 then I asked you, "Well, how does the
22 number of axles play into that
23 equation," and then you just spit the

254

1 same answer back. What I want to know
2 is how does the number of axles play
3 into that equation. If you know, tell
4 me; if you don't know, tell me.
5     A.    The number -- tires are on
6 axles -- tires are on axles. I mean, I
7 don't know what else to tell you, sir,
8 besides tires are on axles. It's four
9 tires to an axle or it could be two
10 tires to an axle. I don't know. I
11 don't understand what --
12    Q.    Is the answer you don't
13 know?
14    A.    Ask the question again now.
15    Q.    Your statement to me was --
16 and if you don't know, just tell me.
17    A.    Ask your question.
18    Q.    I'm irrelevant one way or
19 the other. Okay?
20    A.    Okay.
21    Q.    Your testimony was that if
22 a vehicle has eighteen wheels or less,
23 it can ride on the interstate so long

255

1 as it doesn't exceed seventy-six
2 thousand pounds. Okay. And I asked
3 you in your CDL training, how the
4 number of axles factored into that
5 equation, and that's my question.
6     A.    The axles, because you can
7 only -- I don't know exactly how much,
8 but the axles, you can only have so
9 much weight per axle.
10    Q.    Okay. And so in your
11 tri-axle dump truck, how much weight
12 could you carry down the interstate?
13    A.    Per axle?
14    Q.    Okay.
15    A.    Do you mean -- do you mean
16 how much weight can I carry down the
17 interstate?
18    Q.    In a tri-axle.
19    A.    Around seventy-six thousand
20 pounds.
21    Q.    And that's what you got
22 from your CDL training; is that
23 correct?

256

1     A.    That's correct.
2         MR. ROBERSON: I'm glad you
3 cleared that up.
4     Q.    I'll show you what's been
5 premarked Defendant's Exhibit 3.
6
7         (Whereupon, Defendant's Exhibit 3
8         was marked for identification and
9         same is attached hereto.)
10
11    Q.    This is a copy of the
12 ticket you got coming back from Calera;
13 is that correct?
14    A.    (Witness reviews document).
15 It looks correct.
16    Q.    You can hold on to it.
17         On that morning, were you a
18 part of a number of trucks that went to
19 Calera to pick up gravel?
20    A.    I did leave with a number
21 of trucks headed toward Calera.
22    Q.    Okay. How many trucks?
23    A.    It was three other trucks

64  (Pages 253 to 256)

# FREEDOM COURT REPORTING

257

1　that was in front of me. It was four
2　of us in all.
3　　　Q.　Okay. Four total; is that
4　correct?
5　　　A.　That's correct.
6　　　Q.　And y'all were in line
7　going to Calera to pick up gravel?
8　　　A.　Yes, sir.
9　　　Q.　And, obviously, the other
10　three trucks got loaded and went on
11　their way?
12　　　A.　Got loaded and went on
13　their way.
14　　　Q.　So you were last in line?
15　　　A.　I was last in line (nodding
16　head).
17　　　Q.　All right. Now, you got
18　loaded --
19　　　A.　Yes, sir.
20　　　Q.　-- is that true?
21　　　A.　Yes, sir.
22　　　Q.　And they gave you a
23　little -- I guess you'd consider this a

258

1　receipt (indicating).
2
3　　　(Whereupon, Defendant's Exhibit 4
4　　　was marked for identification and
5　　　same is attached hereto.)
6
7　　　Q.　They gave you a receipt,
8　and I believe I'm reading this
9　correctly, and if I'm not, tell me, but
10　it looks like they weighed you down
11　with eighty-one thousand seven hundred
12　and forty pounds total on that ticket
13　there. Will you take a look at that
14　for me?
15　　　A.　(Witness complies). Yeah,
16　gross weight at scale at Calera,
17　eighty-one thousand seven hundred
18　forty.
19　　　Q.　And that's indicated on the
20　receipt that they gave you showing how
21　much they weighed you in at Calera;
22　correct?
23　　　A.　That's correct.

259

1　　　Q.　Did you sign that?
2　　　A.　I did.
3　　　Q.　And then after you signed
4　that, you got on the interstate with
5　your truck; correct?
6　　　A.　That's correct.
7　　　Q.　So you got on the
8　interstate overweight; correct?
9　　　A.　That's correct.
10　　　Q.　In fact, that eighty-one
11　thousand seven forty is more than the
12　seventy-six thousand pounds that you
13　understood you could operate on the
14　interstate pursuant to your CDL
15　training; is that correct?
16　　　A.　That's correct.
17　　　Q.　Now, you say in your
18　interrogatory responses that you tried
19　to call -- the other truck -- I'm
20　quoting, "It was my first time in
21　Calera, the other trucks had gone off
22　and left me behind. I tried to reach
23　them on the CB. I suppose they had

260

1　gotten out of reach. They didn't
2　respond, so I went on down the
3　interstate."
4　　　　Why were you calling them
5　on the CB?
6　　　A.　To see which way -- to see
7　which way they were going back to
8　Montgomery.
9　　　Q.　Which way had you gotten
10　there?
11　　　A.　Excuse me?
12　　　Q.　You thought they were going
13　a different way than you had gotten
14　there?
15　　　A.　Yeah. I mean, I didn't
16　know which way -- I didn't know which
17　way they were going back.
18　　　Q.　Why would they go back a
19　different way than they came?
20　　　A.　Because from where we were
21　it was closer to take up to Calera than
22　going out and hitting the interstate
23　and going up to Calera. So I didn't

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

261

1 know whether they were going to come
2 down the same way or go down the
3 interstate.
4    Q.    Let me ask you this:  How
5 did you get -- where did you go from --
6 where did you start your day?  Where
7 did you start that drive out?  Did you
8 start in Wetumpka on your way to Calera
9 or was it a different site?
10    A.    I can't remember how that
11 went; I can't remember exactly how that
12 went.
13    Q.    So in any event, you went
14 to Calera a certain route; correct?
15    A.    That's correct.
16    Q.    And then you got loaded,
17 and you were going to call other truck
18 drivers to determine how they were
19 going back?
20    A.    How they were going back,
21 that is correct.
22    Q.    And you expected they'd go
23 a different way on the way back?

263

1    A.    I tried to call all three
2 of the other trucks.
3    Q.    Did you call them on the
4 way up to ask why y'all were going on
5 31?
6    A.    I didn't (shaking head).
7    Q.    Did you know before you got
8 the ticket that you weren't supposed to
9 be operating that truck at that weight
10 on the interstate or did you learn it
11 after you got the ticket?  Was that
12 news to you?
13    A.    I mean, it didn't make no
14 difference which way I came down, I
15 still would have been overweight.
16    Q.    That's not my question.
17    A.    Whichever way I came down,
18 I would have been overweight.  It
19 didn't make any difference.  If I had
20 came back down 31 --
21    Q.    Uh-huh (nodding head).
22    A.    -- the way everybody else
23 came, I would have been overweight; if

262

1    A.    I didn't know whether or
2 not they were -- I know the interstate
3 was quicker because the whole while
4 going up that way, I was wondering why
5 we were going up 31 with all these
6 little small towns and traffic lights,
7 why didn't we just go straight up the
8 interstate.  The whole time up there, I
9 was wondering -- the whole time up
10 there, I was wondering that.
11    Q.    Uh-huh (nodding head).
12    A.    And on the way back, I
13 guess I thought maybe somebody got a
14 genius idea and they was going to go
15 back down the interstate, a quicker
16 way.  So after I couldn't get them,
17 after I couldn't get nobody, after I
18 couldn't get either of them on the CB,
19 I just went down the interstate.
20    Q.    So you just made that call?
21    A.    I did (nodding head).
22    Q.    Who did you try to call on
23 the CB?

264

1 I came down the interstate, I would
2 have been overweight.
3    Q.    Uh-huh (nodding head).
4    A.    Whichever way I came back
5 down, I would be overweight.
6    Q.    Listen to my question.  At
7 the time when you got this ticket, is
8 that the first time you learned that
9 you couldn't operate your tri-axle dump
10 truck on the interstate at the weight
11 you had?
12    A.    Ask that question again,
13 please.
14    Q.    Never mind.  I'll move on.
15 Don't worry about it.
16       Did you ever ask anybody
17 where you could and couldn't drive the
18 dump truck in terms of roads; anybody
19 for advice or education on that?
20    A.    Not that I can recall.
21    Q.    In fact, Southeast Cherokee
22 agreed to pay for half that ticket,
23 didn't they?

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

265

1    A.   They did (nodding head).
2    Q.   And, in fact, they gave you
3  -- they loaned you money to pay your
4  half; isn't that right?
5    A.   I don't know.
6    Q.   Do you recall them loaning
7  you money?
8    A.   I don't know if you can
9  call it a loan. I believe that they
10  just paid the ticket and then took the
11  other half out of my check. I don't
12  know if you can call that a loan.
13
14      (Whereupon, Defendant's Exhibit 5
15      was marked for identification and
16      same is attached hereto.)
17
18    Q.   I'll show you what's been
19  marked as Defendant's Exhibit 5. Do
20  you remember signing the Employee Loan
21  Agreement?
22    A.   To pay the ticket and then
23  take it out of my check. I mean --

266

1    Q.   Yeah, to pay for half the
2  ticket.
3    A.   In my opinion, I wouldn't
4  really call it a loan. It was just a
5  paid ticket and then the other half
6  taken out of my check.
7    Q.   Okay. But you agree that's
8  your signature on the Employee Loan
9  Agreement?
10    A.   That's my signature
11  (nodding head).
12    Q.   I'll show you some
13  photographs of some truck damage. I'll
14  show you some photographs that's going
15  to be marked Defendant's Exhibit 6.
16
17      (Whereupon, Defendant's Exhibit 6
18      was marked for identification and
19      same is attached hereto.)
20
21    Q.   I'm going show you some
22  truck damage, what appears to be the
23  left bumper -- right bumper -- I'm

267

1  sorry, left fender, right front of the
2  vehicle of the service truck you drove.
3  Let me show you those. Take a look
4  through those photographs real quick.
5    A.   (Witness complies).
6      MR. ROBERSON: Brett, have
7  you produced these before today?
8      MR. GARRETT: Yeah, I think
9  I did; black and white copies.
10      MR. ROBERSON: When?
11      MR. GARRETT: I don't know.
12  I got them from your EEOC file. I may
13  can check back through it, but they're
14  in the EEOC file you gave me, I
15  believe. I just happened to have color
16  copies of them. There they are right
17  there (indicating). You got them?
18      MR. ROBERSON: I got them
19  from the EEOC, I didn't get them from
20  you.
21      MR. GARRETT: I know. You
22  gave them to me. I just got the color
23  copies instead of black and whites.

268

1      MR. ROBERSON: Okay. My
2  client didn't give them to the EEOC.
3      MR. GARRETT: Do you want
4  me to give you another set? I'll get a
5  copy and give you another copy if you
6  want them.
7      MR. ROBERSON: See, we're
8  in federal court, and normally you
9  would make the documents you're going
10  to use that you consider to be relevant
11  to your claims and defense available to
12  the other side pursuant to Rule 26 --
13      MR. GARRETT: Unless --
14      MR. ROBERSON: -- which you
15  haven't.
16      MR. GARRETT: Unless
17  they've already been produced. You've
18  already got them. I don't have to give
19  them to you twice.
20    Q.   Do you recall looking at
21  those?
22    A.   This damage -- this damage
23  here (indicating)?

67  (Pages 265 to 268)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

269

1       MR. ROBERSON: His question
2   is have you seen those before?
3       Q.   Yeah, have you seen those
4   photographs?
5       A.   I have (nodding head).
6       Q.   Okay.
7       A.   Do you mean have I seen
8   these photos before?
9       Q.   Yeah -- not those specific
10  color photos, but photographs re-
11  presenting that damage on that vehicle.
12      A.   No, I haven't.
13      Q.   Okay. What photographs
14  have you seen?
15      A.   I haven't seen any
16  photographs pertaining to this.
17      Q.   Okay. Well, having taken a
18  look at that, does that appear to be,
19  the best you can tell from the
20  photographs, evidence of some kind of
21  damage to the service truck?
22      A.   That's what it appears to
23  be, yes.

270

1       Q.   Do you deny causing that
2   damage?
3       A.   Yeah, I do.
4       Q.   You do deny it?
5       A.   Yeah, I do.
6       Q.   If the -- Let me ask you
7   this: Do you recognize that damage?
8       A.   I don't even recognize this
9   damage (indicating).
10      Q.   Are you going to testify
11  that that damage was not on the truck
12  when you were driving it?
13      A.   I'm going to testify that
14  that damage was already at this same
15  left fender. Now, that right -- this
16  right clip thing (indicating), I don't
17  know anything -- I don't know anything
18  about that.
19      Q.   Okay. Go ahead.
20      A.   But this left front fender,
21  I did bump it with an excavator, but it
22  was on a place that was already like
23  this (indicating).

271

1       Q.   Okay.
2       A.   It caused -- it caused
3   another little crack there, but this is
4   the crack right here (indicating) that
5   I did cause; truth and honest, this is
6   the crack I did cause (indicating).
7   But this hole right here and all the
8   rest of that, a lot of that was already
9   there when I first started driving the
10  truck.
11      Q.   Okay.
12      A.   This left front fender,
13  Donnie Gantt had already bumped it
14  himself; this same place, this same
15  spot.
16      Q.   Okay. So your testimony is
17  you made it worse, but you didn't cause
18  the original damage; is that correct?
19      A.   Um --
20      Q.   You just said you added
21  that big crack. I'm going to draw an
22  arrow --
23      A.   I'm not going to say I made

272

1   it any worse. I did bump it.
2       Q.   Yeah. That long crack you
3   just pointed to and made reference to,
4   that was something you did. I'm going
5   to do an arrow to it. I don't want it
6   to be misleading.
7       A.   Yeah, I see what you're
8   saying. I mean -- but I did bump it;
9   truthfully, I did bump it.
10      Q.   What did you do?
11      A.   I bumped it with the
12  tail-end of the excavator.
13      Q.   And I'm going to show
14  you --
15      A.   Why is that other picture
16  even in there?
17      Q.   I'm going to show you --
18  I'm just going to do an arrow on this
19  thing -- let's go off the record.
20
21      (Whereupon, a discussion was held
22      off the record.)
23

68  (Pages 269 to 272)

# FREEDOM COURT REPORTING

273

1    Q.   I'm just going to do an
2  arrow to this crack you were talking
3  about just so there's no confusion.
4  And that would be the -- what your
5  testimony is that you caused by hitting
6  the truck with the excavator with the
7  understanding, obviously, that you're
8  going to say that some of the damage
9  was already there.  I understand that.
10  I just want to point to the crack, and
11  take a look at that --
12    A.   I've already looked at it.
13    Q.   I just want you to agree
14  with my arrow.  I don't want to
15  misrepresent anything.
16    A.   I agree.
17    Q.   I'm going to mark that as
18  Defendant's Exhibit 7 -- what is marked
19  collectively as 6.  That's fine.
20    Let me ask you about an
21  incident, and this is just in the file
22  that's been produced.  There's a phone
23  call note dated March 28, '06.

