IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CURTIS DECAREY FLOYD, )<br>)<br>PLAINTIFF, )<br>)<br>v. )<br>)<br>SOUTHEAST CHEROKEE )<br>CONSTRUCTION, INC. )<br>)<br>DEFENDANT. ) | CASE NO. 2:07cv577-MEF<br><br>(WO - Do Not Publish) |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981, Curtis Decarey Floyd ("Floyd") brings suit against his former employer Southeast Cherokee Construction, Inc. ("Southeast") for alleged discrimination on the basis of his race and for alleged retaliation. This cause is before the Court on the Defendant's Motion for Summary Judgment (Doc. # 13) filed on May 30, 2008 by Southeast. For the reasons set forth below, it is hereby ORDERED that the motion is GRANTED in part and DENIED in part.

## JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction and venue, and the Court finds adequate allegations in support of personal jurisdiction and venue.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party

2

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

Southeast is a corporation located in Wetumpka, Alabama. It specializes in general building, contracting, and site preparation and improvement. Lynn and Jerry Carter are the owners of Southeast. At least one of their children is a company employee. On May 2, 2005, Southeast hired Floyd, an African-American male, as a tri-axle dump truck driver at the pay rate of $10.25 or $10.50 per hour.[1]

Very shortly after Southeast hired Floyd, the service truck driver quit unexpectedly. A "service truck" is designed to carry diesel fuel, oil, fluids, water, and grease. The driver

---

[1] The testimony is in conflict about the amount.

of the service truck is responsible for using the service truck to perform mechanical repairs and preventative maintenance duties for Southeast's vehicle and heavy equipment fleet. A service truck driver must also have the training and experience necessary to operate all of the vehicles and heavy equipment in Southeast's fleet. A service truck driver must have a Commercial Drivers License (CDL) with HAZMAT certification. Because Floyd was the only current employee available who had the requisite CDL and HAZMAT certification, Southeast temporarily moved Floyd into the service truck driver position.[2]

On June 5, 2005, Southeast hired Donald Gantt ("Gantt"),[3] a Caucasian male, to drive the service truck. When Southeast hired Gantt, Floyd went back to driving the tri-axle dump truck. Southeast reduced Floyd's pay from the rate he had been making as a service truck driver, but paid him more than he had initially been paid to drive the tri-axle dump truck.

On July 23, 2005, Gantt quit. Southeast again asked Floyd to fill the position. There is a factual dispute about whether this was a request for Floyd to permanently fill the position or whether he was asked to temporarily fill the position. Floyd worked as a service truck driver for Southeast until the termination of his employment on September 28, 2005.

On several occasions during his employment with Southeast, a supervisor named Randy Davis ("Davis") required Floyd to go and service a bush hog that was Davis' personal

---

[2] There is conflicting evidence before the Court regarding whether Floyd's pay was increased during the time he was asked to temporarily serve as a service truck driver.

[3] Gantt had previously worked for Southeast as a service truck driver. When he was rehired, Southeast paid him less money than it had been paying Floyd when he was working as a service truck driver.

property. Floyd believed that Gantt had done this for Davis as well, but that he had been paid by Davis for the work. After servicing it several times, Floyd asked Davis for compensation and pointed out that Gantt had been paid to do it. Davis gave Floyd what he believes to have been about half what he had been paying Gantt. The next time Floyd serviced the bush hog he asked Davis for compensation and Davis responded "you do whatever I tell you to do and you do it or you take your ass home." Davis did not compensate Floyd again.

On September 14, 2005, Southeast purchased a new service truck. It was placed in the company garage for modifications. Floyd was never allowed to drive the service truck. There is evidence before this Court that, if believed, could establish that certain management officials for Southeast made statements indicating that Southeast wanted a white male for the service truck; that Floyd would not be driving the new truck; and that "no black man" was going to run the service truck.

On September 28, 2005, Southeast terminated Floyd's employment. Southeast Vice President of Operations, Jerry Carter ("Carter") made the decision. In an affidavit given in support of Southeast's motion for summary judgment, Carter contends that he terminated Floyd's employment because he was coming to work late repeatedly,[4] being insubordinate to foremen on job sites, faking his service duties, and driving too fast on job sites.[5] Carter

---

[4] Floyd disputes Carter's assertion that he was repeatedly late to work. He contends that he was about five minutes late to work on one occasion and that it never happened again. Carter rebuked Floyd on the one occasion when he was late to work.