274

1    A.   There's a what?
2    Q.   A phone call note, a little
3  memorandum phone call note, March 28,
4  '06.  It's dated 10:45 a.m.  The
5  message says "Jason Carter saw Decarey
6  at four-way market 3-27-06 about 6:00
7  or 7:00 p.m.  Decarey spit at Jason and
8  give him the finger."  Do you deny
9  that?
10    A.   Yes, sir.  I do.
11    MR. GARRETT:  Put that down
12  as Defendant's Exhibit 7.
13
14    (Whereupon, Defendant's Exhibit 7
15  was marked for identification and
16  same is attached hereto.)
17
18    MR. ROBERSON:  What's the
19  name on that?
20    MR. GARRETT:  Which name?
21    MR. ROBERSON:  The person
22  who made that call.
23    MR. GARRETT:  Jason Carter.

275

1    Q.   Let's look at some of these
2  statements.  I've been produced a
3  number of statements in this case, some
4  are handwritten, some are typed up from
5  three individuals; Deon Daniels, Donald
6  Gantt, and then one is an interview
7  statement we got from the EEOC; a
8  statement taken by a guy named Randy
9  Harris.  Let's talk about -- I want to
10  talk about each of these for just a
11  second.
12    Deon Daniels, did you
13  contact him about this case?
14    A.   I did.
15    Q.   Okay.  When did you contact
16  him?
17    A.   It was -- I don't remember
18  the exact date.  It was for -- because
19  of the EEOC finding.
20    Q.   Uh-huh (nodding head).
21    A.   I don't remember the exact
22  date.
23    Q.   Okay.  Did you contact him

276

1  before or after the EEOC?  You said
2  because of the finding, I assume that
3  would be after but I don't -- you tell
4  me.
5    A.   Could you ask that question
6  again, please?
7    Q.   Yeah.  I just want to know
8  when you contacted him about giving a
9  statement in this case.
10    A.   Okay.  I don't remember the
11  exact date.  It was -- it was during
12  the time -- it was for the EEOC to do
13  their finding.
14    Q.   I'm sorry?  Before; was it
15  before or after?
16    A.   Before the EE -- ask your
17  question again.
18    Q.   I just want to know when
19  you got the statement; when you called
20  him to get the statement, when you
21  called him on the phone.
22    A.   You want to know whether or
23  not it was before the EEOC finding or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

277

1  not?
2      Q.   I'd just like to know when,
3  but if you want to do the EEOC, that's
4  fine.
5          MR. ROBERSON:  Brett, let
6  me just explain something.  The EEOC
7  took a statement from Deon and I took a
8  statement, so there's more than one
9  statement from Deon Daniels.
10         MR. GARRETT:  Okay.
11         MR. ROBERSON:  I took his
12  statement after -- I think it's
13  actually after the lawsuit, so not only
14  after the cause finding but after the
15  lawsuit.  The statement the EEOC got
16  was before the cause finding.
17         MR. GARRETT:  Do you have a
18  copy of that?
19         MR. ROBERSON:  Of Deon's
20  statement?
21         MR. GARRETT:  Yeah.
22         MR. ROBERSON:  I gave you a
23  copy of the file.  It's in it.

278

1          MR. GARRETT:  Did you just
2  mirror the same statement; is that what
3  you're saying?
4          MR. ROBERSON:  Yeah.  They
5  took a handwritten statement.
6          MR. GARRETT:  Okay.  That's
7  what I'm trying to find out.  You are
8  saying --
9          MR. ROBERSON:  That's the
10  EEOC.
11         MR. GARRETT:  Okay.
12         MR. ROBERSON:  I mean,
13  that's not Deon -- I mean, Decarey,
14  that's the EEOC.
15         MR. GARRETT:  Okay.  I've
16  got that.
17         MR. ROBERSON:  Okay.
18         MR. GARRETT:  So the
19  handwritten statement -- let me ask
20  him.
21         MR. ROBERSON:  Sure.
22      Q.   Do you know the -- did
23  someone -- did you contact -- I'm a

279

1  little confused on how he came to be in
2  play.  That's what I'm trying to figure
3  out.  Okay?  Did you contact Deon
4  before going to see the EEOC or after,
5  before you filed the initial EEOC
6  Complaint or after?
7      A.   After I filed the first
8  complaint.
9      Q.   Okay.  With the EEOC?
10     A.   The EEOC, it was for --
11  Deon was for the EEOC finding after I
12  filed the Complaint.
13     Q.   You said "it was for."
14  What do you mean by that?  Did you
15  contact him yourself?
16     A.   Yeah, as a witness.
17     Q.   So you called him?
18     A.   Yes, sir.
19     Q.   When did you call him?
20     A.   After I filed to the EEOC.
21     Q.   Okay.  That's what I wanted
22  to know.  You called Deon after you
23  filed the EEOC Complaint?

280

1      A.   Uh-huh (nodding head).
2      Q.   Okay.  Did you do that on
3  your own or did the EEOC ask you to
4  contact him?
5      A.   The EEOC asked me to
6  contact him.
7      Q.   Okay.  And I assume you got
8  him on the phone, called him on the
9  phone --
10     A.   That's correct.
11     Q.   -- or did you go see him?
12     A.   I called him on the phone,
13  then went to see him.
14     Q.   So you called him on the
15  phone.  What did you tell him?
16     A.   I told him -- I told him
17  that I needed him to be a witness for
18  me on a discrimination case against
19  Southeast Cherokee, would he be willing
20  to -- to tell what he knows about the
21  situation.
22     Q.   Okay.
23     A.   And he said he would.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

281

1    Q.   Okay.  Then what did you
2  say?  Did you tell him you wanted to
3  get a statement from him?
4    A.   Excuse me?
5    Q.   Did you tell him you wanted
6  to get a statement from him?
7    A.   I did.
8    Q.   Okay.  And did you write
9  the statement for him (indicating)?
10   A.   Excuse me?
11   Q.   Did you write the statement
12  for him?
13   A.   Are you talking about his
14  statement?
15   Q.   Yeah.  Did you write --
16   A.   Did I write his statement
17  for him?
18   Q.   Correct.
19   A.   No, sir.
20   Q.   Okay.  So as far as you
21  know, the handwritten statement from
22  Deon Daniels, that's Deon's handwriting
23  as far as you know (indicating)?

282

1    A.   That's Deon's handwriting.
2    Q.   Did you tell him what you
3  wanted him to talk about in his
4  statement?
5    A.   No, sir, I didn't.
6    Q.   Well, how did he know what
7  to write down?  Did you tell him the
8  basis of the Complaint?
9    A.   I told him the basis of the
10  Complaint, I did not tell him what I
11  wanted him to talk about.
12   Q.   Okay.  I just wanted to
13  read this to you just to see if I can
14  narrow some things down.  It says "I,
15  Deon Daniels, heard Jeremy Deloach say"
16  -- first of all, who's Jeremy Deloach?
17   A.   He's -- I believe Jeremy
18  was one of the supervisors.
19   Q.   Was he your supervisor?
20   A.   He wasn't my supervisor.  I
21  believe he was Deon's supervisor.
22   Q.   Okay.  So you never worked
23  for Jeremy Deloach; correct?

283

1    A.   I never worked for Jeremy
2  Deloach.  Pedro was my supervisor, and
3  Pedro, Mr. Randy Davis, and on up the
4  chain.
5    Q.   Who told you that Pedro was
6  your supervisor?
7    A.   Mr. Randy Davis.  Pedro is
8  the head mechanic, I was the service
9  guy under Pedro.
10   Q.   Who told you Pedro was your
11  supervisor?  Mr. Davis -- Are you
12  saying that Mr. Davis told you that
13  Pedro was your supervisor?
14   A.   Pedro -- Pedro was the one
15  that called me and told me -- Pedro was
16  my supervisor.
17   Q.   Pedro is a mechanic.  What
18  I'm asking you is who told you at
19  Southeast Cherokee that Pedro was your
20  supervisor?  Who instructed you that or
21  told you that?
22   A.   Pedro.
23   Q.   So Pedro -- it's your

284

1  testimony that Pedro told you that he
2  was your supervisor?
3    A.   Pedro told me that he was
4  the supervisor over the service man's
5  job.
6    Q.   Did anyone other than Pedro
7  say that to you at any time?
8    A.   There wasn't anybody other
9  than Pedro telling me that he wasn't.
10   Q.   My question is:  Did
11  anybody at Southeast Cherokee tell you
12  that Pedro was your supervisor?
13   A.   Randy Davis.
14   Q.   When did he tell you that?
15   A.   Now, if you're looking for
16  exact dates --
17   Q.   Absolutely.
18   A.   -- I can't tell you that.
19   Q.   Tell me when he did that.
20  When did Randy tell you that Pedro was
21  your supervisor?
22   A.   Pedro -- I mean, the other
23  foremens on the job is not the

71 (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

285

1  supervisor of the service man.  Pedro
2  is the only supervisor.
3      Q.   I'm asking you who told
4  you that.
5      A.   I just told you, sir.
6      Q.   You said Randy Davis told
7  you?
8      A.   Pedro --
9      Q.   When did he tell you that?
10  How did you gather that information?
11      A.   How did I gather the
12  information that Randy Davis told
13  me that Pedro was --
14      Q.   No.  How did you gather the
15  information that Pedro was your
16  supervisor?
17      A.   I mean, everybody knows
18  that Pedro is the supervisor of the
19  service guys.  Pedro is the master
20  mechanic.  Pedro sees about all the
21  equipment.
22      Q.   I understand what you
23  think, what I'm asking you is --

286

1      A.   It's not what I think.
2  It's the fact of the thing.
3      Q.   I hear your opinion.  I
4  just want to know --
5      A.   The service man just aids
6  Pedro.  Pedro was my supervisor.
7      Q.   I understand your opinion,
8  but what I'm you is you just said Randy
9  Davis told you that he's going to be
10  your supervisor, and I want to know
11  what he did, if he did it, and I want
12  to know what he said, if he said it.
13      A.   I can't remember the exact
14  dates.
15      Q.   Do you remember what he
16  said and when?  I mean, when you were
17  hired, two months later?  You tell me.
18      A.   "Pedro is your supervisor."
19      Q.   I hear what you're saying,
20  I hear your belief, I hear whatever.
21  What I want to know is what Randy Davis
22  said to you that made you believe that.
23      A.   Randy Davis said "Pedro is

287

1  your supervisor."
2      Q.   Okay.  Randy Davis said,
3  quote, "Pedro is your supervisor"?
4      A.   That's correct.
5      Q.   When did he tell you that?
6      A.   I can't remember the exact
7  dates.
8      Q.   I don't want an exact date.
9  I want to know the context.  Was it
10  when you were hired, was it months
11  later, was it toward the end?  Give me
12  some kind of idea of when --
13      A.   I can't remember right now;
14  I can't exactly remember.
15      Q.   So you can't remember when
16  he told you that?
17      A.   No, sir.
18      Q.   Can you remember the
19  context of the conversation he told it
20  to you in?
21      A.   As a matter of fact, it's
22  coming to my memory.  I remember asking
23  Pedro, and Pedro was specifically

288

1  telling me that "none of those other
2  foremans on any of those other jobs are
3  over you.  Now, you're supposed to --
4  if they need something done, you're
5  supposed to do what -- not any of those
6  other foremans on those other jobs are
7  over you.  I'm over you."
8      Q.   Pedro told you that?
9      A.   Yes.
10      Q.   Okay.  I got that.  Now I
11  want to know the context of stating --
12  you saying Randy Davis told you.
13      A.   Randy Davis said "Pedro is
14  your supervisor."
15      Q.   That's what I want to know
16  the context of.  Was it when you were
17  hired?  When did he tell you?  What was
18  the context that he -- anything you can
19  help me with?  Did he do it when he
20  hired you, two months later?  Was there
21  a conversation he told it to you in,
22  did you ask him?
23      A.   I can't remember the merits

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

289

1  of the conversation. I just remember
2  it.
3      Q.  You just remember that
4  statement?
5      A.  Yes, sir.
6      Q.  It just floats around in
7  your memory?
8      A.  Yes.
9      Q.  Did you ever ask Randy if
10  Pedro was your supervisor? Did you
11  ever ask him? If you did, tell me; if
12  you didn't, tell me. You know --
13      A.  I can't really remember,
14  but I may have asked Randy -- Mr. Randy
15  Davis about Pedro telling me that he
16  was my only supervisor. I mean, that
17  very well may be the reason that he
18  told me "Pedro is your supervisor."
19      Q.  Okay. Did you ever ask
20  anyone other than Randy Davis who your
21  supervisor was?
22      A.  Not that I can remember.
23      Q.  Are you going to testify in

290

1  this case that Pedro was your only
2  supervisor?
3      A.  I'm going to testify if it
4  come up that Pedro was my supervisor,
5  and from Pedro up to Mr. Randy Davis,
6  and from -- up from Mr. Randy Davis to
7  Mr. Jerry Carter and up to Ms. Lynn
8  Carter.
9      Q.  Okay. Any other
10  supervisors on the same level as Pedro
11  or Randy, in your mind?
12      A.  Excuse me?
13      Q.  Any other supervisors on
14  the same level as Pedro or Randy -- in
15  your mind on the same level as they are
16  that were your supervisor?
17      A.  Pedro and Randy are not on
18  the same level.
19      Q.  I understand. Hori-
20  zontally, not vertically, is there
21  someone who is equal to Pedro or equal
22  to Randy that you would consider to be
23  your supervisor?

291

1      A.  I just told you who my
2  supervisor was and how the chain --
3      MR. ROBERSON: Did you have
4  the same supervisor when you drove the
5  tri-axle dump truck?
6      THE WITNESS: Yeah, the
7  same supervisor.
8      A.  Because anything dealing
9  with driving, anything dealing with --
10  that's like the tri-axle dump truck
11  driver, ain't nobody their supervisor
12  but Randy Davis on up the chain like
13  that.
14      Q.  Let me ask you this: Have
15  you ever seen anything writing that
16  said Pedro was your supervisor,
17  anything like that?
18      A.  No, but Pedro was the only
19  one that called me -- besides Pedro and
20  Mr. Randy Davis, they were the only two
21  that ever called me and said "Decarey,
22  you need to go out to over here and do
23  this, Decarey you need to go out to

292

1  over here and do" --
2      Q.  And Pedro was a mechanic?
3      A.  Pedro is the master
4  mechanic, the head mechanic, yes.
5      Q.  Who is Bob? "Also I heard
6  Bob and Jeremy say," quote, "Decarey,
7  his ass was not driving the new fuel
8  truck." Who is Bob?
9      A.  Is that on Deon's
10  statement?
11      Q.  Uh-huh (nodding head).
12      A.  Well, Deon overheard it.
13  His is the only statement --
14      Q.  I know. I'm just asking
15  who Bob is. I'm going to ask Deon all
16  about this. I just want to know about
17  Bob. Who's Bob?
18      A.  He probably meant Bobby.
19      Q.  Who's Bobby?
20      A.  Bobby was Randy Davis' son;
21  Bobby Davis.
22      Q.  Bob is Randy Davis' son?
23  What does he do? What's his job?