[5] In a sworn statement, Floyd denies being insubordinate to anyone and claims to have performed all duties as instructed. He further denies faking any service work and notes that

5

also faults Floyd for not having the proper mechanical training or knowledge necessary to service and repair the equipment in Southeast's fleet and lacking the mechanical experience necessary to operate or maneuver the equipment in the fleet for servicing purposes. Carter points out that Floyd inadvertently damaged the service truck by striking its fender with an excavator and contends that he received complaints that Floyd's performance as a service truck driver was substandard.[6] Carter notes that Floyd received a citation for driving an overweight dump truck on the Interstate on June 7, 2005. Finally, Carter states that on September 27, 2005, Floyd got the service truck stuck at a work site in a very precarious leaning situation because he ignored warnings from fellow workers to avoid certain areas of the site as they were extremely wet.

According to Floyd and other witnesses, it is not uncommon for equipment or trucks to get stuck at work sites. Furthermore, Floyd contends after the truck was pulled out by a piece of the equipment at the work site, Davis ordered Floyd to smooth over the tire marks the service truck had left with a shovel. Floyd pointed out that a piece of equipment could smooth the place over in seconds, but it would take some time with a shovel. Davis told

---

he was never written-up for failing to perform any service work during his employment with Southeast. Southeast had in place a written progressive disciplinary procedure addressing violations of company standards and behavior. Arguably, it was not followed to the letter in Floyd's case.

[6] Floyd has provided a sworn declaration from Gantt, a Caucasian who had worked for Southeast as a service truck driver. Gantt states that he was never written up, counseled, disciplined, suspended or terminated for damaging equipment or getting the service truck stuck despite having done both while in Southeast's employ.

6

Floyd to get a shovel and do it or take his "ass home." Floyd also heard Davis say under his breath that Floyd could take his "ass" home anyway, whether Floyd knew it or not.

When Floyd arrived at work on September 28, 2005, he saw Justin Bethea ("Bethea"), a Caucasian male employee of Southeast, driving the new service truck which Floyd had never been allowed to drive. On that same day, Carter confronted Floyd about the incident and his other performance concerns about Floyd. In Carter's view, Floyd's attitude about this rebuke and his job performance was poor. According to Floyd, Carter told him that he was fired and that Bethea was being given his job because he was more qualified. Indeed, Southeast filled the service truck position by hiring Bethea into the position. He had no prior experience as an operator of a service truck and had just received his endorsement to drive the service truck two days before the termination of Floyd's employment. According to Deon Daniels ("Daniels"), a Southeast employee, a Southeast manager stated that Southeast fired Floyd so that it could have a white male drive the service truck.

## DISCUSSION

### A. RETALIATION CLAIM

In his Complaint, Floyd sets forth a claim in which he alleges that Southeast retaliated against him because he engaged in protected activities by reporting racially disparate treatment. Doc. # 1 at ¶ 11. The Complaint fails to set forth much specific factual allegations in support of the retaliation claim; however, Floyd does allege that prior to the termination of his employment with Southeast, he was required to service a bush-hog located

7

off the employer's premises and that he was not compensated for this work although white employees were compensated for servicing the bush-hog off the job site.  Doc. # 1 at ¶ 8.  Floyd further alleges that when he "complained of this disparate treatment," he was told to do as he was told or "take [his] ass home."  *Id.*  For its part, Southeast seeks summary judgment on the retaliation claim by arguing that Floyd is precluded from litigating such a claim because he failed to include it in his October 17, 2005 Charge of Discrimination with the Equal Employment Opportunity Commission.  Indeed, in his deposition testimony, Floyd seems to admit he has no evidence that would support a retaliation claim.  *See* Doc. # 24-1 at p.191, line 20 to p. 197, line 7.  In light of this admission, it is perhaps not surprising that Floyd's counsel makes no attempt whatsoever to address the retaliation claim in his brief in opposition to Southeastern's motion for summary judgment.

Southeast is entitled to summary judgment on Floyd's retaliation claim because there is no evidence before this Court from which a reasonable jury could find for Floyd on this claim.  Additionally, Floyd has abandoned this claim by failing to address it in his brief in opposition to Southeast's motion for summary judgment.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment; the onus is on the *parties* to formulate arguments.  *See, e.g. Resolution Trust Corp. v . Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied,* 516 U.S. 817 (1995); *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990), *reh'g denied,* 921 F.2d 283 (11th Cir. 1990); *Robinson v. Regions Fin. Corp.,* 242 F. Supp.