73 (Pages 289 to 292)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

293

1    A.    He's a supervisor over a
2    crew.
3    Q.    Is he your supervisor?
4    A.    He's not my supervisor.
5    Q.    Neither is Jeremy?
6    A.    Neither is Jeremy.
7    Q.    Who's Chaz?
8    A.    He's an excavator operator;
9    he's an operator.
10    Q.    Okay.  Did you have any
11    conversations with Chaz about your case?
12    A.    About my case?
13    Q.    Uh-huh (nodding head).
14    A.    No, sir.
15    Q.    Have you had any conver-
16    sations with Bob about your case?
17    A.    No, sir.
18    Q.    How about Jeremy Deloach?
19    A.    No, sir.
20    Q.    What about Mr. Harris,
21    have you seen his statement in this
22    case?
23    A.    Seen Mr. Harris' statement?

294

1    Q.    His statement in the case;
2    Mr. Randy Harris?
3        MR. ROBERSON:  I don't know
4    who he is.
5    Q.    Randy Harris, do you know
6    Randy?
7    A.    Yes, I do.
8    Q.    Who is Randy?
9    A.    Randy Harris -- Randy
10    Harris was a guy that drove tri-axle
11    dump trucks; was one of the guys that
12    drove tri-axle dump trucks at the time
13    that I was driving.  And I don't --
14    yes, that's who Randy is; he was
15    driving the tri-axle dump truck at the
16    same time I was driving.
17    Q.    Have you called him about
18    your case or spoken to him at all about
19    it?
20    A.    I also contacted Randy to
21    be one of my witnesses.
22    Q.    Okay.  Did you tell him
23    about your case?

295

1    A.    I told him about the merits
2    surrounding my case and that's it and
3    that it was up at the EEOC.
4    Q.    And did you do that at the
5    behest or at the direction of the EEOC?
6    A.    I did.
7    Q.    Did they ask you to do
8    that?
9    A.    I did -- they did.
10    Q.    Okay.  And did you go and
11    meet with Mr. Harris physically at his
12    house or somewhere else?
13    A.    I bumped into him
14    somewhere, I can't remember exactly
15    where it was, but we did talk over the
16    phone.  I can't remember exactly where
17    I bumped into him at, but I did bump
18    into him somewhere, and I got his
19    information, I sent it to my case
20    worker up at the EEOC, and they got in
21    touch with him.
22    Q.    Okay.  Have you ever seen
23    his typed statement or written

296

1    statement?
2    A.    I don't recall seeing it.
3    I don't recall ever seeing it.
4    Q.    I may have asked you this
5    before: Did Pedro ever tell you he was
6    your supervisor?  Did you answer that?
7    A.    Yes, I did answer that.
8    Q.    And you said he told you
9    that, that's your testimony?
10    A.    Yes, he did.
11    Q.    If he disagrees with that,
12    it would be a lie or he's mistaken?
13    A.    Does Pedro still work for
14    Southeast Cherokee?
15    Q.    I just want you to answer
16    my question.
17    A.    Yes, he would be.
18    Q.    How about the statement
19    from Donald Gantt, did you contact Mr.
20    Gantt?
21    A.    Could you ask that question
22    again?
23    Q.    Did you contact Mr. Gantt?

74  (Pages 293 to 296)

## FREEDOM COURT REPORTING

297

1    A.    I did.
2    Q.    Okay.  When did you do
3 that?
4    A.    I see -- I see -- I
5 contacted Mr. Gantt to aid with the
6 EEOC finding.
7    Q.    Did you do that at the
8 direction of the EEOC?
9    A.    I did (nodding head).
10    Q.    Do you and Mr. Gantt see
11 each other often?
12    A.    Quite often (nodding head).
13    Q.    Why is that?
14    A.    He lives in a neighboring
15 town, yes.
16    Q.    Lives where?
17    A.    He lives in a neighboring
18 town.
19    Q.    A neighboring town?
20    A.    Uh-huh (nodding head).
21    Q.    Are y'all friends?
22    A.    Well, because he lives in a
23 neighboring town, um --

298

1    Q.    I mean, he lives in
2 Eclectic, you live in Wetumpka; right?
3    A.    Well, the address says
4 Wetumpka, but actually it's -- it's a
5 Wetumpka address.
6    Q.    Well, how far -- you say
7 you see him quite often because he's in
8 a neighboring town.  I mean, how do you
9 see him quite often?
10    A.    I bump into him.
11    Q.    Where do you bump into him
12 quite often?
13    A.    A small town.
14    Q.    Where do you bump into him
15 often?  Do you mean like at the grocery
16 store, at Wal-Mart?
17    A.    Yeah, different places.
18    Q.    Do y'all hang out with the
19 same people, do y'all have similar
20 friends?
21    A.    (Witness shaking head), no.
22    Q.    He doesn't know anybody in
23 your family?

299

1    A.    (Witness shaking head).
2    Q.    He does not?  Mr. Gantt
3 doesn't know anyone in your family?
4    A.    Yeah.
5    Q.    He does know people in your
6 family?
7    A.    Yeah.
8    Q.    Well, are you saying you
9 see each other at church?
10    A.    No, sir.
11    Q.    You don't see each other at
12 church?
13    A.    No, sir.
14    Q.    How about parties?
15    A.    No, sir.
16    Q.    Cookouts?
17    A.    No, sir.
18 (no tape)
19    Q.    So the -- you see him a
20 lot, I think you said fairly often, is
21 that what you said?
22    A.    Yeah, I see him -- I see
23 him from time to time.

300

1    Q.    But you're not friends with
2 him?
3    A.    I mean, we're not -- we're
4 not enemies either.  We don't have
5 anything against one another.  We may
6 have a brief conversation and shake
7 each other's hand and go our way.
8    Q.    Do you ever call him on the
9 phone for social purposes, hang out, go
10 to a party, anything like that?
11    A.    No, sir.
12    Q.    How about Randy Harris,
13 same question?
14    A.    No, sir.
15    Q.    You're not friends?
16    A.    No, sir.
17    Q.    Do you bump into him quite
18 often?
19    A.    Actually, no.
20    Q.    Okay.  What about Deon
21 Daniels, same question, are y'all
22 friends?
23    A.    I mean, the same thing; the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

301

1  same thing with Deon, he lives in a
2  neighboring area. I bump into him from
3  time to time. We may have a brief
4  conversation, shake each other's hand,
5  and go on our way.
6      Q.  Do you ever call him and
7  socially hang out?
8      A.  No, sir.
9      Q.  You don't share the same
10  friends?
11      A.  No, sir.
12      Q.  What do you understand
13  about Donnie Gantt's drug problem?
14      A.  What do I understand about
15  it?
16      Q.  Uh-huh (nodding head).
17      A.  I understand that it -- I
18  understand that his drug problem caused
19  him to not be able to hold his job as a
20  service man.
21      Q.  Not to hold his job?
22      A.  Yes, sir.
23      Q.  What do you mean by that?

303

1  What's your understanding of his
2  training or his skills, his employment
3  skills or training?
4      A.  In what?
5      Q.  His ability to put food on
6  the table. How does he make his
7  living?
8      A.  I believe that he's -- I
9  believe that he is capable -- is
10  capable of supplying a good living for
11  himself. I believe he can do a number
12  of different things besides having a
13  CDL. I believe he can weld.
14      Q.  He can weld?
15      A.  Yes, sir.
16      Q.  Okay.
17      A.  I believe he's -- I believe
18  he's capable of doing right for
19  himself.
20      Q.  Do you have any information
21  about his mechanical training?
22      A.  I don't have any infor-
23  mation on that.

302

1      A.  I assume that the reason he
2  was laying out like he was was because
3  of a drug problem.
4      Q.  Let me ask you this:  Do
5  you know why Mr. Gantt was terminated?
6      A.  Terminated? I don't know
7  whether he -- I believe he quit.
8      Q.  Do you know why he quit?
9      A.  I'm not for sure.
10      Q.  Have you ever asked him?
11      A.  As a matter of fact, no.
12      Q.  Okay. Do you have any
13  information with regard to Mr. Gantt's
14  training?
15      A.  Training?
16      Q.  Training (nodding head),
17  his skills.
18      A.  Being --
19      Q.  Period. Do you have any
20  information about his training or
21  skills?
22      A.  In what?
23      Q.  Any way you know it.

304

1      Q.  Is he mechanically in-
2  clined? Has he worked as a mechanic?
3      A.  Well, he was a service man
4  for Southeast Cherokee. I don't know
5  exactly what he did while he was there
6  and what he didn't do.
7      Q.  Do you think he was
8  qualified for that job?
9      A.  I believe he was (nodding
10  head).
11      Q.  And, obviously, he either
12  -- he left Southeast Cherokee because
13  he had a drug problem and they hired
14  him back, is that your understanding?
15      A.  That's my understanding.
16      Q.  Any problem in them hiring
17  him back?
18      A.  Excuse me?
19      Q.  Do you have any problem
20  with Southeast Cherokee hiring him
21  back?
22      A.  Did I have any problem with
23  it?

76  (Pages 301 to 304)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

305

1    Q.   Yes.
2    A.   Not at all.
3    Q.   I'll show you a couple of
4  things here.  We're getting close.
5        Do you recall receiving a
6  handbook when you started your
7  employment with Southeast Cherokee?
8    A.   What kind of a handbook?
9    Q.   An employee handbook.
10   A.   What kind of an employee
11 handbook?
12   Q.   I'm just asking if you
13 recall receiving one.
14   A.   I received some kind of a
15 package along with my application.
16   Q.   Okay.
17
18     (Whereupon, Defendant's Exhibit 8
19     was marked for identification and
20     same is attached hereto.)
21
22   Q.   I'll show you two
23 documents which have been marked

306

1  collectively as Defendant's Exhibit 8.
2  Take a look at those documents and see
3  if you recall signing those documents.
4    A.   (Witness complies).  I do.
5    Q.   Those are, in fact, your
6  signatures on those two documents
7  (indicating)?
8    A.   They are.
9    Q.   In your interrogatory
10 responses, you claim to have been late
11 to work only one time.  Are you going
12 to tell the jury that?
13   A.   I am (nodding head).
14   Q.   So it's going to be your
15 testimony that in the four months you
16 were working at Southeast Cherokee, you
17 were late to work one time?
18   A.   I am (nodding head).
19   Q.   What time did you get to
20 work in the morning?
21   A.   At 6:00.
22   Q.   I'm sorry?
23   A.   6:00.

307

1    Q.   6:00 a.m.
2    A.   Uh-huh (nodding head).
3    Q.   After you left Southeast
4  Cherokee, what was your next
5  employment?  While you're thinking
6  about that --
7        MR. GARRETT:  Off the
8  record.
9
10     (Whereupon, a discussion was held
11     off the record.)
12
13   Q.   While you're thinking about
14 that, let me do something for the
15 record.  I'm just going to admit these
16 five SJIS reports for the criminal
17 background stuff, whichever exhibit it
18 was.
19
20     (Whereupon, Defendant's Exhibit 9
21     was marked for identification and
22     same is attached hereto.)
23

308

1        MR. GARRETT:  Let's take a
2  break.
3
4      (Whereupon, a brief recess was
5      taken.)
6
7    Q.   The question on the table
8  was after you left Southeast Cherokee,
9  where did you go to work?
10   A.   Crysel Door and Millwork.
11   Q.   Where are they located?
12   A.   It's off of Highway 14 in
13 Wetumpka.  I don't remember the exact
14 address.
15   Q.   What were you doing for
16 Crysel?
17   A.   I was building door frames
18 for homes and delivering them to the
19 job site, to the home.
20   Q.   What kind of truck were you
21 using to deliver?
22   A.   It was sometimes a flatbed
23 truck, sometimes a van, a U-Haul type

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

309

1 truck. We call it a van.
2         MR. ROBERSON: A box truck?
3         THE WITNESS: A box truck,
4 yes.
5         Q. Okay. And the flatbed was
6 like a Ford F250 with a flatbed on it
7 or something like that?
8         A. Something like -- a 350 or
9 something like that with a flatbed on
10 it.
11         Q. Okay. No dump truck
12 though; right?
13         A. No dump truck (shaking
14 head).
15         Q. All right. Now, when did
16 you start working for Crysel?
17         A. I can't remember the exact
18 date.
19         Q. I don't need the exact
20 date. If you can just give me the
21 month and the year will be fine.
22         A. It's been so long ago, I'd
23 be hard pressed to even give you the

310

1 month. I can give you -- it was around
2 the last of -- the last months of 2005
3 or 2006.
4         Q. Late '05 or early '06 --
5         MR. ROBERSON: Yeah.
6         Q. -- is that correct?
7         A. That's correct.
8         Q. Let me ask you this: After
9 you left -- we'll do it this way and
10 maybe it will work better; if not, tell
11 me: How many months were you off work
12 between the time you left Southeast
13 Cherokee and the time you started at
14 Crysel? How many months were you
15 without work? Does that help?
16         A. However many months that
17 is.
18         Q. You left late September of
19 '05, and you're telling me you started
20 this new job late '05 or early '06.
21         MR. ROBERSON: He's
22 answered these questions in his
23 interrogatories starting --

311

1         MR. GARRETT: Yeah, I'm
2 looking at it right here.
3         MR. ROBERSON: -- with
4 Number 12.
5         MR. GARRETT: Right.
6         Q. But it also says you worked
7 through a temp agency for three or four
8 months and then a cabinet shop. So now
9 I'm trying to figure out the progress;
10 I'm trying to get there is what I'm
11 saying.
12         MR. ROBERSON: Do you
13 remember when you worked for the temp
14 agency?
15         Q. Did you go see a temp
16 agency after you left Southeast
17 Cherokee?
18         A. I did (nodding head).
19         Q. Okay. So your first -- I
20 probably didn't state that as best I
21 could.
22         A. Well, probably it would be
23 better stated to say that I got on with

312

1 Crysel Millwork through the temp
2 agency.
3         Q. How long -- let me ask you
4 this way, and I may have unartfully
5 asked the question: How long between
6 the time when you stopped working at
7 Southeast Cherokee and the time you
8 went to see the temp agency?
9         A. Crysel Millwork, Crysel
10 Door and Millwork was my first job.
11         Q. Yeah, I got that -- I got
12 that, but you were placed with them
13 through a temp agency?
14         A. I was (nodding head).
15         Q. My question is: Between
16 the time you left Southeast and the
17 time you went to see the temp agency --
18 how much time -- when did you go see
19 the temp agency?
20         A. Well, it was my first job
21 after I left Southeast Cherokee, so
22 whatever the paperwork said, that's
23 when I -- I'd be hard pressed to give

78  (Pages 309 to 312)

# FREEDOM COURT REPORTING

313

1   you the exact date.
2       Q.   Did you get hired at Crysel
3   the first day you went to the temp
4   agency or did it take some time?
5       A.   It wasn't the first day.
6   It took some time from -- took some
7   time me going back and forth to the
8   temp agency before I actually --
9       Q.   Okay.
10      A.   -- got on with Crysel.
11      Q.   Let me ask you this way:
12  First of all, what's the name of the
13  temp agency and where is it located?
14      A.   I believe that was Work
15  Force.
16      Q.   Work Force.  Is that out of
17  Wetumpka or somewhere else?
18      A.   I believe it's -- well,
19  it's out of Wetumpka.  It was either
20  Labor Ready or Work Force or one -- but
21  it was the only one in Wetumpka.
22      Q.   Either Labor Ready or Work
23  Force in Wetumpka?