2d 1070, 1075 (M.D. Ala. 2003) (Thompson, J.) (where plaintiff's opposition to summary judgment addresses discrimination with respect to only four positions, claims with regard to the other twenty-five positions in the defendant's brief are deemed abandoned); *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1107 n.1 (M.D. Ala. 2003); *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp. 2d 1280, 1286 (M.D. Ala. 2001). For these reasons, Southeast's motion for summary judgment is due to be GRANTED as to Floyd's retaliation claim and that claim will be DISMISSED with prejudice.

**B.  RACE DISCRIMINATION CLAIM: RACIALLY HOSTILE-ENVIRONMENT[7]**

In his Complaint, Floyd alleged that while employed with Southeast he was subjected to a hostile working environment on the basis of his race. Specifically, he alleges that unnamed supervisors and coworkers referred to Floyd and other African-Americans as "niggers." Doc. # 1 at ¶ 7. He also alleges Carter, who Floyd alleges is the owner of Southeast, profanely threatened to shoot him if the owner every learned that Floyd was selling his fuel. *Id.*[8]

In his brief in opposition to Southeast's motion for summary judgment, Floyd offers little evidentiary support of his racially hostile-environment claim. Indeed, since filing the

---

[7] Floyd's two race discrimination claims are brought pursuant to both Title VII and 42 U.S.C. § 1981. Claims under Title VII and Section 1981 have the same legal elements. *See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164 (1989); *Howard v. BP Oil*, 32 F.3d 520, 524 n.2 (11th Cir. 1994).

[8] This incident is described in Floyd's deposition. *See* Doc. # 24 at Ex. 1, p. 162, line 11 to p. 163, line 2.

Complaint, Floyd has admitted that he never heard anyone at Southeast call him a "nigger." Doc. # 24 at Ex. 1, p. 141, line 18 to p. 142, line 14. Floyd did describe a single incident during his employment with the son of the company's owner, Brent Carter, referred an African-American law enforcement official as a "nigger" when Floyd was present. *Id*. at p. 142, line 10 to p. 144, line 20. Later that same day, Brent Carter approached Floyd and a Caucasian employee who was changing a tire on Floyd's vehicle. *Id*. at p. 151, line 8 to p. 153, line 19. According to Floyd, Brent Carter asked him what he had "done tore up now." *Id*. Floyd responded that the other employee was just changing his tire, and Brent Carter retorted by saying "Guys, just like a black man." *Id*. Furthermore, Floyd complains that Randy Davis required him to service Davis' personally owned bush hog without compensation despite having paid a Causcasian employee for the same work and made Floyd perform manual labor as punishment for getting a vehicle stuck at a job site.

To establish a claim that he was subjected to a racially hostile work environment, Floyd must need to show that (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the hostile environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). Much of the mistreatment of which Floyd complains he cannot establish that it

was based on his race as opposed to some other reason. Of course, Floyd has offered two statements made by Brent Carter in the workplace that clearly involve either the use of a racial epithet or a critical reference to Floyd which highlighted his race. While these could establish that Floyd experienced some harassment was based on his race, he still cannot offer sufficient evidence to support this claim because he has failed to offer evidence that the alleged harassment was so severe or pervasive as to alter the terms and conditions of his employment. Floyd has not proffered evidence from which a reasonable jury could find that he experienced a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). Because Floyd has not offered sufficient evidence to support a *prima facie* case of a race discrimination claim arising out of a racially hostile working environment, Southeast is entitled to judgment as a matter of law on that claim, and its motion for summary judgment is due to be GRANTED as to that claim.

**C. RACE DISCRIMINATION CLAIM: TERMINATION OF EMPLOYMENT**

In addition to prohibiting employers from creating racially hostile working environments, Title VII and Section 1981 also prohibit employers from discriminating against employees with respect to decisions relating to the termination of their employment. *See* 42 U.S.C. § 2000e-2(a)(1). "A Title VII disparate treatment plaintiff must prove that the defendant acted with discriminatory purpose." *Nix v. WLCY Radio/Rahall Communications,*

11

738 F.2d 1181, 1184 (11th Cir. 1984). A plaintiff may attempt to do so by offering either statistical,[9] direct, or circumstantial evidence. In this case, Floyd contends that he can established a *prima facie* case of discriminatory termination by both direct evidence and circumstantial evidence.