314

1       A.   (Witness nodding head).
2       Q.   And you don't remember how
3   much time went between the time you
4   left Southeast Cherokee and the time
5   you went to see the temp agency; is
6   that correct?
7       A.   I don't remember.  All I
8   remember is that being my first job
9   since I left.
10      Q.   Okay.  And when you went to
11  the temp agency, what kind of job did
12  you sign up for or list your interests
13  as being?
14      A.   A driver's position.
15      Q.   Okay.  And through the temp
16  agency, you got hired on at Crysel; is
17  that correct?
18      A.   Yes.
19      Q.   Your first job?
20      A.   Yes, sir.
21      Q.   Okay.  And you think you
22  started at Crysel in late '05, early
23  '06; is that about right?

315

1       A.   Yes, sir.
2       Q.   Okay.  And I've got here
3   you made eight dollars an hour at
4   Crysel; is that correct?
5       A.   Yes, sir.
6       Q.   You say this is only a
7   temporary position.  Why was that only
8   a temporary position?
9       A.   Through a temp agency?
10      Q.   Yeah.  What was temporary
11  about the position?
12      A.   Well, the majority of temp
13  jobs are temporary positions.
14      Q.   Sure, I understand that,
15  but was it a seasonal thing, was it --
16  did you have an opportunity to stay
17  there, was somebody out on maternity
18  leave?  I mean, what was the temporary
19  nature of the job?
20      A.   I got hired on through a
21  temp service.
22      Q.   Okay.  Do you know why the
23  job was available in a temporary

316

1   status?  I'll state it another way:  Do
2   you know why the job that you got was
3   only temporary?
4       A.   I don't know why the job
5   was only temporary.
6       Q.   How long was the job for
7   when you took it as being temporary?
8       A.   It was never said.
9       Q.   Did you ask?
10      A.   I didn't.
11      Q.   How long did you stay at
12  Crysel?
13      A.   We're talking about years
14  back and day after day after day.
15  You've got to kind of bear with me on
16  all this.
17      Q.   Take your time.  I don't
18  want to pressure you.
19      MR. ROBERSON:  (Indicating
20  interrogatories).
21      A.   Three or four months.
22      Q.   Why did you leave Crysel?
23      A.   Like I say, it was temp.  I

79  (Pages 313 to 316)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

317

1  was laid off and told that I would be
2  called at a later date, but I never was
3  called back.
4      Q.   Okay.  And after you were
5  laid off at Crysel, did you go back to
6  the temp agency or did you go find
7  other employment directly?
8      A.   Well, I was --
9      Q.   Sorry to interrupt you.
10  Were you terminated or were you laid
11  off?
12      A.   I was laid off.
13      Q.   Okay.  No negative
14  connotation of you being laid off?
15      A.   I was laid off.
16      Q.   Okay.  So --
17      A.   I was told that I would be
18  called at a later date.
19      Q.   Okay.  Did you go back with
20  the temp agency or did you go to other
21  direct employment?
22      A.   I can't remember; I can't
23  remember.

318

1      Q.   Okay.  Do you remember
2  when you would have started -- What
3  was your next job after Crysel?
4  Does Alabama Metal Roofing ring a bell?
5      A.   It rings a bell, but I'm
6  trying to place them in order.
7      Q.   Okay.
8      A.   I believe it was Transport
9  Driver.
10      Q.   Okay.  And what were you
11  doing for Transport Driver?
12      A.   I was a truck driver.
13      Q.   Okay.  What were you
14  delivering?
15      A.   Chickens.  They drive --
16  they haul chickens for Sylvest Chicken
17  in Montgomery.
18      Q.   Okay.  In-state work,
19  out-of-state work?
20      A.   In-state.
21      Q.   In-state.  It says you made
22  eleven thirty-seven an hour; is that
23  correct?

319

1      A.   That's correct.
2      Q.   How long did you stay with
3  Transport Driver?
4      A.   A couple of months.  My dad
5  got ill and I had to -- got real ill
6  and I had to help see about him.  So I
7  took a leave of absence, and I was told
8  to take as much time as I needed.
9      Q.   Okay.  So you left there on
10  good terms?
11      A.   I did (nodding head).
12      Q.   No negative connotation
13  with that parting of the ways; correct?
14      A.   I left on good terms.
15      Q.   And how long were you out
16  with your dad?
17      A.   A few months (un-
18  intelligible).
19      Q.   Okay.  And what were you --
20  I understand your dad -- well, tell me,
21  what was your dad -- what was wrong
22  with him?
23      A.   He had a tumor.

320

1      Q.   Okay.  And what was you
2  being out -- what kind -- I don't want
3  to get all into your personal business,
4  but what kind of tumor?
5      A.   A brain tumor.
6      Q.   A brain tumor.  Did he pass
7  away?
8      A.   He didn't.
9      Q.   Is he alive today?
10      A.   (Witness nodding head).
11      Q.   That's a blessing.  During
12  those three months when you were out,
13  what was your purpose of being out?
14  Was it to take him for medical
15  treatment?
16      A.   Taking him for medical
17  treatment and just -- just, I mean, he
18  was -- just to take care of him,
19  whatever he needed.
20      Q.   Okay.
21      A.   Take him back for medical
22  treatment and to -- my dad's a real big
23  guy --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

321

```
 1      Q.   Yeah.
 2      A.   -- about six five, three
 3  twenty-five, so my mom couldn't do it
 4  by herself.
 5      Q.   Okay.  And his tumor was
 6  treated, thank God; right?  I mean --
 7      A.   (Witness nodding head).
 8      Q.   Did he have surgery or
 9  chemo?
10      A.   He had surgery.
11      Q.   Okay.  So the tumor was
12  removed?
13      A.   (Witness nodding head).
14      Q.   And did you go back to work
15  for Transport Driver after your leave
16  of absence had expired?
17      A.   I didn't.
18      Q.   Why not?
19      A.   Mainly because -- mainly
20  because of -- the gentleman that had
21  hired me --
22      Q.   Uh-huh (nodding head).
23      A.   -- he had moved on --
```

322

```
 1      Q.   Okay.
 2      A.   -- and there was another --
 3  there was another person in his
 4  position.
 5      Q.   Okay.
 6      A.   I would have had to -- I
 7  would have had to go back through the
 8  whole process again, and the position
 9  that I was in, it was no longer
10  available.
11      Q.   And I guess you called and
12  got all this information on the phone?
13      A.   I did.
14      Q.   Who did you speak with over
15  there?  Do you remember?
16      A.   I can't remember her name,
17  but I asked for Travis, and Travis
18  wasn't no longer there.
19      Q.   Who did you ask for?
20  Travis?
21      A.   Uh-huh (nodding head).
22      Q.   Do you know Travis' last
23  name?
```

323

```
 1      A.   I think I've still got a
 2  card (looking through billfold).  I'm
 3  looking for his card.  I can't remember
 4  Travis' last name.
 5      Q.   Okay.  So what was your
 6  next employment after leaving
 7  Transportation -- I mean -- I'm sorry,
 8  after the three-month leave of absence
 9  ended, what was your next job?
10      A.   (Witness looks through
11  billfold).
12      Q.   It's okay.  I don't need
13  it.
14      A.   It was never determined
15  three months or how long.  He told me
16  to take as much time as I needed.
17      Q.   Right.  You told me you
18  were out three months.  Is that true?
19  If it's not, tell me.
20      A.   I didn't give you a
21  specific number.
22      Q.   Where did I get three
23  months from?
```

324

```
 1      A.   I don't know.  I never gave
 2  you a specific number.
 3      Q.   You didn't say you were out
 4  three months watching your dad?
 5      A.   I said for a few months.
 6      Q.   A few months?
 7      A.   Yeah.
 8      Q.   I'm sorry, I thought you
 9  said three.  Tell me how many months
10  you were out with your dad.
11      A.   A few months.  I can't
12  remember exactly how long.
13      Q.   Did you say three?
14      A.   A few.  I can't remember
15  exactly how long.
16      Q.   So you were out a few
17  months with your dad, called back to
18  Transportation, and that job had been
19  liquidated, so what was your next step
20  to get employment?
21      A.   I went to the unemployment
22  -- I started going to the unemployment
23  office and filling out applications on-
```

81  (Pages 321 to 324)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

325

1 line on the computer.
2　　Q.　For unemployment?
3　　A.　At the unemployment office
4 (nodding head).
5　　Q.　Okay. And while you were
6 doing that, you were looking for work?
7　　A.　Yeah.
8　　Q.　How were you going about
9 looking for work?
10　　A.　Well, I was going places.
11 The unemployment office is set up where
12 you -- everybody that's hiring, and a
13 lot of different companies and whatnot,
14 what you do is you fill out your
15 application --
16　　Q.　Right.
17　　A.　-- and you fax it to them,
18 you send it to them.
19　　Q.　Okay.
20　　A.　And because I didn't have
21 -- because I didn't have the means to
22 go around -- go around every day
23 searching for a job by that means, so I

326

1 went to the unemployment office and got
2 on the computer.
3　　Q.　Okay. I mean, when was
4 your next -- I understand that. What
5 was your next job after your dad got
6 better?
7　　MR. ROBERSON:　(Indicating
8 interrogatories).
9　　Q.　Does Alabama Metal Roofing
10 ring a bell or something like that;
11 Alabama Metal Roofing?
12　　A.　Yeah, it does. I want to
13 make sure I place them in the right
14 order, but I know you've got them there
15 (indicating).
16　　Q.　Uh-huh (nodding head).
17　　A.　Just off the top of my
18 head, you know --
19　　Q.　Okay. That's fine. I
20 mean, I just -- did you ever get -- let
21 me ask you this: Did you ever get --
22 receive unemployment payments?
23　　A.　I didn't.

327

1　　Q.　Okay. Any reason why not?
2　　A.　I don't know exactly why I
3 was denied.
4　　Q.　Okay. So your application
5 for unemployment was denied?
6　　A.　It was (nodding head).
7　　Q.　And then you were trying to
8 -- Can you tell me the next job you had
9 after Transportation?
10　　A.　I believe it was Alabama
11 Metal Roofing.
12　　Q.　Okay. What were you doing
13 for them?
14　　A.　I worked with a crew that
15 put on metal roofing.
16　　Q.　Okay. How much were you
17 making? Do you recall? It's got here
18 eight dollars an hour. Is that right
19 you think? If not, tell me.
20　　A.　Yeah, I was making ten
21 dollars an hour.
22　　Q.　You believe you were making
23 ten an hour?

328

1　　A.　Yeah.
2　　Q.　Okay. Working full-time?
3　　A.　Full-time (nodding head).
4　　Q.　How long did you work with
5 them? A matter of months?
6　　A.　Yeah, a matter of months.
7　　Q.　Okay. Less than six
8 months?
9　　A.　Yeah.
10　　Q.　And what was your reason
11 for leaving Alabama Metal Roofing?
12　　A.　I had a motorcycle
13 accident.
14　　Q.　When was that?
15　　A.　In May.
16　　Q.　May of '07; right --
17　　A.　(Witness nodding head).
18　　Q.　-- or is that right? You
19 tell me.
20　　A.　May of '07.
21　　Q.　And were you injured; is
22 that why you had to leave your job or
23 some other reason?

82　(Pages 325 to 328)

# FREEDOM COURT REPORTING

329

1    A.  Is that why I left?  I
2  believe that's why I left.
3    Q.  Let me ask it this way:
4  Were you terminated from Alabama Metal
5  Roofing?
6    A.  I was not terminated.
7    Q.  Whose motorcycle were you
8  driving when you were in the accident?
9    A.  A friend of mine's.
10    Q.  Okay.  Were you injured in
11  the motorcycle accident?
12    A.  Yeah, I was slightly
13  injured.
14    Q.  Okay.  Do you recall -- I
15  hate for you to rack your brain.  If
16  you don't remember, just tell me.  Did
17  the wreck cause you to leave that job
18  or do you think it was something else?
19  If you don't remember, just tell me,
20  that's fine.  If you do remember, tell
21  me that too.
22    A.  I can't remember.
23    Q.  Okay.

330

1    A.  I can't remember.
2    Q.  After you left Alabama
3  Metal Roofing, where did you go next
4  for employment?
5    A.  I believe it was Poole
6  Logging and Trucking, I believe, was
7  the next one.
8    Q.  Poole Logging and Trucking.
9  Where are they out of?
10    A.  Out of Montgomery.
11    Q.  What were you doing for
12  them?
13    A.  I was driving a truck.
14    Q.  How much were you making?
15    A.  I was getting paid by the
16  day; a hundred and twenty dollars a
17  day.
18    Q.  Okay.  Working full-time?
19    A.  Full-time (nodding head).
20    Q.  Are you still at Poole or
21  somewhere else now?
22    A.  I'm somewhere else now.
23    Q.  How long did you stay at

331

1  Poole; how many months?
2    A.  You've got to bear with me.
3  Like I said, I've been in between jobs
4  regular since --
5    Q.  Yes, I know.
6    A.  -- about six months, I
7  believe.  I believe I stayed with Poole
8  about six months.
9    Q.  Why did you leave Poole
10  Logging?
11    A.  I had an accident in
12  Prattville.
13    Q.  You had an accident in
14  Prattville?
15    A.  Uh-huh (nodding head).
16    Q.  Did you tell me about that
17  earlier?  I don't remember that.
18    A.  Oh, man, I've been coming
19  up with so many dates now, I mean --
20    Q.  Yeah, but this was just
21  last year though, wasn't it, just --
22    A.  I said if there was
23  anything else, you know.  I don't

332

1  remember right now.
2    Q.  Okay.  Well, now you
3  remember this one.  Tell me about this
4  accident.
5    A.  It was the fifth wheel --
6  the fifth wheel that -- the king pin
7  that connects to the fifth wheel of the
8  truck that connects the trailer and
9  truck together broke, and the logs --
10  the logs overturned in the road.
11    Q.  So you were driving a
12  diesel truck?
13    A.  Yeah.
14    Q.  You were pulling a log
15  trailer?
16    A.  Yes, sir.
17    Q.  The kind that's got the
18  ribs on the side; is that correct?
19    A.  Yes, sir.
20    Q.  And the fifth wheel broke
21  and the trailer overturned --
22    A.  Yes, sir.
23    Q.  -- spilling the logs out?