In the context of employment discrimination cases is well-settled that direct evidence is evidence which if believed proves the existence of a fact in issue, such as the existence of a discriminatory motive, without inference or presumption; if the evidence merely suggests that the employer acted with a discriminatory motive then it is circumstantial evidence, not direct evidence. *See, e.g., Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086-87 (11th Cir. 2004); *Standard v. A.B.E.L. Servs.*, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); *Burrell v. Board of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir. 1997); *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1987); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir.1987). Direct evidence of discrimination is evidence which reflects a discriminatory attitude correlating to the discrimination complained of by the employee. *Wilson,* 376 F.3d at 1086. "Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard,* 161 F.3d at 1330. Moreover, direct evidence is composed of "only the most blatant remarks, whose intent could

---

[9] A plaintiff in an employment discrimination case may establish a *prima facie* case of discrimination under Title VII on the basis of statistical proof of a pattern of discrimination. *See, e.g., Wilson v. AAA Plumbing Pottery Corp.,* 34 F.3d 1024, 1027 (11th Cir. 1994). Floyd makes no attempt to use statistical proof to establish a *prima facie* case.

be nothing other than to discriminate" on the basis of some impermissible factor. *Carter,* 870 F.2d at 582. The Court finds that the evidence provided in this matter by Daniels does constitute direct evidence. For this reason, Southeast's motion for summary judgment is due to be DENIED as to this claim.

In the alternative, the Court finds that even if the evidence before it was not deemed to constitute direct evidence of race discrimination, Southeast is still not entitled to summary judgment as to this race discrimination claim because Floyd has offered sufficient circumstantial evidence of race discrimination to establish a *prima facie* case and to create a jury question as to whether the proffered reasons for the termination of his employment were pretextual. To establish a discrimination claim by circumstantial evidence using the *McDonnell Douglas* framework, the employee has the initial burden of showing, by a preponderance of the evidence, a *prima facie* case of the proscribed practice. *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied,* 488 U.S. 1004 (1989). The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the *prima facie* case raises a rebuttable presumption that the employer is liable to the employee. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.

1997).

The Eleventh Circuit Court of Appeals has repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible. *See, e.g., Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999) (collecting cases).

> In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, [the Eleventh Circuit has] stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'"

*Id.* at 1268 (citing *Hill v. Metro. Atlanta Rapid Trans. Auth.,* 841 F.2d 1533 (11th Cir. 1988), *modified,* 848 F.2d 1522 (11th Cir. 1988) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978))).

Once a plaintiff establishes the requisite elements of the *prima facie* case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno,* 115 F.3d at 1564 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981)). The employer's burden is "exceedingly light." *Holifield,* 115 F.3d at 1564. This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis v. Qualico Miscellaneous, Inc.,* 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001).

If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See, e.g., Holifield,* 115 F.3d at 1565; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997) (plaintiff "has the opportunity to discredit the defendant's proffered reasons for its decision"). Thus, once the employer articulates a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256; *Combs,* 106 F.3d at 1528. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000).

The Court finds Southeast's argument that Floyd has been unable to establish a *prima facie* case of race discrimination with regard to the termination of his employment unpersuasive. Bearing in mind the requisite flexibility with which the Court must approach

the application of the *prima facie* case, the Court finds that Floyd has offered sufficient evidence to support a *prima facie* case of race discrimination in Southeast's decision to terminate his employment. In the Court's view when the evidence before it is viewed in the light most favorable to Floyd, a reasonable jury could find in that Floyd has established a *prima facie* case of race discrimination with regard to the termination of his employment. This is particularly true because, *inter alia*, Southeast appeared to find Floyd qualified enough for the position from which he was later terminated to put him into it twice and because Southeast filed the service truck driver position with a Caucasian who had no truck driving experience after the termination of Floyd's employment. Furthermore, the Court finds that genuine issues of material fact exist with respect to whether Southeast's legitimate, non-discriminatory reasons for its decision to terminate Floyd's employment were a pretext for race discrimination. In so finding, the Court notes that it could be found that Southeast failed to follow its own employment procedures with respect to its disciplinary actions against Floyd and that it gave differing reasons for the termination of Floyd's employment. Moreover, the testimony of Deon Daniels regarding certain statements by management and other evidence before this Court about disparate treatment of Floyd prior to the termination of his employment suffice to create a jury question on the issue of pretext. Thus, for this alternative reason, Southeast's motion for summary judgment is due to be DENIED as to the claim arising out of the termination of Floyd's employment.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1. Defendant's Motion for Summary Judgment (Doc. # 13) is GRANTED in part and DENIED in part as set forth in this Memorandum Opinion and Order.

2. Floyd's retaliation claim is DISMISSED with PREJUDICE.

3. Floyd's race discrimination claim based on an allegedly hostile work environment is DISMISSED with PREJUDICE.

4. Floyd's race discrimination claim arising out of the termination of his employment remains pending.

DONE this the 11th day of August, 2008.

                                        /s/ Mark E. Fuller
                                  CHIEF UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

**1.** **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

(a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

(b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

(c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

(d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

(e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2. **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).