83  (Pages 329 to 332)

# FREEDOM COURT REPORTING

333

1    A.    Yes, sir.
2    Q.    Why were you fired for
3 that?
4    A.    Because any time you have
5 an accident, it counts against your
6 CDL. Whether you be at fault or non-
7 fault, it's still on the MVR, and it --
8 actually, it goes against you whether
9 you're at fault or not.
10    Q.    Did you lose your CDL
11 license?
12    A.    I didn't.
13    Q.    So why were you fired? I'm
14 still confused. Why were you fired?
15 Why were you let go for the fifth wheel
16 breaking?
17    A.    The insurance -- the
18 company I was driving for, the
19 insurance dropped them.
20    Q.    And after you left Poole,
21 where did you go next? Hold on. How
22 long were you -- you said six months,
23 you think, at Poole?

334

1    A.    Around six months.
2    Q.    And after that six months
3 was up, where was your next employment?
4    A.    With the City of Eclectic.
5    Q.    I'm sorry, one more time.
6    A.    With the City of Eclectic.
7    Q.    Is that where you're
8 currently employed?
9    A.    No.
10    Q.    What did you do for the --
11 I thought you put on here -- did you
12 recently switch jobs?
13    A.    I did.
14    Q.    This says your present
15 employer is the City of Eclectic back
16 in April. So you've gotten your new
17 job since then?
18    A.    Yeah.
19    Q.    Do you remember when you
20 started with the city?
21    A.    Like I said, I've had so
22 many jobs in the last couple of years,
23 man, dates and -- dates and --

335

1    Q.    This would have been pretty
2 recent like '08 -- or late '07/'08, the
3 last couple of months.
4    A.    Late '07.
5    Q.    Okay.
6    A.    Late '07.
7    Q.    Okay. And what were you
8 doing for the city?
9    A.    Late '07 until -- just
10 recently I just got this other job.
11 That was temporary. It was maybe -- it
12 was like two or three days this week, a
13 whole week the next week.
14    Q.    Part-time?
15    A.    And then it may be a whole
16 week or two without doing anything, and
17 then they'd call and said come on in,
18 and it might be another --
19    Q.    Okay. What were you doing
20 for them?
21    A.    Just whatever the city need
22 doing, mowing lawn or Weed-eating.
23    Q.    Okay. And you say that was

336

1 part-time?
2    A.    Part-time, yes, sir.
3    Q.    All right. And that was
4 until what -- where are you at now?
5 When did you quit the city job?
6    A.    I didn't quit. It was
7 part-time.
8    Q.    Okay. Well, I mean, were
9 you terminated?
10    A.    No. I didn't quit -- I
11 mean, I wasn't terminated.
12    Q.    How is it that you're no
13 longer working with the city or are you
14 still working with the city?
15    A.    No, I'm not still working
16 with the city.
17    Q.    Somehow your employment
18 ended; right, with the city?
19    A.    My employment ended -- the
20 city just said that they didn't need me
21 anymore. It wasn't anything stable or
22 anything like that.
23    Q.    So they let you go?

84  (Pages 333 to 336)

# FREEDOM COURT REPORTING

337

1    A.    Yes, sir.
2    Q.    But you don't think you
3  were terminated?
4    A.    I wasn't terminated.
5    Q.    You were let go; correct?
6    A.    I was told that I wasn't
7  needed anymore.
8    Q.    Okay.  Why weren't you
9  needed anymore, can you tell me that?
10  I mean, this was just a few months ago.
11  I mean, why are you no longer -- what
12  happened?  Did the job dissolve, did
13  something happen?
14    A.    I don't know.
15    Q.    You didn't ask any
16  questions?
17    A.    (Witness shaking head).
18    Q.    They called you one day and
19  said we've got to let you go and you
20  didn't ask a question as to why --
21    A.    (Witness shaking head).
22    Q.    -- is that correct?
23    A.    That's correct.

338

1    Q.    Is it your testimony that
2  you did -- did you do anything --
3  strike that.
4        Did you do anything wrong
5  to be let go?
6    A.    No, sir.
7    Q.    Okay.  So you left the
8  city, and now where are you?
9    A.    I'm at English Pool
10  Company.
11    Q.    All right.  And you would
12  have started this -- how many months
13  were you with the city?  A few months;
14  four, five?
15    A.    From around April of
16  last year, I worked with the city
17  temporarily up until the first part of
18  this year.
19    Q.    Okay.  April of '07 to
20  early '08, how about that?
21    A.    Okay.
22    Q.    And then early '08 you
23  started with English Pool?

339

1    A.    Yes, sir.
2    Q.    What are you doing for
3  them?
4    A.    Service technician.
5    Q.    Let me back up.  I blew
6  over this.  How much were you getting
7  paid for the city?
8    A.    Eight dollars.
9    Q.    How many hours a week were
10  you working on average?
11    A.    It varied.  I mean, it
12  would be -- it varied.
13    Q.    Give me your best estimate.
14    A.    I mean, it varied.  It
15  might be -- it might vary to the point
16  of where it was sixteen hours one week
17  and forty-two hours the next week and
18  the next week, we may not work at all.
19    Q.    Okay.
20    A.    It varied.
21    Q.    All right.  Fair enough.
22  You started an at English Pool in '08.
23  What are you doing for them?

340

1    A.    I'm a service technician.
2    Q.    Okay.  What are you doing
3  as a service technician?
4    A.    I --
5    Q.    What are your duties?
6    A.    -- go out and service
7  people's pools.  I check the chemicals
8  in it, I add chemicals to it if needed,
9  I check on their pumping system, I
10  replace pumping systems, I fix their
11  pumping systems if needed.
12    Q.    Okay.  A full-time job?
13    A.    Full-time (nodding head).
14    Q.    How much are you getting
15  paid?
16    A.    Well, I'm in training right
17  now.  I'm ten dollars while I'm in
18  training.
19    Q.    Ten dollars per hour?
20    A.    Yes, sir.
21    Q.    Forty-hour week, fifty-hour
22  week?
23    A.    I've been getting around

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

341

1  fifty-five, sixty hours.
2      Q.   All right.  Do you drive a
3  truck or will you?
4      A.   Yes, sir.
5      Q.   What kind of truck are you
6  going to drive; a van or --
7      A.   There's different trucks on
8  the yard.  I can't say which one of
9  them I'll be driving.  There are
10  different trucks on the yard.  There's
11  a regular F150 on the yard, there's a
12  dually crew cab on the yard, a dump
13  truck on the yard, different trucks on
14  the yard.
15      Q.   Okay.  For what you're
16  going to be doing, what are you going
17  to be driving?
18      A.   I can't say.
19      Q.   I mean, to service pools,
20  you're not driving a dump truck, for
21  example, that's for building pools;
22  right?
23      A.   I'll be driving a regular

342

1  truck.
2      Q.   A Ford F150 type truck --
3  pickup truck or --
4      A.   Well, there are different
5  trucks on the yard.  I can't tell you
6  what kind of truck I'm going to be
7  driving in the future.
8      Q.   They haven't told you?
9      A.   No, sir.
10      Q.   Okay.  Let me look at this
11  -- let me ask you this:  Any other
12  damages besides -- I understand you're
13  going to be claiming in this case the
14  pay difference between what you could
15  have been making at Southeast Cherokee
16  and what you have been making since.  I
17  understand that.  We've talked about
18  your mental anguish damages because of
19  your wife and losing your apartment and
20  losing your car.  Let me ask you this
21  before I slip up:  Do you own a car
22  right now?
23      A.   I do.

343

1      Q.   How long have you owned
2  that car or truck, whatever?
3      A.   For about six or eight
4  weeks.
5      Q.   Before that, did you have a
6  vehicle?
7      A.   No, sir.
8      Q.   How were you getting to and
9  from work?
10      A.   Well, I was pretty much
11  catching rides; I was pretty much
12  catching rides.
13      Q.   Did you have access to a
14  vehicle?  Did your parents own one that
15  you could borrow or something like
16  that?
17      A.   Sometimes, sometimes.
18      Q.   All right.  Besides the
19  damages we discussed with regard to
20  your mental anguish damages and the
21  wage stuff, any other damages you're
22  going to be claiming in this case that
23  I need to know about?

344

1      A.   Um --
2      MR. ROBERSON:  It's in the
3  Complaint.
4      MR. GARRETT:  I mean, can
5  you tell me?
6      MR. ROBERSON:  Punitive
7  damages.
8      MR. GARRETT:  Huh?
9      MR. ROBERSON:  Punitive
10  damages.
11      MR. GARRETT:  Anything
12  else?
13      MR. ROBERSON:  That's it.
14  Attorney fees and cost if successful.
15      MR. GARRETT:  Okay.
16      All right.  Let me speak to
17  my client and look over some notes and
18  we may be done.
19
20      (Whereupon, a brief recess was
21  taken.)
22
23      MR. GARRETT:  I don't have

86  (Pages 341 to 344)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

345

1 any further questions.
2        MR. ROBERSON:  I've got a
3 few.
4
5 EXAMINATION BY MR. ROBERSON:
6        Q.   Decarey, I'm going to show
7 you what I've marked as Plaintiff's
8 Exhibit 1.
9
10        (Whereupon, Plaintiff's Exhibit 1
11        was marked for identification
12        and same is attached hereto.)
13
14        Q.   This is a document that's
15 labeled at the bottom EEOC File Decarey
16 Floyd 0259.  It says Progressive
17 Disciplinary Policy.  Do you recognize
18 this to be part of that handout, that
19 manual that he gave you earlier?
20 Because this is what the EEOC had from
21 Southeast Cherokee.
22        A.   I do (nodding head).
23        Q.   Okay.  And it says on here

346

1 that this company where you worked had
2 a progressive disciplinary policy; that
3 is, that if you engaged in misconduct
4 or if your job performance was not
5 acceptable, that they would take
6 certain steps; first, to meet with you
7 and discussed the matter, inform you,
8 write you up, reprimand you, suspend
9 you, et cetera.
10        Now, during the time that
11 you worked for Southeast, did anyone
12 meet with you and counsel you?
13        A.   On what terms?
14        Q.   For anything you were doing
15 wrong.  I know you got a ticket for
16 being overweight, but other than that,
17 did anybody write you up for anything
18 you did wrong?
19        A.   No, sir.
20        Q.   Ever written up for being
21 late?
22        A.   No, sir.
23        Q.   Ever counseled for being

347

1 late?
2        A.   One time.
3        Q.   When you were late the one
4 time?
5        A.   One time I was late.
6        Q.   Orally counseled?
7        A.   Orally counseled, yes, sir.
8        Q.   Okay.  Were you ever
9 suspended?
10        A.   No, sir.
11        Q.   It says "For offenses which
12 merit a suspension or discharge, the
13 employee will be offered the
14 opportunity to submit a written
15 statement."
16        When you were discharged,
17 were you ever provided an opportunity
18 to submit a written statement?
19        A.   No, sir.
20        Q.   Did you know, Decarey, that
21 when an employer fails to follow their
22 own written policy, that that is
23 evidence of discrimination?  Did you

348

1 know that?
2        MR. GARRETT:  Object to the
3 form.
4        Q.   You can answer.
5        A.   No, sir, I didn't.
6
7        (Whereupon, Plaintiff's Exhibit 2
8        was marked for identification and
9        same is attached hereto.)
10
11        Q.   Exhibit 2 that I'm going
12 to show you is also from the EEOC file.
13 Now, Randy Harris, is he black or
14 white?
15        A.   Randy Harris is black.
16        Q.   And he was a tri-axle dump
17 truck driver?
18        A.   Yes, sir.
19        Q.   And the EEOC interviewed
20 him, were you aware of that?
21        A.   Yes, sir.
22        Q.   Did you tell them that he
23 was potentially a witness?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

349

1    A.    Yes, sir.
2    Q.    And they contacted him and
3  took his statement or interviewed him?
4    A.    Yes, sir.
5    Q.    And then they typed up this
6  document dated September 19, 2006. I
7  assume Ms. Hodge or her secretary typed
8  this up.
9         Do you know if Randy Harris
10 lived in Elmore, Alabama?
11   A.    Yes, sir.
12   Q.    And is that his phone
13 number, 334-414-4429?
14   A.    Yes, sir.
15       MR. ROBERSON:  We'd offer
16 Exhibit 2.
17
18     (Whereupon, Plaintiff's Exhibit 3
19     was marked for identification and
20     same is attached hereto.)
21
22   Q.    And I'm going to show you
23 what I've marked as Exhibit 3 --

350

1        MR. GARRETT:  Object to the
2  foundation of Exhibit 2.  You can go
3  ahead.
4    Q.    -- Declaration of Deon
5  Daniels.  Now, did you work with Deon
6  Daniels.
7    A.    Yes, sir.
8    Q.    Did he provide information
9  to the EEOC on your behalf?
10   A.    Yes, sir, he did.
11   Q.    Did I contact Deon Daniels
12 and obtain this statement (indicating)?
13   A.    Yes, sir.
14   Q.    And this declaration, which
15 is under oath under penalty of perjury,
16 is it signed; Exhibit 3 signed by Deon
17 Daniels?
18   A.    Yes, sir, it is.
19   Q.    Do you recognize his
20 signature?
21   A.    Yes, sir.
22   Q.    Does he say that Randy
23 Davis, a manager at Southeast Cherokee

351

1  Construction, stated that "ain't no
2  black man going to run the service
3  truck"?  Is that what he said?
4    A.    Yes, sir.
5    Q.    Has he told you that's what
6  Randy Davis said?
7    A.    Yes, sir.
8    Q.    Outside of this de-
9  claration, he's told you that?
10   A.    Yes, sir.
11       MR. GARRETT:  Object to
12 hearsay.
13   A.    He say he heard Randy Davis
14 say that out of his own mouth.
15   Q.    Okay.  Well, that statement
16 is direct evidence of discrimination.
17 Do you know what direct evidence is?
18       MR. GARRETT:  Are you
19 asking a question or telling him
20 something?
21   A.    No, sir.
22   Q.    You don't know what it is?
23   A.    No, sir.

352

1        MR. GARRETT:  Object to the
2  form of the question.
3    Q.    Direct evidence is evidence
4  if believed by a jury proves
5  discrimination.  Do you understand
6  that?
7    A.    Yes, sir.
8    Q.    So if a jury believes that
9  Randy Davis said that, you win this
10 case.  You understand that?
11   A.    Yes, sir.
12       MR. GARRETT:  Object to the
13 form.
14   Q.    Do you understand that you
15 get a trial because Deon Daniels says
16 this; that is, the Court cannot dismiss
17 your case because there is direct
18 evidence involved in your case?  Do you
19 understand that?
20   A.    Yes, sir.
21       MR. GARRETT:  Object to the
22 form of the question.
23   Q.    I don't have anything

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

353

1   further.

2        MR. GARRETT:  I don't have

3   anything else.

4

5        FURTHER DEPONENT SAITH NOT.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number: 130 2006 00282

Decarey Floyd
196 Mt. Zion Road
Wetumpka, AL 36904                                    Charging Party

Southeast Cherokee Construction
P. O. Box 2057
Wetumpka, AL 36902                                    Respondent

## LETTER OF DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleged that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964, in that he was subjected to a racially hostile work environment, and was discharged because of his race, black. The Respondent denied the allegations.

The investigation revealed that Charging Party was selected to drive the service truck on more than one occasion because he was the only one qualified to do so. The evidence indicated that Respondent replaced Charging Party with a White male who had no experience as an operator of a service truck and who had just received the endorsement to drive the service truck two days before the Charging Party was discharged.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe that Charging Party was discharged, as alleged. There is insufficient evidence to support the Charging Party's allegation that he was subjected to a racially hostile work environment.

Plaintiff's Ex. 2

Letter of Determination
Charge No. 130-2006-00282
Page 2

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate form and return it to the Commission at the above address no later than ___29 JAN 2007___. You may fax your response directly to (205) 212-2105 to the attention of Julia Y. Hodge. Failure to respond by ___29 JAN 2007___, will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a Conciliation Agreement is acceptable to the District Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

1 2 JAN 2007
_____
Date

_Delner Franklin-Thomas_
Delner Franklin-Thomas
District Director

Enclosure:    Invitation to Conciliation

cc::    R. Brett Garrett, Respondent's Attorney

# Declaration of Donald Gantt

My name is Donald Gantt, I live at 654 ~~Kentbrae~~ Kowliga Rd, Eclectic, AL 36024 I am 50 years old. I worked as a fuel truck driver for SE Cherokee Construction from approximately Aug 2004 to Aug 2005 then I came back in January 2006 & stayed a few months.

I made $12 per hour. I opened the driver door, & a man on an excavator ran into the door. This damage happened while I was operating the fuel truck.

I was never written up or counseled for being late or for poor attendance.

I went to Rehab in the fall of 2005. I also went to a halfway house in Bessemer.

I quit my job voluntarily. I was never disciplined or suspended. I have been stuck in the fuel truck before & had to be pulled out.

I declare that this 1 page statement is true & correct under penalty of perjury.

11-15-07

Donald Gantt

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CURTIS DECAREY FLOYD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: |
| | ) | |
| v. | ) | 2:07-cv-577-MEF |
| | ) | |
| SOUTHEAST CHEROKEE | ) | |
| CONSTRUCTION, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DEON A. DANIELS

My name is Deon Daniels. I am forty-one years of age. My date of birth is March 25, 1966. I reside at 1085 Estes Road, Wetumpka, Alabama 36092. I am a black male. I formerly worked at Southeast Cherokee Construction, Inc. until November 4, 2006. I worked there for over a year. I worked with Decarey Floyd, who is also a black male.

While Decarey was working at Southeast Cherokee Construction, I overheard Jeremy Deloach state that Floyd would not be driving the new fuel truck. I also overheard Randy Davis, a manager at Southeast Cherokee Construction, state that "ain't no black man going to run the service truck". Davis also expressed that Southeast wanted a white male for the service truck.

I heard Davis state that Southeast fired Decarey so that they could have a white male drive the service truck.

When I worked at Southeast Cherokee Construction, I made numerous requests for a raise. I never received a raise while I worked there. White employees have asked for

a raise and received them.

A white male named Chaz cost the company several hundred dollars because he damaged a rented track hoe. Southeast Cherokee Construction had to later buy this piece of equipment. Although Southeast employees damage equipment almost everyday, the piece of equipment that I operated was almost two years old and was never damaged.

I am aware of operators and truck drivers getting stuck while driving equipment. When that occurs, which is frequent, another employee pulls them out with another piece of equipment. Getting stuck at a wet construction site is not a big deal.

I, Deon Daniels, under penalty of perjury declare that the above typed statement consisting of two pages is true and correct to the best of my knowledge.

Deon Daniels

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| v. | ) | **2:07-cv-577-MEF** |
| | ) | |
| **SOUTHEAST CHEROKEE** | ) | |
| **CONSTRUCTION, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF DECAREY FLOYD

My name is Decarey Floyd. I am the Plaintiff in the lawsuit styled Decarey Floyd v. Southeast Cherokee Construction, Inc., 2:07-cv-577. I am giving this declaration under my own free will and under penalty of perjury. I have personal knowledge of the below stated facts.

1.      I worked for Southeast Cherokee Construction for several months. I did what the foreman instructed me to do. I was not insubordinate to anyone while I performed my duties there. I do not know what Jerry Carter is talking about when he provides an affidavit claiming I was insubordinate to foremen.

2.      I performed all service work on heavy equipment. I routinely provided fuel and lubrication to the equipment. I did not fake any service work. I was never written-up for failing to perform any service work as part of my duties there.

_____
Decarey Floyd

# PROGRESSIVE DISIPLAINARY PROCEDURE

## A. Policy

It is the policy of the Company that any employee who violates any of the Company's standards of job performance and behavior shall be subject to corrective disciplinary action, up to and including discharge. Southeast Cherokee Construction, Inc. utilizes a progressive disciplinary procedure in dealing with those less serious violations that do not warrant suspension of discharge for the first offense. For offenses, which merit a suspension or discharge for the first offense, the employee will be offered the opportunity to submit a written statement of his/her version of the facts.

## B. Procedures

1. On the first violation of a less serious Company rule, other than a violation for which suspension or discharge is appropriate, the supervisor shall take the following action:

    (a)    Meet with the employee to discuss the matter; and

    (b)    Inform the employee of the nature of the problem (be specific) and the action necessary to correct the problem; and

    (c)    Prepare a Notice of Employee Reprimand for the Supervisor's own records indicating that the meeting has taken place. Issue a reprimand and warn the employee of future disciplinary action, due to subsequent incidents. A copy of the reprimand should be forwarded to the Human Resources manager and shall remain in the employee's personnel file for twelve (12) months from the date of the incident.

2. Should a second violation of any nature occur, other than a violation for which suspension or discharge is appropriate, the supervisor should follow steps 1(a) through 1(c), and inform the employee that a third incident may result in suspension without pay.

3. Should a third violation of any nature occur, other than a violation for which suspension or discharge is appropriate, the supervisor should follow steps 1(a) through 1(c), and suspend the employee without pay for up to three (3) working days and inform the employee that a fourth violation will result in termination.

4. A fourth violation of any nature occurring in less than 12-months from the third violation may result in termination of employment.

Plaintiff's Ex. 6

Interview Statement
Randy Harris
September 19, 2006


Randy Harris states that he resides at 175 Chad Drive, Elmore, Alabama 36025. His telephone number is (334) 414-4429.

Mr. Harris states that he was hired by Southeast Cherokee Construction Company on March 20, 2005, as a tri-axle truck driver. He worked in that capacity approximately one year and a half. He voluntarily terminated his employment around the second or third week in July 2006.

He states that during his tenure of employment Decarey Floyd was hired as a tri-axle truck driver. He drove the tri-axle truck approximately four months. Mr. Floyd was the only employee who had hazmat on his Commercial Driver License (CDL) license so they assigned him to drive the truck because the other white service truck driver quit. They allowed the white service truck drivers to take the fuel truck home, but Mr. Floyd was not afforded the same privilege. The fuel truck Mr. Floyd drove was damaged when he was assigned to drive. The left side of the front fender had a crack in it. He does not know who cracked the fender. He states that the fender was like that when he got there. The person who quit while driving the service truck came back to work. Mr. Floyd was taken off the service truck and reassigned to drive the tri-axle truck. Mr. Floyd, to his knowledge, did not experience any problems while driving the tri-axle or service trucks. The white guy who returned to work, quit again. He called the company and told them to come and get the truck which was parked at his house because he was not coming back. Mr. Floyd was again placed on the service truck.

Mr. Harris states that he heard Justine and the white mechanic, Pedro, state that they were not going to allow Floyd to drive the new fuel truck. They were going to get rid of Floyd to keep him from driving the new fuel truck.

He states that Justin went and tried about three or four times to get his CDL license. The boss man went through an instructor at John Patterson for Justin's license and that same day Justin got his license. Justin took the truck home and has been taken it every since.

He also states that he was late for work and was written up. He had to sign some papers. He was told by Randy Davis that if he got four warnings he could be terminated. Mr. Davis has a real nasty attitude.

He states further that if it rains hard the field is going to be wet so the truck would get stuck during the wet conditions because they want you to continue to work.

Plaintiff's Ex. 7

Page 2
Interview Statement
Randy Harris
September 19, 2006.

Mr. Harris states that he voluntarily terminated his employment because he and Randy Davis had
words. He injured his finger on the truck. When he went to the doctor, he was told to perform light
duty work and no use of that finger. He was instructed to see the doctor within a week. When he
told Randy what the doctor said, Randy started cursing. Randy told him that if he did not go back
to the doctor and get a release, he was going to take him off the truck and put a shovel in his hand.
Randy also told him that he would be so far back in the woods he would wish he was fired. He
states that he went back to work the next day, however, he had to be off work again. While he was
off, he filled out applications for other jobs. When the first job came through, he quit.

_____

Julia Y. Hodge, Investigator

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **2:07-cv-577-MEF** |
| | ) | |
| **SOUTHEAST CHEROKEE** | ) | |
| **CONSTRUCTION, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AFFIDAVIT OF JERRY ROBERSON

BEFORE ME APPEARED JERRY ROBERSON, and after being duly sworn, states upon oath as follows:

1.      My name is Jerry Roberson.  I am counsel for the Plaintiff, Decarey Floyd in this case.  I was admitted to practice law in Alabama in 1983.  I was admitted to practice Georgia in 1985.  I have been practicing law for twenty-five years.  I am presently admitted to all three District Courts in Alabama and am admitted in Georgia.  I have personal knowledge of the below facts.

2.      Approximately 85% or more of my cases are pending in Federal Courts in Alabama.  I am familiar with the Scheduling Orders entered by Federal Judges.  I have a manual calendaring system and a computer driven one.  In this case, the Order entered on August 20, 2007, only referred to a discovery deadline dated August 14, 2008.  There was a dispositive motion deadline of May 30, 2008, but there was no deadline designated for the date responses to dispositive motions were due.

3.    Although defense counsel wrote to Plaintiff's counsel on a few occasions requesting dates for the deposition of the Plaintiff, each time the Plaintiff's counsel told the defense lawyer that until he provided written discovery responses to the outstanding discovery which had been sent by Plaintiff, he would not be tendering the Plaintiff for deposition.  Plaintiff sent discovery to defendant on December 3, 2007.  (Exhibit 1). Plaintiff granted defendant additional time to respond. (Exhibit 2).  Defendant responded on February 7, 2008.  (Exhibit 3).  Defendant's responses were incomplete . (Exhibit 4). For example, Plaintiff requested information on the race of the service truck driver who replaced Floyd, in an effort to prove a prima facie case.  Defendant objected and has refused to respond.  Plaintiff also requested contact information for black employees of the defendant. Defendant has objected and refused to respond.  Eventually, an agreement was reached to tender Plaintiff even though defense counsel has still not provided complete discovery responses to Plaintiff's counsel.  Plaintiff was deposed on May 19, 2008. Garrett has also stated that before his client could mediate this case, he would have to depose Plaintiff. Defendant's counsel was unwilling to allow Plaintiff to depose its representatives before the Plaintiff was deposed.

4.    On May 19, 2008, at Plaintiff's deposition, counsel for the Plaintiff requested deposition dates for representatives of the defendant.  This request was made to Brett Garrett.  The defendant's response to the Court's Order to show cause does not accurately reflect that deposition dates were requested for representatives of the defendant on May 19th.  No dates have ever been provided, other than a tentative date of June 11th.  Plaintiff's counsel spoke with defense counsel who said he would contact his clients to see if they were available on June 11th. This was after the Court entered the order of June 4, 2008 requiring Plaintiff's response to the summary judgment motion by June 17th.

5.    Later in the same week, Plaintiff's counsel received an e-mail stating that the representatives for the Defendant were not available to be deposed until June 17th.

6.    In this case, Plaintiff's counsel has requested deposition dates for the representatives of the Defendant.  Plaintiff's counsel has been ordered to respond to two motions for summary judgment, both pending before this Court, by the same date, June 17, 2008.  (See Scheduling Order in *Sims v. Coosa County Board of Ed.*, 2:07-cv-704-MEF). No representative of the defendant will have been deposed by that date.  Plaintiff's counsel will file a response by June 17th, but is requesting time to supplement the record with depositions taken of the representatives for the Defendant after June 17, 2008.

7.    The discovery cut-off in this case is August 14, 2008.  Plaintiff's counsel, by this Court's scheduling order, has two more months to complete discovery.

8.    Plaintiff's counsel has obtained signed declarations from some prior employees of the defendant.  These include statements made of former employees that they heard managers of the defendant make statements which should be considered direct evidence of discrimination.  Plaintiff's counsel also has obtained the written progressive discipline policy of the defendant employer which was not followed in Decarey Floyd's discharge.

9.    Counsel has not been able to interrogate defendant's representatives under oath about these and other relevant matters.  Counsel has not been able to obtain testimony concerning why Floyd was discharged rather than be returned to his job as a dump truck driver.  Plaintiff's counsel has not been able to fully explore the disparate treatment of Floyd as compared with white employees of the Defendant, such as whether the other dump truck

drives drove when their vehicles were overweight. Plaintiff has not been able to inquire as to why the progressive discipline policy was not followed in Floyd's discharge. Counsel had not been able to inquire why white service truck drivers were not disciplined for getting stuck or damage the service truck, yet Floyd was discharged because he got stuck and slightly damaged the truck.

FURTHER AFFIANT SAITH NOT.

I have read the above statement and it is true and correct to the best of my knowledge.

JERRY ROBERSON

Jefferson County        )
State of Alabama         )

Sworn to and subscribed before me on this 10th day of June, 2008.

Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Jan 9, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My Commission Expires:_____

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS DECAREY FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| v. | ) | **2:07-cv-577-MEF** |
| | ) | |
| **SOUTHEAST CHEROKEE** | ) | |
| **CONSTRUCTION, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

**COMES NOW** the Plaintiff, Decarey Floyd, and pursuant to FRCP 34, requests that

the  Defendant Southeast Cherokee Construction, Inc., produce the original and permit the

inspection and copying of the below described documents within 30 days.

    1.    An organizational chart which lists all members of the Plaintiff's chain of

command, including all supervisors, as they existed on the following dates:

        a.    The date Decarey Floyd was hired;
        b.    The date Decarey Floyd was terminated;

    2.    The complete personnel file (including all W-2s, wage or commission

statements, etc.) for each of the below named or described individuals.

        a.    Decarey Floyd;
        b.    The person who replaced Decarey Floyd after his termination;
        c.    Any African American employee who has been hired by this defendant
            since January 1, 2002; and
        d.    The personnel file of all persons who have held the position as fuel

truck operator since January 1, 2002.

3.     All written qualifications, including all job postings for the position Decarey

Floyd held as a fuel truck operator.

4.     All e-mails or other writings discussing the decisions to terminate the plaintiff.

5.     All writings, e-mails, or materials which relate to any job evaluation,

performance evaluation, job performance deficiency, or any disciplinary action regarding

the Plaintiff.

6.     A written job description which outlines all job duties for a fuel truck operator.

7.     All written policies of this defendant which prohibit racial discrimination.

8.     All written materials provided to employees for their training in the area of

racial discrimination.

9.     Any disciplinary policy, work rules, regulations, or other written materials

concerning the employer's expectations, job performance, or disciplinary actions.

Respectfully submitted,

Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Phone Number:  205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2007, I served a copy of the foregoing document upon counsel of record either through the CM/ECF system, via facsimile or by placing a copy of the same in the United States Mail, first class postage prepaid and addressed as follows:

Richard Brett Garrett
Robert A. Huffaker
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270
Phone: 334-206-3100
Fax:   334-262-6277
E-mail: rah@rsjg.com

Jerry Roberson (ROB010)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CURTIS DECAREY FLOYD,         )
                                  )
        Plaintiff,           )      Civil Action No.:
                                  )
v.                            )      2:07-cv-577-MEF
                                  )
SOUTHEAST CHEROKEE      )
CONSTRUCTION, INC.          )
                                  )
        Defendant.       )

## PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT

**COMES NOW** the Plaintiff, Decarey Floyd, and pursuant to Rule 33 of the Federal Rules of Civil Procedure propounds the following Interrogatories to the Defendant Southeast Cherokee Construction, Inc., to be answered under oath within 30 days.

1.    Identify all persons, providing their name, address and job title who had any role in the decision to terminate the Plaintiff.

2.    For each person identified in interrogatory number 1, state with specificity what role each person played in the decision to terminate the Plaintiff, whether they made the decision, recommended the decision, or approved the decision.

3.    Identify all persons who made any written evaluation of the Plaintiff's job performance, describing in detail the nature of the evaluation, when the evaluation occurred, and identifying all people who were interviewed and all records which were consulted as part

of the said evaluation.

4.    Identify the employee, agent, or representative of the defendant who is most knowledgeable concerning all compensation and employment related benefits available to the plaintiff.

5.    Identify the person who replaced the plaintiff, indicating his race and date of birth.

6.    Identify every person who has filed an EEOC charge or lawsuit alleging race, gender, or age discrimination against this defendant since January 1, 2002, providing the name and address of the plaintiff; the name and address of counsel; style of lawsuit and jurisdiction in which it was pending; and whether said charge or suit has been resolved or is still pending.

7.    Identify the name of the IT person who is most knowledgeable concerning the forensic recovery of the defendant's e-mail traffic.

8.    Identify the chain of command for the plaintiff when he was employed with this defendant.

9.    Identify all persons who are African American who have been hired by this Defendant since 2002, providing name, address, job title, telephone number, and date of birth, and whether said person is still working for this Defendant, and if not, the reason for his separation.

10.    Identify all African-American persons who have left the employment of this defendant since January 1, 2002, providing their name, address, job title, telephone number,

date of separation and reason for separation.

11.    State whether this employer had a written policy which prohibits race discrimination at the time Decarey Floyd at anytime since January 1, 2002. If so, please state the appropriate person to contact regarding a complaint of race discrimination with this employer.

12.    State whether Decarey Floyd was ever the subject of any written discipline while he worked for this Defendant. If so, state the date of said discipline and the nature of said discipline along with the persons most knowledgeable concerning the discipline.

13.    State whether Decarey Floyd was every provided with any written warning concerning his job performance. If so, state the date of said written warning, who made said written warning, and the person most knowledgeable concerning the contents of the written warning.

14.    State whether this defendant employed a progressive disciplinary policy. If so, please describe the nature and terms of said disciplinary policy.

15.    If this defendant had a progressive disciplinary policy, state whether Decarey Floyd was ever the subject of any discipline under this policy. If so, please provide the date of said discipline, the person taking said discipline against Floyd, and the person most knowledgeable regarding this discipline.

16.    Does this defendant have a training program for employees regarding prohibiting racial discrimination. If so, please identify the person who is most knowledgeable regarding this program, providing their name, address, and employment

classification.

Respectfully submitted,

Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Phone Number:  205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2007, I served a copy of the foregoing document upon counsel of record either through the CM/ECF system, via facsimile or by placing a copy of the same in the United States Mail, first class postage prepaid and addressed as follows:

Richard Brett Garrett
Robert A. Huffaker
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270
Phone: 334-206-3100
Fax:    334-262-6277
E-mail: rah@rsjg.com

Jerry Roberson (ROB010)

# EXHIBIT 2

LAW OFFICES

# RUSHTON, STAKELY, JOHNSTON & GARRETT

## A PROFESSIONAL ASSOCIATION

Charles A. Stakely
J. Theodore Jackson, Jr.
James W. Garrett, Jr.
Robert A. Huffaker
Thomas H. Keene
Richard B. Garrett
Jeffrey W. Blitz
Dennis R. Bailey
Ronald G. Davenport
Fred W. Tyson
Robert C. Brock
F. Chadwick Morriss
T. Kent Garrett
Frank J. Stakely
William S. Haynes
Helen Crump Wells
Paul M. James, Jr.

Chris S. Simmons
Robert C. Ward, Jr.
Bowdy J. Brown
Daniel L. Lindsey, Jr.
Patrick M. Shegon
Benjamin C. Wilson
L. Peyton Chapman, III
William I. Eskridge
Alan T. Hargrove, Jr.
R. Austin Huffaker, Jr.
Richard L. McBride, Jr.
R. Mac Freeman, Jr.
James R. Dickens, Jr.
R. Brett Garrett
Bethany L. Bolger
T. Grant Sexton, Jr.
Stephen P. Dees

*Of Counsel:*
Jesse M. Williams, III

184 COMMERCE STREET
MONTGOMERY, ALABAMA  36104

Mailing Address:
Post Office Box 270
Montgomery, Alabama  36101-0270

Writer's Direct Telephone: (334) 206-3260
Writer's Direct Facsimile: (334) 481-0808
Email: bg@rsjg.com
Website: www.rsjg.com

January 4, 2008

Jerry Roberson, Esq.
ROBERSON & ROBERSON
PO Box 380487
Birmingham, AL 35238

> Re:    <u>Decarey Floyd v. Southeast Cherokee Construction</u>
>        United States District Court, Middle District of Alabama
>        Case No.: 2:07-cv-544-MEF

Dear Jerry:

I enjoyed speaking with you on January 3, 2008 regarding outstanding discovery in this case and I appreciate your leniency in receiving that discovery late, taking into account the fact that my client needs additional time to secure information requested due to the holidays. I will submit responses to you in the near future.

If you have any questions or comments, please feel free to contact me at the number above listed.

Sincerely,

R. Brett Garrett

RBG2/kml

cc:    Robert A. Huffaker, Esq.

EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

CURTIS DECAREY FLOYD,     §
    §
    Plaintiff,     §
    §
vs.     §     2:07-cv-577-MEF
    §
SOUTHEAST CHEROKEE     §
CONSTRUCTION, INC.,     §
    §
    Defendant.     §

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW Defendant, Southeast Cherokee Construction, Inc., and responds to Plaintiff's first request for production of documents as follows:

1.  An organizational chart which lists all members of the Plaintiff's chain of command, including all supervisors, as they existed on the following dates:

    a.    The date Decarey Floyd was hired;
    b.    The date Decarey Floyd was terminated.

**RESPONSE:** <u>See</u> **Defendant's response to Plaintiff's interrogatory 8.**

2.  The complete personnel file (including all W-2s, wage or commission statements, etc.) for each of the below named or described individuals.

    a.    Decarey Floyd;
    b.    The person who replaced Decarey Floyd after his termination;
    c.    Any African American employee who has been hired by this defendant since January 1, 002; and
    d.    The personnel file of all persons who have held the position as fuel truck operator since January 1, 2002.

**RESPONSE: Defendant objects to Plaintiff's request for production 2 in that it demands irrelevant information. Moreover, Plaintiff's request for production 2 is overbroad and overly burdensome.**

3.    All written qualifications, including all job postings for the position Decarey Floyd held as fuel truck operator.

**RESPONSE: <u>See</u> attached.**

4.    All e-mails or other writings discussing the decisions to terminate the plaintiff.

**RESPONSE: Defendant is unaware of any e-mails discussing the decision to terminate Decarey Floyd. Otherwise, <u>see</u> Defendant's response to Plaintiff's interrogatory 3.**

5.    All writings, e-mails, or materials which relate to any job evaluation, performance evaluation, job performance deficiency, or any disciplinary action regarding the Plaintiff.

**RESPONSE: <u>See</u> Defendnat's response to Plaintiff's interrogatory 3.**

6.    A written job description which outlines all job duties for a fuel truck operator.

**RESPONSE: <u>See</u> Defendant's response to Plaintiff's request for production 3.**

7.    All written policies of this defendant which prohibit racial discrimination.

**RESPONSE: <u>See</u> attached.**

8.    All written materials provided to employees for their training in the area of racial discrimination.

**RESPONSE:** <u>See</u> **Defendant's response to Plaintiff's request for production 7 above.**

9.     Any disciplinary policy, work rules, regulations, or other written materials concerning the employer's expectations, job performance, or disciplinary actions.

**RESPONSE: <u>See</u> attached.**

Respectfully submitted this the <u>1</u><sup>st</sup> day of <u>February, 2008</u>.


_s/ R. Brett Garrett_
R. BRETT GARRETT (GAR085)
Attorney for Defendant, Southeast
Cherokee Construction, Inc.

<u>Of Counsel:</u>
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
PO Box 270
Montgomery, AL 36101-0270
334-206-3138 (telephone)
334-481-0808 (fax)
bg@rsjg.com (email)


## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed and served a copy of the foregoing upon:

Jerry Roberson, Esq.
ROBERSON & ROBERSON
PO Box 380487
Birmingham, AL 35238

by placing same in the United States Mail, postage prepaid and properly addressed on this the <u>1</u><sup>st</sup> day of <u>February, 2008</u>.


_s/ R. Brett Garrett_
Of Counsel

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CURTIS DECAREY FLOYD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | 2:07-cv-577-MEF |
| v. | § | |
| | § | |
| SOUTHEAST CHEROKEE | § | |
| CONSTRUCTION, INC. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES

COMES NOW Defendant, Southeast Cherokee Construction, Inc., and responds to Plaintiff's first interrogatories as follows:

1.    Identify all persons, providing their name, address and job title who had any role in the decision to terminate the Plaintiff.

**RESPONSE: Senior Vice President, Jerry Carter, made the decision to terminate Mr. Floyd.**

2.    For each person identified in interrogatory number 1, state with specificity what role each person played in the decision to terminate the Plaintiff, whether they made the decision, recommended the decision, or approved the decision.

**RESPONSE: See response to Plaintiff's interrogatory 1 above.**

3.    Identify all persons who made any written evaluation of the Plaintiff's job performance, describing in detail the nature of the evaluation, when the evaluation occurred, and identifying all people who were interviewed and all records which were consulted as part of the said evaluation.

**RESPONSE:** Senior Vice President, Jerry Carter, made a written evaluation of Plaintiff's job performance subsequent to his termination. A copy of Mr. Carter's written evaluation is attached.

4. Identify the employee, agent, or representative of the defendant who is most knowledgeable concerning all compensation and employment related benefits available to the plaintiff.

**RESPONSE: Lynn Carter**

5. Identify the person who replaced the plaintiff, indicating his race and date of birth.

**RESPONSE: Defendant objects to Plaintiff's interrogatory 5 as it is vague and does not reference an identifiable individual.**

6. Identify every person who has filed an EEOC charge or lawsuit alleging race, gender, or age discrimination against this defendant since January 1, 2002, providing the name and address of the plaintiff; the name and address of counsel; style of lawsuit and jurisdiction in which it was pending; and whether said charge or suit has been resolved or is still pending.

**RESPONSE: None other than Decarey Floyd.**

7. Identify the name of the IT person who is most knowledgeable concerning the forensic recovery of the defendant's email traffic.

**RESPONSE: Defendant has no knowledge of any e-mails sent to it by Decarey Floyd. However, those most knowledgeable are Lynn Carter and Ray Ponder.**

8. Identify the chain of command for the plaintiff when he was employed with this defendant.

**RESPONSE:** Defendant objects to Plaintiff's interrogatory 8 as it is vague. Moreover, it attempts to elicit information that is irrelevant and not designed to procure discoverable information. Without waiving said objection, President, Lynn M. Carter; Senior Vice President, Jerry Carter; and Horizontal Operations Manager, Randy Davis.

9.    Identify all persons who are African American who have been hired by this Defendant since 2002, providing the name, address, job title, telephone number, and date of birth, and whether said person is still working for this Defendant, and if not, the reason for his separation.

**RESPONSE:** Defendant objects to Plaintiff's interrogatory 9 in that it seeks production of information which is irrelevant, inadmissible and not designed to seek discoverable information.

10.    Identify all African-American persons who have left the employment of this defendant since January 1, 2002, providing their name, address, job title, telephone number, date of separation and reason for separation.

**RESPONSE:** See response to Plaintiff's interrogatory 9 above.

11.    State whether this employer had a written policy which prohibits race discrimination at the time Decarey Floyd at anytime since January 1, 2002 (*sic*). If so, please state the appropriate person to contact regarding a complaint of race discrimination with this employer.

**RESPONSE:** Yes. Lynn Carter.

12.    State whether Decarey Floyd was ever the subject of any written discipline while he worked for this Defendant. If so, state the date of said discipline and the nature of said discipline along with the persons most knowledgeable concerning the discipline.

**RESPONSE: Defendant is unaware of any written discipline Decarey Floyd received during the tenure of his employment.**

13. State whether Decarey Floyd was every (*sic*) provided with any written warning concerning his job performance. If so, state the date of said written warning, who made said written warning, and the person most knowledgeable concerning the contents of the written warning.

**RESPONSE: See response to Plaintiff's interrogatory 12 above.**

14. State whether this defendant employed a progressive disciplinary policy. If so, please describe the nature and terms of said disciplinary policy.

**RESPONSE: Defendant objects to Plaintiff's interrogatory 14 in that "progressive disciplinary policy" is not specifically defined.**

15.    If this defendant had a progressive disciplinary policy, state whether Decarey Floyd was ever the subject of any discipline under this policy. If so, please provide the date of said discipline, the person taking said discipline against Floyd, and the person most knowledgeable regarding this discipline.

**RESPONSE: See Defendant's response to Plaintiff's interrogatory 14 above.**

16.    Does this defendant have a training program for employees regarding prohibiting racial discrimination. If so, please identify the person who is most knowledgeable regarding this program, providing their name, address, and employment classification.

**RESPONSE:** Defendant objects to Plaintiff's interrogatory 16 in that it fails to define "training program."

_(signature)_
LYNN M. CARTER, PRESIDENT

Sworn to and subscribed before me this the __4__ day of __February__, 2008.

_(signature)_
NOTARY PUBLIC
My Commission Expires: _10-24-10_

[SEAL]

s/ R. Brett Garrett
R. BRETT GARRETT (GAR085)
Attorneys for Defendant, Southeast Cherokee
Construction, Inc.

Of Counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
PO Box 270
Montgomery, AL 36101-0270
334-206-3138 (telephone)
334-481-0808 (fax)
bg@rsjg.com (email)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed and served a copy of the foregoing upon:

Jerry Roberson, Esq.
ROBERSON & ROBERSON
PO Box 380487
Birmingham, AL 35238

by placing same in the United States Mail, postage prepaid and properly addressed on this the
____7th____ day of <u>February, 2008</u>.

<u>s/ R. Brett Garrett</u>
Of Counsel

6

# EXHIBIT 4

## ROBERSON & ROBERSON
### ATTORNEYS AT LAW
3765 KINROSS DRIVE
POST OFFICE BOX 380487
BIRMINGHAM, ALABAMA 35238-0487
TELEPHONE: (205) 981-3906
FACSIMILE: (205) 981-3908

JERRY D. ROBERSON*
*ALSO MEMBER GEORGIA BAR

CHRISTIAN E. ROBERSON
(1966-2002)

March 14, 2008

**VIA FACSIMILE 334-262-6277**
Richard Brett Garrett
Rushton Stakely Johnston & Garrett
P.O. Box 270
Montgomery, Al. 36101-0270

**Re:    Curtis Decarey Floyd v. Southeast Cherokee Construction, Inc.**

Dear Brett:

This letter is in response to the defendant's responses to the plaintiff's discovery requests. The Federal Rules require that we "meet and confer" prior to my filing a Motion to Compel. I am entitled to the discovery responses that I requested and to which you have objected. I am articulating the reasons for my entitlement prior to filing a Motion to Compel.

In my interrogatory #5, I request the identity of the person who replaced the plaintiff, indicating his race and date of birth. You have objected to this interrogatory. It should be simple to identify the person who replaced the plaintiff as the driver of the truck. That is one of the ways that the plaintiff may demonstrate a prima facie case of race discrimination, if his replacement was of a different race. As such, you are not only required to give me the information requested, but you also have to make the replacement's personnel file available to me.

In interrogatory #9, I asked you to identify all African Americans who have been hired by this defendant since 2002. You objected claiming that information was irrelevant. This is a race discrimination case. All African Americans who have been hired since 2002 are potential witnesses. Their experiences are relevant. If you have hired 10 blacks, and my client is the only one with a problem you could prove that. I must have their contact information in order to properly investigate this case. You cannot exclude this information as it is reasonably calculated to lead to the discovery of admissible evidence.

The same reasoning holds true for interrogatory #10.

In interrogatory #14, you say progressive disciplinary policy is not specifically defined. However, your document lists that you have a progressive disciplinary policy. A progressive disciplinary policy is one in which the first infraction merits a verbal

counseling, then as further infractions ensue the disciplinary consequences are more significant. They lead to written warnings, suspensions, and finally termination. I am asking if this defendant had a progressive disciplinary policy and if so, what disciplinary action was taken Decarey Floyd prior to his termination.

In interrogatory #15, I am entitled to the same information.

In interrogatory #16, I have asked what type of training program your company has to train employees regarding prohibiting racial discrimination. If you have a training program to prevent racial discrimination, I am entitled to know. If there are written materials, I am entitled to them. If you have no training program, simply state that you do not.

As concerns your responses to my request for production, I am entitled to the information I have requested in request #2 for the reasons I have previously outlined. This request was for the personnel file of Decarey Floyd, the person who replaced him, African Americans hired since January 1, 2002, and the personnel file of all persons who held the position as fuel truck driver. These are all comparators.

I would appreciate having this information as soon as possible. We need to complete our depositions. I need this in order to conduct the meaningful depositions.

I think you have some significant problems in the defense of this action. I am sure you think my case has problems. It seems to me an appropriate time to try to resolve this case is after you provide me with this requested discovery. If your client does not wish to settle this case, then they should forward this information and begin taking depositions and paying you to defend this action.

I certainly will agree to mediate this case after your provide this discovery. Please call me.

Very truly yours,

Jerry Roberson

JDR/tlb

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CURTIS DECAREY FLOYD,　　　　　§
　　　　　　　　　　　　　　　　§
　　　　Plaintiff,　　　　　　　　§
　　　　　　　　　　　　　　　　§　　　2:07-cv-577-MEF
v.　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
SOUTHEAST CHEROKEE　　　　　　§
CONSTRUCTION, INC.　　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　Defendant.　　　　　　　　§
　　　　　　　　　　　　　　　　§

## AFFIDAVIT OF JERRY CARTER

BEFORE ME, _Grace E. Goolsby_ , a notary public in and for said County and State, personally appeared **JERRY CARTER**, and being duly sworn, deposed and says on oath that the averments contained in the foregoing are true to the best of his ability, information, knowledge and belief, as follows:

"My name is Jerry Carter. I am over the age of twenty-one and am personally familiar with all the facts set forth in this Affidavit. I am the Vice President of Operations at Southeast Cherokee Construction, Inc.

The "oil/greaser" or "service truck" is designed to carry diesel fuel, oil, fluids, water and grease. The driver of the service truck is responsible for using the service truck to perform mechanical repairs and preventive maintenance duties for Southeast's vehicle and heavy equipment fleet including, but not limited to, dump trucks, backhoes, front-end loaders, bulldozers, excavators and scraper tractors. As such, the service truck driver position requires specialized mechanical training and skill. A service truck driver's duties include (1) monitoring/changing belts and hoses on the fleet's heavy equipment, (2), maintaining/changing

Plaintiff's Ex. 9

oil levels, (3) maintaining/changing fluid levels, (4) changing tires, (5) keeping heavy equipment fueled, (6) maintaining/changing hydraulic fluid, (7) greasing fittings, and (8) being able to work under the master mechanic for starter and alternator repair. In order to perform services on job sites, the service truck driver must also have training or experience necessary to operate all of the vehicles and heavy equipment in Southeast's fleet and, further, to maneuver the equipment as needed for servicing. Since the service truck driver position requires specialized training and experience, the position pays more than a tri-axle dump truck driver. Further, since the service truck is designed to carry fuel, its driver must have a Commercial Drivers License (CDL) with HAZMAT certification.

On or about May 7, 2005, approximately one week after Decarey Floyd was hired, my service truck driver unexpectedly quit. As such, I was put in a position where I needed a service truck driver immediately with the appropriate CDL and HAZMAT certification. A long time Southeast employee, Justin Bethea, approached me and asked for the position. Mr. Bethea, a white male, had been employed with Southeast for a number of years. During that time period he trained as an assistant to Southeast's master mechanic and as an equipment operator. Prior to being hired by Southeast, Mr. Bethea received mechanics training, including preventive maintenance training, with Express Oil Change, a former employer. Mr. Bethea also had engine repair experience and, according to Southeast's master mechanic, was mechanically inclined. Mr. Bethea did not, however, have a CDL or HAZMAT certification as needed to drive the service truck. As such, I told Mr. Bethea that if he wanted the job he needed to take the appropriate training courses and pass the licensure test. Mr. Bethea began taking courses to receive his CDL.

2

Since Mr. Bethea did not have the necessary license to drive the service truck, I approached Mr. Floyd and asked if he would be willing to drive the service truck temporarily until an experienced operator could be hired. I asked him to fill the position because he was the only employee available who had the requisite CDL and HAZMAT certification. I instructed Mr. Floyd with regard to the service truck driver's duties and told him to do the best he could with his limited training and experience, generally, to get the truck to the job sites. It was my expectation that the mechanics and foremen would have to help Mr. Floyd take care of the equipment since he was not qualified to do so. I agreed to increase Mr. Floyd's pay from $10.25 to $11.50 per hour, the rate of pay given to the previous service truck driver.

Within ten minutes of offering Mr. Floyd $11.50 per hour, he again approached me and demanded that his rate of pay be increased from $11.50 to $13.00 per hour, a pay rate substantially higher than that paid to the previous service truck driver. I acquiesced to Mr. Floyd's demand since he was the only employee available with the necessary CDL and HAZMAT certification.

Mr. Floyd drove the service truck until a more qualified employee, Donald Gantt, was hired on June 5, 2005. Mr. Floyd relinquished the service truck position without complaint and returned to driving a tri-axle dump truck. When he resumed his position as tri-axle dump truck driver, he received a pay raise for driving the dump truck from $10.25 to $10.50 per hour.

Mr. Gantt, a white male in his 50's, had worked for Southeast in the past as a service truck driver. He was paid less money to drive the service truck than Mr. Floyd, $12.10 per hour. Mr. Gantt continued to operate the service truck until approximately July 23, 2005 when he quit for health reasons. After Mr. Gantt quit, Mr. Floyd was again asked to fill in temporarily as

3

service truck driver until an experienced operator could be hired. He again agreed to accept the position at the rate of $13.00 per hour.

When Mr. Floyd was driving the service truck subsequent to Mr. Gantt leaving, Mr. Bethea was in the process of completing his studies to obtain his CDL and HAZMAT certification. Also, during this time period, Southeast ordered a new service truck. The new truck was delivered to Southeast and, subsequently, placed in the company garage for modifications. Mr. Floyd continued to operate the service truck until his termination on September 28, 2005. Soon thereafter, Mr. Bethea received his CDL license and HAZMAT certification. He was hired to operate the service truck after Mr. Floyd's termination. Mr. Bethea was paid $10.25 per hour to operate the new service truck, substantially less than Mr. Floyd.

I terminated Mr. Floyd on September 28, 2005 for a number of legitimate, non-discriminatory reasons including (1) being repeatedly late for work, (2) being insubordinate to foremen on job sites, (3) placing grease on areas of equipment that would not take grease, i.e., "faking" his service duties, and (4) driving too fast on job sites. Moreover, Mr. Floyd did not (5) have the proper mechanical training/knowledge necessary to service and/or repair the equipment in Southeast's fleet or (6) have the mechanical experience necessary to operate/maneuver the equipment in the fleet for servicing purposes. As a result of Mr. Floyd's inability to properly operate heavy equipment, he inadvertently caused damage to the service truck by striking its fender with an excavator. I also received numerous complaints from employees and foremen that Mr. Floyd's performance as service truck driver was substandard. In addition, Mr. Floyd was ticketed on June 7, 2005 for driving overweight on the Interstate.

The day before Mr. Floyd was terminated, September 27, 2005, he was operating the service truck at a job site in Montgomery, Alabama. Mr. Floyd was warned by fellow workers to

4

avoid certain areas of the job site as they were extremely wet. Mr. Floyd ignored the warnings, however, and drove the service truck into an area that was extremely soft (next to a newly poured sidewalk), causing the service truck to sink to its axles. After bottoming out, the truck leaned over and to the left creating a potentially dangerous HAZMAT situation as related to a fuel spill. The service truck had to be pulled out with the use of heavy equipment on the job site.

The next day, September 28, 2005, I confronted Mr. Floyd with regard to the incident as well as other performance concerns addressed above. He did not appear to take the incidents seriously and displayed a poor attitude about his job performance. Specifically, when confronted about wiping grease on fittings that would not accept grease, i.e., "faking" service work, Mr. Floyd simply smiled and did not deny the allegation. I subsequently terminated his employment."

Further, affiant sayeth not.

_____
JERRY CARTER

STATE OF ALABAMA        )
                                           )
COUNTY OF _Elmore_    )

Sworn to and subscribed before me on this the _30th_ day of _May_, 2008.

_____
Notary Public
My Commission Expires
_8-22-10_

5

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 130-2006-00282 |
| | | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Decarey Floyd** | **(334) 612-1104** | **10-19-1977** |

Street Address                    City, State and ZIP Code

**2103-G Victoria Place Apts., Prattville, AL 36066**

Named Is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code |
|---|---|---|
| **SOUTH EAST CHEROKEE CONSTRUCTION** | **over 15** | **(334) 567-9858** |

Street Address                    City, State and ZIP Code

**P. O. Box 2057            Wetumpka, AL 36092**

| Name | No. Employees, Members | Phone No. (Include Area Code |
|---|---|---|
| | | |

Street Address                    City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest    Latest |
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **09/28/2005** |
| ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment on May 2, 2005, as a Truck Driver. Within 2-3 days of my employment, I was offered the Service Truck Driver's job which I accepted at a higher rate of pay. During my employment derogatory comments were made using racial names referring to me as a Black man rather than my name as they did for similarly situated White employees. In my presence, the owner's son referred to Black man (who did not work at the company) as a "nigger." The owner, on one occasion said he would shoot me if he learned that I was ever selling his fuel.   During my employment, I was required to service a bush hog offsite without compensation for the service. A similarly situated White male was compensated for the service. On September 28, 2005, I was summoned to the office and informed by the owner that I was no longer needed. It is my belief that the company did not wish to have a Black male driving its newly purchased fuel truck. The truck was delivered approximately 2-weeks prior to my discharge, but I was never allowed to drive the vehicle.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED
EEOC

OCT 1 7 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Oct 17, 2005**   _[signature]_<br>Date              Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Plaintiff's Ex. 10

DeCarey Floyd   SOUTHEAST CHEROKEE CONSTRUCTION,INC  WETUMPKA, AL 36092

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

CHECK NO.  007623

| HOURS | | | | EARNINGS | | | | |
|---|---|---|---|---|---|---|---|---|
| EMP. NO. 238 | OVERTIME 24.00 | HOLIDAY .00 | SPECIAL .00 | REGULAR 420.00 | VACATION .00 | SICK .00 | .00 | .00 |
| REGULAR 40.00 | VACATION | SICK | TOTAL HRS. 64.00 | OVERTIME 378.00 | HOLIDAY | SPECIAL | | |

| TAXES/WITHHOLDINGS | | VOLUNTARY DEDUCTIONS | | | GROSS PAY 798.00 |
|---|---|---|---|---|---|
| FICA 61.05 | STATE W/H TAX 27.34 | LOA | .00 | UNI 5.50 | .00 |
| | | GAR | .00 | .00 | .00 |
| FEDERAL W/H TAX 56.91 | OTHER ST. W/H .00 | | .00 | .00 | .00 |
| | | | .00 | .00 | .00 |
| | CITY W/H TAX .00 | | .00 | .00 | .00 |

GROSS PAY 798.00

TOTAL TAXES W/H. 145.30

TOTAL OTHER TAXES .00

TOTAL VOL. DED. 5.50

| PAY PERIOD | | YEAR TO DATE | | | NET PAY 647.20 |
|---|---|---|---|---|---|
| 06/18/05 | GROSS 5,595.63 | FED. W/H TAX 410.42 | OTHER ST. TAX .00 | |
| | FICA 428.08 | STATE W/H TAX 191.28 | CITY W/H TAX .00 | |

Regular rate:        10.500